IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| ERIK DAVIDSON, | : | |
| | : | |
| & | : | |
| | : | |
| JOHN RESTIVO, | : | |
| | : | |
| & | : | |
| | : | |
| NATIONAL CENTER FOR PUBLIC | : | |
| POLICY RESEARCH, | : | |
| | : | CIVIL ACTION NO.: 6:24-cv-00197 |
| | : | |
| Plaintiffs, | : | CLASS-ACTION COMPLAINT FOR |
| | : | DECLARATORY, INJUNCTIVE, |
| v. | : | AND MANDAMUS RELIEF |
| | : | |
| GARY GENSLER, | : | |
| in His Official Capacity as | : | |
| Chairman, U.S. SECURITIES | : | |
| AND EXCHANGE COMMISSION, | : | |
| | : | |
| & | : | |
| | : | |
| U.S. SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
| | : | |
| & | : | |
| | : | |
| CONSOLIDATED AUDIT TRAIL, LLC, | : | |
| | : | |
| Defendants. | : | |

## **COMPLAINT**

This lawsuit concerns an unprecedented scheme by an administrative agency, the Securities and Exchange Commission (SEC), to unilaterally set in motion one of the greatest government-mandated mass collections of personal financial data in United States history: the Consolidated Audit Trail (CAT). Without any statutory authority, SEC adopted a regulation, Rule 613, that

forces brokers, exchanges, clearing agencies, and alternative trading systems (ATS) to capture data on every investor's trades, from inception to completion. The data is then stored in a centralized database that SEC and private regulators can mine for data and analyze in perpetuity. Thousands of people—many of them not even in the government—will have access to this information.[1] No one can opt out of this forced disclosure. Brokers cannot opt out, and neither can Americans executing their own trades, unless they stop trading in U.S. markets. This surveillance database reportedly would be the largest database of securities data ever created,[2] and the largest database outside the NSA.[3] Unlike NSA, however, SEC entirely lacks the authority, history, or special oversight structure that permits it to engage in the seizure and surveillance of private information.

### *The Panopticon Is Here*

At the time of the French Revolution, the British philosopher Jeremy Bentham coined the term "Panopticon" to describe the terror of a prison wherein all inmates would be subject to 24-hour surveillance by an unseen observer.[4] Such a system was unthinkable for free people, yet today SEC's scheme frighteningly seizes the personally identifiable record of "every order, cancellation, modification and trade execution for all exchange-listed equities and options across all U.S.

---

[1] *Oversight of the Status of the Consolidated Audit Trail, Hearing Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 116th Cong. (2019) (Testimony of Shelly Bohlin, COO of FINRA CAT LLC), *available at* https://perma.cc/G49S-GR3G

[2] Secs. Indus. and Fin. Mkts. Ass'n ("SIFMA") , Comment Letter Addressing Notice of Filing Amendment to the Nat'l Mkt. Sys. Plan Governing the Consolidated Audit Trail at 2 (Jun. 30, 2022), *available at* https://perma.cc/2Y5Y-AK4H.

[3] *Implementation and Cybersecurity Protocols of the Consolidated Audit Trail: Hearing Before the Subcomm. on Cap. Mkts, Secs, and Inv., H. Comm. On Fin. Servs.*, 115th Cong. 2 (Nov. 30, 2017) (statement of Rep. Bill Huizenga, Chairman, Subcomm. on Cap. Mkts, Securities and Investment),        *available        at*        https://www.govinfo.gov/content/pkg/CHRG-115hhrg31288/pdf/CHRG-115hhrg31288.pdf.

[4] Jeremy Bentham, *Panopticon; or, the Inspection House* (1791).

markets"[5] for everyone who trades on an American exchange—at least the Panopticon applied only to persons imprisoned for a crime. Nothing in the securities laws gives the SEC power to regulate investment decisions of Americans nor to gather all investment data from them or their brokers.

Historically, a government that wished to track its citizens had to devote large resources to having them followed. That is no longer the case: modern surveillance tools enable mass tracking of individuals' every movement, every transaction, every purchase, sale, or transfer of securities at low cost while powerful computer algorithms can process that information to reveal personal and private details of each person's financial life or investment strategy. With technological surveillance and data-processing technology becoming ever cheaper and increasing exponentially in power—witness the growth in the power of AI and bots over our electronic lives—the only things that stand in the way of this Orwellian "Big Brother" are our laws and our courts. This class-action complaint challenges SEC's shocking arrogation of power to impose dystopian surveillance, suspicionless seizures, and real or potential searches on millions of American investors.

### The Founders' Vision

The Framers of the Constitution ensured protection of "persons, houses, papers, and effects" from "unreasonable searches and seizures." U.S. CONST. amend. IV.  Knowing all too well how such seizure of papers imperiled their own liberty, the Framers would scarcely believe the unbridled power SEC seeks to exert through the CAT.  By seizing innocent Americans' private financial information and storing it in a giant database that allows broad access by government and non-governmental persons or entities alike, SEC—a mere administrative agency—has conjured

---

[5] Press Release, SEC Approves New Rule Requiring Consolidated Audit Trail to Monitor and Analyze Trading Activity (July 11, 2012), *available at* https://perma.cc/R9H3-V5QD.

into being exactly what the Constitution was written to prevent.  Equally troubling and unreasonable, this vulnerable warehouse of seized information also exposes data lawlessly extracted from every investing American to easy onslaught from known cybersecurity threats, domestic and foreign, including even the possible theft of their holdings.[6] These assets comprise the core of Main Street investors' financial security, which is essential to their individual liberty, wealth, well-being, and personal security. The government has no license to put these interests at risk. To the contrary, the Constitution expressly prohibits uncaging this CAT.

"The Fourth Amendment refers to 'papers' because the Founders understood the seizure of papers to be an outrageous abuse distinct from general warrants." Donald A. Dripps, *"Dearest Property": Digital Evidence and the History of Private "Papers" As Special Objects of Search and Seizure*, 103 J. Crim. L. & Criminology 49, 52 (2013). Thus, "[i]f one goes back to the early Republic … it is difficult to find any federal executive body that could bind subjects to appear, testify, or produce records." Philip Hamburger, *Is Administrative Law Unlawful?* 221 (Univ. of Chi. Press 2014). Indeed, it was so well established at common law that "[p]apers are the owner's goods and chattels" and "are his dearest property" that "it may be confidently asserted that [these] propositions were in the minds of those who framed the fourth amendment to the constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures." *Boyd v. United States*, 116 U.S. 616, 626-28 (1886) (first and second quotations quoting *Entick v. Carrington*, 19 How. St. Tr. 1029 (1765)). The Supreme Court therefore recognized that "a compulsory production of a man's private papers" is the same as "[b]reaking into a house and

---

[6] Letter from Seven Senators to SEC Chair (July 24, 2019), *available at* https://perma.cc/3KSA-WEPT.

opening boxes and drawers," and constitutes an unlawful "invasion of his indefeasible right of personal security, personal liberty and private property[.]" *Id*. at 622, 630.

While the Constitution made clear the government lacks the authority to peek into—much less seize and keep a permanent record of the content of—a person's private papers without a warrant, SEC has now arrogated the power to demand government seizure of *everyone*'s private trading information without *any* judicial process.

### *The Stakes Are High*

This case requires this court to exercise its Article III duties to declare CAT unconstitutional under the Vesting Clause, art. I, §1; the Taxing and Appropriations Clauses of Article I; and the First, Fourth, and Fifth Amendments. Where Americans and American entities, like Erik Davidson, John Restivo ("Individual Plaintiffs"), and NCPPR, invest in the securities markets, they do not "'voluntarily assume[] the risk' of [the party] turning over" the details of their personal investment activity for review by SEC. *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (first alteration in original) (quoting *Smith v. Maryland*, 442 U.S. 735, 745 (1979)). Indeed, Americans expect and have thus far enjoyed the opposite assumption—that the third party *and* the government will respect their contractual and constitutional rights. Defendants have unlawfully violated those rights, liberties, and expectations, in defiance of the Constitution, as set forth below.

Further, the CAT scheme is unlawful because no statute confers authority on SEC to engage in this conduct at all. Indeed, no statute *could* confer such authority—the First, Fourth, and Fifth Amendments forbid it.

### *Appropriations and Spending by the Executive*

The CAT scheme further violates the Constitution and laws of the United States because it bypasses Congress' power of the purse and erects a multi-billion-dollar scheme in which SEC self-

appropriates these billions by extracting funds from self-regulatory organizations, or SROs, such as Financial Industry Regulatory Authority, also known as FINRA, to fund and operate a scheme never authorized by Congress. This scheme of spending without appropriation imposes enormous costs on American capital markets (reported to be at least $2.4 billion to implement and $1.7 billion to operate each year as of the last detailed report in 2016)[7] and is a brazen end-run around the Constitution and laws of the United States, including the Anti-Deficiency Act and the Miscellaneous Receipts Act, which dictate that the legislature alone can raise, receive or spend money or contributions. Alexander Hamilton explained that in a constitutional order that assigns the lawmaking and appropriations powers to the legislature, "no money can be expended, but for an *object*, to an *extent*, and out of a *fund*, which the laws have prescribed." (Emphases in original). Alexander Hamilton, Explanation, in The Works of Alexander Hamilton, Vol. 8, p.128 (Henry Cabot Lodge ed., 2d ed. 1903).

This lawless enterprise has been many years in the planning, with a record of misfeasance, malfeasance and incompetence that alone would justify its cessation.[8] Whether it could ever be

---

[7] *Joint Industry Plan; Order Approving the Nat'l Mkt. Sys. Plan Governing the Consolidated Audit Trail*, Release No. 34-79318 (Nov. 15, 2016), 81 Fed. Reg. 84,696, 84,863 (Nov. 23, 2016). Initial estimates for the costs of implementation and maintenance of the Consolidated Audit Trail have climbed considerably and have become more opaque. *See Examining the Agenda of Regulators, SROs, and Standards-Setters for Accounting, Auditing: Hearing Before the H. Subcomm. on Cap. Mkts*, 118th Cong. (2023) (Testimony of Robert Cook, President and CEO, FINRA) ("The initial estimates for CAT were based on an assumption about how much volume there would be, essentially. Those estimates turned out to be way off. We are now seeing volumes that are ten times what they were estimated to be, and of course volume translates to processing costs, storage costs for data, and so naturally the costs are higher.") https://www.youtube.com/live/aduHWUfuLJg?si=HEzBeVZhWBFjca3n&t=5877 (beginning at 1:37:57)).

