**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ERIK DAVIDSON, JOHN RESTIVO & NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,<br><br>    Plaintiffs,<br><br>v.<br><br>GARY GENSLER, *et al.*,<br><br>    Defendants. | Civil Action No. 6:24-cv-00197-ADA-DTG<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION
AND STAY PURSUANT TO 5 U.S.C. § 705**

Mark Siegmund
State Bar Number 24117055
CHERRY JOHNSON SIGMUND
  JAMES, PLLC
400 Austin Avenue
Suite 903
Waco, TX 76701
Tel: (254) 732-2242
MSiegmund@CJSLAW.com

Margaret A. Little CT303494
Andrew J. Morris*
Margot J. Cleveland*
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Tel: (202) 869-5210
Peggy.Little@ncla.legal
Andrew.Morris@ncla.legal
Margot.Cleveland@ncla.legal
*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION AND SUMMARY .......................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

        1.     In 1975, Congress Passed Deregulatory Legislation Authorizing SEC to "Facilitate" a National System Linking All U.S. Stock Exchanges ............... 3

        2.     In 2012, SEC Cited the 1975 Legislation to Justify the CAT, a Surveillance System Enabling SEC to Monitor Every Investor's Stock Transactions ................................................................................................... 5

        3.     The CAT Bypasses Safeguards That Had Prevented SEC from Obtaining Investors' Names and Information Without Establishing Good Cause .......... 8

        4.     SEC Ordered Self-Regulatory Organizations to Build the CAT for It ........... 9

        5.     CAT's Total Cost, Outsourced to SROs, Exceeds SEC's Entire Budget ...... 11

ARGUMENT ................................................................................................................ 12

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................ 12

       A.  SEC Violated the APA by Acting Without Statutory Authority ................................. 12

         1.     Section 11A's Text Rules Out Any Possible Authority for the CAT ........... 13

         2.     Pre-CAT History Shows SEC Knew § 11A Did Not Authorize the CAT .... 19

         3.     The Supreme Court's "Major Questions" Decisions Further Confirm That Congress Never Authorized the Consolidated Audit Trail's Creation .. 21

       B.  The CAT Rule Violates the Fourth Amendment ........................................................ 27

         1.     The CAT's Collection of Investors' Information Is a Search and Seizure.... 27

         2.     The Searches and Seizures Violate the Fourth Amendment ........................ 29

    II.     PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ................................................. 33

    III.     THE BALANCE OF EQUITIES WEIGHS IN PLAINTIFFS' FAVOR ....................... 35

    IV.     THE COURT SHOULD ISSUE A STAY AND AN INJUNCTION............................. 36

       A.  The Court Should Issue a Stay Under 5 U.S.C. § 705 ............................................... 36

       B.  The Court Should Also Enjoin Defendants, and the Injunction Should Apply to CAT LLC and Third Parties Implementing the CAT ................................................. 38

CONCLUSION ............................................................................................................. 41

# TABLE OF AUTHORITIES

**Cases**

Affinity Healthcare Servs., Inc. v. Sebelius,
720 F. Supp. 2d 12 (D.D.C. 2010) ............................................................................ 37

Ala. Ass'n of Realtors v. HHS,
141 S. Ct. 2485 (2021) ..................................................................................... 23, 35

All. for Hippocratic Med. v. FDA,
78 F.4th 210 (5th Cir. 2023) .................................................................................. 35

Arizona v. Gant,
446 U.S. 332 (2009) ............................................................................................. 28

Biden v. Nebraska,
600 U.S. 477 (2023) ................................................................................. 22, 24, 27

Boyd v. United States,
116 U.S. 616 (1886) ................................................................................. 28, 32, 33

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,
531 U.S. 288 (2001) ............................................................................................. 39

BST Holdings, LLC  v. OSHA,
17 F.4th 604 (5th Cir. 2021) .......................................................................... 23, 37

Bus. Roundtable v. SEC,
905 F.2d 406 (D.C. Cir. 1990) ........................................................................... 4, 15

Canal Auth. of Fla. v. Callaway,
489 F.2d 567 (5th Cir. 1974) ................................................................................. 38

Carpenter v. United States,
484 U.S. 19 (1987) ............................................................................................... 28

Carpenter v. United States,
585 U.S. 296 (2018) ................................................................................. 29, 32, 33

Chandler v. Miller,
520 U.S. 305 (1997) ............................................................................................. 30

Elrod v. Burns,
427 U.S. 347 (1976) ............................................................................................. 34

FDA v. Brown & Williamson Tobacco Corp.,
529 U.S. 120 (2000) ............................................................................................. 22

Florida v. Jardines,
569 U.S. 1 (2013) ................................................................................................. 29

FTC v. Am. Tobacco Co.,
264 U.S. 298 (1924) ................................................................................. 21, 28, 30

FTC v. Bunte Bros.,
312 U.S. 349 (1941) ............................................................................................. 20

*Inhance Techs., LLC v. EPA,*
96 F.4th 888 (5th Cir. 2024) .................................................................................. 13, 17

*Katz v. United States,*
389 U.S. 347 (1967) ........................................................................................................ 28

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ........................................................................................................ 13

*Ladd v. Livingston,*
777 F.3d 286 (5th Cir. 2015) ......................................................................................... 12

*Louisiana v. Biden,*
55 F.4th 1017 (5th Cir. 2022) ................................................................................ 34, 35

*Louisiana v. Horseracing Integrity & Safety Auth., Inc.,*
617 F.Supp.3d 478 (2022) ............................................................................................. 33

*Manhattan Cmty. Access Corp. v. Halleck,*
139 S. Ct. 1921 (2019) ............................................................................................ 39, 40

*Nat'l Ass'n for Gun Rts., Inc.,*
2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) ................................................................ 33

*NFIB v. OSHA,*
595 U.S. 109 (2022) ................................................................................................ passim

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................................................................ 35

*Opulent Life Church v. City of Holly Springs,*
697 F.3d 279 (5th Cir. 2012) ......................................................................................... 34

*Regal Knitwear Co. v. NLRB,*
324 U.S. 9 (1945) ............................................................................................................ 38

*Resol. Tr. Corp. v. Walde,*
18 F.3d 943 (D.C. Cir. 1994) ........................................................................................ 28

*Rest. L. Ctr. v. U.S. Dep't of Lab.,*
66 F.4th 593 (5th Cir. 2023) ......................................................................................... 34

*Riley v. California,*
573 U.S. 373 (2014) ......................................................................................... 28, 32, 33

*Ruckelshaus v. Monsanto,*
467 U.S. 986 (1984) ........................................................................................................ 28

*Ry. Lab. Exec. Ass'n v. Nat'l Mediation Bd.,*
29 F.3d 655 (D.C. Cir. 1994) ................................................................................. 20, 21

*Smith v. Maryland,*
442 U.S. 735 (1979) ........................................................................................................ 32

*Sw. Airlines Co. v. Saxon,*
596 U.S. 450 (2022) ........................................................................................................ 13

iii

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
   732 F.3d 535 (5th Cir. 2013) ............................................................. 35

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ............................................................. 35

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ................................................. 34, 36, 37

*Texas v. United States,*
   40 F.4th 205 (5th Cir. 2022) ............................................................. 37

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ............................................................. 16

*United States v. Ackerman,*
   831 F.3d 1292 (10th Cir. 2016) ........................................................ 28

*United States v. Di Re,*
   332 U.S. 581 (1948) ........................................................................... 32

*United States v. Jones,*
   565 U.S. 400 (2012) ..................................................................... 28, 29

*United States v. Miller,*
   425 U.S. 435 (1976) ........................................................................... 29

*United States v. Warshak,*
   631 F.3d 266 (6th Cir. 2010) ............................................................. 28

*Utility Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ........................................................................... 27

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..................................................... 35, 37

West Virginia v. EPA,
   577 U.S. 1126 (2016) (mem. op.) ..................................................... 37

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ................................................................... passim

*Whitman v. Am. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) ........................................................................... 26

*Winter v. NRDC,*
   555 U.S. 7 (2008) ............................................................................... 33

**Constitutional Provisions**

U.S. CONST. amend. IV ......................................................................... 27

U.S. CONST. art. I, § 9 ........................................................................... 24

**Statutes**

15 U.S.C. § 78 ....................................................................................... 17

15 U.S.C. § 78b ................................................................................................ 17

15 U.S.C. § 78f .................................................................................................. 6

15 U.S.C. § 78k-1 ..................................................................................... passim

15 U.S.C. § 78o-3 ........................................................................................ 6, 17

15 U.S.C. § 78s .................................................................................................. 6

5 U.S.C. § 705 ............................................................................................ 36, 37

5 U.S.C. § 706 ............................................................................................ 13, 27

**Regulations**

63 Fed. Reg. 12559 (Mar. 13, 1998) ............................................................... 18

66 Fed. Reg. 35836 (June 29, 2001) ................................................................. 8

70 Fed. Reg. 37496 (June 29, 2005) ............................................................... 19

75 Fed. Reg. 32556 (proposed June 8, 2010) ......................................... passim

77 Fed. Reg. 45722 (Aug. 1, 2012) .......................................................... passim

81 Fed. Reg. 84696 (2016) ....................................................................... passim

86 Fed. Reg. 44142 (Aug. 6, 2021) ................................................................ 17

88 Fed. Reg. 62628 (Sep. 12, 2023) .................................................... 11, 13, 16

**Rules**

Fed. R. Civ. P. 65 ..................................................................................... 3, 12, 38

FINRA Rule 6800 ..................................................................................... 10, 36

**Other Authorities**

11A Charles Alan Wright *et al.*,
   FEDERAL PRACTICE AND PROCEDURE (2d ed. 1995) ...................................... 34, 37

Austin Weinstein and Jamie Tarabay,
   *SEC Had a Fraught Cyber Record Before X Account Was Hacked*,
   Bloomberg Law (Jan. 11, 2024) .................................................................. 25

Bjorn N. Jorgensen, *et al.*,
   *The Historical Evolution of Financial Exchanges* (Sept. 2011) ................................. 4

Dale A. Oesterle,
   *Regulation NMS: Has the SEC Exceeded its Congressional Mandate to Facilitate a "National Market System" in Securities Trading?*,
   1 N.Y.U. J. L. & Bus. 613 (2005) .............................................................. 19

Gregg A. Jarrell,
   *Change at the Exchange: The Causes and Effects of Deregulation*,
   27 J.L. & Econ. 273 (1984) ........................................................................... 3

Mihailis E. Diamantis,
   *Privileging Privacy: Confidentiality as a Fourth Amendment Protection*,
   21 U. Pa. J. Const. L. 485 (2018)............................................................................................. 29

## INTRODUCTION AND SUMMARY

This case challenges the Securities and Exchange Commission's (SEC) unlawful "Consolidated Audit Trail," known colloquially as the "CAT." This behemoth is a new mass surveillance program—a database that tracks every stock transaction on every stock exchange in the United States. It collects the name and personally identifiable information of every individual investor. In the words of SEC Commissioner Hester Peirce, it is a "comprehensive surveillance database" that enables SEC "to watch investors' every move in real time."[1]

SEC Chair Gary Gensler called the CAT "unprecedented,"[2] which it indisputably is, because it transforms SEC's relationship with retail investors. For the first 75 years SEC existed, it had no direct relationship with these investors. None. Like any other government actor, it is prohibited from collecting Americans' private information unless it first shows good cause and then complies with procedural safeguards that protect ordinary citizens and respect the Constitution. But SEC no longer bothers with good cause. Instead, it created the CAT program, appointing itself as the direct, real-time overseer of more than 100 million investors. SEC causes the seizure of Americans' personal information and tracks every stock investment. With no evidence of wrongdoing, the SEC then searches this colossal database of trading information for hints that someone, somewhere might have broken the law.