[8] *See, e.g.*, James Rundle & Anthony Malakian, *CAT's Tale: How Thesys, the SROs and the SEC Mishandled the Consolidated Audit Trail,* WatersTechnology (Feb. 14, 2019) (setting forth a detailed and disturbing history of a scheme that never had any lawful basis for its inception), https://perma.cc/V8VJ-ZTUK.

successfully launched was in doubt for the better part of a decade. As late as October 2019, SEC Commissioner Hester Peirce warned that "[i]mplementation is now on course to begin soon." She sounded the warning: "but it is not too late to change course."[9]

Defendants are now finalizing and instituting this lawless and ill-advised enforcement regime. Defendants' unconstitutional, unlawful, and *ultra vires* conduct violates the civil liberties of Plaintiffs and inflicts on-going, and imminent future irreparable harm on Plaintiffs, our Constitution, and the civil liberties of all Americans. Accordingly, plaintiffs, as named Class Representatives, bring this facial and as-applied challenge seeking injunctive and mandamus relief on behalf of themselves and a class of similarly situated individuals.

### *SEC's Violations Injure a Large Class of Plaintiffs*

Plaintiffs, as named Class Representatives, bring this action on behalf of a class of similarly situated individuals: all individuals for whom the CAT database contains any securities transaction information, or any personally identifiable information, that refers or relates to the individual or to a securities account associated with the individual.

## <u>PARTIES</u>

1.      Plaintiff National Center for Public Policy Research ("NCPPR") is organized under the laws of Delaware and has its principal place of business in Washington, DC. NCPPR, through its Free Enterprise Project, invests in securities traded on U.S. exchanges, and NCPPR's private investment information has been, and will continue to be, unconstitutionally seized by Defendants.

2.      Plaintiffs Erik Davidson and John Restivo are natural persons and residents of the State of Texas. Each of them invests in securities traded on U.S. exchanges and the each's private

---

[9] Hester Peirce, *This Cat is a Dangerous Dog,* RealClearPolicy (Oct. 9, 2019), *available at* https://perma.cc/B5BJ-A6RF.

investment information has been, is expected to be, and/or will continue to be unconstitutionally seized by Defendants.

3.      Defendant Gary Gensler is the Chairman of the Securities and Exchange Commission and is sued in his official capacity.

4.      Defendant SEC is an agency of the United States, which has forced the unreasonable seizure of Plaintiffs' private financial information.

5.      Defendant Consolidated Audit Trail, LLC (CAT LLC) is Delaware limited liability corporation formed on August 29, 2019, to administer the CAT on behalf of the SEC. CAT LLC is sued as a Defendant and in the alternative, if CAT LLC did not engage in state action as an agent of SEC, as a Relief Defendant.

## JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1361 (actions in the nature of mandamus).

7.      This Court has the authority to grant declaratory and injunctive relief in this matter pursuant to 28 U.S.C. §§ 2201 and 2202.

8.      Venue for this action properly lies in this district pursuant to 28 U.S.C. §§ 1391(b)(2), (e)(1)(C) because the Individual Plaintiffs reside in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and because the owners of the property at issue in this action are situated in this judicial district.

## STATEMENT OF FACTS

I.   THE CONSOLIDATED AUDIT TRAIL

A.   **SEC's Limited Statutory & Investigative Authority**

9.    In 1934, Congress established SEC to "protect[] investors, maintain[] fair, orderly, and efficient markets, and [to] facilitate[e] capital formation."[10] Nothing in this organic statute, or any subsequent enactment of Congress, authorizes the lawless and unconstitutional CAT scheme.

10.    From the day in 1934 when Congress created SEC, the agency's ability to obtain private citizens' confidential information has been carefully constrained—limited by substantive and procedural requirements. Those requirements also reflect the constitutional imperative that the only authority SEC possesses is the authority Congress granted it by statute.

11.    True to those limitations, for the past 50 years the primary procedure for SEC to obtain some information about private citizens' stock trading has been to make valid "blue sheet requests" to broker-dealers. *See* SEC Enforcement Manual § 3.2.2 (Nov. 28, 2017) ("Blue sheets"). To make a valid blue-sheet request, SEC first must have an articulable basis to investigate possible violations of the securities laws, *id*., a basis it can develop from reviewing the extensive daily market surveillance data that is available to it. The scope of the underlying investigation limits the scope of the blue-sheet request because each request is limited to the securities and the time frame on which the investigation focuses. *Id*. This lawsuit does not challenge SEC's use of blue sheets.

12.    Historically, SEC also obtained trading information by issuing investigative subpoenas. By statute, Congress expressly authorized—and limited—this process. *See*, *e.g.*, Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74 § 19(c) (2023) (codified at 15 U.S.C. § 77s(c)); Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 § 21(b) (2023) (codified at 15

---

[10]   SEC Mission Statement, SEC (last visited Mar. 18, 2024), *available at* https://www.sec.gov/about/mission.

9

U.S.C. § 78u(b)). As with the blue sheets, SEC must begin with some facts indicating a possible violation of the law. *See*, *e.g.*, Securities Act of 1933, § 19(c), 15 U.S.C. § 77s(c) (referring to "investigations"); Exchange Act § 21(b), 15 U.S.C. § 78u(b) (same). Under its procedures, SEC then can issue a "formal order of investigation," followed by an investigative subpoena. *See* SEC Enforcement Manual § 2.3.3. By statute, each subpoena's scope is limited to "books, papers, or other documents" that are "material to the inquiry." *See*, *e.g.*, Securities Act § 19(c), 15 U.S.C. § 77s(c) (referring to "investigations"); Exchange Act § 21(b), 15 U.S.C. § 78u(b) (same). Also, by statute, to enforce a subpoena, SEC must file a court action and obtain an order from a federal judge. *See* Exchange Act § 21(c), 15 U.S.C. § 78u(c). This lawsuit does not challenge SEC's use of investigative subpoenas.

### B. Rule 613 and the Flash Crash

13.     In 2010, SEC saw an opportunity to bypass these longstanding safeguards. On May 6 of that year, the securities markets experienced the "Flash Crash," during which major stock indices plunged as much as 15% in a few minutes, before rebounding almost as quickly.

14.     In a September 30, 2010, report entitled *Findings Regarding the Market Events of May 6, 2010*, SEC attributed the Flash Crash to a mutual fund complex using an algorithm to hedge existing equity positions.[11]

15.     Just 20 days after the Flash Crash, and prior to issuing its Report on the Flash Crash, SEC issued a 203-page release proposing Rule 613 and the creation of the Consolidated Audit Trail. Exchange Act Release No. 34-62174, File No. S7-11-10 (May 26, 2010). SEC issued the

---

[11] *Findings Regarding the Market Events of May 6, 2010*, Report of the Staffs of the CFTC and SEC to the Joint Advisory Committee on Emerging Regulatory Issues at 2-3 (Sept. 30, 2010), *available at* https://perma.cc/FPG7-4LN6.

final rule two years later. *Consolidated Audit Trail*, Exchange Act Release No. 34-67457 (July 18, 2012), 77 Fed. Reg. 45722 (Aug. 1, 2022) (codified at 17 C.F.R. § 242.613).

16.     Rule 613 represented a radical break from the historical limitations on SEC's access to confidential trading information. The rule mandated the creation of a vast database of an unprecedented scale. As SEC's press release explained, the database would track "every order, cancellation, modification and trade execution for all exchange-listed equities and equity options across all U.S. markets."[12]

17.     Equally groundbreaking, but left unmentioned in SEC's press release, Rule 613 granted SEC real-time access to this data—without any need to obtain a warrant, issue a subpoena, or even have cause to suspect an investor of wrongdoing.

18.     In short, the CAT enables SEC "to watch investors' every move in real time." Hester Peirce, Statement in Response to Release No. 34-88890; File No. S7-13-19 at 7 (May 15, 2020).[13]

19.     This fundamental change in its access to trading information was necessary, according to SEC, because "the regulatory data infrastructure" was "outdated" and "inadequate to effectively oversee a complex, dispersed, and highly automated national market system." 77 Fed. Reg. at 45723. A key underlying change, according to SEC, was that during the decades since the formation of the National Market System in 1975, equities trading has fragmented to numerous exchanges and trading venues. *Id*. at 45736.

---

[12] Press Release, SEC Approves New Rule Requiring Consolidated Audit Trail to Monitor and Analyze Trading Activity (July 11, 2012)*, available at* https://perma.cc/R9H3-V5QD.
[13] *Available at* https://www.sec.gov/news/public-statement/peirce-statement-response-release-34-88890-051520

20.     As SEC Commissioner Peirce has forcefully argued, see *supra*, n.9, Americans would not for a moment tolerate government organizations partnered with private firms to collect complete information on everything they buy, nor a program where the government received a "direct feed" of movements from their cars' GPS. Yet CAT proposes to do just that with the far more valuable, and therefore vulnerable, database of their investments and retirement savings.

21.     Further, Americans' civil liberty to be free of suspicionless government seizures has been casually extinguished by an unelected group of bureaucrats, not Congress. Such unlimited access to data allows the government to create *post hoc* theories of enforcement that threaten our civil liberties to be free of government intrusion in the conduct of our lives. Right now, investors' investment strategies and trading activity are private and proprietary.  The CAT would now allow for the first time ever government (or its employees) to track and replicate successful, proprietary trading strategies. It could even allow government (or its agents) to actively undermine a particular target's trades.

22.     SEC's justification for the program does not withstand reasoned scrutiny. Commissioner Peirce notes that SEC's enforcement division "already has sufficient tools to get the information it needs to pursue credible leads about market misconduct and to do so quickly."[14] Specifically, the individual exchanges all maintain their own separate audit trails.

23.     SEC was frustrated, though, that, to monitor all U.S. equities markets, it had to "cobble together" data from multiple information systems. 77 Fed. Reg. at 45723. In SEC's view, even when combined, those audit trails did not capture all the market information SEC would like. *See id*. at 45723, 45726-33.

---

[14] Peirce, *supra* n.9.