SEC issued the initial CAT Rule in 2012, ordering SROs to design, build, and fund the CAT program. *See* 75 Fed. Reg. 32556 (proposed June 8, 2010). Designing and building this

---

[1] Exh. OO, Stmt. of Hester M. Peirce in Response to Rel. No. 34-88890 (May 15, 2020).
[2] Exh. H, Chair Gary Gensler, Statement on CAT Funding (Sep. 6, 2023), *available at* https://www.sec.gov/news/statement/gensler-statement-cat-funding-090623 (last visited May 24, 2024) (quoting Exh. B, Mary Schapiro, "Opening Statement at SEC Open Meeting: Consolidated Audit Trail," July 11, 2022)).

complex project took years. In 2020, the CAT database began a phased implementation. It now is scheduled to be "fully operational" on May 31, 2024.[3]

The CAT has captured and will continue to capture confidential information belonging to Plaintiffs, who purchase stock through U.S. exchanges. In this motion, Plaintiffs seek a preliminary injunction and a stay that, in sum, stays SEC's initial order that required creation of the CAT; stays the related SEC order that authorized the Financial Industry Regulatory Authority (FINRA) to require broker-dealers to submit information to the CAT database; enjoins SEC, CAT LLC, and FINRA from facilitating the production of any information to the CAT database; and enjoins SEC from accessing any information in the CAT database.

The Court should grant the stay and issue an injunction. To begin, Plaintiffs are likely to succeed on the merits. This memorandum sets out two of the reasons the CAT is unlawful. First, SEC lacked statutory authority to create the CAT. By creating it anyway, SEC violated the Administrative Procedure Act. Second, the CAT violates investors' Fourth Amendment rights. It carries out the kinds of governmental intrusion the Framers feared—except it does so on a scale the Framers could not have imagined. It employs digital technology and cutting-edge data-analysis tools to violate the Fourth Amendment on an unprecedented, industrial scale.

Plaintiffs face irreparable harm if the CAT continues to collect their data, because irreparable harm is established when an agency issues a rule without authority or violates a plaintiff's constitutional rights. Finally, the balance of the equities and public interest tip strongly in Plaintiffs' favor because the public interest is served by ending unlawful agency actions.

---

[3] Exh. W, Kenneth E. Bentsen, Jr. (Pres. and CEO, Securities Industry and Financial Markets Association (SIFMA), *A Safer CAT for Investors* (Apr. 25, 2024), *available at* https://www.sifma.org/resources/news/a-safer-cat-for-investors/#:~:text=Bentsen%2C%20Jr.%20is%20President%20and,in%20municipal%20and%20housing%20finance (last visited May 24, 2024).

The injunction should apply to all Defendants, including CAT LLC. As explained below, CAT LLC is a state actor, and therefore should be bound by the requested preliminary injunction. The Court should also order SEC to direct CAT LLC to cease collecting data and to refrain from accessing such data, as SEC illegally authorized CAT's collection of such information. Finally, pursuant to Fed. R. Civ. P. 65(d)(2), this Court should enjoin FINRA and other entities implementing the CAT from enforcing its rules requiring broker-dealers and others to provide information to the CAT.

## STATEMENT OF FACTS

### 1. In 1975, Congress Passed Deregulatory Legislation Authorizing SEC to "Facilitate" a National System Linking All U.S. Stock Exchanges

In 1934, Congress created SEC to "protect[ing] investors, maintain[ing] fair, orderly, and efficient markets, and to facilitate[ing] capital formation." Exh. QQ, SEC Mission Statement.[4] In 1975, Congress amended the Securities Exchange Act to add the provision that SEC now cites to justify the CAT, § 11A. Securities Acts Amendments of 1975, Pub. L. No. 94-29, § 7, 89 Stat. 97, codified at 15 U.S.C. § 78k-1. *See, e.g.*, 75 Fed. Reg. 32556 (citing § 11A); 88 Fed. Reg 62673 (Sept. 12, 2023) (same). Congress passed the § 11A amendment as "deregulatory legislation," reflecting the broader deregulatory trend of the 1970s.[5] As two leading scholars describe § 11A, it was the product of "a pre-Carter fit of deregulatory zeal." *Id*. (Also discussing the deregulatory purpose of the Securities Acts Amendments of 1975, *see* Gregg A. Jarrell, *Change at the Exchange: The Causes and Effects of Deregulation*, 27 J.L. & Econ. 273 (1984). *See also Bus.*

---

[4] *Available at* https://www.sec.gov/about/mission (last visited May 24, 2024).
[5] Jonathan R. Macey and David D. Haddock, *Shirking at the SEC: The Failure of the National Market System*, 1985 U. Ill. L. Rev. 315, 315, 331 (1985).

*Roundtable v. SEC*, 905 F.2d 406, 416 (D.C. Cir. 1990), which discusses in detail the deregulatory purposes and statutory history of the 1975 Amendments to the Securities Acts.

At the time, Congress's goal in amending the Exchange Act was "to break down the unnecessary regulatory restrictions … which restrain[ed] competition among markets and market makers." Exh. AA, S. Rep. 94-75 at 12–13 (1975), 1975 U.S.C.C.A.N. 179, 191. As the Conference Report explained, the legislation "directed" SEC "to remove existing burdens on competition." Exh. V, H. Conf. Rep. 94-229 at 94 (1975), 1975 U.S.C.C.A.N. 321, 325.

To that end, § 11A "direct[ed]" SEC "to facilitate the establishment of a national market system. ("NMS")" 15 U.S.C. § 78k-1(a)(2). In particular, § 11A permitted the approximately twelve U.S. stock exchanges[6] to link together electronically. *See* 15 U.S.C. § 78k-1(a)(1)(D). It also directed SEC "to carry out" certain "objectives" that Congress specified. *Id*. (a)(2). These objectives focused on linking the stock exchanges, improving their execution of trades, eliminating anti-competitive exchange practices, and enhancing market information flow. Specifically, the objectives sought "to assure" the following:

- the "*economically efficient execution* of securities transactions," 15 U.S.C. § 78k-1(a)(1)(C)(i) (emphasis added);

- "*fair competition* among brokers and dealers" and "among exchange markets," 15 U.S.C. § 78k-1(a)(1)(C)(ii) (emphasis added);

- the "*availability* to "brokers, dealers, and investors *of information* with respect to quotations for and transactions in securities," 15 U.S.C. § 78k-1(a)(1)(C)(iii) (emphasis added);

- the "practicability of brokers *executing* investors' *orders* in the best market," 15 U.S.C. § 78k-1(a)(1)(C)(iv) (emphasis added);

- "an opportunity … for investors' *orders to be executed* without … a dealer," 15 U.S.C. § 78k-1(a)(1)(C)(v) (emphasis added); and

---

[6] *See* Bjorn N. Jorgensen, *et al.*, *The Historical Evolution of Financial Exchanges* at A.1.19 (Sept. 2011), *available at* https://dx.doi.org/10.2139/ssrn.1922250 (last visited May 24, 2024).

4

- "[t]he *linking of all markets … through communication and data processing facilities* [to] foster efficiency, enhance competition, increase the information available to" *the market* and "contribut[ing] to *best execution of orders*," 15 U.S.C. § 78k-1(a)(1)(D) (emphasis added).

To further advance these objectives, § 11A enabled the stock exchanges to collaborate without violating antitrust or other laws: Referring to the exchanges as "self-regulatory organizations" (SROs), § 11A permitted SEC to "authorize or require self-regulatory organizations *to act jointly with respect to* … planning, developing, operating, or regulating a national market system." 15 U.S.C. § 78k-1(a)(3)(B) (emphasis added). Notably, § 11A limited this SEC authority to the "furtherance of" the objectives listed above. 15 U.S.C. § 78k-1(a)(3).

### 2. In 2012, SEC Cited the 1975 Legislation to Justify the CAT, a Surveillance System Enabling SEC to Monitor Every Investor's Stock Transactions

In 2010, 35 years after Congress enacted § 11A, SEC cited it as its primary authority for proposing the CAT. *See* 75 Fed. Reg. 32556. Two years after that, in 2012, SEC issued the final rule (the CAT Rule). Exh. HH, *Consolidated Audit Trail*, Exchange Act Release No. 34-67457 (July 18, 2012) (codified at 17 C.F.R. § 242.613).[7]  The CAT Rule ordered SROs to create—for SEC's use—a national database that records every transaction in the entire national market system. Exh. J, 17 C.F.R. § 242.613(a)(1). This national "consolidated audit trail" would log "every order, cancellation, modification and trade execution for all exchange-listed equities and options across all U.S. markets." Exh. A, SEC Press Rel. 2012-134, SEC Approves New Rule Requiring Consolidated Audit Trail to Monitor and Analyze Trading Activity (July 11, 2012).[8]

---

[7] *Available at* https://www.sec.gov/files/rules/final/2012/34-67457.pdf (last visited May 24, 2024)
[8]  *Available at* https://www.sec.gov/news/press-release/2012-2012-134htm (last visited May 24, 2024).

For decades before SEC created the CAT, various SROs had maintained their own separate, proprietary "audit trails." These were files that recorded certain information about stock transactions, primarily recording the names of stocks traded and the terms of the stock trades. *See* 77 Fed. Reg. 45722, 45727-28, 45727 n.48 (Aug. 1, 2012); 81 Fed. Reg. 84696, 84807 (2016) ("CAT NMS Plan Order") (discussing contents of SRO audit trails). These audit trails did not collect information identifying individual investors. *See* 77 Fed. Reg. 45727-28 & 45727 n.48; 81 Fed. Reg. 84807; Exh. B, Chair Mary L. Schapiro, Opening Statement at SEC Open Meeting: Consolidated Audit Trail (July 11, 2012)[9] ("Schapiro Stmt.") (before the CAT, these audit trails had "never collected … information such as the identity of the customers who originate orders"). The SROs had no reason to collect that information, because they have no authority over individual investors. Their role is to regulate broker-dealers, individual brokers, and other members of the securities industry. *See, e.g.*, 15 U.S.C. §§ 78f(b), 78o-3(b), 78s(g)(1) & (h)(1). If SEC wanted the names of individual investors, it had to request that information from the broker-dealers who served those investors.