24.     Further, according to the Adopting Release, SEC's information needs were not met by the blue-sheet process because that process required SEC to make a specific request to a broker-dealer "for specific securities during specified timeframes." *Id.* at 45727.

25.     In SEC's words, the blue-sheet process "is generally only used by regulators in narrowly-focused enforcement investigations that generally involve trading in particular securities on particular days or with particular broker-dealers." *Id*. at 45728. Also, a complete response can take "days or weeks." *Id.*

26.     While SEC's Adopting Release did not expressly highlight the issue, it surely viewed as a further limitation of the blue-sheet process that, to request a blue sheet, SEC's Enforcement Manual required SEC to have an articulable basis to conduct a regulatory investigation and then the blue-sheet requests were limited to the scope of the investigation. *See* SEC Enforcement Manual § 3.2.2.

27.     Moreover, even though SEC isolated the cause of the Flash Crash to a mutual fund complex,[15] and even though SEC cited a possible future flash crash to justify Rule 613, 77 Fed. Reg. at 45733, Rule 613 is not limited to data from mutual fund complexes trading to accumulate or reduce a net long or short position. Instead, and despite this limited justification for Rule 613, the regulation requires the collection of data for trades, even by *retail* investors—and it requires the collection of privately identifiable information not collected by standard blue-sheet requests.

28.     Furthermore, this amassing of information does nothing to avert a flash crash: In short, the CAT was conceived on a pretext that is simply erroneous and illegitimate.[16]

---

[15] *Findings Regarding the Market Events of May 6, 2010*, Report of the Staffs of the CFTC and SEC to the Joint Advisory Committee on Emerging Regulatory Issues at 2-3 (Sept. 30, 2010).

[16] Peirce, *supra* n.9 ("A more limited version of the program that looked only at the trades of large institutional investors would be almost as useful for reconstructing market events and would not

29.     Yet under this scheme as it is now being implemented, all information about all trades by all Americans is transmitted to the SEC within a day without any law or law enforcement justification.

**C.     SEC Co-Opts SROs to Seize Private Information Pursuant to CAT**

30.     SEC, through Rule 613, outsourced the collection of this information to SROs—FINRA and national securities exchanges—which it ordered to propose for SEC a "joint National Market System Plan" ("CAT NMS Plan") for "the creation, implementation, and maintenance of a consolidated audit trail and central repository" of the CAT data. 17 C.F.R. § 242.613(a)(1).

31.     Rule 613 provided only a broad framework to guide the SROs in designing, creating, and implementing the CAT NMS Plan, 17 C.F.R. § 242.613(b), but mandated the SROs collect and make available to SEC specified categories of information. *See Id.* at (c)(7).

32.     Among other details, Rule 613 required the SROs to create a unique "Customer-ID" for every customer, *Id.* at (j)(5), who trades in securities on a U.S. exchange, and provide details on every "reportable event," which is defined as "the original receipt, or origination, modification, cancellation, routing, and execution," of an order for a security on a U.S. exchange. *Id.* at (j)(9).

33.     For each original receipt or origination of an order, SEC required the collection of "information of sufficient detail to identify the customer," the date and times of orders placed, the material terms of the orders, and details concerning the broker-dealer processing the order. *Id.* at (c)(7).

---

violate the privacy interests of specific individuals. The risk that a bus driver placing a trade for her daughter's college fund will cause market turbulence is outweighed by the invasion of privacy and the attendant risk that cybercriminals will deplete the college education fund.").

34.     The rule instructed the SROs to expand this list, requiring them to "add[] granularity and details regarding the scope and nature of Customer-ID[]." *Id.* at (b)(6)(ii).

35.     SEC explained it intends to use this confidential data for several purposes, but primarily for surveillance and enforcement—for "investigations of potential securities law violations." 77 Fed. Reg. at 45,727. SEC Commissioner Peirce has expressed alarm about the "emphasis that is being placed on the [CAT] database's ultimate utility as an enforcement tool."[17]

36.     This alarm is well-founded, because the database will hold confidential data from more than 100 million private citizens. According to knowledgeable commentators, it will be the largest securities database anywhere,[18] and the largest database of any kind outside of the National Security Agency.[19] Some experts believe it will be the largest database of any kind ever built.[20]

**D.     The CAT's Arrested Development**

37.     Following promulgation of Rule 613, the SROs worked on their assignment for two years, before submitting a proposed plan in 2014. Two years later, in November 2016, SEC adopted a version of the SROs' Plan. *See Joint Industry Plan; Order Approving the Nat'l Mkt. Sys. Plan Governing the Consolidated Audit Trail*, Exchange Act Release No. 34-79318, File No. 4-698 (Nov. 15, 2016).

38.     Under the CAT NMS Plan adopted by SEC in 2016, each SRO must require its members to record and report extensive information for every trading order or cancellation. Complying with Rule 613's instruction to add details to the requirements to provide customer

---

[17] Hester Peirce, *Intellectual Siren Song*, Remarks at the 7th Annual Conference on Financial Market Regulations (May 20, 2020), *available at* https://perma.cc/WKG6-EVW8.

[18] *CAT NMS Provides Progress Update on the Consolidated Audit Trail*, Business Wire (Oct. 26, 2018), *available at* https://perma.cc/2YPZ-QSX3.

[19] *See supra* n.3.

[20] Bob Pisani, *It's Google vs. Amazon to Create the Biggest Database in History*, CNBC (April 27, 2016), *available at* https://perma.cc/2QZ3-VTF2.

information, *see* 17 C.F.R. § 242.613(b)(6)(ii), the Plan required the creation of a unique "Designated ID" for each customer making an order.

39.     The CAT NMS Plan also required categories of information labeled "Customer Account Information" and "Customer Identifying Information." SEC Approved CAT NMS Plan §6.4(d)(ii) (Nov. 15, 2016).

40.     "Customer Account Information" included data fields such as the unique customer account number and the date the account was opened. *Id.* at § 1.1

41.     "Customer Identifying Information" includes several pieces of personal identifying information or PII:

> [I]nformation of sufficient detail to identify a Customer, including, but not limited to, (a) with respect to individuals: name, address, date of birth, individual taxpayer identification number ("ITIN")/social security number ("SSN"), [and the] individual's role in the account (e.g., primary holder, joint holder, guardian, trustee, person with the power of attorney) … .

*Id*.

42.     In the years since SEC approved the initial Plan, the CAT has run into one unanticipated setback after another, slowing the project. Some of the obstacles have been technical challenges created by the database's sheer size and complexity. But the main impediment dragging implementation of the CAT scheme concerned issues related to violations of privacy and the exposure of investor information to inevitable cybersecurity breaches—and who was on the hook for such losses—important details that ultimately impact whether SEC's seizure of information, even if lawful (which it is not), was reasonably executed.

43.     Data breaches will expose investors' PII to third parties. Breaches also will expose them to catastrophic financial loss, because hackers or faithless permissive interlopers could use brokerage information to steal investors' portfolios.

44.     By 2017, the CAT project was drawing extensive criticism because of these cybersecurity concerns.[21] By that time, hackers had breached numerous databases containing private financial information, including databases at sophisticated tech companies, large financial firms, and major government agencies.

45.     SEC itself fell victim to hacking in 2016 when its Electronic Data Gathering, Analysis, and Retrieval system, or "EDGAR," which is the primary system for companies to file documents with SEC under the Securities Act of 1933, the Securities Exchange Act of 1934, and other federal statutes, was infiltrated.[22] The EDGAR hackers obtained access to nonpublic information filed with SEC and then traded on that information to make millions.[23]

46.     Just last month, SEC's lax security controls materially damaged investors by enabling a hacker to access its X (formerly Twitter) account. SEC had chosen to disable a basic X security feature called "multi-factor authentication." This SEC failure permitted a hacker to access the X account through an SEC staffer's cell phone. The hacker posted a false tweet announcing much-anticipated but false news: that SEC had approved the first-ever spot-Bitcoin exchange traded funds. Bitcoin's price immediately spiked. SEC deleted the false tweet after 30 minutes, and Bitcoin's price fell just as quickly. This fall caused huge losses to the many investors who had purchased Bitcoin based on the assumption that SEC's official X account is reliable.

47.     The over nine-year journey from CAT's inception to its recent execution has been detailed in numerous industry publications.[24] Secrecy, mismanagement, waste, deception, and

---

[21] *See*, *e.g.*, Rundle & Malakian,, *supra* at n.8 (CAT "started to attract an enormous amount of criticism and concern regarding cybersecurity").

[22] *See* discussion in SEC Chairman Jay Clayton, *Statement on Cybersecurity* (Sept. 20, 2017), *available at* https://perma.cc/7V3A-LA2X.

[23] *U.S. SEC Settles with Two Traders over EDGAR Filing System Hack*, Reuters (Apr. 9, 2020), *available at* https://www.reuters.com/article/idUSKCN21R33G/.

[24] *See*, *e.g.*, Rundle & Malakian, *supra* n.8.

confusion plagued the project from day one with bidding wars succeeded by vendor failures, and regulators desperately distancing themselves from accountability for the disaster they themselves set in motion. Amazingly FINRA bid on the work, while serving on the committee that would award the work. Here's how one industry insider put it:

> When the SEC wrote this rule, think of 13 crazy aunts and uncles … that the SROs put in charge of this. … Think of the SEC putting them in a van, driving them out into the desert, handing them shovels and saying, 'Dig your own graves, we'll be back in a year!' The SEC comes back, and these guys are still standing with shovels and they're like, 'But we told you to dig your own graves! This time we're serious. We'll come back in a year and this time you'd better have dug them.' They come back and they are still standing there.[25]

*Id.* (internal quotation marks omitted)

48.     Security conditions have not improved. To the contrary, as SEC, in its own words, stressed in a March 2023 Fact Sheet, the "Financial Services Sector increasingly is being attacked by cyber threat actors who use constantly evolving and sophisticated tactics, techniques, and procedures to cause harmful cybersecurity incidents. This poses a serious risk to the U.S. securities markets."[26]

49.     The CAT database presents cyberhackers an especially attractive target, for the obvious reason that it collects PII and trading information for every transaction and every investor in the U.S. equities markets. As one SEC Commissioner warned, the CAT database will be "so vast and so attractive to hackers that it will be hard to protect" from cybercriminals.[27]

50.     The CAT database is especially vulnerable because a large number of users, spread across more than twenty different organizations—governmental and private—have,

---

[25] *Id.*

[26] Fact Sheet, Addressing Cybersecurity Risks to the U.S. Securities Markets (Mar. 15, 2023), *available at* https://www.sec.gov/files/34-97142-fact-sheet.pdf.