SEC did not have direct access to the SRO audit trails, but it could make requests for the data. 77 Fed. Reg. at 45729. SEC could make these requests only for data it needed to conduct enforcement investigations or perform other regulatory oversight. 75 Fed. Reg. at 32558.

The CAT replaced this longstanding system. Unlike the SRO audit trails, the CAT records the name of every *investor* involved in a stock trade, as well as the investor's home address and birth year. *See* Exh. C, Limited Liability Company Agreement of Consolidated Audit Trail, LLC

---

[9] *Available at* https://www.sec.gov/news/statement/2012-07-12-open-meeting-statement-mls (last visited May 24, 2024).

App. D-33-34 (Sep. 6, 2023) (CAT NMS Plan). [10] The CAT combines all this information for more than 100 million investors.[11] It tracks more than 400 *billion* transactions every day.[12] The resulting database is colossal. According to Defendant CAT LLC, "no other comparable system or database of this scale … and complexity exists anywhere in the world." Exh. D, Letter from B. Becker to V. Countryman 8-9 (May 22, 2023).[13]

The CAT provides all this information to SEC in real time. (In practice, that means no later than the next morning.) *See* 81 Fed. Reg. at 84712-13. SEC employs advanced data analytics to search the database for "potential securities law violations," 77 Fed. Reg. at 45727, and, even more broadly, to "identify bad actors who … perform illegal activity." Exh. FF, SEC Rel. No. 34-88393, Order Granting Conditional Exemptive Relief 20 (March 17, 2020).[14] When SEC chooses to do so, it shares this information with the Department of Justice and state prosecutors for their use in criminal prosecutions. Exh. E, *SEC Enforcement Manual* § 5.2.1 (SEC Div. of Enforcement 2017).[15] Commissioner Peirce expressed alarm that SEC has placed such a strong "emphasis" on

---

[10] *Available at* https://www.catnmsplan.com/sites/default/files/2023-09/LLC_Agreement_of_Consolidated_Audit_Trail_LLC-as-of-9.06.23.pdf (last visited May 24, 2024).

[11] *See, e.g.*, Exh. X, Kenneth E. Bentsen, Jr. (Pres. and CEO of Securities Industry and Financial Markets Association), *CAT: Access to Sensitive Personal and Transaction Data Requires Maximum Protection and Accountability*, SIFMA (Nov. 22, 2019), *available at* https://www.sifma.org/resources/news/cat-access-to-sensitive-personal-and-transaction-data-requires-maximum-protection-and-accountability/ (last visited May 24, 2024).

[12] Exh. GG, SEC Rel. No. 34-98290, Joint Industry Plan; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, 201 (Sep. 6, 2023) (citing CAT LLC July 2023 Response Letter at 22), *available at* https://www.sec.gov/files/rules/sro/nms/2023/34-98290.pdf (last visited May 24, 2024)

[13] *Available at* https://www.catnmsplan.com/sites/default/files/2023-06/05.22.23-Exemption-Request-Regarding-FAM-4.pdf (last visited May 22, 2024).

[14] SEC Rel. No. 34-88393, Order Granting Conditional Exemptive Relief (March 17, 2020), *available at* https://www.sec.gov/files/rules/exorders/2020/34-88393.pdf (last visited May 24, 2024)

[15] *Available at* https://www.sec.gov/divisions/enforce/enforcementmanual.pdf (last visited May 24, 2024).

using the CAT system "as an enforcement tool." Exh. F, Commissioner Hester Peirce, Intellectual Siren Song (Sept. 18, 2020).[16]

### 3. The CAT Bypasses Safeguards That Had Prevented SEC from Obtaining Investors' Names and Information Without Establishing Good Cause

SEC receives all this CAT data without following procedures that previously had limited its access to information about individual investors. Before the CAT, the only entities that maintained material amounts of customer-identifying information were broker-dealers, who maintained this information because the investors were their clients. SEC could obtain limited customer-identifying information from the broker-dealers, but only after complying with established procedural requirements. The primary means for SEC to obtain this information was through "blue sheet requests." *See* Exh. E, *SEC Enforcement Manual* § 3.2.2 (citing "[§] 17(a) of the Exchange Act and Rule 17a-25 thereunder"). *See* Exh. K, 17 C.F.R. § 240.17a-25 ("Electronic submission of securities transaction information by exchange members, brokers, and dealers") (cleaned up); *see also* 66 Fed. Reg. 35836, 35836 (June 29, 2001) (Final Rule - Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers) ("For several decades, the Commission requested" information about buyers and sellers of securities through the blue-sheet process).

The *SEC Enforcement Manual* documents the procedures for these requests. In particular, it establishes that SEC must have an articulable basis for investigating possible violations of law. *See* Exh. E, *SEC Enforcement Manual* § 3.2.2 (requiring SEC Staff to identify in advance specific securities and a time frame for each request). These procedures also limit the information SEC can

---

[16] *Available at* https://www.sec.gov/news/speech/peirce-intellectual-siren-song-2020-09-18 (last visited May 24, 2024).

obtain, limiting the scope of the request to the stocks and the time frame that are relevant to the possible violations. *See id.*

SEC bypassed these procedures when it created the CAT. SEC purported to justify this change by criticizing the blue-sheet process as too slow and too limited in scope for SEC's purposes. 77 Fed. Reg. at 45728. It complained that the process is suited only for "narrowly-focused enforcement investigations that generally involve trading in particular securities on particular dates or with specific broker-dealers." *Id.* But SEC did not acknowledge that, by bypassing blue-sheet procedures, it was bypassing the longstanding requirement that it articulate a good-cause, factual predicate for obtaining information about individual investors.

### 4.  SEC Ordered Self-Regulatory Organizations to Build the CAT for It

Although SEC considers the CAT important to its enforcement and other activities, see 77 Fed. Reg. at 45722-23, 45726-27, SEC ultimately outsourced ownership and operations to the SROs, requiring them to provide SEC "unfettered access to the data in the central repository without being its owner." *Id.* at 45775. SEC ordered the SROs to draft and propose what it called a "NMS plan" for "the creation, implementation, and maintenance of a consolidated audit trail and central repository." *See* 77 Fed. Reg. at 45804. *See also* Exh. J, 17 C.F.R. § 242.613(a)(1). The SROs worked on this complex assignment for three years, and in 2015 submitted a proposed plan. Exh. EE, SEC Release No. 73511, Joint Industry Plan (Nov. 3, 2014).[17] SEC approved the plan in 2016. 81 Fed. Reg. 84696 (2016).

This CAT NMS Plan provided for, among many other things, creating a separate entity to own and operate the database. That entity now is CAT LLC, which is owned jointly by FINRA

---

[17]  SEC Release No. 73511, Joint Industry Plan (Nov. 3, 2014), *available at* https://www.sec.gov/files/rules/sro/nms/2014/34-73511.pdf (last visited May 24, 2024) (excerpts).

and 24 exchanges. *See* Exh. LL, SEC Exchange Act Release No. 79318 at 14 (Nov. 15, 2016), 81 Fed. Reg. 84696; *see also* Exh. C, CAT NMS Plan, at Exh. A. According to the CAT NMS Plan, the SROs created CAT LLC to "create, implement, and maintain the CAT and the Central Repository pursuant to" two SEC rules, "SEC Rule 608 ["Regulation NMS"] and SEC Rule 613 [the CAT Rule]." CAT NMS Plan Order, 81 Fed. Reg. at 84944.

SEC has no power to set up a limited liability company to own and operate its regulatory activities, and it further lacks power to order the SROs it regulates to set up such an operation or to approve rules that set up such an LLC. The Exchange Act confers no such power on the Commission, nor does any provision of the Act provide that the Commission may order SROs to set up a limited liability company to effectuate its regulatory initiatives under Rule 613 or any other rule promulgated or approved by the Commission.

The CAT database began a phased implementation in June 2020. *See* Exh. DD, SEC Press Rel. 2020-92. SEC Provides for Phased CAT Broker-Dealer Reporting Timelines with Conditional Exemption for Impacts of COVID-19 (Apr. 20, 2020).[18] FINRA rules require broker-dealers to transmit to the CAT database the detailed customer and trading information identified in the CAT NMS Plan. *See* FINRA Rule 6800 series (Consolidated Audit Trail Compliance Rule). The FINRA rules were approved by SEC orders, which SEC issued under the SEC CAT Rule.[19] The CAT is

---

[18] *Available at* https://www.sec.gov/news/press-release/2020-92 (last visited May 24, 2024).
[19]    Exh. II, SEC Release No. 34-80255 (Mar. 15, 2017), *available at* https://www.sec.gov/files/rules/sro/finra/2017/34-80255.pdf (last visited May 24, 2024); Exh. JJ, Release No. 34-89441 (July 31, 2020), *available at* https://www.sec.gov/files/rules/sro/finra/2020/34-89441.pdf (last visited May 24, 2024); Exh. KK, SEC Release No. 34-90887 (Jan. 11, 2021), *available at* https://www.sec.gov/files/rules/sro/finra/2021/34-90887.pdf (last visited May 24, 2024).

now scheduled to be "fully operational" on May 31, 2024, when FINRA will require compliance with all the final CAT FINRA data reporting procedures.[20]

Since June 2020, Plaintiffs have purchased stocks on United States exchanges, and they plan to continue to do so. Davidson Dec. ¶ 3; Restivo Dec. Dec. ¶ 3; Shepard Dec. ¶ 4.

### 5.   CAT's Total Cost, Outsourced to SROs, Exceeds SEC's Entire Budget

SEC also ordered the SROs and certain brokers to pay the cost of building and operating the CAT. *See* 88 Fed. Reg. 62628 (Sep. 12, 2023). Ultimately, this entire cost falls on investors. In substance, SEC is funding the CAT by having the SROs impose a tax on every share of stock traded on a U.S. exchange. 88 Fed. Reg. at 62628-30 (2023). SEC lacks power to self-appropriate funds from SROs to fund its regulatory operations.