[27] Peirce, *supra* n.9.

and will have access to it.[28] These include many members of SEC staff, as well as employees of a long list of SROs, such as FINRA and more than a dozen equity exchanges and trading venues, including: BATS Exchange, Inc.; BATS-Y Exchange, Inc.; BOX Options Exchange LLC; C2 Options Exchange, Inc., Chicago Board Options Exchange, Inc.; Chicago Stock Exchange, Inc., EDGA Exchange, Inc.; EDGX Exchange, Inc.; Financial Industry Regulatory Authority, Inc.; International Securities Exchange, LLC; ISE Gemini, LLC; Miami International Securities Exchange LLC; NASDAQ OMX BX, Inc., NASDAQ OMX PHLX LLC; The NASDAQ Stock Market LLC; National Stock Exchange, Inc.; New York Stock Exchange LLC; NYSE MKT LLC; and NYSE Arca, Inc.[29]

51.     Granting access to personal financial information to an estimated 3,000 people or entities[30] also makes the CAT database vulnerable to disclosures through sheer accident. Just this past year, carelessness by a single employee at the Consumer Financial Protection Bureau ("CFPB") exposed PII of 256,000 private citizens.[31] CFPB, however, has been less than transparent about the breach: Although the breach occurred in February of 2022, the public did not learn of the breach until *The Wall Street Journal* broke the story in April, 2022.[32]

52.     The CAT database will contain more than 400 times the amount of PII stored by the CFPB. No wonder the project was paralyzed for a decade by accountability concerns. That

---

[28] *See* Amended CAT NMS Plan for Consol. Audit Trail, LLC (Aug. 29, 2019), *available at* https://perma.cc/ZF4L-B5N5.
[29] *Id.* at App. C at 119.
[30] *See* SIFMA Comment Letter, *supra* n.2, at 2.
[31] Caitlin Reilly, *CFPB Employee Sent Data of 250,000 Customers to Pers. Email*, Roll Call (April 19, 2023), *available at* https://perma.cc/M6NY-P2E9.
[32] Andrew Ackerman, *CFPB Says Staffer Sent 250,000 Consumers' Data to Personal Account*, Wall Street Journal (April 19, 2023), *available at* https://www.wsj.com/articles/in-major-incident-cfpb-says-staffer-sent-250-000-consumers-data-to-personal-account-fdc0a540.

thousands of people, many unconnected to the government, have access to this database exposes Americans' investment information to breaches by faithless government and contract workers, as well as private company and SRO affiliated personnel, a risk all too fresh in the news with respect to IRS returns (Charles Littlejohn) and CIA files (Joshua Schulte) to name only two examples.

53.     Because of concerns about these cybersecurity risks, Congress held several hearings in late 2017. Lawmakers and others expressed grave concern over the cybersecurity risk posed by the CAT-system's collection of PII for every trader of securities on U.S. exchanges.[33]

54.     During one such hearing, then-Chair of the Subcommittee on Capital Markets, Securities, and Investment, Committee on Financial Services, Congressman Bill Huizenga, also highlighted the risk the gathering of identifiable proprietary transaction data posed to market manipulation.[34]

55.     In July 2019, seven senators reiterated these concerns in a letter to the SEC Chair. First, the senators stressed that "[a] single database that includes the PII of every American investor would be a target too tempting to ignore."[35] The senators further warned that hacks of CAT could be used to "manipulate or disrupt our equity markets, trade stocks based upon material nonpublic information," and even "steal entire portfolios and sell them on the dark web."[36] The senators concluded their letter by entreating SEC not to collect PII from retail investors.[37]

---

[33] *See, e.g., Implementation and Cybersecurity Protocols of the Consolidated Audit Trail, supra* at n.3.
[34] *Id.*
[35] July 24, 2019 Letter, *supra* n.6.
[36] *Id.*
[37] *Id.*

56.     That request reflects the views of most Americans. According to a 2018 poll by Morning Consult, 89% of investors oppose having their PII sent to the CAT.[38]

57.     Numerous commenters have also criticized CAT's collection of PII, including civil liberty advocates such as the American Civil Liberties Union. Writing in 2019, the ACLU complained that "the CAT will collect and store far too much [PII]" and urged SEC to "consider further measures to limit the personal information maintained by the CAT."[39]

58.     In response to these complaints, SEC issued an "Exemptive Order" in March 2020. The Order conceded that "the most secure approach to addressing any piece of sensitive retail Customer PII would be to eliminate its collection altogether." *Order Granting Conditional Exemptive Relief*, Release No. 34-88393 (Mar. 17, 2020), 85 Fed. Reg. 16152, 16156 (Mar. 20, 2020). The Order then eliminated the requirement that social security numbers be maintained by the CAT, with the SROs instead using a specified algorithm to convert the social security number to a new unique number assigned to every investor. The Order also provided that account numbers and complete birth dates would no longer be required by the CAT scheme, but it retained the requirement that critical sensitive information, such as each investor's "name, address, and birth year" as well as the individual's role in the account, be collected. *Id*.

59.     Commentators criticized the Exemption Order for failing to meaningfully address the known hacking risks—risks that remain even without the collection of social security numbers.

---

[38] Am. Secs. Ass'n & Morning Consult Poll, *Am. Investors Oppose Sending their Pers. Info. to the Consol. Audit Trail (CAT)*, *available at* https://perma.cc/V5EU-3PF6.
[39] Letter from ACLU to SEC (Dec. 16, 2019), *available at* https://bit.ly/3MZ7ktV.

60.     Further, as the Securities Industry and Financial Markets Association or "SIFMA" stressed, the modified Order provided SROs only "an open-ended standard while just offering potential examples of such data elements." SEC's modified Order thus raises the possibility the government would later mandate additional data-collection requirements beyond the scope of Rule 613. *See* SIFMA Letter to Vanessa Countryman (June 5, 2023) at 6–8, *available at* https://perma.cc/3FX5-M27X.

61.     The high risk of cybersecurity threats has been further highlighted by the parties who know the CAT database best—the owners and operators of the CAT database. The SROs charged with developing the database, which includes FINRA and some 20-plus securities exchanges, own the CAT database through a Delaware limited liability corporation formed on August 29, 2019 named "Consolidated Audit Trail LLC" ("CAT LLC").[40]

62.     CAT LLC controls the storage and protection of the CAT data it receives from national securities exchanges and broker-dealers, as mandated by SEC.

63.     In 2020, CAT LLC requested SEC approve a limit to its liability to broker-dealers for losses resulting from their use of CAT LLC, including by cyberbreaches.[41] CAT LLC proposed an extremely low liability cap of either $500 or the amount of fees the suing party had paid CAT LLC during the relevant year. *Id*. at 592.

64.     SEC denied the request, concluding that "the proposed Limitation of Liability Provisions would reduce Participants' incentives to invest in CAT data security." *Joint Indus.*

---

[40] CAT LLC is owned by 25 entities including FINRA. *See* CAT NMS Plan, *Plan Participants* (last visited Mar. 15, 2024), *available at* https://bit.ly/46ycvbu.
[41] *See Notice of Filing of Amend. to the Nat'l Mkt. Sys. Plan Governing the Consol. Audit Trail*, Release No. 34-90826 (Dec. 30, 2020), 86 Fed. Reg. 591 (Jan. 6, 2021) ("Notice").

*Plan; Order Disapproving an Amend. to the Nat'l Mkt. Sys. Plan Governing the Consol. Audit Trail*, Exchange Act Release No. 34-93484; File No. 4-698, at 27 (Oct. 29, 2021).

65.     While SEC denied CAT LLC's request for a limit to liability, the mere request highlights the gravity of concerns about cyberbreaches.

66.     SEC's categorical denial of CAT LLC's request to provide a limitation of liability lest it "reduce … incentives to invest in CAT data security" perfectly encapsulates the Orwellian double-speak that shows SEC's reckless failure to consider, much less assure that investors will be made whole again if their PII is hacked. The whole regime is silent on the liability elephant in the room: Whether SEC and FINRA will seek to hide behind the curtain of dubious claims of sovereign immunity—dubious because SEC lacks immunity when it acts *ultra vires* and both SROs and SEC lack immunity because no statute authorizes this scheme.[42]

**E.     CAT's High Financial Costs Are Not Subject to Congressional Control Now**

67.     Not only will investors bear any loss to their investments caused by the hacking of CAT, but brokers and investors will also bear enormous costs to build this huge database.

68.     The Proposing Release, issued in 2010, estimated that implementing the rule would cost $4 billion, and that "total ongoing aggregate annual costs" would be about $2.1 billion.[43] And

---

[42] *See*, e.g., *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007) (*en banc*) ("SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions").

[43] Since 2010, the cost estimates have varied. According to the Order Approving to National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 34-79318 (Nov. 15, 2016), 81 Fed. Reg. 84696, 84852 (Nov. 23, 2016), "[t]he Commission estimated that the cost of the Plan would be approximately $2.4 billion in initial aggregate implementation costs and $1.7 billion in ongoing annual costs," as well as $1.6 billion "or more" per year because of "duplicative audit trail data reporting responsibilities for a period of up to a maximum of 2.5 years preceding[.]" *See also Consolidated Audit Trail*, Release No. 34-62174, 75 Fed. Reg. 32556, 32602 (Jun. 8, 2010) ("Therefore, for all SROs and members, we estimate that the total one-time aggregate cost to implement the proposed Rule would be approximately $4 billion and the total ongoing aggregate annual costs would be approximately $2.1 billion.").

those figures, according to SIFMA, are grossly underestimating the real cost of implementing and running the CAT scheme.[44]

69.     The Proposing Release's cost estimates exceeded SEC's entire annual budget of $1.1 billion for fiscal year 2010. For fiscal years 2012-2014, SEC's budget totaled $1.3 billion. The most recently approved budget for fiscal 2023 was $2.2 billion and for 2024, SEC's proposed budget is $2.4 billion.[45]

70.     When SEC issued the final rule in 2012, however, it dodged the cost question by deferring it to a later day, stating that "the costs and benefits of creating a consolidated audit trail" are "more appropriately analyzed" after SEC approves a CAT plan.[46]

71.     The costs have increased "precipitously," with "CAT operating costs projected for 2023 … approximately 5.2 … times the cost projections in the [original] CAT" proposal.[47]

72.     Further, as SEC Commissioner Mark T. Uyeda recently stressed, "the annual increases in CAT operating costs during the past three years of 73.2%, 27.3% and 27.0%, respectively, are not sustainable over the long term."[48]

---

[44] 77 Fed. Reg. at 45737 ("SIFMA, in particular, estimated that the cost per broker-dealer to implement real-time reporting could be millions of dollars and that the cost of capturing options quotes in real time alone could exceed the Commission's $2.1 billion estimate for the annualized cost of the audit trail.").