As to the cost of the CAT, estimates remain a moving target, shifting steadily higher since SEC first proposed the program. *See, e.g.*, Exh. CC, SEC Commissioner Mark Uyeda, Statement on Consol. Audit Trail Revised Funding Model (Sept. 6, 2023) (stating that costs have increased "precipitously" since SEC first issued the CAT Rule).[21] SEC's estimates are at least $2.4 billion to design, build, and implement the CAT, followed by annual costs of $1.7 billion to operate it. 81 Fed. Reg. at 84801. SEC also estimates that broker-dealers will incur additional compliance costs of more than $1.5 billion each year, 81 Fed. Reg. at 84860, though the leading trade association for broker-dealers contends this estimate is far too low. *See* Exh. G, Letter from Joseph Corcoran and Ellen Greene, Managing Directors, SIFMA to Vanessa Countryman, Secretary, SEC, at 4-6

---

[20] Exh. W, Kenneth E. Bentsen, Jr. (Pres. and CEO, Securities Industry and Financial Markets Association (SIFMA), *A Safer CAT for Investors* (Apr. 25, 2024), *available at* https://www.sifma.org/resources/news/a-safer-cat-for-investors/#:~:text=Bentsen%2C%20Jr.%20is%20President%20and,in%20municipal%20and%20housing%20finance (last visited May 24, 2024).

[21] *Available at* https://www.sec.gov/news/statement/uyeda-statement-cat-funding-090623 (last visited May 24, 2024).

(June 22, 2022).[22] Even accepting SEC's estimates, these figures indicate annual operating costs of at least $3.2 billion, a figure larger than the total annual budget of SEC itself. That budget was $1.1 billion for fiscal year 2010 (when SEC first proposed the CAT) and is $2.2 billion for fiscal year 2024. *See* Exh. MM, SEC, *Budget History – B[udget]A[uthority] vs. Actual Obligations ($ in 000s)*.[23]

## ARGUMENT

Under Fed. R. Civ. P. 65(a), a preliminary injunction is warranted when a movant shows "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015). For the reasons explained below, all four factors favor Plaintiffs, entitling them to a preliminary injunction.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs have a substantial likelihood of success on the merits, because the CAT program violates the Administrative Procedure Act (APA) (*see* Compl. Count Seven) and the Fourth Amendment (*see* Compl. Count Three). Plaintiffs are likely to prevail on both of these claims, as well as the remaining counts in the Complaint. However, Plaintiffs carry their burden for this motion so long as they are likely to prevail on even one count.

### A. SEC Violated the APA by Acting Without Statutory Authority

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). *See*

---

[22] *Available at* https://www.sec.gov/comments/4-698/4698-20132695-303187.pdf (last accessed May 22, 2024).

[23] *Available at* https://bit.ly/46vwE1D (last visited May 24, 2024).

*also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[An] agency literally has no power to act … unless and until Congress confers power upon it."). An agency that acts without delegated authority violates the APA, which requires courts to "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Because, as detailed below, SEC lacks authority to establish the CAT, SEC violated the APA.

### 1.   Section 11A's Text Rules Out Any Possible Authority for the CAT

**S**EC bears the burden of showing it had legal authority to create the CAT. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); s*ee Inhance Techs., LLC v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) (same). Meeting this burden requires that SEC "point to explicit Congressional authority." *Id. See also Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022) ("As always, we begin with the text.").

Here, SEC concedes that Congress never gave it "express" authorization to create the CAT:

> The Supreme Court's major questions doctrine is not implicated here. … There is no reason to question that Congress would have intended for the Commission to address the serious shortcomings and regulatory obstacles associated with the lack of a consolidated audit trail. And there is therefore no basis for dispensing with ordinary principles of statutory construction to require express authorization for CAT by Congress.

88 Fed. Reg. at 62673. (Responding to Comment raising Major Questions Doctrine.)

Instead, SEC apparently contends it received *implicit* authorization, citing Exchange Act § 11A(a)(3)(B). *See, e.g.*, 75 Fed. Reg. 32556; 88 Fed. Reg. 62673. This is the § 11A subparagraph described in the fact section above which authorizes SEC to "require self-regulatory organizations [SROs] to act jointly with respect to … planning, developing, operating, or regulating a national market system." 15 U.S.C. § 78k-1(a)(3)(B).

### *The Relevant Statutes in Full*

SEC's reliance § 11A(a)(3)(B) is misplaced, however, because it ignores that the authority

13

specified in § 11A(a)(3), of which sub-(B) is one type, is limited by the preamble. To elucidate this point, and for ease of the Court's analysis, the relevant sub-sections of the statute are quoted in full:

First, § 11A(a)(2) provides:

**The Commission is directed**, therefore, having due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets, **to use its authority under this chapter** to facilitate the establishment of a national market system for securities (which may include subsystems for particular types of securities with unique trading characteristics) **in accordance with the findings and to carry out the objectives set forth in paragraph (1) of this subsection**. The Commission, by rule, shall designate the securities or classes of securities qualified for trading in the national market system from among securities other than exempted securities. (Securities or classes of securities so designated hereinafter in this section referred to as "qualified securities".)

15 U.S.C. § 78k-1(a)(2) (emphasis added).

Section § 11A(a)(3)(B) then provides:

**(3)** The Commission **is authorized in furtherance of the directive in paragraph (2)** of this subsection--

**(B)** by rule or order, to authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system (or a subsystem thereof) or one or more facilities thereof; . . .

15 U.S.C. § 78k-1(a)(3)(B).

Thus, the authority SEC has in § 11A(a)(3)(B) to "authorize or require self-regulatory organizations to act jointly," is limited to rules that are "in furtherance of the directive in paragraph (2). And, in turn, Congress's directive in § 11A(a)(2) to SEC is to regulate "in furtherance of" the objectives specified by paragraph (1) of this subsection 11A. 15 U.S.C. § 78k-1(a)(2).

Those objectives, *see* 15 U.S.C. § 78k-1(a)(3)(C), are specific and limited first to assuring:

(C)
(i) economically efficient execution of securities transactions;
(ii) fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets;

14

(iii) the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities;
(iv) the practicability of brokers executing investors' orders in the best market; and;
(v) an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer.

Additionally, 15 U.S.C. § 78k-1(a)(3)(D) provides as an objective:

(D) The linking of all markets for qualified securities through communication and data processing facilities will foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors, facilitate the offsetting of investors' orders, and contribute to best execution of such orders.

None of these purposes or objectives authorizes the CAT—even implicitly.

By listing these permissible objectives, Congress limited the scope of SEC's authority. The D.C. Circuit in *Bus. Roundtable v. SEC*, 905 F.2d 406, 416 (D.C. Cir. 1990), emphasized the limiting function of these objectives, explaining that § 11A "requires" SEC "to use its authority in accordance with the findings and to carry out the objectives" § 11A "set[s] forth." *Id.* at 416 (quoting 15 U.S.C. § 78k-1(a)(2)) (rejecting SEC's claim it had authority to bar SROs from listing stock in corporations that provide for different allocations of voting power among shareholder classes). That court set out a full analysis of § 11A, stating: "Surprisingly, the Commission does not concede a lack of jurisdiction over such issues [not included in the statute.]" *Id.* at 413. After a full review of § 11A and its enactment—exactly what is at issue here—the *Business Roundtable* panel concluded:

Indeed, Congress made clear that the power to regulate central information processing was not intended to give the SEC "either the responsibility or the power to operate as an 'economic czar.'" … To argue that Congress's 'equal regulation' mandate supports SEC control over corporate governance through national listing standards is to gamble that the court will accept a Commission spin on a statutory fragment without even a glance at its context. Wrong court, bad gamble.

905 F.2d at 416 (citation omitted).

15

So, too, this court must reject SEC's roundabout double-negative rationale: "There is no reason to question that Congress would have intended for the Commission to address the serious shortcomings and regulatory obstacles associated with the lack of a consolidated audit trail," 88 Fed. Reg. at 62673, offered in response to comments asserting that such a database was a major question only Congress could decide. And not even Congress can pass legislation that violates the First and Fourth Amendments to the Constitution!

In adopting CAT, SEC failed to identify any § 11A objective CAT would purportedly advance. SEC's silence on this critical point is no surprise—because CAT furthers none of the § 11A objectives. Specifically, the CAT surveillance system has nothing to do with the permissible objectives of "linking" the different exchanges, "the efficient execution of securities transactions," and providing market information "to brokers, dealers, and investors." 15 U.S.C. § 78k-1(a)(1)(C) & (D). Those objectives are categorically different from the goals of CAT. And § 11A's objectives do not remotely permit SEC to collect individual investors' information and scrutinize that collected data to search for possible violations of the law. Nor do the objectives permit SEC to pay for a new surveillance program by creating an outsourced taxing-and-spending system. This silence—the dog that didn't bark—is fatal to the CAT. *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015) (congressional silence does not provide an agency the authority to act).

Nor can SEC avoid these limitations by pointing to the words "act jointly" in the provision authorizing it to "require self-regulatory organizations to act jointly." 15 U.S.C. § 78k-1(a)(3)(B). This same "act jointly" sentence limits SEC's authority to "furtherance of" the same list of objectives just described, thus ruling out a program like the CAT. 15 U.S.C. § 78k-1(a)(3) .

Confirming that conclusion, the subparagraph permitting the SROs to "act jointly" had a specific purpose, which was to empower the SROs—the stock exchanges—to collaborate without

risking antitrust liability. SEC itself has emphasized this purpose. For example, in unrelated litigation with certain exchanges, it asserted that the "act jointly" provision "simply enables joint action that might otherwise raise antitrust concerns." SEC Br. at 5, *Nasdaq Stock Market LLC v. SEC*, No. 21-1167 (D.C. Cir.); *see id*. at 36-37.  Likewise, in its order approving one version of the CAT NMS Plan, SEC explained "act jointly" as follows: "Congress permitted the Commission to authorize SROs to engage in joint action that may otherwise give rise to antitrust concerns." *Joint Industry Plan; Order Approving, as Modified, a National Market System Plan Regarding Consolidated Equity Market Data*, 86 Fed. Reg. 44142, 44158 n.242 (Aug. 6, 2021). As these SEC arguments confirm, the words "act jointly" did not authorize SEC to evade the limitations the specified "objectives" place on its authority.

SEC has claimed authority to establish the CAT based on its general authority to oversee SROs. In its various rulemaking rationales, SEC explained it has overseen SRO audit trails for decades. It then makes a "nothing to see here" argument—contending that the CAT is merely an incremental, organic extension of those old audit trails. *See, e.g*., 75 Fed. Reg. at 32558-61, 32605, 32564 and n.126; 77 Fed. Reg. at  45726-30 (noting SEC's authority to order SROs to enhance their audit trails and to review certain information and describing various "market surveillance" the SROs performed); 81 Fed. Reg. at 84807 (discussing contents of SRO audit trails).

This SEC theory is mistaken, for at least two reasons. First, it fails the threshold legal requirement that SEC identify "specific" authority in a statute. *Inhance Techs.,* 96 F.4th at 893 ("[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions."). SEC string cites several purported sources for its general authority to oversee SROs. *See* 75 Fed. Reg. at 32605 nn.413-415 (citing 15 U.S.C. §§ 78b, 78(f)(b)(1), 78(f)(6), 78s(g)(1), 78(h)(1), 78o–3(b) , 78o–3(b)(2)). But it does not even attempt to identify any language

in these provisions authorizing it to order SROs to collect—for SEC's use—*investor-identifying* information about every trade in the entire market. A reader can scour the text of those statutes set forth for the Court above without finding any authorizing provision from Congress. So, this argument fails as a matter of law.