[45] *See* SEC, *Budget History – BA vs. Actual Obligations ($ in 000s)* (last visited Mar. 15, 2024), *available at* https://bit.ly/46vwE1D.

[46] *Final Rule, Consolidated Audit Trail*, Exchange Act Release No. 34-67457, File No. S7-11-10 17 (Jul. 18, 2012), *available at* https://www.sec.gov/files/rules/final/2012/34-67457.pdf.

[47] Mark Uyeda, *Statement on Consol. Audit Trail Revised Funding Model* (Sept. 6, 2023), *available at* https://bit.ly/3T1sFXt (second ellipsis and alteration in original).

[48] *Id.* (quoting Comment Letter by Fin. Info. Forum and Sec. Indus. and Fin. Mkt. Ass'n, File Number 4-698: Joint Indus. Plan; Order Instituting Proceedings to Determine Whether to Approve or Disapprove an Amendment to the Nat'l Mkt. Sys. Plan Governing the Consol. Audit Trail (June 16, 2023), at 2).

**F.      The Costliest Part of CAT—Its Constitutional Defects and Infringements**

73.      Massive as the estimates are, and as precipitously as the costs continue to increase, they fail to capture the most significant cost imposed by the CAT: the violation of the constitutional and privacy rights of more than 100 million American citizens and SEC's utter disregard for our constitutional structure.

74.      Without seeking or securing authority from Congress, let alone appropriations, SEC ordered SROs to establish the CAT database to seize Americans' personal financial data. This scheme creates for SEC its own private taxation system, assessing SROs for the costs of this multi-billion-dollar experiment, which are in turn paid by investors. This it cannot do. Our Constitution requires SEC to seek and secure appropriations from Congress for such a vast undertaking.

75.      Further, Rule 613 mandates the seizure of the personal and investment information of every individual who invests in securities traded on U.S. exchanges, no matter the purpose—to buy a house, to pay for their children's education, or to prepare for retirement.

76.      Through the CAT scheme, the government seizes the personal and financial information of Americans by requiring its near-immediate transmission to the CAT database, violating their reasonable expectations that their brokers can and will keep their investment and personal information confidential.

77.      With access to CAT, SEC has the further ability to search that information, without any basis to suspect wrongdoing, applying daunting technological tools unknown in their reach and effect to search for what SEC may perceive as signs of possible violations of the law or for other purposes.

78.      Rule 613 also enables SEC to review private citizens' investment choices and, in many cases, to see their entire portfolios. It enables SEC to review citizens' trading strategies and

thereby evaluate the core values and moral convictions that motivate Americans' investment decisions.

79.    SEC's access to the CAT database empowers it to expand its mission well beyond protecting investors, to assume the role of evaluating citizens' investment decisions against its own political standards. This unprecedented assumption of power poses a grave danger to citizens' privacy and constitutional rights, regardless of which party holds power.

80.    No law or historical practice provides precedent for the federal government mandating the collection of Americans' private financial information without a warrant, a subpoena, or even the suspicion of wrongdoing; nor to search such information without limitation.

81.    SEC's massive search and seizure CAT scheme is conceivable only because of what the United States Supreme Court labeled as the recent "seismic shift" in technology for collecting massive volumes of real-time data. *Carpenter*, 138 S. Ct. at 2219 (holding that, even where government begins with an investigative focus on the defendant, it must obtain a warrant to obtain cell-phone location data). In *Carpenter*, advances in technology resulted in wireless carrier databases automatically capturing data, making it possible to physically track nearly every cell phone user "for years and years." *Id.* at 2219. The government could obtain this information without needing to "know in advance whether they want to follow a particular individual, or when." *Id*. at 2218.

82.    This same seismic shift in technology makes CAT possible, but the seizure of data is even more constitutionally offensive than the government's request for data in *Carpenter*. There, at least, the Government already had focused on a suspect and had obtained a court order for the defendant's cell-site data. In contrast, under Rule 613 SEC does not need an investigative

predicate, much less a court order, to obtain and analyze private information, nor is the information available limited to any particular person or time frame.

83.     Just as Americans do not forfeit their privacy by using a cell phone, they do not forfeit their privacy by opening a brokerage account. And worse than in *Carpenter*, where the government wanted to access information held by a third party, Rule 613 puts the government itself—SEC—squarely in the full-time surveillance business.

### G.     Transmission of Customer Information to the CAT

84.     Broker-dealers first began submitting retail investor information to the CAT Central Depository in approximately June, 2020. By that date, most broker-dealers were required to report data for orders involving a national market system (NMS) or over-the-counter (OTC) equity securities. *See* FINRA Rule 6895(c)(1)(A) (effective June 22, 2020).

85.     Reporting requirements for the same large broker-dealers expanded in July 2020 to include data for options. *See* FINRA Rule 6895(c)(1)(B).

86.     By December 2021, all FINRA members, including small broker-dealers, began reporting these categories of data. FINRA Rule 6895(c)(1)(D).

87.     In July 2022, SEC released an order granting temporary relief from certain requirements of the CAT, delaying its full implementation until 2024.[49]

### H.     SEC Lacks Authority to Issue Rule 613

88.     The Adopting Release states that SEC adopted the rule "[p]ursuant to the Exchange Act and particularly, Sections 2, 3(b), 5, 6, 11A, 15, 15A, 17(a) and (b), 19, and 23(a) thereof,"

---

[49] *Order Granting Temporary Conditional Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS under the Exchange Act, from Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail*, Exchange Act Release No. 34-95235 (Jul. 8, 2022), 87 Fed. Reg. 42242 (Jul. 14, 2022).

*Consolidated Audit Trail*, Exchange Act Release No. 34-67457, 77 Fed. Reg. 45722, 45808 (Aug. 1, 2012), but none of those provisions provides authority for SEC to create the CAT (nor to order its creation).

89.   SEC's organic 1934 statute only provides authority to protect—not imperil—investors, maintain fair, orderly, and efficient markets, and to facilitate capital formation. The CAT scheme does none of these things.  *See* 15 U.S.C. § 78d; SEC Mission Statement, *available at* https://perma.cc/NS6Z-NKCC.

90.   The 1975 amendment giving SEC power to "facilitate the establishment of a national market system" is likewise devoid of authority to establish the CAT scheme to seize investor papers, effects, and information. Securities Acts Amendments, Pub. L. No. 94-29, § 7, 89 Stat. 97, 112 (1975) (codified at 15 U.S.C. § 78k-1(a)(2)).

91.   The Supreme Court has warned against finding new authority in decades-old statutes, and Congress could not possibly have intended in the 1930s, or in the 1970s when Congress authorized SEC to "facilitate the establishment of a national market system," to authorize the CAT scheme.  *Id*.

92.   The Exchange Act contains no language even suggesting that SEC is authorized to create a surveillance program of such "vast economic and political significance."  *Utility Air Regulatory Group (UARG) v. EPA*, 573 U.S. 302, 324 (2014).  *See also West Virginia v. EPA*, 142 S. Ct. 2587, 2595, (2022) (citing *UARG* and identifying the "major questions doctrine"); *Biden v. Nebraska,* 143 S. Ct. 2355, 2374(2023) (discussing the major questions doctrine).  Rather, CAT transforms a statutory directive to "facilitate the establishment of a national market system for securities" into a license to create a mass surveillance regime. This paradigm shift constitutes

a "fundamental revision of the statute, changing it from [one sort of] scheme" of … regulation into an entirely different kind. *West Virginia v. EPA*, 142 S. Ct. 2587, 2612 (2022) (cleaned up).

## II.   INJURIES TO PLAINTIFFS

93.    SEC's CAT scheme has caused Plaintiffs actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer—including the *ultra vires*, unreasonable, and unconstitutional search and seizure of their confidential personal and financial information.

94.    Each Plaintiff has a property right in confidential and personally identifiable information relating to their respective investments and their business records.

95.    Each Plaintiff has a reasonable and subjective expectation that such information will remain private and will not be searched, seized, or otherwise provided to a government agency, absent compliance with the mandates of the Fourth Amendment.

96.    Each Plaintiff has been and will continue to be forced to incur substantial monetary expenses to pay the multi-billion-dollar cost of the Consolidated Audit Trail. These expenses include all costs Rule 613 has imposed and will continue to impose primarily on exchanges and broker-dealers, but ultimately borne by investors.

97.    Plaintiffs face a significant increased risk that their confidential personal information, including personally identifiable information, will be improperly disclosed by third parties. Plaintiffs' information could be disclosed either through a cyberbreach or through accidental disclosure by one of the thousands of people with access to the CAT database. As alleged above, the material and imminent nature of this threat is demonstrated by, among other things, the demand by the entities most knowledgeable about CAT's technical operations for limited liability for cyberbreaches.

98.     Defendants' conduct has inflicted past injury, and it continues to inflict present, ongoing, imminent, and continuing irreparable injury on Plaintiffs.

### CAT LLC ENGAGED IN STATE ACTION AS AN AGENT OF SEC

99.     A private entity is a state actor "when the government compels the private entity to take a particular action." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). CAT LLC has accepted and maintained information in the CAT database solely because SEC compelled CAT LLC's owners—the SROs—to create the CAT program and operate the CAT database.