Second, SEC's "nothing to see here" assertion fails on the undisputed facts. The CAT is not like the pre-CAT SRO audit trails. Most important here, the pre-CAT audit trails did not collect customer-identifying information. *See* 81 Fed. Reg. at 84811-12 (discussing contents of SRO audit trails); *see also* Exh. B, Schapiro Stmt., *supra* at n.8 (stating that before the CAT, these audit trails had "*never* collected" the identity of the investors (emphasis added)). This was because the SRO audit trails had a different purpose from the CAT: The SROs maintained these audit trails to enforce their own rules against their own members, not to enable SEC to conduct enforcement surveillance over the general public. *See, e.g.*, 63 Fed. Reg. 12559, 12560 (Mar. 13, 1998) (adoption of system by FINRA's predecessor to enable that SRO to enforce its own rules).

Likewise, the pre-CAT SRO "market surveillance" programs did not collect investor-identifying information. Those programs scanned information about the performance of stocks, looking for unusual or suspicious activity. *See, e.g.*, 77 Fed. Reg. at 45727-28, 45727 n.48; 81 Fed. Reg. at 84807. They reviewed information such as the trading volume and the prices of various stocks. *Id.* ("SRO market surveillance relies primarily on data from the SRO audit trails"). Market surveillance did *not* involve review of individual investor information—which, as just noted, the SROs did not possess. *Id.*

Again, SEC itself provides support for this conclusion. To show that the audit trails were inadequate for SEC's goals, SEC's rulemaking releases described the many differences between the SRO audit trails and the CAT. *See, e.g.*, 75 Fed. Reg. at 32558-62. In the same vein, two SEC

Chairs attested to these essential differences by touting the CAT as "unprecedented," Exh. H, Gensler stmt., *supra* n.2 (quoting Exh. B, Mary L. Schapiro, *Opening Statements at SEC Open Meeting: Consolidated Audit Trail* (July 1, 2012)). Another Chair did so by proclaiming the CAT represented a "sea change." Exh. I, Mary Jo White, *Chairman's Address at SEC Speaks 2014* (Feb. 21, 2014).[24] And the SROs repeated the same message, declaring the CAT "the first of its kind, both in substance and in scale." 89 Fed. Reg. 10850, 10882 (Feb. 13, 2024). So, the CAT is not merely an incremental, organic adjustment to the prior SRO audit trails, and SEC's general authority to oversee SROs did not provide it authority to create the "unprecedented" CAT program to surveil ordinary investors.

### 2. Pre-CAT History Shows SEC Knew § 11A Did Not Authorize the CAT

SEC's regulatory history confirms it lacked authority to adopt the CAT. Prior to 2010 when it first began exploring the creation of a consolidated audit trail, SEC never sought to collect information on individual investors under the guise of § 11A authority. Rather, the first 35 years after Congress passed § 11A, SEC issued numerous rules relating to the national market system.[25] Those rules were limited to topics such as promoting competition, improving stock trading procedures, and enhancing communications among stock exchanges and market participants. *See, e.g., Regulation NMS*, 70 Fed. Reg. 37496, 37498 (June 29, 2005) (SEC's "comprehensive" revision and consolidation of the rules it had issued under § 11A). The rules contained not a hint about tracking individual investors, much less tracking every investor and trade in the entire national market system. In sum, for the first 35 years after Congress passed § 11A, SEC cannot

---

[24] *Available at* https://www.sec.gov/news/speech/2014-spch022114mjw (last visited May 24, 2024).

[25] For a discussion of rules SEC issued during the first 30 years under § 11A, *see* Dale A. Oesterle, *Regulation NMS: Has the SEC Exceeded its Congressional Mandate to Facilitate a "National Market System" in Securities Trading?*, 1 N.Y.U. J. L. & Bus. 613, 654-55 (2005).

"point to anything … that so much as hints at the existence of [the] 'latent' authority" it now asserts. *Ry. Lab. Exec. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 669 (D.C. Cir. 1994) (en banc).

There is more. SEC's pre-2010 treatment of investor-identifying information affirmatively demonstrates that, until it suddenly proposed the CAT, SEC understood it could not obtain investor information without following required procedures. *West Virginia v. EPA*, 597 U.S. at 725 (previous agency practice indicates agency's understanding it did not have the authority it now is claiming). As recounted above, before SEC created the CAT, it obtained access to investor-identifying information only by complying with the blue-sheet process. SEC's practice over decades of complying with that process contradicts its contention that, all along, it had believed it was authorized to ignore that process and instead seize all investor information in the entire NMS.

SEC chose to bypass the blue-sheet requirements when it announced the CAT. SEC has tried to downplay this change, but it was indisputably momentous. Through this change, SEC suddenly crossed a bright red line that previously had separated the agency from information about individual investors—unless it showed good cause for seeking that information, then respected governing procedural safeguards. Section 11A did not remotely authorize SEC to erase that well-established line.

This history is important, because an agency's longstanding practice of respecting certain limits on its authority provides powerful evidence against the agency's later effort to expand beyond those limits on its own initiative. Justice Frankfurter famously explained this principle: When a court is deciding "the extent of [agency] power conveyed by … statutory language, … the want of assertion of power by [the agency that] presumably would be alert to exercise it, is … significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. at 725 (quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941)).

20

Similarly, in *West Virginia v. EPA*, the Supreme Court gave great weight to the fact that EPA was claiming new authority based on the Clean Air Act—but 45 years after Congress had passed that statute. *Id*. at 722, 725, 728 (rejecting agency's claim of previously unused authority). And in *NFIB v. OSHA*, the Supreme Court found it "telling that OSHA, in its half century of existence, ha[d] never before adopted a … regulation of th[e] kind" for which it then claimed authority. 595 U.S. at 119 (rejecting agency's claim of previously unused authority). To give one more example, the D.C. Circuit held that the National Mediation Board lacked certain authority it was claiming, for the first time, more than 50 years after Congress had enacted the relevant statute. *Ry. Lab. Exec. Ass'n*, 29 F.3d at 659 (stating that "the Board's novel claim of authority is belied by longstanding agency practice").

In fact, SEC's history of respecting the blue-sheet process indicates its awareness that seizing investors' information without following that process violates the Fourth Amendment. Now that SEC is conducting suspicionless seizures, the CAT's assault on privacy violates the Fourth Amendment on an unprecedented scale, as explained below (in section I.B). The CAT's violation of the Constitution provides still more evidence that Congress never authorized SEC to create it. A century ago, Justice Holmes explained this connection when the Supreme Court rejected a Federal Trade Commission (FTC) order that violated the Fourth Amendment. "Anyone who *respects* … the Fourth Amendment would be loath to believe that Congress intended to authorize one of its *subordinate agencies* to" issue an order violating that Amendment. *FTC v. Am. Tobacco Co*., 264 U.S. 298, 305 (1924) (emphasis added) (citation omitted).

### 3. The Supreme Court's "Major Questions" Decisions Further Confirm That Congress Never Authorized the Consolidated Audit Trail's Creation

This series of statutory considerations—text, statutory context, and SEC's pre-2010 understanding of its limited authority—establishes that neither § 11A nor any other statute

21

authorized SEC to create the CAT. That is more than enough to decide the matter. But the "major questions doctrine" points to the same conclusion.

The Supreme Court's "major questions doctrine" jurisprudence teaches that when an agency claims authority of particularly great "breadth" and "economic and political significance," *West Virginia v. EPA*, 597 U.S. at 721, it must establish Congress granted it such authority with clarity: The greater the scope of authority Congress intends to grant, the greater the clarity expected from Congress. *See id.* at 723-24. This expectation follows from "commonsense principles of communication," *Biden v. Nebraska*, 600 U.S. 477, 514 (2023) (Barrett, J., concurring), which teach that Congress would not delegate authority of "economic and political significance" using words that are "cryptic." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *Biden v. Nebraska*, 600 U.S. at 507 (stating that this expectation about congressional clarity follows from "traditional tools of judicial decisionmaking").

These commonsense expectations apply with full force to the CAT. The CAT transforms SEC's role in the national market system by collecting for SEC's review the name and investment activity of every stock-market investor. This change is well beyond "major" because, for the first 75 years it existed, SEC had no direct relationship with investors. It could not obtain investor information without complying with procedures that required good cause. But through the CAT, SEC appointed itself as the direct monitor of more than 100 million investors—from every walk of life, from retired teachers to young families saving for their future. And it ordered SROs to pay for the entire program assuming powers of appropriation vested only in Congress. *See West Virginia v. EPA*, 597 U.S. at 723 (referring to changes that are "major" or "transformative"). The SEC is not the Inquisitor of Investor Transactions—at least not yet!

SEC thus wants to transform a statutory directive to "facilitate the establishment of a national market system for securities," 15 U.S.C. § 78k-1(a)(2), into a license to create a mass surveillance regime over private actors who are not otherwise subject to direct contact with a securities regulator. This paradigm shift constitutes a "'fundamental revision of the statute, changing it from [one sort of] scheme of … regulation' into an entirely different kind." *West Virginia v. EPA*, 597 U.S. at 728  (citation omitted; bracket in original).

This change easily triggers the heightened expectations of clarity identified in the "major questions" cases. The breadth of the CAT's impact eclipses, for example, the scope of the Centers for Disease Control's eviction moratorium, where the Supreme Court emphasized the "sheer scope" of an agency order that could place between 6 and 17 million citizens at risk of eviction. *Ala. Ass'n of Realtors v. HHS,* 141 S. Ct. 2485, 2489 (2021) (rejecting CDC's claim of statutory authority).

The costs to build and operate the CAT are also indisputably "significant." *West Virginia v. EPA*, 597 U.S. at 721 (stating that where costs are "economically and politically significant," the agency's assertion of authority provides a "reason to hesitate before concluding that Congress meant to confer such authority") (cleaned up). Each element of the CAT's cost is substantial: the estimated $2.4 billion to establish it, the estimated $1.7 billion per year to operate it, and the estimated compliance costs of an additional $1.5 billion or more each year. 81 Fed. Reg. at 84801, 84860. Plus, the entire program exceeds the agency's budget!

The Supreme Court has consistently found similar or lower costs sufficient to require an agency to provide clear evidence of Congress's intent. For example, OSHA's Covid vaccine mandate would have imposed compliance costs of approximately $3 billion, *NFIB v. OSHA*, 595 U.S. at 120; *see also BST Holdings, LLC  v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (referring to

"nearly $3 billion" in compliance costs); and the EPA's emissions requirements the Supreme Court addressed in *West Virginia v. EPA* would have imposed compliance costs of $5 billion to $8 billion, 597 U.S. at 774 n.6 (Kagan, J., dissenting); *see also id.* at 714 (addressing compliance costs). In both cases, the Supreme Court held such significant costs required a clear Congressional grant of authority for the agencies to promulgate the relevant regulations—and because there was no clear delegation of authority, the Court struck the regulations.