100.    SEC Rule 613 required the SROs to create the entire CAT program. *See, e.g.,* 17 C.F.R. § 242.613(a)(1) (stating that the SROs "shall" submit a plan to create the CAT). Rule 613 requires the SROs to create and maintain the central repository that CAT LLC controls and maintains. *See, e.g.,* 17 C.F.R. § 242.613(e)(1) (stating that the SROs "shall provide for the creation and maintenance of a central repository" as defined in the Rule). The Rule mandates that the SROs make this database available to SEC. *Id*.

101.    To comply with these mandates, the SROs created CAT LLC.[50] See ¶ 61, above. The SROs submitted the CAT LLC limited liability agreement ("Limited Liability Company Agreement of CAT NMS, LLC") to SEC as the initial CAT Plan ("CAT NMS Plan"). *Id.* As also alleged above, SEC approved that initial CAT NMS Plan on November 15, 2016. *Id*.

102.    This Plan states that the SROs created CAT LLC to comply with SEC Rule 613. CAT NMS Plan at 1. It also states that the purpose of CAT LLC is to "create, implement, and

---

[50] *See* Exchange Act Release No. 79318 at 14 (Nov. 15, 2016), 81 Fed. Reg. 84696 (Nov. 23, 2016), https://www.sec.gov/rules/sro/nms/2016/34-79318.pdf (''CAT NMS Plan Order''). Likewise, the "Recitals" in the CAT NMS Plan state that the LLC Agreement "serves as the National Market System Plan required by SEC Rule 613." CAT NMS Plan at 1.

maintain the CAT and the Central Repository pursuant to SEC Rule 608 and SEC Rule 613." *Id.* at 1.

103.    The CAT NMS Plan contains a 132-page "Discussion" specifically provided to comply with the "SEC Rule 613(a) require[ment] to discuss various 'considerations' related to how the [SROs] propose to implement the requirements of the CAT NMS Plan." CAT NMS Plan at C-1 to C-132.  It states that the Central Repository maintained by CAT LLC is being created to comply with an SEC mandate that "national securities exchanges and their members must report to the Central Repository the information required by SEC Rule 613(c)(7)."  *Id.* at C-4–C-5. It acknowledges that CAT LLC will provide all collected information to SEC as required by Rule 613. *See*, *e.g.*, *id.* at C-15.

104.    Because CAT LLC exists solely to perform functions compelled by SEC, and to perform those functions for SEC's benefit, it is a state actor and an agent of SEC.  Accordingly, CAT LLC is bound by the Constitution and other laws that govern SEC's conduct.

## CLASS ACTION ALLEGATIONS

105.    ***Class Definition.***  Plaintiffs brings this action on their own behalf and on behalf of all others similarly situated ("the Class"), pursuant to Federal Rule of Civil Procedure 23(b)(2). The Class is defined as follows:

> All individuals for whom the CAT database contains any securities transaction information, or any personally identifiable information, that refers or relates to the individual or to a securities account associated with the individual.  The class includes but is not limited to all individuals who are or were legal or beneficial owner of a security or who are or were authorized to give trading instructions relating to a security.
> .

106.    For purposes of this Complaint and because this suit is being brought as a class action, references to Plaintiffs should be construed not just as applying to the named Class Representatives but as applying to all Class Members even where not explicitly stated.

107.    This action is well suited to class treatment and the Class as defined has all the applicable conditions for class treatment.

108.    *Numerosity.*  The exact size of the class is unknown, but it exceeds 100 million individuals in the United States.  *See, e.g.*, estimate from Securities Industry and Financial Markets Association at Randy Snook, Beware of CAT, SIFMA (Nov. 30, 2017), https://perma.cc/8YJL-AAE9. The numerosity requirement in Fed. R. Civ. P. 23(a)(1) is readily met here.

109.    *Commonality.*  There are multiple questions of law and fact common to the Class, including but not limited to:

    a.  Whether the SEC Rule 613 and the CAT program exceed SEC's authority and were *ultra vires* in violation of Article I's Vesting Clause;

    b.  Whether the SEC Rule 613 and the CAT program exceed SEC's authority and were *ultra vires* in violation of Article I, § 7, cl. 1; Article I, §. 8, cl. 1; and Article I, §. 9.

    c.  Whether Rule 613 and the CAT program violate Plaintiffs' Fourth Amendment Rights by requiring and conducting unreasonable searches and seizures of Plaintiffs' private papers and information;

    d.  Whether Rule 613 and the CAT program violate Plaintiffs Fifth Amendment rights by taking their property without providing constitutionally sufficient due process of law;

    e.  Whether Rule 613 and the CAT program violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(B), because they violate Plaintiffs' constitutional rights as alleged above;

     f.   Whether Rule 613 and the CAT program violate the Administrative Procedure Act,

5 U.S.C. § 706(2)(C), because they are not authorized by the Securities Exchange

Act or any other statute; and

     g.   Whether Plaintiffs are entitled to the relief described in the below Prayer for Relief.

As a result, the commonality requirement of Fed. R. Civ. P. 23(a)(2) is met here.

110.    ***Typicality.***  Plaintiffs' claims are typical of the Class, because they have purchased

stock, sold stock or both since CAT began collecting data.  As a result, the typicality requirement

of Fed. R. Civ. P. 23(a)(3) is met here. The Defendants also treat all the members of the Class the

same [or substantially the same] as to the applicable allegations and claims made herein making

them typical of the Class in that respect.

111.    ***Adequacy of Representation.***  Plaintiffs will fairly and adequately protect the

interests of the Class Members.  Plaintiffs' interests are aligned with, and not antagonistic to, those

of the other members of the Class.  Additionally, Plaintiffs are seeking identical declaratory and

injunctive relief that would benefit all putative Class Members.  Plaintiffs have also retained

counsel competent and experienced in the prosecution of class-action litigation to represent

themselves and the Class.  As a result, the adequacy-of-representation requirement of Fed. R. Civ.

P. 23(a)(4) is met here.

112.    ***Fed. R. Civ. P. 23(b)(2) Class Type.***  Certification for injunctive and declaratory

relief is appropriate under Rule 23(b)(2) because Defendants have acted on grounds that generally

apply to the class, so that preliminary and final injunctive relief, and corresponding declaratory

relief, are appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(2).

113.    ***Class Action Superiority & Efficiency.***  Additionally, though it is not necessary

for a Rule 23(b)(2) class action, class-wide treatment of the common issues presented by this suit

against Defendants in a single forum represents a means of determining Defendants' legal obligations to each Class Member that is superior to potentially a large number of individual lawsuits. As a result, class-wide adjudication of Defendants' liability followed by the grant of undifferentiated declaratory and injunctive relief is the most efficient means of adjudication.

<u>**COUNT I: VIOLATION OF THE VESTING CLAUSE,**</u>
<u>**ART. 1 SEC. 1 OF THE CONSTITUTION**</u>
(Against Gensler and SEC)

114.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

***Vesting Authority***

115.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I § 1.

116.    Because Article I, § 1 vests "[a]ll legislative Powers" in the Congress, "the lawmaking function belongs to Congress … and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

117.    The prohibition against divestment of legislative power is "intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011). "The principle that Congress cannot delegate away its vested powers exists to protect liberty." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring). This applies with doubled force when a mere regulatory agency has arrogated that power to itself. The CAT was initiated by SEC without a shred of Congressional authority, and the scheme is wholly illegitimate.

118.    "[O]ur Founders deliberately designed the legislative power to be exercised only by elected representatives in a public process—so that the lines of accountability would be clear and the sovereign people would know, without ambiguity, whom to hold accountable." *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from denial of review *en banc*) (cleaned up). "Of the three branches, Congress is the most responsive to the will of the people. … If legislators misused this power, the people could respond, and respond swiftly." *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring).

119.    When agencies arrogate power properly vested solely in Congress, our laws risk becoming nothing more than the will of the current president, or, worse yet, the will of unelected officials barely responsive to him. *See* S. Breyer, *Making Our Democracy Work: A Judge's View* 110 (2010).  In a world like that, agencies could churn out new laws more or less at whim. Intrusions on liberty would not be difficult and rare, but easy and profuse. *See* THE FEDERALIST No. 46, at 303, No. 62, at 378 (James Madison). Stability would be lost, with vast numbers of laws changing with every new presidential administration. Rather than embody a wide social consensus and input from minority voices, laws would more often bear the support only of the party currently in power. Powerful special interests, which are sometimes "uniquely" able to influence the agendas of administrative agencies, would flourish while others would be left to ever-shifting winds. Thomas Merrill, *Capture Theory and the Courts: 1967-1983*, 72 CHI.-KENT L. REV. 1039, 1043 (1997).

120.    Agencies lack power to address questions of "economic and political significance" when Congress has not provided clear and explicit authorization. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000). Put another way, a vaguely worded Congressional

delegation to, for example, regulate "as in [the agency's] judgment may be necessary," does not "authoriz[e] an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2487, 2489 (2021) (cleaned up). That is because such powers are vested in Congress. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist J., concurring) ("When fundamental policy decisions underlying important legislation about to be enacted are to be made, the buck stops with Congress.").

121.    The CAT scheme represents an emerging and disturbing pattern whereby federal agencies unconstitutionally regulate matters clearly outside the scope of their statutory authority. The Supreme Court recently struck down a federal agency's *ultra vires* attempt to ban evictions nationwide based on limited statutory authority to "implement measures like fumigation and pest extermination." *Ala. Assoc. of Realtors*, 141 S. Ct. at 2486, 2489 (2021). And the Fifth Circuit enjoined an agency's misuse of a workplace safety statute to impose a nationwide vaccination mandate. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021); *stay lifted by In re MCP No. 165, OSHA*, Case no. MCP 21-7000 (6th Cir. Dec. 17, 2021).

122.    The Supreme Court has admonished courts to not "ascribe unenacted purposes and objectives to a federal statute." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019). Here, the Exchange Act's grant of regulatory authority to SROs has remained unchanged for decades. During that time, SEC has never mandated the seizure of investors' trading information. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts must] greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal citation omitted). Courts must "carefully scrutinize an agency's suggested interpretations of its mandates and which have the effect of expanding its authority beyond the statutory bounds. If an agency was meant to

have authority to do such and such a thing, Congress must say so. And when it has said, 'Thus far and no farther,' it is the Court's responsibility to blow the whistle and call the out of bounds." *FTC v. Hornbeam Special Situations*, LLC, No. 1:17-cv-3094-TCB, 2018 WL 6254580 at *6 (N.D Ga. Oct. 15, 2018) (citing *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013)).