The CAT's costs are even more substantial, but they also have independent constitutional significance because SEC completely bypassed Congress's control of the appropriations process. U.S. CONST. art. I, § 9 (stating that Congress possesses sole power over appropriations). As described above, SEC is not paying for the CAT by seeking an appropriation from Congress but instead ordered SROs under their regulatory thumb to raise the money to fund it. In effect, SEC has created for itself an outsourced investor-surveillance program comparable in size to the agency's entire $2.4 billion Congressionally approved budget. This approach collides with the Supreme Court's reminder in *Biden v. Nebraska* that "among Congress's most important authorities is its control of the purse," so that significant financial decisions further reinforce the need for clear congressional authorization." 600 U.S. at 505-06  (cleaned up). SEC's effort to sidestep the Constitution's appropriations process makes it even less likely that, when Congress passed § 11A, it authorized the CAT.

The changes SEC wrought through the CAT also are "political[ly] significan[t]," *West Virginia v. EPA*, 597 U.S. at 721, to say the least. Surely it is a politically significant question whether SEC can appoint itself the direct monitor of more than 100 million Americans. The damage this change inflicted on investors' privacy has triggered years of controversy. SEC Commissioner Peirce, for example, has warned about "the significant costs that a comprehensive

24

surveillance tool of this type presents to Americans' liberty and privacy." Exh. OO, Stmt. of Hester M. Peirce in Response to Release No. 34-88890 (May 15, 2020).[26]

Also controversial, the CAT forces investors to endure increased risks from cyberhackers. SEC's own EDGAR database already has been hacked, causing losses to investors. *See* Exh. BB, SEC Chair Jay Clayton, Statement on Cybersecurity (Sept. 20, 2017).[27] Earlier this year SEC Chair Gensler's X (Twitter) account was breached and misused, causing more losses to investors. *See, e.g.*, Austin Weinstein and Jamie Tarabay, *SEC Had a Fraught Cyber Record Before X Account Was Hacked*, Bloomberg Law (Jan. 11, 2024).[28]

These risks have triggered objections by critics ranging from the American Civil Liberties Union to securities industry groups.[29] The issue has also triggered a flurry of activity in Congress. Hearings have investigated the damage CAT is doing to investor privacy and the cybersecurity of investors' data;[30] senators have complained to the SEC Chair about cybersecurity risks;[31]

---

[26] *Available at* https://www.sec.gov/news/public-statement/peirce-statement-response-release-34-88890-051520 (last visited May 24, 2024).

[27] *Available at* https://www.sec.gov/news/public-statement/peirce-statement-response-release-34-88890-051520 (last visited May 24, 2024).

[28] *Available at* https://www.bloomberg.com/news/articles/2024-01-11/sec-had-a-fraught-cyber-record-long-before-x-account-was-hacked (last visited May 24, 2024).

[29] Exh. Y, Letter from ACLU to SEC (Dec. 16, 2019), *available at* https://www.aclu.org/documents/aclu-letter-sec-consolidated-audit-trail (last visited May 24, 2024); Exh. NN, SIFMA Letter to Ms. Vanessa Countryman on CAT Data Security Questions (Jun. 4, 2020), *available at* https://www.sifma.org/wp-content/uploads/2020/06/SIFMA-Letter-on-March-17-2020-CAT-Cybersecurity-Questions.pdf (last visited May 24, 2024).

[30] *See, e.g.*, Exh. N, Implementation and Cybersecurity Protocols of the Consolidated Audit Trail, Hearing before the U.S. H.R. Comm. on Fin. Servs. (Nov. 30, 2017),*available at* https://www.govinfo.gov/content/pkg/CHRG-115hhrg31288/pdf/CHRG-115hhrg31288.pdf (last visited May 22, 2024); Exh. O, Data Security: Vulnerabilities and Opportunities for Improvement: Hearing before the Subcomm. on Fin. Institutions and Consumer Credit of the H. Comm. on Fin. Srvs. 115th Cong. (Nov. 1, 2017), *available at* https://financialservices.house.gov/uploadedfiles/115-52.pdf (last visited May 24, 2024).

[31] *See* Exh. Z, Letter from Sen. Kennedy, *et. al*., to SEC Chair (July 24, 2019), *available at* https://www.kennedy.senate.gov/public/_cache/files/a/a/aa9c1d31-12e9-41e0-8f77-

legislation to protect investors' privacy has been proposed in the Senate and the House of Representatives;[32] and 22 senators have filed a litigation brief (in litigation between SROs and broker dealers over how they will divide the costs of the CAT) objecting to the entire CAT program.[33] Likewise, 23 states have filed a brief in the same litigation objecting to the entire program.[34] In sum, by every relevant consideration, the CAT Rule triggers the "major questions" expectation—that Congress would have spoken clearly if, in 1975, it had intended to grant SEC the major expansion in authority that SEC claimed when it issued the CAT Rule. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress … does not … hide elephants in mouseholes.").

The Supreme Court has recently applied the major-questions approach to strike down a series of agency actions for lack of the required statutory authority. In just the last three years, the Court has rejected a nationwide eviction moratorium the Centers for Disease Control and Prevention issued based on Covid-19 concerns, *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. at 2490; held that OSHA likely lacked authority to impose a vaccine mandate on large employers, *NFIB v.*

---

29e0404d4a13/A822E08E203D7481239ED084DE86BAEC.letter-to-sec-on-pii-on-cat-002-.pdf (last visited May 24, 2024).; Exh. P, Protecting Investors' Personally Identifiable Information Act, S. 2230, 118th Cong. (2023), *available at* https://www.congress.gov/118/bills/s2230/BILLS-118s2230is.pdf (last visited May 24, 2024)

[32] *See, e.g.*, Exh. P, S. 2230, *supra* n.31; Exh. Q, Protecting Investors' Personally Identifiable Information Act, H.R. 4551, 118th Cong. (2023), *available at* https://www.congress.gov/118/bills/hr4551/BILLS-118hr4551ih.pdf (last visited May 22, 2024); Exh. R, Protecting Investors' Personally Identifiable Information Act, H.R. 2039, 117th Cong. (2021), *available at* https://www.congress.gov/117/bills/hr2039/BILLS-117hr2039ih.pdf (last visited May 24, 2024); Exh. S, American Customer Information Protection Act, H.R. 4785, 115th Cong. (2018), *available at* https://www.congress.gov/115/bills/hr4785/BILLS-115hr4785ih.pdf (last visited May 24, 2024)

[33] Brief of Senator Tom Cotton And 21 Other Members of Congress As Amici Curiae In Support Of Petitioners, *Am.. Secs. Ass'n, v. SEC*, No. 23-13396 (11th Cir.) (filed Feb. 15, 2024).

[34] Brief of Arkansas and 22 Other States as Amici Curiae In Support Of Petitioners, *Am. Secs. Ass'n, v. SEC*, No. 23-13396 (11th Cir.) (filed Feb. 15, 2024).

*OSHA*, 595 U.S. at 119-20 (2022); vacated Environmental Protection Agency emissions rules designed to force power plants to transition away from coal, *West Virginia v. EPA*, 597 U.S. at 729-30; and struck down a Department of Education program forgiving certain student loans and transferring that debt obligation to taxpayers, *Biden v. Nebraska*, 600 U.S. at 505-07.

This Court should do the same here. To say the least, when Congress passed Exchange Act § 11A or authorized SEC to oversee SROs, it did not "speak clearly," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), to say it was authorizing an SEC-surveillance program tracking ordinary investors. To the contrary: Every one of the statutory-construction factors points in the opposite direction, separately and together establishing that Congress did not authorize SEC to create the CAT. Because SEC has acted "contrary to constitutional right, power, privilege, or immunity and in excess of statutory jurisdiction, authority or limitations or short of statutory right," 5 U.S.C. § 706, Plaintiffs have a strong likelihood of prevailing on the merits of their APA claim.

## B.  The CAT Rule Violates the Fourth Amendment

Plaintiffs are also likely to prevail on their Fourth Amendment claim. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[] against unreasonable searches and seizures." U.S. CONST. amend. IV. In promulgating the CAT Rule, SEC ordered the collection of investors' records, which is a seizure under the Fourth Amendment. SEC's later review of those records constitutes a search. The seizures and searches are "unreasonable" because they were not supported by a warrant—or even a reasonable suspicion of wrongdoing—and do not satisfy a recognized exception to the warrant requirement.

### 1.  The CAT's Collection of Investors' Information Is a Search and Seizure

A Fourth Amendment "search" occurs whenever the government intrudes on a person's "papers," "effects," or other property to gather information, or it violates that person's "reasonable

expectation of privacy." *United States v. Jones*, 565 U.S. 400, 405-06 (2012) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).

The Supreme Court recognizes that the Fourth Amendment has long protected "effects" and confidential financial "papers." For example, it found financial "papers" to be protected in *American Tobacco*, 264 U.S. at 305–06, and *Boyd v. United States*, 116 U.S. 616 (1886). It has applied these categories to information in digital format, as it did in *Riley v. California*, 573 U.S. 373, 399, 401 (2014), which referred to "digital files" stored on a smartphone as "private effects." (Second quotation quoting *Arizona v. Gant*, 446 U.S. 332, 345 (2009)). Other courts have similarly recognized email as "papers" or "effects" within the meaning of the Fourth Amendment. *See*, *e.g.*, *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016); *United States v. Warshak*, 631 F.3d 266, 274 (6th Cir. 2010).

The Supreme Court has also protected confidential business data as property. For example, in *Carpenter v. United States*, 484 U.S. 19 (1987), the Court held that defendants' misappropriation of financial information possessed by *The Wall Street Journal* deprived it of "money or property" for purposes of the mail and wire fraud statutes. *Id*. at 25-26. *See also Ruckelshaus v. Monsanto*, 467 U.S. 986, 1003-04 (1984) (recognizing confidential business data as property protected by the Takings Clause); *Resol. Tr. Corp. v. Walde*, 18 F.3d 943, 949 (D.C. Cir. 1994) (holding the Fourth Amendment's privacy interest required the court to interpret the statute at issue as prohibiting the agency from inspecting personal financial records absent articulable suspicion of wrongdoing).

The Fourth Amendment also protects electronic personal data where the person at issue has a reasonable expectation of privacy. *Katz*, 389 U.S. at 360 (Harlan, J., concurring). Thus, the Supreme Court recently held that the Fourth Amendment protects cell phone records of a person's physical movements, and therefore that the government's acquisition of those digital records to

open an "intimate window into a person's life" amounted to a search. *Carpenter v. United States*, 585 U.S. 296, 310 (2018). *See also* Mihailis E. Diamantis, *Privileging Privacy: Confidentiality as a Fourth Amendment Protection*, 21 U. Pa. J. Const. L. 485, 494 (2018) (footnote omitted) (summarizing authorities and noting the "widespread recognition in the law that people have privacy interests in their financial information").