123.     But when agencies arrogate legislative power vested solely in Congress, "the citizen confronting thousands of pages of regulations—here, 351 pages of an initial rule in October 2012 followed by thousands of pages of subsequent rulemaking—the public "can perhaps be excused for thinking that it is the agency really doing the legislating." *City of Arlington*, 569 U.S. at 315 (Roberts, C.J., dissenting). Elected officials no longer bear personal responsibility for enacting laws, thereby depriving voters of control over the laws that govern them. "The bureaucracy triumphs—while democracy suffers." *Rettig*, 993 F.3d at 409 (Ho, J., dissenting from denial of review *en banc*).

124.     SEC is taking a page out of the same unlawful playbook by misusing the Exchange Act.

125.     Not only did Congress not delegate authority to SEC to adopt the CAT scheme, any such "delegation" would be unconstitutional in any event, because it exceeds Congress' authority by violating the Bill of Rights. Therefore, SEC's CAT scheme is *ultra vires* in violation of any conceivable constitutional authority.

126.     Accordingly, this Court should set aside Rule 613 as exceeding SEC's authority in violation of Article I's Vesting Clause. As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

<u>**COUNT II: VIOLATION OF THE CONSTITUTION'S VESTING OF THE POWER OF THE PURSE,AND APPROPRIATIONS IN CONGRESS, ART. I , SEC. 8**</u>
<u>**(Against Gensler and SEC)**</u>

***Ultra Vires Violation of the Power of the Purse and Appropriations Authority***

127.    Art. I, Sec. 8, Clause 1 of the Constitution provides: "The Congress shall have Power to lay and collect Taxes … and provide for the … general Welfare of the United States.

128.    Art. I, Sec. 7, Clause 1 (the Origination clause) provides: "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills."

129.    The power of Congress to levy taxes is subject to "only two qualifications." *License Tax Cases*, 72 U.S. (5 Wall) 462, 471 (1866). Direct taxes must be levied by the rule of apportionment, U.S. CONST. Art. I, § 9, cl.4., and indirect taxes by the rule of uniformity. *Id.* Art. I, § 8, cl.1.

130.    Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This Clause seeks "to assure that public funds will be spent according to the letter of the [budgetary] judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

131.    "All funds belonging to the United States—received from whatever source, however obtained, and whether in the form of cash, intangible property, or physical assets—are public monies, subject to public control and accountability." *See generally*, Kate Stith, *Congress' Power of the Purse*, 97 YALE L. J. 1343, 1356 (1988). Executive agencies may spend funds on a program only if they can convince Congress to appropriate the money. This applies not only to the direct use of funds raised by the government or through SEC's self-appropriation through FINRA

and other SROs, but also to the vast diversion of government technology, support, employee time, and promotion efforts for the CAT. The Constitution and laws including the Anti-Deficiency Act and Miscellaneous Receipts Act enshrine the concept that the legislature alone can raise, receive, or spend money.

132.    Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "A law may be construed to make an appropriation out of the Treasury … only if the law specifically states that an appropriation is made[.]" *Id.* § 1301(d).

133.    The expenditure of public funds that were not lawfully appropriated for that purpose violates the Anti-Deficiency Act's prohibition against federal agencies obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Federal employees who violate the Act are subject to sanctions, including removal from office, fines, imprisonment, or both. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990).

134.    Upon information and belief, SEC has funded the CAT—a program for which it lacks both statutory authority and Congressional appropriation to support—by requiring FINRA to expend over three billion dollars at last count.

135.    The failure of SEC to deposit into the Treasury funds it ordered FINRA to raise to fund its data-gathering experiment violates the Miscellaneous Receipts Act, which provides that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). The only exception to the Miscellaneous Receipts Act is where an agency has statutory authority to retain the funds or it is a form of prepayment.

136.   "If there could be 'public money' that is not deposited in the Treasury prior to expenditure, the Congress' control over expenditures is rendered an 'empty shadow.'" 10 ANNALS OF CONG. 1330-31 (1809) (statement of Rep. J. Randolph).

137.   Bluntly put:  No agency has the power to direct the seizing of Americans' private financial records or to fund this unlegislated and unfunded project by requiring regulated SROs to raise revenues for the project.

138.   Defendants acted *ultra vires* by commandeering FINRA to provide $3 billion and counting of funds for a program, into perpetuity, for which SEC lacked any lawful appropriation or power to establish.

139.   That government-levied requirement that SROs fund a program mandated by SEC, with neither authority nor appropriation, placed a $3 billion tax on American capital markets.

140.   SEC further acted *ultra vires* by using funds appropriated by Congress for authorized purposes to instead develop, promote, test, and/or market the unconstitutional massive surveillance CAT scheme.

141.   Because no Act of Congress "specifically states that an appropriation is made" to fund this scheme to seize the private financial information of Americans, SEC's expenditure of public funds, as well as its diversion of government technology and resources, including human resources, to the CAT is unconstitutional.

142.   As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

**COUNT III: VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION AGAINST UNLAWFUL SEARCH AND SEIZURE OF PLAINTIFFS' PRIVATE FINANCIAL INFORMATION AND RIGHT TO BE SECURE IN SAME (Against All Defendants)**

143.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

144.    The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures … ." U.S. CONST. amend. IV.

145.    "Papers are the owner's goods and chattels; they are his dearest property, and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and erried away the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect." *Boyd v. United States*, 116 U.S. 616, 628 (1886) (quoting *Entick v. Carrington*, 19 How. St. Tr. 1029 (1765)).

146.    A "compulsory production of a man's private papers" is no different than "[b]reaking into a house and opening boxes and drawers." *Id*. at 622, 630. Both involve "the invasion of his indefeasible right of personal security, personal liberty. and private property[.]" *Id*. at 630.

147.    Historically, investors in corporations held physical possession of stock certificates, either personally or stored with a third-party bailee, such as a bank, and the seizure of such stock certificates required legal process in conformity with the Fourth Amendment. *See e.g., Direction der Disconto-Gesellschaft v. United States Steel Corp.*, 267 U.S. 22 (1925).

148.    Justice Holmes observed nearly a century ago that "[a]nyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to

authorize one of its subordinate agencies to sweep all our traditions into the fire and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime." *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305–06 (1924) (internal citation omitted). Personal financial records indisputably are "papers" and "effects" protected by the Fourth Amendment. *Id.* at 305.

149. Technological developments, however, now allow for the digitalizing of papers, yet that data remains the individual's papers within the meaning of the Fourth Amendment. For example, in *Riley v. California*, 573 U.S. 373, 399, 401 (2014), the Court referred to "digital files" stored on a smartphone as "private effects." *See, e.g., United States v. Ackerman*, 831 F.3d 1292, 1304 (10th Cir. 2016) ("After all, if opening and reviewing 'physical' mail is generally a 'search'—and it is—why not 'virtual' mail too?") (internal citation omitted) (Gorsuch, J.); *United States v. Warshak*, 631 F.3d 266, 287 (6th Cir. 2010) (accord). *See also United States v. Seljan*, 547 F.3d 993, 1014-17 (9th Cir. 2008) (Kozinski, J., dissenting) ("What makes papers special—and the reason why they are listed alongside houses, persons, and effects—is the ideas they embody, ideas that can only be seized by reading the words on the page.")

***Unreasonable Seizure in Violation of the Fourth Amendment***

150. The Individual Plaintiffs retained a property right in their papers. which are stored electronically pursuant to contractual agreements with their respective brokers.

151. Plaintiff NCPPR also retained a property right in its papers, which are stored electronically pursuant to its brokerage agreements.

152. Plaintiffs also have a subjective and reasonable expectation of privacy in their financial papers and business records related to their accounts and financial transactions which were stored electronically and seized pursuant to the CAT scheme.

153.    This information did not lose its protection simply because it was held by a third party. By entrusting this information to their brokers, Plaintiffs did not forfeit their right to exclude the government from this material (unless the government obtained constitutionally sufficient legal authority to compel its production, which the government did not do here).

154.    Defendants have unreasonably seized Plaintiffs' financial papers and business records which were stored electronically.

155.    Plaintiffs had a reasonable and subjective expectation that their financial papers and business records which were stored electronically would not be seized without a warrant supported by probable cause (or even individualized suspicion) of wrongdoing.

156.    The seizures of Plaintiffs' financial papers and effects which were stored electronically were searches within the meaning of the Fourth Amendment because they intruded upon Plaintiffs' property interest and reasonable expectations of privacy.

157.    Such searches are unreasonable under the Fourth Amendment because they were not conducted pursuant to warrants supported by probable cause—nor even reasonable suspicion of wrongdoing.

158.    Upon information and belief, the Defendants caused the Plaintiffs' financial papers and effects which were stored electronically to remain seized.

159.    Unless ordered to expunge Plaintiffs' private financial papers and effects which are stored electronically, SEC will continue to hold these papers and effects in violation of the Fourth Amendment. Continuing to hold information that was unlawfully collected inflicts a Fourth Amendment injury. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 338-39 (4th Cir. 2021) (*en banc*).

160.    Unless enjoined, SEC will continue to cause the unreasonable and unconstitutional seizures of Plaintiffs' electronically stored financial papers and business records.

### *Unreasonable Manner of Seizure in Violation of the Fourth Amendment*

161.    As the Supreme Court emphasized in *Carpenter*, 138 S. Ct. at 2219, the Fourth Amendment's guarantee of reasonableness depends on not only how a seizure is made, but also how it is carried out. Wholesale collection of cell-site data was troubling because there, as here, the government could deploy that technique against everyone, as opposed to discrete and justified targets.

162.    Not only was the seizure of Plaintiffs' financial papers and business records unreasonable, the manner of the seizure was unreasonable in that the CAT scheme represents a cybersecurity risk of unmitigated proportion.

### *Unreasonable Search in Violation of the Fourth Amendment*

163.    The CAT scheme further violates Plaintiffs' Fourth Amendment right by subjecting Plaintiffs' financial papers and business records which were stored electronically to untold number of unreasonable searches, with approximately 3,000 people at SEC and SROs having access to the CAT database and able to search Plaintiffs' information at will.