Plaintiffs likewise have a reasonable expectation of privacy in their financial information and personal identifying information. They reasonably expected their brokers would maintain the confidentiality of their information, absent the government obtaining a warrant, subpoena, or other legal process. Davidson Dec. ¶3;  Restivo Dec. ¶4; Shepard Dec. ¶4.[35]

### 2.  The Searches and Seizures Violate the Fourth Amendment

The Fourth Amendment requires searches and seizures to be "reasonable." *Carpenter v. United States*, 585 U.S. at 317. Yet, SEC's extensive history of regulatory releases on the CAT completely ignores the question of "reasonableness." Instead, SEC has purported to justify the CAT's searches and seizures by complaining that the procedural requirements limiting its access to investor information impeded its law-enforcement and other regulatory goals. *See, e.g.*, 77 Fed. Reg. at 45727-28 (2012) (explaining SEC's view that the CAT is justified because of the procedural hurdles in SEC "blue-sheet" process); 75 Fed. Reg. at 32557-58 (2010) (same). Its rulemaking releases state repeatedly that possessing a database that logs information about every

___
[35] The "third-party" doctrine, articulated in 1976 in *United States v. Miller*, 425 U.S. 435, 443 (1976), is not relevant here. The doctrine does not apply at all where a *property*-based search has occurred. *Florida v. Jardines*, 569 U.S. 1, 11 (2013). Nor does it extend to "expectation of privacy" cases that involve "detailed and comprehensive" collections of digital data. *Carpenter*, 585 U.S. at 309-10 (holding that the third-party doctrine does not extend to data reflecting one person's cell-phone location history). *See also United States v. Jones*, 565 U.S. 400, 417 (2012) (Sotomayor, J., concurring) (the third-party doctrine "is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks").

investor in the entire NMS enhances SEC's "efficiency," *see*, *e.g.*, 77 Fed. Reg. 45722, *passim*; 75 Fed. Reg. 32557, 32557, *passim*. And, as also noted above, SEC is applying advanced data-analysis tools to search the CAT for evidence of "potential securities law violations," 77 Fed. Reg. at 45727.

But SEC's impatience with legally required procedures does not excuse it from the requirements of the Fourth Amendment. Of course, required constitutional procedures can be inconvenient for the government. That is the point. No doubt, law enforcement would be more efficient if SEC could simply vacuum up every transaction in the entire marketplace, then search the database for leads by using advanced data analytics. The problem with SEC's rationale is that administrative efficiency in search of possible violations is not an exception to the Fourth Amendment's warrant requirement.

Government actors have long advanced this "efficiency" excuse for violating the Fourth Amendment. For just as long, courts have rejected it. *See Chandler v. Miller*, 520 U.S. 305, 323 (1997) (law-enforcement efficiency does not excuse the failure to get a warrant, because "the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged"). A full century ago, Justice Holmes applied this principle to a federal agency—the FTC—when that agency attempted to ignore the Fourth Amendment and search private materials for possible violations of the law. *FTC v. Am. Tobacco Co*., 264 U.S. at 305-06. He warned against agencies that seek to ignore the Fourth Amendment and thus "sweep all our traditions into the fire … to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime." *Id*. (citation omitted).

The CAT systematizes just this kind of unlawful dragnet fishing expedition—except now on an oceanic scale made possible by recent advances in digital and analytics technology. These

30

technologies enable SEC to conduct a continuous dragnet of suspicionless searches, vacuuming up vast amounts of private information from more than 100 million citizens. With its automated searches and seizures, SEC is committing the broadest-ever violation of the Fourth Amendment.

SEC compounds the egregiousness of its record-breaking violation by making the improperly seized information broadly available outside the agency. At its discretion, SEC discloses this information to prosecutors at the Department of Justice and in the states. Exh. E, *SEC Enforcement Manual* § 5.2.1. And the CAT system automatically provides all information in the database to FINRA and more than 20 stock exchanges. *See, e.g.*, Exh. C, CAT NMS Plan § 3.1; Exh. A; App. D, § 8.1. This means that every one of the more than 20 stock exchanges has access to personal information identifying every investor who invests through any one of the other exchanges. It also means that CAT makes this private information available to more than 3,000 regulators and non-governmental contractors spread across SEC and more than 20 other organizations. These people include staff at SEC, FINRA, and more than 20 equity exchanges and trading venues. *See id.*. It also means that more than 3,000 people, at SEC, FINRA, and the exchanges have access to this information.

Still worse, the CAT exposes investors' private information to broader disclosure through theft by cyberhackers—an event knowledgeable commenters consider inevitable. [36] The risks cyberhacking imposes on investors could hardly be more serious. Cyberhackers not only can disclose investors' private information to the world at large, they can steal investors' portfolios

---

[36] *See, e.g.*, Exh. T, Letter from Christopher A. Iacovella, Chief Executive Officer, American Securities Association, to Vanessa Countryman, Secretary 1-2 (Jan. 29, 2021), *available at* https://d1d329da-dbb0-4cc9-b461-d7bd4ad09b4e.usrfiles.com/ugd/d1d329_edad42e865154f2fa50b72b0b5584fc8.pdf (last visited May 24, 2024); Exh. U, Letter from eight Attorneys General to Congress 4-5 (Aug. 15, 2023), *available at* https://arkansasag.gov/wp-content/uploads/2023-08-15-Arkansas-AG-Letter-Supporting-Investor-PII-Protections.pdf (last visited May 24, 2024).

outright. *See also* Exh. Z, Letter from Sen. Kennedy, *et. al.*, to SEC Chair (July 24, 2019) ("Chinese hackers could use this information to … steal entire portfolios and sell them on the dark web.").[37] For many investors, these portfolios represent much or all their life savings. Where Americans and American entities, like Erik Davidson, John Restivo ("Individual Plaintiffs"), and NCPPR, invest in the securities markets, they do not "voluntarily 'assume[] the risk'" that SEC will "turn[] over" the details of their personal investment activity for review by SEC. *Carpenter*, 586 U.S. at 315 (first alteration in original) (quoting *Smith v. Maryland*, 442 U.S. 735, 745 (1979)).

Concern about government intrusions, though intrusions less severe than the one the CAT unleashes, motivated the Framers to adopt the Fourth Amendment. As the Supreme Court explained, "the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). That is why "a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 585 U.S. at 305 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). The Framers could not, however, have anticipated the far more serious danger presented by the CAT. The relatively modest, retail-level surveillance that alarmed the Framers was trivial in scale compared with this massive, automated surveillance program.

In *Boyd v. United States*, 116 U.S. at 635, the Supreme Court held that the Fourth Amendment prohibited the seizure of private financial records, and counseled that "[i]t is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy

---

[37] *Available at* https://www.kennedy.senate.gov/public/_cache/files/a/a/aa9c1d31-12e9-41e0-8f77-29e0404d4a13/A822E08E203D7481239ED084DE86BAEC.letter-to-sec-on-pii-on-cat-002-.pdf (last visited May 24, 2024).

encroachments thereon." *Id*. at 635. The CAT program's encroachment on Plaintiffs' Fourth Amendment rights is "stealthy," both because SEC created it through an unlawful administrative power grab and because SEC acted through the cat's paw of the SROs over many years in a process that was utterly opaque to the public. But this makes the CAT all the more dangerous. The CAT inflicts a Fourth Amendment injury worse than in *Riley*, which involved a single cell phone, 573 U.S. at 378, and worse than in *Carpenter*, which involved one person's cell-site location information, 585 U.S. at 301. The CAT violates the Fourth Amendment rights of more than 100 million Americans. It seizes their private information for SEC's use; combines this private information to create "the single largest government database targeting the private activities of American citizens." *See* Exh. PP, William P. Barr, *The SEC is Watching You*, Wall St. J. (April 15, 2024)[38]; then searches the information using powerful, advanced analytical techniques. Against that background, Plaintiffs are more than likely to succeed on the merits of their Fourth Amendment claim.

## II. PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Plaintiffs also meet the requirement they are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). First, they will suffer irreparable harm because, absent preliminary relief from this Court, they will continue to be subjected to a surveillance regime that SEC established without legal authority. Parties who are subjected to such an unlawful rule suffer irreparable harm. *Louisiana v. Horseracing Integrity & Safety Auth., Inc*., 617 F.Supp.3d 478, 500 (2022); *see also Nat'l Ass'n for Gun Rts., Inc.*, 2023 WL 6613080, at *18 (N.D. Tex. Oct. 7, 2023) (finding irreparable non-

---

[38]    *Available at* https://www.wsj.com/articles/the-securities-and-exchange-commission-is-watching-you-surveillance-4e782f82 (last visited May 24, 2024).

economic harm because, among other things, plaintiffs would be subject to a rule that violates the APA).

Second, Plaintiffs will suffer irreparable harm because the CAT violates their *constitutional* rights. The deprivation of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Accordingly, "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995)) (internal quotation marks omitted).

Third and finally, although Plaintiffs need not show irreparable financial harm, absent an injunction they will suffer irreparable harm in the form of the increased costs of the CAT program. "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (citing *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). Although the dollar amount of the harm to Plaintiffs remains uncertain—largely because of the CAT program's still-evolving nature—it is established that the CAT program has imposed and will continue to impose additional costs on stock investors, including Plaintiffs. *See supra* at 10-11. Plaintiffs need not show the amount is material, however, because "in determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'" *Rest. L. Ctr.*, 66 F.4th at 597 (quoting *Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016)). Plaintiffs will not be able to recover these costs from SEC, so they constitute additional irreparable harm.

Moreover, quantification of costs is irrelevant given Defendants' sovereign immunity. Where costs are not recoverable because the government-defendant enjoys sovereign immunity

from monetary damages, irreparable harm is generally satisfied. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). That is because the only possible relief is for the Court to order an end to the illegal and unconstitutional CAT—which is precisely what the Plaintiffs seek.

## III.    THE BALANCE OF EQUITIES WEIGHS IN PLAINTIFFS' FAVOR

The balance of harms and the public interest also favor an injunction. These two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). SEC's side of this balance-of-harms has a weight of zero, as does any SEC claim to serve the public interest, because "neither [the government] nor the public has any interest in enforcing a regulation that violates federal law.'" *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 235 (5th Cir. 2023); *see also Accord Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) ("There is generally no public interest in the perpetuation of unlawful agency action."). On the other hand, Plaintiffs' side of the scale has considerable weight, because there is an important public interest "in having governmental agencies abide by the federal laws that govern their existence and operations," *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (per curiam) (quotation omitted), to say nothing of the Constitution.