164.    Upon information and belief, SEC searched Plaintiffs' electronically stored financial papers and business records.

165.    Any search of Plaintiffs' electronically stored financial papers and business records pursuant to Rule 613 was unreasonable and in violation of the Fourth Amendment.

166.    Unless enjoined, SEC will continue to unreasonably and unconstitutionally search Plaintiffs' electronically stored financial papers and business records.

167.    Expunging Plaintiffs' unlawfully collected electronically stored private financial papers and business records is the remedy for a Fourth Amendment violation. *Church of Scientology v. IRS*, 484 U.S. 9 (1987).

168.    As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

### COUNT IV: VIOLATION OF THE DUE PROCESS PROTECTIONS OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION IN SEIZING PLAINTIFFS' PRIVATE FINANCIAL INFORMATION
### (Against All Defendants)

169.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

170.    The Fifth Amendment to the United States Constitution provides that "[n]o person shall" "be deprived of life, liberty, or property, without due process of law."

171.    Plaintiffs hold property rights in their personal information and business records including those stored electronically.

172.    Plaintiffs retain ownership of their personal information and business records when those records are shared with fiduciaries pursuant to the terms of service agreements.

173.    SEC CAT scheme deprives Plaintiffs of their protected property interests in their private papers and records.  Plaintiffs also possess a substantial liberty interest in maintaining the privacy of their personal and financial records.

174.    Defendants violated the Due Process Clause of the Fifth Amendment by depriving the Plaintiffs of their protected property rights, namely their electronically stored personal papers

and business records, without providing them either pre- or post-deprivation notice and an opportunity to be heard.

175.    To the extent Rule 613 authorizes deprivation of Plaintiffs' property rights without either pre- or post-depravation notice and an opportunity to be heard, Rule 613 violates Plaintiffs' Fifth Amendment Due Process rights.

176.    Unless ordered to expunge Plaintiffs' electronically stored private financial papers and business records, SEC will continue to hold that property unlawfully.

177.    Unless enjoined, SEC will continue to cause the unlawful deprivation of Plaintiffs' property rights, without Due Process of law.

178.    As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

## COUNT V: VIOLATION OF THE FIRST AMENDMENT
### (Against All Defendants)

179.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

180.    The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievance." U.S. CONST., Amend. I.

181.    The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. United States Jaycees*, 468 U. S. 609, 622 (1984).

182.    Further, the Supreme Court had made clear "that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

183.    In *NAACP v. Alabama*, the Supreme Court stressed that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," *id.* at 460, and that there is a "vital relationship between freedom to associate and privacy in one's associations," *id.* at 462. Accordingly, the Court held in *NAACP* the First Amendment prohibited the State of Alabama from compelling the organization to produce its membership lists. *Id.* at 452–53.

184.    The Supreme Court in *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), further held that a state law requiring the disclosure of donors violates the First Amendment's right to privacy in their associations.

185.    Rule 613 violates the First Amendment expressive interests and Plaintiffs' Rights of Association by compelling the disclosure of Plaintiffs' association with entities in which they invest.

186.    Rule 613 further violates the First Amendment and Plaintiffs' Rights of Association by compelling the disclosure of Plaintiffs' association with non-profit entities to whom they make donations of stock.

187.    Disclosure of Americans' financial associations—including their donations of securities to organizations they wish to support—exposes them to cancellation and violates their First Amendment rights of association under the Supreme Court doctrine first articulated in *NAACP v. Alabama*, and recently reaffirmed in *Americans for Prosperity Foundation v. Bonta*.

188.    The CAT scheme is an end-run around this proscription against such compelled disclosure and must be declared unconstitutional and enjoined by this court.

189.    Americans also enjoy First Amendment protection for the expressive content of their trading strategies and investment decisions which are proprietary and personal.

190.    The CAT scheme seizes that information and allows the government to have access to such individual expressive and associative interests which are protected by the First Amendment.

191.    Government seizure of that information violates the First Amendment.

192.    As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

### COUNT VI: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: AGENCY ACTION CONTRARY TO CONSTITUTIONAL RIGHT (Against All Defendants)

193.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

194.    The APA provides that a court must "hold unlawful and set aside agency action … found to be … contrary to constitutional right." 5 U.S.C. § 706(2)(B). *See also* 5 U.S.C. § 703 (addressing remedies).

195.    As alleged above, the CAT scheme violates the Vesting and Appropriations Clauses of the Constitution, as well as Plaintiffs' constitutional rights under the First, Fourth, and Fifth Amendments.

196.    Because the agency's action violates Plaintiffs' constitutional rights, it should be invalidated and set aside under 5 U.S.C. §§ 702 and 706(2)(B).

197.    As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

## COUNT VII: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY (Against Gensler and SEC)

198.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

199.    The APA provides that a court must "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(c). *See also* 5 U.S.C. § 703 (addressing remedies).

200.    "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

201.    Yet, the Exchange Act does not contain a single phrase explicitly or even implicitly granting SEC or SROs power to impose mandatory reporting to the government of all trades made by anyone and everyone on an exchange.

202.    Because Rule 613 is not authorized by the Securities Exchange Act or any other statute, it should be invalidated and set aside. 5 U.S.C. §§ 702, 706(2)(C).

203.    As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual, concrete, and continuing injuries—injuries they have suffered and will continue to suffer.

Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

## COUNT VIII: RELIEF UNDER THE MANDAMUS ACT (28 U.S.C. § 1361)
### (Against All Defendants)

204.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

205.    The Mandamus Act, 28 U.S.C. § 1361, vests district courts with original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to Plaintiffs.

206.    As alleged above, all Defendants have a clear, indisputable, and non-discretionary duty to comply with the Constitution and other governing laws including the Exchange Act and the Administrative Procedure Act.

207.    All Defendants have breached this duty by issuing Rule 613 and implementing the CAT program.   By these actions, all Defendants have violated the Constitution and the Administrative Procedure Act and have acted without any statutory authority.

208.    If the Court does not grant mandatory injunctive relief as requested in the below Prayer for Relief, then Plaintiffs have no adequate remedy absent mandamus.   *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 615 (1838) ("If the denial of the right be considered as a continuing injury, to be redressed by a series of successive actions, as long as the right is denied; it would avail nothing, and never furnish a complete remedy.").

209.    This Court should grant Plaintiffs relief in the nature of mandamus under the Mandamus Act, 28 U.S.C. § 1361, (i) prohibiting Defendants from taking any action to enforce or implement Rule 613; (ii) compelling SEC and Gensler to abrogate all SRO rules enacted in reference to Rule 613 or otherwise enacted to implement the CAT program, *see* 15 U.S.C. § 78s(c);

and (iii) compelling Defendants to expunge from all databases maintained or controlled by Consolidated Audit Trail LLC, and from any platform maintained or controlled by SEC, all information referring or relating to the Plaintiffs and all information obtained pursuant to Rule 613.

## COUNT IX: UNJUST ENRICHMENT
### (Against CAT LLC as Relief Defendant)

210.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

211.    Relief Defendant CAT LLC received and maintained possession of information in the CAT database as part of, and as a consequence of, the constitutional and other legal violations by Gensler and SEC, as alleged above.  CAT LLC has no legitimate claim to this information, which it possesses in violation of the law.

212.    By virtue of the foregoing, CAT LLC has been unjustly enriched and, under the circumstances, it is not just, equitable, or conscionable for it to retain this information.

* * *

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an Order and Judgment:

A.  Certifying the class as defined in ¶ 105, above;

B.  Declaring that SEC's Rule 613 is null and void, and set aside in its entirety, because it violates the Vesting and Appropriations Clauses of Article I;

C.  Declaring that SEC's Rule 613 is null and void, and set aside in its entirety, because it violates Plaintiffs' Fourth Amendment Rights;

D.  Declaring that SEC's Rule 613 is null and void, and set aside in its entirety, because it violates Plaintiffs' Fifth Amendment Rights;

E.  Declaring that SEC's Rule 613 is null and void, and set aside in its entirety, because it violates Plaintiffs' First Amendment Rights;

F.  Declaring that, in promulgating Rule 613, Defendants violated the Administrative Procedure Act by taking an action contrary to Plaintiffs' constitutional rights;

G.  Declaring that, in promulgating Rule 613, Defendants violated the Administrative Procedure Act by taking an action in excess of statutory authority;

H.  Setting aside and holding unlawful SEC's Rule 613, and declaring that Rule 613 is null and void in its entirety under the Administrative Procedure Act;

I.  Enjoining Defendants and others acting in concert with them from implementing and enforcing Rule 613, or in the alternative granting Plaintiffs relief in the nature of mandamus under the Mandamus Act prohibiting Defendants and others acting in concert with them from implementing and enforcing Rule 613;

J.  Enjoining SEC and Gensler to abrogate all SRO rules enacted in reference to Rule 613, *see* 15 U.S.C. § 78s(c), or in the alternative granting Plaintiffs relief in the nature of mandamus under the Mandamus Act compelling SEC and Gensler to abrogate all SRO rules enacted in reference to Rule 613, *see* 15 U.S.C. § 78s(c);

K.  Ordering Defendants to expunge from all databases maintained or controlled by Consolidated Audit Trail LLC, and from any platform maintained or controlled by SEC, all information referring or relating to the Plaintiffs and all information obtained pursuant to Rule 613;

L.  Awarding Plaintiffs expenses of this litigation, including reasonable attorneys' fees;

M.  Awarding Plaintiffs all costs of this action;

N.  Retaining jurisdiction to enforce the terms of any order entered;

O.  Granting Plaintiffs such other and further relief as the Court deems just and proper.

April 16, 2024

Respectfully submitted,

/s/ Mark D. Siegmund
Mark D. Siegmund
CHERRY JOHNSON SIEGMUND JAMES, PLLC
400 Austin Avenue
Suite 903
Waco, TX 76701
254-732-2242
MSiegmund@CJSLAW.com


Margaret A. Little*
Senior Litigation Counsel
Andrew J. Morris*
Senior Litigation Counsel
Margot J. Cleveland*
Of Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450 Washington,
DC 20036
(202) 869-5210
peggy.little@ncla.legal
andrew.morris@ncla.legal
margot.cleveland@ncla.legal

*Applications for Admission *Pro Hac Vice* to be filed