"In this regard, the government/public-interest analysis collapses with the merits." *All. for Hippocratic Med.*, 78 F.4th at 251. That is, once Plaintiffs have established a likelihood of success on the merits—as Plaintiffs did in section I above—the remaining preliminary injunction "factors are presumed and weigh in favor of an injunction." *See Elrod v. Burns,* 427 U.S. at 373 (1976); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). As the Supreme Court has observed, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. at 2490. Further, the injunction and stay

relate to a program that is not even fully in operation by the SEC's own admission.

Beyond the need to stop the unconstitutional and *ultra vires* invasion of Plaintiffs' privacy, financial considerations also favor the Plaintiffs. Halting the hemorrhaging of billions of dollars in unauthorized expenditure that has served as an unlegislated tax and deadweight cost on Americans who invest in the market to maximize returns serves both the Plaintiffs and the public interest. Any minor costs SEC incurs to comply with a stay and preliminary injunction are dwarfed by the malfeasance involved in the continuation of this costly and illegal scheme.

## IV.    THE COURT SHOULD ISSUE A STAY AND AN INJUNCTION

### A.  The Court Should Issue a Stay Under 5 U.S.C. § 705

SEC has created and adopted the CAT through a Rule effectuated through a series of orders. *See* Exh. HH, CAT Rule, Exchange Act Release No. 34-67457 (July 18, 2012); SEC Release No. 34-80255 (Mar. 15, 2017) (approving FINRA CAT-compliance rules that require broker-dealers to transmit information to the CAT); FINRA Rule 6800 Series ("Consolidated Audit Trail Compliance Rule")[39]; Exh. II, SEC Release No. 34-80255 (citing Exh. J, 17 C.F.R. § 242.613 ("Consolidated audit trail") and Exh. L, 17 C.F.R. § 242.608 ("National market system")). However, as detailed above, SEC lacks any authority to issue rules or otherwise regulate concerning the CAT and SEC violates the Fourth Amendment in doing so. Accordingly, this Court should stay SEC CAT Rules, including Exh. II, SEC Release No. 34-80255 and Exh. HH, Release No. 34-67457.

The interim remedy of a stay is authorized by 5 U.S.C. § 705. *See, e.g.*, *Texas v. EPA*, 829 F.3d at 435 ("We have the power *to stay* the agency's action 'to the extent necessary to prevent

---

[39] *Available at* https://www.finra.org/rules-guidance/rulebooks/finra-rules/6800 (last visited May 24, 2024).

irreparable injury[.]'" (quoting 5 U.S.C. § 705) (emphasis added) (alteration in original)); *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (Section 705 "authorizes reviewing courts to stay agency action pending judicial review." (emphasis added)). And a stay is warranted here because "[m]otions to stay agency action pursuant to [Section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief," namely the preliminary injunction factors. *Id.*; *see also Texas v. EPA*, 829 F.3d at 435 (applying preliminary injunction factors). Here, as detailed above, Plaintiffs satisfy all four factors. *See supra* Section I.

Under Section 705, courts—including the Supreme Court—routinely stay already-effective agency action.. *See, e.g., West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem. op.); *BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130; *Texas v. EPA*, 829 F.3d 405. A federal court has broad power to "issue all necessary and appropriate process to postpone the effective date of an agency action *or to preserve status or rights pending conclusion of the review proceedings*." 5 U.S.C. § 705 (emphasis added). Here, the "status quo" to be restored is "the last peaceable uncontested status existing between the parties before the dispute developed." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 11A FEDERAL PRACTICE & PROCEDURE § 2948 (3d ed. 2013) (cleaned up); *see also Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (stating relevant status quo is "status quo absent the unlawful agency action"); *Wages & White Lion Invs.*, 16 F.4th at 1144. This is because "agencies are creatures of statute" and, thus, "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. at 117.

**B. The Court Should Also Enjoin Defendants, and the Injunction Should Apply to CAT LLC and Third Parties Implementing the CAT**

Plaintiffs also seek a preliminary injunction to preserve the court's ability to effectuate necessary relief on the merits. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Because defendants have placed both implementation and enforcement in the hands of third parties, the court should also order affirmative measures to effectuate and "preserve the court's ability to render a meaningful decision on the merits." *Id.* This means that a specific injunction under Rule 65 should enter, and that pursuant to Rule 65(d)(2)(C), that injunction should bind all "other persons who are in active concert or participation with," Rule 65(d)(2)(C)., "the parties," and/or "the parties' officers, agents, servants, employees and attorneys." *Id.* (d)(2)(A) and (B). As set out in detail in the accompanying Proposed Order, the injunction should require SEC to inform FINRA that SEC's approval of the FINRA Rule 6800 Series has been stayed, with that stay rendering FINRA Rule 6800 Series unapproved, pending resolution by this Court; should require all Defendants to safeguard any information collected by CAT LLC, or received from CAT LLC; and should require all Defendants to refrain from accessing any information possessed by or received from CAT LLC.

The injunction should bind CAT LLC in addition to the other defendants, for multiple reasons. It should be bound—and would be bound even if it were not a party—because it is acting as an "agent" of SEC and in "active concert" with it. Fed. R. Civ. P. 65(d)(2) (injunction order can bind the parties' agents and persons in active concert); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) (explaining that Fed. R. Civ. P. 65(d) ensures "that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding").

Indeed, SEC controls CAT LLC so closely that CAT LLC is indisputably a state actor. A private entity is treated as a state actor "when the government compels the private entity to take a particular action, … or … when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (internal citations omitted). *See also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'") (cleaned up).

CAT LLC has accepted and maintained information in the CAT database solely because SEC "compel[led]" CAT LLC's owners—the SROs—to create the CAT program and operate the CAT database. Moreover, SEC has acted jointly with CAT LLC and the SROs to create and carry out the CAT program. SEC Rule 613 required the SROs to create the entire CAT program. *See, e.g.*, Exh. J, 17 C.F.R. § 242.613(a)(1) (stating that the SROs "shall" submit a plan to create the CAT). Rule 613 requires the SROs to create and maintain the central repository that CAT LLC controls and maintains. *See, e.g.*, Exh. J, 17 C.F.R. § 242.613(e)(1) (stating that the SROs "shall provide for the creation and maintenance of a central repository" as defined in the Rule). The Rule mandates that the SROs make this database available to SEC.

The SROs under orders of the SEC created CAT LLC to comply with these mandates.[40] The SROs submitted the CAT LLC limited liability agreement ("Limited Liability Company Agreement of CAT NMS, LLC") to SEC as part of the initial CAT Plan ("CAT NMS Plan"). That

---

[40] *See* Exh. LL, Exchange Act Release No. 79318 at 14 (Nov. 15, 2016), 81 Fed. Reg. 84696 (Nov. 23, 2016), *available at* https://www.sec.gov/rules/sro/nms/2016/34-79318.pdf (last visited May 24, 2024). Likewise, the "Recitals" in the CAT NMS Plan state that the LLC Agreement "serves as the National Market System Plan required by SEC Rule 613." Exh. C, CAT NMS Plan at 1.

initial CAT Plan expressly stated that the SROs created CAT LLC to comply with SEC Rule 613. Exh. C, CAT NMS Plan at 1. It also stated that the purpose of CAT LLC is to "create, implement, and maintain the CAT and the Central Repository pursuant to SEC Rule 608 and SEC Rule 613." *Id*. at 1. Specifically, to comply with the "SEC Rule 613(a) require[ment] to discuss various 'considerations' related to how the [SROs] propose to implement the requirements of the CAT NMS Plan," the CAT NMS Plan contained a 132-page "Discussion." Exh. C, CAT NMS Plan at App. C-1-C-132. That discussion explained the Central Repository maintained by CAT LLC was being created to comply with an SEC mandate that "each national securities exchange and its members must report to the Central Repository the information required by SEC Rule 613(c)(7)." *Id*. at C-4-C-5. The CAT Plan further acknowledged that CAT LLC would provide all collected information to SEC as required by Rule 613. *See*, *e.g.*, *id*. at C-15. SEC approved that initial CAT NMS Plan on November 15, 2016. *Id*.

Not only did SEC "compel[]" the creation of CAT LLC, *Halleck*, 139 S. Ct. at 1928, it has acted jointly with CAT LLC and its owners by closely managing the entire process, and now micromanaging the CAT's operations and requiring government access to all its data. SEC's webpage of SEC releases overseeing the CAT lists no fewer than 63 SEC releases discussing the CAT. Exh. M, SEC Rule 613 (Consolidated Audit Trail) Releases.[41]

Because CAT LLC exists solely to perform functions compelled by SEC, and it performs those functions jointly with SEC for SEC's benefit, it is a state actor and an agent of SEC. *Halleck*, 139 S. Ct. at 1928. A clearer case of state action can hardly be imagined. Accordingly, the stay and preliminary injunction should apply to CAT LLC, as well as the other Defendants.

FINRA and other SROs should also be enjoined from enforcing the FINRA Rule 6800

---

[41] *Available at* https://www.sec.gov/divisions/marketreg/rule613-info (last visited May 24, 2024).

Series, "Consolidated Audit Trail Compliance Rule," because SEC lacked the authority to approve

the CAT Rule and because FINRA and the other SRO exchanges are "in active concert" with SEC

and/or CAT LLC.

## CONCLUSION

For the reasons detailed above, the Court should grant the motion for a stay and preliminary

injunction. A proposed Order accompanies this motion.


Respectfully submitted,


<table>
<tr><td></td><td><u>/s/ Margaret A. Little</u></td></tr>
<tr><td>Mark D. Siegmund</td><td>Margaret A. Little CT303494</td></tr>
<tr><td>State Bar Number 24117055</td><td>Andrew J. Morris*</td></tr>
<tr><td>CHERRY JOHNSON SIEGMUND</td><td>Margot J. Cleveland*</td></tr>
<tr><td>JAMES PLLC</td><td>NEW CIVIL LIBERTIES ALLIANCE</td></tr>
<tr><td>The Roosevelt Tower</td><td>1225 19th St. NW, Suite 450</td></tr>
<tr><td>400 Austin Avenue, 9th Floor</td><td>Washington, DC 20036</td></tr>
<tr><td>Waco, Texas 76701</td><td>Tel: (202) 869-5210</td></tr>
<tr><td>Tel: (254) 732-2242</td><td>Fax: (202) 869-5238</td></tr>
<tr><td>Fax: (866) 627-3509</td><td>*Admitted <i>Pro Hac Vice</i></td></tr>
</table>


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2024, an electronic copy of the foregoing was filed electronically via the Court's ECF system, which effects service upon counsel of record, In addition, a true and accurate copy of the foregoing was served by hand to:

Brenda Wright
U.S. Attorney's Office
800 Franklin Avenue
Suite 280
Waco, Texas 76701


*/s/ Margaret A. Little*

2