**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| ERIK DAVIDSON, JOHN RESTIVO, and NATIONAL CENTER FOR PUBLIC POLICY RESEARCH, | ) ) ) ) | Case No. 6:24-cv-00197-ADA |
| Plaintiffs, | ) ) | Hon. Alan Albright |
| v. | ) ) | |
| GARY GENSLER, U.S. SECURITIES AND EXCHANGE COMMISSION, and CONSOLIDATED AUDIT TRAIL, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT CONSOLIDATED AUDIT TRAIL, LLC'S**
**COMBINED MOTION TO DISMISS AND OPPOSITION**
**TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 5

    A.    Factual Background ................................................................................. 6

        1.    Self-regulation in the U.S. securities markets ................................ 6

        2.    The consolidated audit trail ............................................................ 8

        3.    CAT LLC's lack of connections to Texas ................................... 11

    B.    Plaintiffs' Claims ................................................................................... 12

ARGUMENT ...................................................................................................................... 12

I.    The Complaint Must Be Dismissed as to CAT LLC ........................................... 12

    A.    This Court Lacks Personal Jurisdiction over CAT LLC ........................ 13

    B.    This Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Claims ................. 17

        1.    This Court lacks subject-matter jurisdiction to review SEC
rules ................................................................................................ 18

            a.    The general federal-question-jurisdiction statute is
displaced by the more specific statute governing review
of SEC agency action .................................................... 18

            b.    The Mandamus Act does not support jurisdiction ........................ 22

        2.    Plaintiffs' inclusion of a private-party defendant does not enable
them to circumvent limits on judicial review of agency action ................ 23

            a.    District courts lack jurisdiction over suits effectively
seeking invalidation of agency action, regardless of the
identity of the defendants .............................................. 23

            b.    This suit must be dismissed because the SEC is a
required party not amenable to suit ............................... 24

    C.    Plaintiffs Fail to State a Claim Against CAT LLC ................................ 26

        1.    CAT LLC is not a state actor and cannot violate the
Constitution .................................................................................... 26

        a.      Market regulation by private entities is not state action ...............26

        b.      There is no "data receipt and reporting" exception to the private-action rule ..........................................................................28

             i.      CAT LLC's conduct is an exercise of private authority ...............................................................28

             ii.     CAT LLC is not a state actor when receiving data.........................................................................29

             iii.    CAT LLC is not a state actor when sharing data..............32

      2.      CAT LLC is not a federal agency and cannot violate the APA................33

      3.      CAT LLC cannot be included in this suit as a relief defendant................34

II.     Plaintiffs Are Not Entitled to a Preliminary Injunction or a Stay......................................36

    A.     Plaintiffs Have No Likelihood of Success on the Merits Against CAT LLC ...........................................................................................................37

    B.     Plaintiffs' Claims of Irreparable Harm Are Belied by Their Yearslong Delay in Bringing Suit .......................................................................37

      1.      Claims of constitutional injury do not suffice to establish irreparable harm in the face of years of delay in seeking relief................37

      2.      Plaintiffs' other theories of irreparable harm lack merit...........................39

    C.     The Balance of the Equities and Public Interest Strongly Disfavor Relief......................................................................................................41

      1.      Immediate relief would create a regulatory vacuum, harming virtually every actor in the U.S. securities markets ...................................41

      2.      The harm from an erroneous injunction would be enormous...................43

      3.      Any benefits to plaintiffs are dwarfed by harms to CAT LLC and the public..............................................................................................45

III.    Any Preliminary Relief Should Be Properly Tailored........................................................46

    A.     Further Briefing Would Be Needed to Clarify the Scope of Any Preliminary Injunction ...................................................................................46

    B.     There Is No Basis for a Stay ...............................................................................47

CONCLUSION...............................................................................................................................49

CERTIFICATE OF SERVICE ....................................................................................................50

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps;">Cases</span>

*Abbott, In re*, 954 F.3d 772 (5th Cir. 2020), *vacated as moot sub nom.*
  *Planned Parenthood Center for Choice v. Abbott*, 141 S. Ct. 1261 (2021) .....................44

*Abbott v. Biden*, 70 F.4th 817 (5th Cir. 2023).........................................................................36

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)................................................................30

*Admar International, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783 (5th Cir. 2021) .........................16

*Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484 (5th Cir. 2014)...............25

*American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999) .................30

*American Road & Transportation Builders Ass'n v. EPA*, 705 F.3d 453
  (D.C. Cir. 2013) .................................................................................................................21

*Antonyuk v. Hochul*, 635 F. Supp. 3d 111 (N.D.N.Y. 2022) ..................................................37

*Axon Enterprise v. FTC*, 598 U.S. 175 (2023).......................................................................20

*Barnes v. Lehman*, 861 F.2d 1383 (5th Cir. 1988) .................................................................30

*Bass v. Parkwood Hospital*, 180 F.3d 234 (5th Cir. 1999).....................................................29

*Benisek v. Lamone*, 585 U.S. 155 (2018) (per curiam)......................................................42–43

*Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179 (7th Cir. 1984).........................................6, 27

*Block v. Community Nutrition Institute*, 467 U.S. 340 (1984)................................................24

*Blum v. Yaretsky*, 457 U.S. 991 (1982)...............................................................................3, 31

*Boles v. Greeneville Housing Authority*, 468 F.2d 476 (6th Cir. 1972) .................................25

*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986) ............................21

*Bowles v. Russell*, 551 U.S. 205 (2007)..................................................................................21

*Boyd v. RentGrow, Inc.*, No. 23-cv-237, 2024 WL 1480054 (N.D. Tex.
  Mar. 12, 2024), *appeal docketed*, No. 24-10276 (5th Cir. Apr. 3, 2024) .........................17

*Braun v. Mediant Communications, Inc.*, No. 19-cv-62563, 2020 WL 5038780
  (S.D. Fla. Apr. 14, 2020) ...................................................................................................17

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001) ........................................................................................................27

*Brown v. Newberger*, 291 F.3d 89 (1st Cir. 2002) ...................................................33

*BST Holdings v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ............................................48

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ...........................................16

*California Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126 (E.D. Cal. 2012), *aff'd*, 784 F.3d 500 (9th Cir. 2015) ........................................25

*Callahan v. United States Department of Health & Human Services ex rel. Azar*, 434 F. Supp. 3d 1319 (N.D. Ga. 2020) .................................................33–34

*Cambranis v. Blinken*, 994 F.3d 457 (5th Cir. 2021) .............................................15

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) ................................26

*Coal River Energy, LLC v. Jewell*, 751 F.3d 659 (D.C. Cir. 2014) ........................20

*Cochran v. United States SEC*, 20 F.4th 194 (5th Cir. 2021) (en banc), *aff'd sub nom. Axon Enterprise v. FTC*, 598 U.S. 175 (2023) ...................19–20

*Conti 11. Container Schiffarts-GMBH & Co. v. MSC Mediterranean Shipping Co.*, 91 F.4th 789 (5th Cir. 2024) .............................................................15–16

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, No. 22-1008, 2024 WL 3237691 (U.S. July 1, 2024) ...........................21–22, 34

*Cornish v. Correctional Services Corp.*, 402 F.3d 545 (5th Cir. 2005) ...........30–31

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019) .......................................37

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) .......................................................13

*Dennis v. Sparks*, 449 U.S. 24 (1980) ....................................................................30

*Desiderio v. National Ass'n of Securities Dealers*, 191 F.3d 198 (2d Cir. 1999)...............3, 27

*Doe ex rel. Doe v. Bush*, 261 F.3d 1037 (11th Cir. 2001) ......................................34

*Doe v. United States*, 831 F.3d 309 (5th Cir. 2016) ...............................................29

*Doe v. Veneman*, 380 F.3d 807 (5th Cir. 2004) .....................................................47

*Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003) .................................................................27

*EEOC v. Peabody Western Coal Co.*, 610 F.3d 1070 (9th Cir. 2010)....................................25

*Elgin v. Department of the Treasury*, 567 U.S. 1 (2012)........................................2, 18

*Epstein v. SEC*, 416 F. App'x 142 (3d Cir. 2010) ......................................................26

*Family Rehabilitation, Inc. v. Azar*, 886 F.3d 496 (5th Cir. 2018).............................23

*FCC v. ITT World Communications, Inc.*, 466 U.S. 463 (1984) ..................................23

*Flagg Bros. v. Brooks*, 436 U.S. 149 (1978)............................................................30

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021)................16

*Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331 (5th Cir. 2020)........................13

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477
    (2010).........................................................................................................27

*Friends of DeReef Park v. National Park Service*, No. 13-cv-3453,
    2015 WL 12807800 (D.S.C. May 27, 2015).........................................................25

*Friends of Lydia Ann Channel v. United States Army Corps of Engineers*,
    701 F. App'x 352 (5th Cir. 2017) ......................................................................34

*General Finance Corp. v. FTC*, 700 F.2d 366 (7th Cir. 1983)..................................19

*Gleave v. Graham*, 954 F. Supp. 599 (W.D.N.Y. 1997),
    *aff'd*, 152 F.3d 918 (Table), 1998 WL 352947 (2d Cir. 1998) (per curiam)....................25

*Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891 (5th Cir. 2023)..............................25

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)............................13

*Grand Union Supermarkets of the Virgin Island, Inc. v. H.E. Lockhart
    Management, Inc.*, 316 F.3d 408 (3d Cir. 2003).................................................14

*GreenState Credit Union v. Hy-Vee, Inc.*, 500 F. Supp. 3d 799 (D. Minn. 2020)..................17

*Hamer v. Neighborhood Housing Services of Chicago*, 583 U.S. 17 (2017) ..........................21

*Harris v. Black Clawson Co.*, 961 F.2d 547 (5th Cir. 1992) ......................................13

*Harrow v. Department of Defense*, 601 U.S. 480 (2024) ........................................21

*Heckler v. Ringer*, 466 U.S. 602 (1984) .................................................................22

*Hill v. SEC*, 825 F.3d 1236 (11th Cir. 2016) ......................................................19

*Hinck v. United States*, 550 U.S. 501 (2007) ........................................................................18

*Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544 (5th Cir. 1988)............28–29

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..................................................17

*J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011) ..............................................16

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) .........................................3, 29, 31

*Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009)...............................................................3, 35

*Jarrell v. Chemical Dependency Unit of Acadiana*, 791 F.2d 373 (5th Cir. 1986)
(per curiam)...........................................................................................................31

*Johnston v. Multidata Systems International Corp.*, 523 F.3d 602 (5th Cir. 2008) ...............13

*Jones v. SEC*, 115 F.3d 1173 (4th Cir. 1997) .......................................................................27

*Karst Environmental Education & Protection, Inc. v. EPA*, 475 F.3d 1291
(D.C. Cir. 2007) ...................................................................................................3, 34

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984)........................................................16

*Kim v. FINRA, Inc.*, No. 23-cv-2420, 2023 WL 6538544 (D.D.C. Oct. 6, 2023),
*appeal docketed*, No. 23-7136 (D.C. Cir. Oct. 19, 2023) .....................................6

*Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 17-cv-3200, 2019 WL 7882552
(N.D. Tex. Sept. 18, 2019)..................................................................................38

*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) .....................................27

*Ligon v. LaHood*, 614 F.3d 150 (5th Cir. 2010) ..............................................................18, 23

*Lindke v. Freed*, 601 U.S. 187 (2024)....................................................................................28

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ...............................................................28

*Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802 (2019) ............................30–31

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)...............................................................................................24

*McGinn, Smith & Co. v. FINRA*, 786 F. Supp. 2d 139 (D.D.C. 2011)....................................32

*McGoveran v. Amazon Web Services, Inc.*, 488 F. Supp. 3d 714 (S.D. Ill. 2020) .................15

*Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195 (W.D. Tex. 2020) .......................................43

*Monkton Insurance Services, Ltd. ex rel. MacRae v. Ritter*, 768 F.3d 429
(5th Cir. 2014)................................................................................................13–14, 16

*Ng v. Board of Regents of the University of Minnesota*, 64 F.4th 992
(8th Cir. 2023)................................................................................................4, 37–38

*Nichols v. Alcatel USA, Inc.*, 532 F.3d 364 (5th Cir. 2008)........................................44

*Nken v. Holder*, 556 U.S. 418 (2009) ...............................................................4, 36, 41

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) ...................................37

*Ohio v. EPA*, Nos. 23A349 etc., 2024 WL 3187768 (U.S. June 27, 2024) .............36

*P2ES Holdings v. Trinity Petroleum Management, LLC*, No. 22-cv-3002,
2023 WL 1967949 (S.D. Tex. Feb. 13, 2023), *report and recommendation
adopted*, 2023 WL 2386885 (S.D. Tex. Mar. 6, 2023)........................................14

*Patterson v. Aker Solutions Inc.*, 826 F.3d 231 (5th Cir. 2016).................................6

*Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F. Supp. 2d 335 (D.N.J. 2002)...............38

*Pickett v. Texas Tech University Health Sciences Center*, 37 F.4th 1013
(5th Cir. 2022).......................................................................................................18

*Polk County v. Dodson*, 454 U.S. 312 (1981).........................................................29

*Preston v. Board of Trustees of Chicago State University*, 120 F. Supp. 3d 801
(N.D. Ill. 2015).......................................................................................................38

*Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949
(N.D. Ill. 2018).......................................................................................................37

*Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96 (5th Cir. 2018).....................13

*Scott v. Schedler*, 826 F.3d 207 (5th Cir. 2016) (per curiam)...................................47

*Scottsdale Capital Advisors Corp. v. FINRA, Inc.*, 678 F. Supp. 3d 88
(D.D.C. 2023), *appeal docketed*, No. 23-5129 (D.C. Cir. argued Feb. 8, 2024)...............27

*Seville v. Maersk Line, Ltd.*, 53 F.4th 890 (5th Cir. 2022) ...............................14, 16

*Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545 (5th Cir. 1993)...................6

*Sierra Club de Puerto Rico v. EPA*, 815 F.3d 22 (D.C. Cir. 2016) ..........................21

*Silver v. NYSE*, 373 U.S. 341 (1963) ......................................................................28

*Sirius Computer Solutions, Inc. v. Sparks*, 138 F. Supp. 3d 821 (W.D. Tex. 2015)................6

*Starbucks Corp. v. McKinney ex rel. NLRB*, 144 S. Ct. 1570 (2024) ...................................... 36

*Texas v. United States EPA*, 829 F.3d 405 (5th Cir. 2016) ......................................................... 48

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ............................................................. 21

*Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964 (2d Cir. 1995) ............................... 39

*United States v. Bebris*, 4 F.4th 551 (7th Cir. 2021) .................................................................. 33

*United States v. Miller*, 982 F.3d 412 (6th Cir. 2020) ......................................................... 32–33

*United States v. Ringland*, 966 F.3d 731 (8th Cir. 2020) ......................................................... 33

*United States v. Rosenow*, 50 F.4th 715 (9th Cir. 2022), *cert. denied*,
    143 S. Ct. 786 (2023) ............................................................................................................ 33

*United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975) ..................................................... 28–29

*United States v. Texas*, 599 U.S. 670 (2023) ............................................................................ 47

*United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) ................................................................ 36

*United States v. Williamson*, No. 21-cr-355, 2023 WL 4056324 (M.D. Fla.
    Feb. 10, 2023) ....................................................................................................................... 32

*University of Texas v. Camenisch*, 451 U.S. 390 (1981) .................................................... 36, 43

*VanDerStok v. BlackHawk Manufacturing Group Inc.*, 659 F. Supp. 3d 736
    (N.D. Tex. 2023) .................................................................................................................... 38

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) ...................................................................... 37

*Wages & White Lion Investments, L.L.C. v. United States FDA*, 16 F.4th 1130
    (5th Cir. 2021) ....................................................................................................................... 48

*Walden v. Fiore*, 571 U.S. 277 (2014) ....................................................................................... 15

*Walker v. Beaumont Independent School District*, 938 F.3d 724 (5th Cir. 2019) .................... 5

*West v. Atkins*, 487 U.S. 42 (1988) ........................................................................................... 28

*West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem.) ................................................................ 48

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ....................... 4, 36, 41

*Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565 (5th Cir. 2001) ............................................ 23

**STATUTES**

5 U.S.C. § 701(1) ..............................................................................................................33

5 U.S.C. § 702 ............................................................................................................24, 33

5 U.S.C. § 703 ..............................................................................................................20

5 U.S.C. § 705 ..............................................................................................................48

15 U.S.C. § 78f(b)(5) .......................................................................................................7

15 U.S.C. § 78k-1 ...........................................................................................................19

15 U.S.C. § 78o-3(b)(6) ....................................................................................................7

15 U.S.C. § 78y(a)(1) ...........................................................................................17–18, 20

15 U.S.C. § 78y(b)(1) ......................................................................................1, 17–19

18 U.S.C. § 2258A(a) .....................................................................................................33

18 U.S.C. § 2258A(b) .....................................................................................................33

28 U.S.C. § 1331 ........................................................................................................18–19

28 U.S.C. § 1361 ....................................................................................................12, 18, 22

28 U.S.C. § 2401(a) ......................................................................................................21

42 U.S.C. § 7607(b)(1) ..................................................................................................21

Mandamus Act, Pub. L. No. 87-748, 76 Stat. 744 (1962) (codified as amended at
    28 U.S.C. §§ 1361, 1391(e)) ....................................................................................22

        § 1(a) ......................................................................................................................22

Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 (codified as amended at
    15 U.S.C. §§ 78a–78rr), ............................................................................................6

**RULES AND REGULATIONS**

17 C.F.R. § 240.17a-3(a)(1) ...........................................................................................39

17 C.F.R. § 240.17a-3(a)(3) ...........................................................................................39

17 C.F.R. § 240.17a-3(a)(17) .........................................................................................39

17 C.F.R. § 240.17a-25(a) ..............................................................................................39

17 C.F.R. § 240.17a-25(b) ..................................................................................39

17 C.F.R. § 240.17a-25(c) ..................................................................................39

17 C.F.R. § 242.613 .............................................................................................8

17 C.F.R. § 242.613(a)(1)(ix) .......................................................................41, 43

17 C.F.R. § 242.613(c) .......................................................................................15

17 C.F.R. § 242.613(e)(1) ...................................................................................26

17 C.F.R. § 242.613(e)(2) ..............................................................................9, 26

17 C.F.R. § 242.613(e)(4)(i)(A) .........................................................................36

17 C.F.R. § 242.613(g) .......................................................................................15

17 C.F.R. § 242.613(g)(3) ...................................................................................15

17 C.F.R. § 242.613(g)(4) ...................................................................................15

Fed. R. Civ. P. 8(a)(1) ........................................................................................18

Fed. R. Civ. P. 12(b) .............................................................................................1

Fed. R. Civ. P. 12(b)(1) ........................................................................................5

Fed. R. Civ. P. 12(b)(2) .....................................................................................5–6

Fed. R. Civ. P. 12(b)(6) ..................................................................................5, 26

Fed. R. Civ. P. 19(a) ...........................................................................................25

Fed. R. Civ. P. 19(b) ...........................................................................................25

Fed. R. Civ. P. 65(c) ...........................................................................................44

Fed. R. Civ. P. 65(d) ...........................................................................................47

Fed. R. Civ. P. 65(d)(2)(B) ...........................................................................35, 47

Fed. R. Civ. P. 65(d)(2)(C) ...........................................................................35, 47

## OTHER AUTHORITIES

*American Securities Ass'n v. United States SEC*, No. 23-13396
     (11th Cir. docketed Oct. 17, 2023) .......................................................2, 9, 40

Brief of the New Civil Liberties Alliance as *Amicus Curiae* in Support of Petitioners (Feb. 15, 2024), ECF No. 65.......................................................................9

Opening Brief of Petitioners (Feb. 8, 2024), ECF No. 49 ...........................................9

Petition for Review (Oct. 17, 2023), ECF No. 1........................................................40

Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64,662 (Oct. 23, 2015)...........................................48

Concept Release Concerning Self-Regulation, Exchange Act Release No. 50,700, 69 Fed. Reg. 71,256 (Dec. 8, 2004) ................................................................6–7

Consolidated Audit Trail, Exchange Act Release No. 62,174, 75 Fed. Reg. 32,556 (June 8, 2010)...........................................................................................7–8, 29

Consolidated Audit Trail, Exchange Act Release No. 67,457, 77 Fed. Reg. 45,722 (Aug. 1, 2012)...........................................................................................8, 19

COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021)........................................................................48

FINRA Rule 7440 (deleted Sept. 1, 2021)..............................................................39

H.R. Rep. No. 73-1383 (1934)...............................................................................28

Notice of Filing and Immediate Effectiveness of a Proposed Rule Change Relating to the Retirement of FINRA's Order Audit Trail System, Exchange Act Release No. 92,239, 86 Fed. Reg. 34,293 (June 29, 2021)........................................41

Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 77,724, 81 Fed. Reg. 30,614 (May 17, 2016) ...............................................................................................................7

Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Notice, Exchange Act Release No. 98,290, 88 Fed. Reg. 62,628 (Sept. 12, 2023) ........................................................9, 36, 40

Order Approving the National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 79,318, 81 Fed. Reg. 84,696 (Nov. 23, 2016) ...........................................................................................................8–9

Order Granting Conditional Exemptive Relief, Exchange Act Release No. 88,393, 85 Fed. Reg. 16,152 (Mar. 20, 2020)..............................................................10

## INTRODUCTION

Plaintiffs bring this suit in a belated effort to eliminate the Consolidated Audit Trail, or "CAT," an important tool relied upon by the private entities that are responsible for self-regulation of the U.S. securities markets.  Plaintiffs' claims fail because they waited years too long, chose a court that lacks both subject-matter and personal jurisdiction, and seek a nuclear temporary remedy that would not only upend the status quo, but also create an untenable financial burden on virtually every entity operating within the securities industry, resulting in chaos.  Plaintiffs' claims lack legal or factual support and should be dismissed for multiple reasons under Federal Rule of Civil Procedure 12(b).

The CAT went into effect following the promulgation of several rules and orders by the Securities and Exchange Commission ("SEC").  In 2012, the SEC issued a final rule directing the self-regulatory organizations ("SROs")—which had previously monitored markets for fraud and abuse using various other audit trails—to propose the design of a centralized system.  In 2016, the SEC issued a final order accepting the SROs' proposal, thus creating the CAT program.  That triggered an enormous (and enormously expensive) undertaking by the SROs to build the CAT, bring it online, and retire certain now-redundant legacy systems.  The securities industry, too, undertook efforts to come into compliance with the CAT's reporting requirements.  Defendant Consolidated Audit Trail, LLC ("CAT LLC")—a private entity jointly owned by SROs participating in the CAT program—was created during this time to oversee the CAT.  By 2018, the CAT was up and running, and, by 2020, broker-dealers were reporting to it daily.  The CAT has been receiving materially identical order, trade, customer, and account data since 2022.

Parties seeking to challenge an SEC rule must file a petition for review in a federal court of appeals within 60 days of the rule's promulgation.  *See* 15 U.S.C. § 78y(b)(1).  Plaintiffs are candid that their asserted injuries stem from the SEC's 2012 rule that kicked off a decade's work

1

to create and operationalize the CAT.  Dkt. 1, pp. 51–52 ("Compl.").  That means plaintiffs have brought their grievances to the wrong court a dozen years too late.  In the meantime, the CAT has become integral to the day-to-day operations of SROs and government regulators.  And plaintiffs have not merely filed an untimely suit trying to tear down that system, they have also asked this Court to enter extraordinary emergency relief—a preliminary injunction and a stay—to shutter the CAT *immediately*.  Plaintiffs offer no hint of justification for their delay, let alone the slightest recognition of the significant and irreparable damage that this preliminary relief would cause the securities markets, regulators, and the investing public.  Plaintiffs seem to suggest that their filings may be timely because May 31, 2024, altered minutiae of broker-dealers' CAT reporting compliance (regarding the timeframe on which they must correct faulty data); in reality, the CAT has received the same information—including any information related to plaintiffs' own trading activity—in part since 2020 and in full since November 2022.

This Court cannot even reach plaintiffs' baseless request for preliminary relief, however, because their complaint suffers several fatal flaws that require dismissal.  Most critically, this Court lacks subject-matter jurisdiction to entertain the suit at all.  Seeking review in a federal court of appeals within 60 days of an SEC rule's promulgation is the exclusive avenue for establishing federal jurisdiction over a challenge to the rule—as illustrated by pending litigation in the Eleventh Circuit that raises similar arguments but purports to target the SEC's 2023 order regarding the CAT's funding.  *See Am. Sec. Ass'n v. U.S. SEC*, No. 23-13396 (11th Cir. docketed Oct. 17, 2023).  This complaint, by its terms, does not comply with the Securities Exchange Act's review scheme, so this Court lacks jurisdiction over it.  *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 8–10 (2012).

As to the claims against CAT LLC, the complaint is further doomed.  For one, CAT LLC is not subject to personal jurisdiction in Texas, as it is not based in the State and lacks minimum

suit-related contacts there.  For another, plaintiffs fail to state a claim against CAT LLC on the merits.  Each of the claims asserted against CAT LLC proceeds from the premise that CAT LLC is either a state actor (capable of violating the Constitution) or a federal agency (capable of violating the Administrative Procedure Act ("APA")).  Both theories fail as a matter of blackletter law.  Securities markets in the United States have an unbroken history, dating back to the Founding, of self-regulation by private entities; consistent with that practice, a wall of precedent confirms that SROs are not state actors subject to constitutional constraints.  *See, e.g.*, *Desiderio v. Nat'l Ass'n of Sec. Dealers*, 191 F.3d 198, 206–07 (2d Cir. 1999).  CAT LLC carries forward this tradition and is likewise not a state actor.  No surprise, then, that plaintiffs meet none of the tests for state action.  The challenged activity—receiving audit-trail data and permitting government regulators to access it—is traditional private conduct of the sort the SROs engaged in long before the SEC directed the creation of a consolidated audit trail.  The fact that this activity is now "extensively regulated[] … 'does not by itself convert [the] action into that of the State.'"  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)).  And private entities like CAT LLC are not subject to suit under the APA in any circumstance.  *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297–98 (D.C. Cir. 2007).

As a fallback, plaintiffs seek to subject CAT LLC to suit as a "relief defendant."  But that concept applies only when the plaintiff obtains a judgment against a defendant for disgorgement of ill-gotten funds and then seeks to enforce that judgment against a third party—the so-called "relief defendant"—who possesses those funds.  *See Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009).  That doctrine has no application here because there is no stolen "*res*" that CAT LLC is keeping from plaintiffs.  This Court should therefore dismiss CAT LLC from this action.

These fundamental problems not only require dismissal, but also necessarily mean plaintiffs cannot establish a strong likelihood of success on the merits—a prerequisite for either a preliminary injunction or a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–21 (2008). Each additional factor of the established test for preliminary relief points to the same commonsense conclusion: Relief is unwarranted.

*First*, irreparable harm. Even when a plaintiff asserts constitutional injury, any presumption of irreparable harm is rebutted when that plaintiff has unjustifiably delayed in asserting his rights. *See, e.g.*, *Ng v. Bd. of Regents of the Univ. of Minn.*, 64 F.4th 992, 998–99 (8th Cir. 2023). Plaintiffs here have, by their own admission, been trading in markets operating under identical CAT requirements for years. Having neglected all this time to assert their purported rights—thereby allowing entities across the securities industry to accrue massive reliance interests—plaintiffs cannot now seriously claim they need urgent relief.

*Second*, the balance of the equities. On the other side of the ledger from plaintiffs' nebulous interest in the privacy of trading information, CAT LLC and the SROs would suffer staggering harm from a preliminary injunction. An order shuttering the CAT overnight would create a regulatory vacuum. Chaos would ensue as the SROs scrambled to assemble stop-gap audit trails to shore up market surveillance. And if an injunction were initially issued and later lifted, the financial costs—not to mention the effort—of restoring the troves of missing data would be enormous.

Casting aside these concerns as "minor costs" to the SEC, plaintiffs suggest they simply seek to preserve the "status quo." Dkt. 25-3, at 36–37 ("PI Br."). That is pure gaslighting. The CAT has been running for years. Suddenly shutting it down would spell catastrophe and require immediate action from the SEC, the SROs, and broker-dealers. Plaintiffs' contrary say-so is astounding.

4

*Third*, the public interest.  Plaintiffs claim to carry the banner of a broad public interest in killing the CAT, but the relief they seek would actually harm the investing public.  Even a short period without any audit-trail system would jeopardize market integrity.  Broker-dealers, too, would need to reconfigure their systems at great cost to comply with whatever new audit trails could be cobbled together on the fly—perhaps only to then *re*-reconfigure if the CAT were resurrected at the conclusion of this case.

What's more, these harms to regulators and the public are the fault of plaintiffs' own inexcusable delay.  The industrywide reliance interests in the CAT have grown and grown as plaintiffs sat on their hands, first while the system was designed beginning in 2012, then when it was built beginning in 2016, then when it went live in 2018, and finally when broker-dealers began reporting to it in 2020.  SROs years ago began retiring predecessor audit trails in reliance on the CAT.

A preliminary injunction and stay are warranted only in an extraordinary case, and only where relief would preserve the status quo in favor of plaintiffs who have diligently asserted their rights and brought strong claims on the merits.  These plaintiffs plead faulty claims after years of twiddling their thumbs.  And they seek relief that would upend the status quo to the great detriment of almost every other actor in the securities industry.

The motion to dismiss should therefore be granted, and plaintiffs' motion for preliminary relief should be denied.

## BACKGROUND

CAT LLC moves to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), lack of personal jurisdiction under Rule 12(b)(2), and failure to state a claim under Rule 12(b)(6).  As to the Rule 12(b)(1) and (b)(6) claims, the Court should accept as true plaintiffs' factual allegations, but not plaintiffs' legal conclusions.  *See Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d

724, 735 (5th Cir. 2019).[1]  For purposes of CAT LLC's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) and its opposition to plaintiffs' motion for a preliminary injunction and a stay, CAT LLC sets forth additional facts that are supported by declarations attached to this brief.  *See Patterson v. Aker Sols. Inc.*, 826 F.3d 231, 233 (5th Cir. 2016); *Sirius Comput. Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 836 (W.D. Tex. 2015) (citing *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993)).

## A.   Factual Background

### 1.   *Self-regulation in the U.S. securities markets*

"Securities industry self-regulation has a long tradition in the U.S. securities markets." Concept Release Concerning Self-Regulation, Exchange Act Release No. 50,700, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004) ("SRO Concept Release").  Securities exchanges were first formed in the Founding era "without aid of any federal or state law or government intervention, oversight, or regulation."  *Kim v. FINRA, Inc.*, No. 23-cv-2420, 2023 WL 6538544, at *2 (D.D.C. Oct. 6, 2023), *appeal docketed*, No. 23-7136 (D.C. Cir. Oct. 19, 2023).  Although the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a–78rr), created some federal oversight over the industry, Congress preserved SROs' status as frontline market regulators.  *See* SRO Concept Release, 69 Fed. Reg. at 71,256 (explaining that the Exchange Act and its subsequent amendments "reflect Congress' determination to rely on self-regulation as a fundamental component of U.S. market and broker-dealer regulation").  Thus, "[t]he purpose of the federal law" governing securities markets "is to strengthen the power and responsibility of the [SROs] in performing a policing function that preexisted federal regulation."  *Bernstein v. Lind-*

---

[1]  For instance, plaintiffs' allegations that CAT LLC "is a state actor and an agent of SEC," Compl. ¶ 104, are legal conclusions that this Court need not accept as true even at the pleading stage.

*Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984) (Posner, J.).  This structure for market regula-tion—the SROs with self-regulatory responsibility over their members, subject to SEC oversight—"has been repeatedly reaffirmed both by Congress and the [SEC]."  SRO Concept Release, 69 Fed. Reg. at 71,257.

Market surveillance—in which audit-trail systems play a major role—has long been a key component of SROs' self-regulation.  *See* 15 U.S.C. § 78f(b)(5) (securities exchanges must have rules "designed to prevent fraudulent and manipulative acts and practices"); *id.* § 78o-3(b)(6) (same for securities associations).  SROs rely on market data that is reported to them by broker-dealer firms to create audit trails used to identify potential misconduct in the securities markets. Prior to the CAT system at issue in this case, individual SROs, pursuant to their own rules, main-tained independent systems with their "own specific audit trail requirements applicable to [their] members."  Consolidated Audit Trail, Exchange Act Release No. 62,174, 75 Fed. Reg. 32,556, 32,557 (June 8, 2010) ("2010 Proposed Rule"); *see id.* at 32,557–63, 32,561 n.85 (providing ex-amples of different SROs' "detailed audit trail data submission requirements for their members covering order entry, transmittal, and execution"); Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 77,724, 81 Fed. Reg. 30,614, 30,698–99 (May 17, 2016) ("2016 CAT NMS Plan Proposal") (describing pre-CAT audit trails); Compl. ¶ 23.  For instance, the Financial Industry Regulatory Authority ("FINRA") (and before that, its predecessor), pursuant to its rules and the rules of SRO exchanges, maintained the cross-market "Order Audit Trail System" (or "OATS"), which received detailed order and trade information.  2010 Proposed Rule, 75 Fed. Reg. at 32,558–59.  In addition, SROs have maintained systems to regularly collect "trading records from broker-dealers needed for regulatory inquiries," including customer and account information.  *Id.* at 32,557–58.

7

2.      *The consolidated audit trail*

a.      In 2010, the SEC proposed Rule 613, 17 C.F.R. § 242.613, in substantial part to stand-ardize "the information captured by each" of the SROs' various audit trails and the format in which that information was captured.  2010 Proposed Rule, 75 Fed. Reg. at 32,557.  Rule 613's stated purpose was to allow the SROs to "more effectively and efficiently fulfill [their] statutory obliga-tions" by creating a mechanism for faster "access to consolidated and more detailed order and market execution information across all markets."  *Id.* at 32,564; *see* Compl. ¶ 19.  The SEC prom-ulgated the final Rule 613 in 2012.  Consolidated Audit Trail, Exchange Act Release No. 67,457, 77 Fed. Reg. 45,722 (Aug. 1, 2012) ("2012 Final Rule").  That rule directed the SROs to submit a plan to create, implement, and maintain a consolidated audit trail, or "CAT."  *Id.* at 45,723.

In May 2016, the SROs submitted a proposed plan for the CAT.  2016 CAT NMS Plan Proposal, 81 Fed. Reg. at 30,614.[2]  Part of the proposal was that the SROs' joint activities related to the consolidated audit trail would be conducted through CAT NMS LLC (the predecessor to CAT LLC, *see id.* at 30,618), a private limited-liability company jointly owned by the SROs.  *Id.*; *see* Compl. ¶¶ 100–103.

The SEC approved the SROs' proposed plan for the CAT system in an order issued in November 2016.  Order Approving the National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 79,318, 81 Fed. Reg. 84,696 (Nov. 23, 2016) ("2016 CAT Order").  Plaintiffs allege that CAT LLC, pursuant to that order, "controls the storage and protec-tion of the CAT data it receives from national securities exchanges and broker-dealers."  Compl.

---

[2]  This brief uses the term "SROs" to refer only to the self-regulatory organizations that participate in the CAT program.  In the technical regulatory parlance, the SROs in this context are often re-ferred to as "Plan Participants" or just "Participants."  *See, e.g.*, Order Approving the National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 79,318, 81 Fed. Reg. 84,696, 84,697, 84,804 n.1868 (Nov. 23, 2016) ("2016 CAT Order").

¶ 62.   And under Rule 613, the SROs and the SEC each have access to CAT data.   17 C.F.R. § 242.613(e)(2); *see* Compl. ¶¶ 100, 103.

Neither plaintiffs nor anyone else timely challenged the 2012 final rule or the 2016 CAT Order.   In a pending petition for review of a 2023 SEC order regarding funding for the CAT, petitioners have presented to the Eleventh Circuit statutory and constitutional arguments similar to those plaintiffs raise here.   *See* Opening Brief of Petitioners at 13–31, *Am. Sec. Ass'n v. U.S. SEC*, No. 23-13396 (11th Cir. Feb. 8, 2024), ECF No. 49; *see also* Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 98,290, 88 Fed. Reg. 62,628 (Sept. 12, 2023) ("2023 Funding Order").   There, the New Civil Liberties Alliance, counsel for plaintiffs in this case, submitted an *amicus* brief on its own behalf.   *See* Brief of the New Civil Liberties Alliance as *Amicus Curiae* in Support of Petitioners, *Am. Sec. Ass'n*, No. 23-13396 (11th Cir. Feb. 15, 2024), ECF No. 65.

b.   After the SEC issued the 2016 CAT Order, the SROs—through CAT NMS LLC and then CAT LLC—began to build the CAT.   In 2019, CAT LLC engaged FINRA CAT, LLC (a subsidiary of FINRA), to be the CAT's plan processor, in charge of technical design, management, and day-to-day operation of the CAT.   *See* Exhibit A, Declaration of Shelly Bohlin ¶¶ 3, 5–6 ("Ex. A").

The relevant basics of the CAT's operation are as follows.   Pursuant to the CAT plan as proposed by the SROs and accepted by the SEC, broker-dealers are required to report data on each order, modification, cancelation, and executed transaction in which they play a part.   *See* 2016 CAT Order, 81 Fed. Reg. at 84,706–07.   That data flows into the CAT's order-and-transaction database, which incorporates hundreds of billions of records each day.   *See* Exhibit B, Declaration of Scott Donaldson ¶ 11 ("Ex. B").   Broker-dealers must also report information about their

customers and accounts to the Customer and Account Information System (or "CAIS"), a separate CAT database.  Ex. A ¶¶ 13, 16–17; Ex. B ¶¶ 9–10.  Broker-dealers report account information, as well as customer name, birth year, address, and a transformed customer-identifier number, to the CAIS; they have never been required to report customers' social security numbers, birthdates, or account numbers, as initially contemplated by the plan.  *See* Order Granting Conditional Exemptive Relief, Exchange Act Release No. 88,393, 85 Fed. Reg. 16,152, 16,152–54 (Mar. 20, 2020); Ex. A ¶¶ 17–18; Compl. ¶ 58.

Broker-dealers report data by directly uploading the information to the CAT's servers or by using an intermediary who receives and aggregates a broker-dealer's data.  Ex. B ¶ 7.  Data storage and processing are conducted entirely through infrastructure controlled by Amazon Web Services ("AWS," a subcontractor of FINRA CAT) and located in AWS data centers in Virginia and Ohio.  *Id.* ¶¶ 4–5.

The CAT order-and-transaction database has been up and running for broker-dealer reporting since 2020.  Ex. A ¶ 20.  Since 2021, CAT LLC has continued to receive data on orders and transactions in materially the same form.  *Id.* ¶ 22.  Since November 2022, broker-dealers have been required to submit complete and accurate customer and account data daily to the CAIS.  *Id.* ¶ 23.  That customer and account data has been received in materially the same form since 2022.  *Id.* ¶ 26.

Although broker-dealers were obligated to report complete customer and account data as of November 2022, there was a period after that during which broker-dealers did not need to correct data errors within the timeframe required by the CAT plan.  Ex. A ¶ 24.  Data reporting was still *mandatory*; broker-dealers simply had more time to correct discrepancies in the data reported

to the CAIS.  *Id.* ¶¶ 23–24.  As of May 31, 2024, broker-dealers must fix errors on the timeframe required by the CAT plan.  *Id.* ¶ 25.

From the perspective of retail investors like plaintiffs, there has been no change to the data received by the CAT system since, at the latest, November 2022.  From then on, broker-dealers have reported materially identical data to the CAT databases on a daily basis.

### 3.    *CAT LLC's lack of connections to Texas*

As described above, CAT LLC is a Delaware limited-liability company formed in August 2019 to assist the SROs in carrying out their CAT-related functions.  Compl. ¶ 5; *see* Exhibit C, Declaration of Brandon Becker ¶¶ 6, 21 ("Ex. C").  CAT LLC has no physical presence or regular activity in Texas, and it is not registered to do business in Texas.  Ex. C ¶¶ 12–20.  CAT LLC is jointly owned by the SROs, which are private entities: FINRA (a national securities association) and the national securities exchanges (*e.g.*, New York Stock Exchange, LLC).  Compl. ¶ 61 & n.40.  CAT LLC is controlled by its operating committee, which comprises SRO representatives.  Ex. C ¶¶ 8, 10.  None of CAT LLC's owners or the members of its operating committee is organized under Texas law or has its principal place of business in Texas.  *Id.* ¶¶ 7, 10.  The operating committee has delegated certain functions to a leadership team, which manages the day-to-day business of CAT LLC; the leadership team is also made up of SRO representatives located in different States—none in Texas.  *Id.* ¶ 11.

As noted above, FINRA CAT is a fully owned subsidiary of FINRA and serves as the CAT plan processor.  Ex. A ¶¶ 3, 5.  FINRA CAT is organized under Delaware law and has its principal place of business in Maryland.  *Id.* ¶¶ 3–4.  FINRA CAT has no facilities or property in Texas and, as mentioned, stores no data in Texas.  *Id.* ¶ 10; Ex. B ¶ 5.

### B.      Plaintiffs' Claims

The complaint alleges nine counts, six of which are asserted against CAT LLC.  Compl.

¶¶ 114–212.  Counts 3–5 allege that CAT LLC violates the Fourth, Fifth, and First Amendments,

respectively.  *Id.* ¶¶ 143–192.  Count 6 alleges that CAT LLC violates the APA because the CAT

program is purportedly unconstitutional.  *Id.* ¶¶ 193–197.  Count 8 asserts an entitlement to relief

under the Mandamus Act, 28 U.S.C. § 1361.  Compl. ¶¶ 204–209.  Count 9 asserts an alternative

theory of unjust enrichment against CAT LLC as a "Relief Defendant," alleging that CAT LLC

"has been unjustly enriched" through its purportedly unlawful receipt of data.  *Id.* ¶ 212; *see id.*

¶¶ 210–212.  The complaint seeks declaratory and injunctive relief relating entirely to Rule 613,

the 2012 final rule requiring the CAT's creation.  *Id.* pp. 51–52.

On May 24, 2024, plaintiffs moved for a stay of the 2012 final rule requiring CAT's crea-

tion and of a related 2017 SEC order approving FINRA's rules for CAT compliance, as well as a

preliminary injunction against continued implementation of the CAT.  Dkt. 25-1; Dkt. 25-2; *see*

PI Br. 2, 36.  Plaintiffs invoke just two claims in their motion.  First, plaintiffs rely on their claim

that the SEC lacked authority to order the creation of a consolidated audit trail, a claim asserted

against the SEC alone.  PI Br. 12–27.  With respect to CAT LLC, plaintiffs rely solely on their

claim that the CAT violates the Fourth Amendment.  *Id.* at 27–33.

### ARGUMENT

### I.      The Complaint Must Be Dismissed as to CAT LLC.

Plaintiffs' constitutional claims against CAT LLC suffer several fatal problems.  Problem

one: CAT LLC is not subject to personal jurisdiction in Texas.  Problem two: This Court lacks

subject-matter jurisdiction because the relief plaintiffs seek—invalidation of an SEC final rule—

is only available through the filing of a petition for review in a federal court of appeals within 60

days of the rule's promulgation.  Plaintiffs cannot circumvent this restriction by including a private

regulated party as a defendant with the SEC. Problem three: Even aside from these jurisdictional defects, the complaint fails to state a claim against CAT LLC on the merits. Plaintiffs' constitutional claims fail because CAT LLC is not a state actor. Plaintiffs' APA claim fails because CAT LLC is not a federal agency. And there is no basis for including CAT LLC as a "relief defendant."

### A.    This Court Lacks Personal Jurisdiction over CAT LLC.

Plaintiffs bear the "burden to make a prima facie showing that personal jurisdiction is proper." *Monkton Ins. Servs., Ltd. ex rel. MacRae v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). But the complaint does not even attempt to explain why (or even assert that) this Court has personal jurisdiction over CAT LLC. And in any event, the evidence submitted by CAT LLC demonstrates that it is not subject to personal jurisdiction in Texas.[3]

First, CAT LLC is not subject to general personal jurisdiction in Texas. General personal jurisdiction requires "affiliations with the State [that] are so continuous and systematic as to render [the defendant] essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). For a corporate entity, it is "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Monkton Ins.*, 768 F.3d at 432; *see Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331, 336–38 (5th Cir. 2020) (applying these principles to a limited-liability company). The general-personal-jurisdiction analysis is straightforward: CAT LLC is a Delaware entity, and its principal place of business is not in Texas. Ex. C ¶ 6; *see Harris v. Black Clawson Co.*, 961 F.2d 547, 551 n.12 (5th Cir. 1992) (declining to decide "whether

---

[3] Personal jurisdiction requires satisfaction of the forum State's long-arm statute and the strictures of the Fourteenth Amendment's Due Process Clause. *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). Here, "[b]ecause the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Id.* (quoting *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)).

a corporation must have a principal place of business" but holding that where entity was inactive in Louisiana, Louisiana could not be its principal place of business).[4]  CAT LLC has no physical presence or regular activity in Texas, and it is not registered to do business there.  Ex. C ¶¶ 13–20.  Plaintiffs have "offer[ed] no reason whatsoever to think this might be the exceptional case where [CAT LLC's] activities in [Texas] are so substantial as to render it at home there."  *Seville v. Maersk Line, Ltd.*, 53 F.4th 890, 895 (5th Cir. 2022) (quotation marks omitted).

Second, CAT LLC is not subject to specific personal jurisdiction in Texas.  To establish specific personal jurisdiction, plaintiffs must demonstrate both that CAT LLC has "purposely directed its activities toward [Texas] or purposefully availed itself of the privileges of conducting activities there," and that their "cause of action arises out of or results from [CAT LLC's] forum-related contacts."  *Seville*, 53 F.4th at 895 (quoting *Monkton Ins.*, 768 F.3d at 433).  Plaintiffs make no allegations as to CAT LLC's contacts with Texas or how plaintiffs' claims relate to those contacts.  Nor could they: CAT LLC has no activities in Texas and has in no way availed itself of any privileges of conducting business in the State.  Ex. C ¶¶ 13–20.  CAT LLC does not advertise or solicit business in Texas; CAT LLC does not ship any product to Texas; and CAT LLC does not store any data in Texas.  *Id.* ¶¶ 17–20.

---

[4]  CAT LLC likely has no principal place of business.  CAT LLC's operating committee—equivalent to a board of directors—meets virtually.  Ex. C ¶¶ 8–9.  As courts in this Circuit have held, "holding companies without active business operations" that conduct board meetings virtually have no principal place of business.  *P2ES Holdings v. Trinity Petroleum Mgmt., LLC*, No. 22-cv-3002, 2023 WL 1967949, at *3–4 (S.D. Tex. Feb. 13, 2023), *report and recommendation adopted*, 2023 WL 2386885 (S.D. Tex. Mar. 6, 2023); *see also Grand Union Supermarkets of the V.I., Inc. v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 411 (3d Cir. 2003) (an entity "must actually conduct business for it to have a principal place of business").  To the extent CAT LLC has ties to any State, they are New York, Illinois, and Washington, D.C., where the leadership team occasionally meets in person.  Ex. C ¶ 12.

Plaintiffs' only allegation regarding Texas is *their own* residence.  Compl. ¶ 2.  But that says nothing about the Court's personal jurisdiction over the defendant.  *See Conti 11. Container Schiffarts-GMBH & Co. v. MSC Mediterranean Shipping Co.*, 91 F.4th 789, 802 (5th Cir. 2024). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [it] to the forum in a meaningful way."  *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

To the extent plaintiffs seek to establish personal jurisdiction over CAT LLC because the data relating to plaintiffs originates in Texas—either because plaintiffs initially provide the data from Texas to their broker-dealers or because plaintiffs' broker-dealers, who actually transmit the data to the CAT, may be in Texas (though plaintiffs make no allegations regarding the location of their broker-dealers)—that would make no difference.  CAT LLC does not reach into Texas to collect data; rather, when individual investors like plaintiffs share information and transmit trading directives to their broker-dealers, those broker-dealers, in turn, report data to CAT servers located outside of Texas, where that data is received and deposited into the CAT databases, also hosted outside of Texas.  Ex. B ¶ 5.  The fact that data stored out of state may have originated in Texas does not suffice to create personal jurisdiction.  *See McGoveran v. Amazon Web Servs., Inc.*, 488 F. Supp. 3d 714, 721–22 (S.D. Ill. 2020) (dismissing for lack of specific personal jurisdiction where plaintiffs alleged that defendant "collected" and "possessed" the personal data of forum residents, but the only part of the data-collection process that occurred in the forum State was "the initial dialing of the phone by Plaintiffs").[5]

---

[5] Broker-dealers are required by SEC and SRO rules to report data to the CAT.  *See* 17 C.F.R. § 242.613(c), (g).  To the extent broker-dealers fail to comply with the reporting requirements, enforcement is solely within the domain of the SROs and the SEC.  Ex. C ¶ 22; *see* 17 C.F.R. § 242.613(g)(3)–(4).  CAT LLC plays no role in that process.  Ex. C ¶ 22.

Moreover, the fact that CAT LLC may eventually receive data that originated in Texas does not establish that CAT LLC "purposely directed its activities toward [Texas] or purposefully availed itself of the privileges of conducting activities there." *Seville*, 53 F.4th at 895 (quoting *Monkton Ins.*, 768 F.3d at 433). The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. To the extent the CAT data relating to plaintiffs has originated in Texas, that is solely due to the fact that plaintiffs happen to live there, not because of any act by CAT LLC contemplating "continuing and wide-reaching contacts" within or "deliberately exploi[ting]" Texas. *Id.* (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984)). Finding jurisdiction on this basis would therefore violate the blackletter rule that the defendant's connection with the forum State must result in its "'own choice,'" not "'the unilateral activity' of other parties." *Conti 11.*, 91 F.4th at 802 (first quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021); then quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Decisions in cases involving far more direct connections with the forum State confirm that this Court lacks personal jurisdiction over CAT LLC here. Even when a defendant *sends* goods into a forum State, that does not suffice unless "the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (plurality opinion). And here, the "goods" (*i.e.*, market data) move *toward* CAT LLC and *away* from Texas. Likewise, the Fifth Circuit has held that "[m]erely running a website that is accessible in all 50 states, but that does not specifically target the forum state, is not enough to create the 'minimum contacts' necessary to establish personal jurisdiction in the forum state." *Admar Int'l, Inc.*

16

*v. Eastrock, L.L.C.*, 18 F.4th 783, 785 (5th Cir. 2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Other cases involving the flow of digital information are in accord.  In the context of data-breach litigation (analogous to plaintiffs' privacy-related claims), "mere data collection" across the country is "[in]sufficiently directed towards Texas to constitute purposeful availment."  *Boyd v. RentGrow, Inc*., No. 23-cv-237, 2024 WL 1480054, at *4 (N.D. Tex. Mar. 12, 2024), *appeal docketed*, No. 24-10276 (5th Cir. Apr. 3, 2024); *see also, e.g.*, *GreenState Credit Union v. Hy-Vee, Inc.*, 500 F. Supp. 3d 799, 805 (D. Minn. 2020) (holding, in a data-breach case, that personal jurisdiction did not lie in Minnesota—though defendant collected Minnesotans' data—because "the systems and infrastructure responsible for managing and monitoring defendant's enterprise-wide data security," as well as defendant's relevant personnel, were in Iowa); *Braun v. Mediant Commc'ns, Inc.*, No. 19-cv-62563, 2020 WL 5038780, at *3 (S.D. Fla. Apr. 14, 2020) (similar). For the same reason, this Court lacks personal jurisdiction over CAT LLC.

### B.    This Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Claims.

Plaintiffs seek a declaration that the SEC's promulgation of Rule 613 in 2012 was unlawful and an injunction against its implementation—put otherwise, they seek to invalidate the rule.  *See* Compl. pp. 51–52.  In their preliminary-injunction brief, plaintiffs additionally seek to stay a 2017 SEC order approving certain CAT reporting rules.  *See* PI Br. 2, 36.  But Section 25 of the Exchange Act sets forth how aggrieved parties must challenge SEC rules: by filing petitions for review in a federal court of appeals "within sixty days after the promulgation of the rule." 15 U.S.C. § 78y(b)(1); *see id.* § 78y(a)(1) (same regarding "entry of [an] order").[6]  This lawsuit is

---

[6]  This part of CAT LLC's brief focuses on relief related to Rule 613, dating from 2012, as pleaded in the complaint, but everything said herein applies essentially identically to the 2017 order of which plaintiffs seek a stay.  Both Section 25(a)(1) (governing review of final orders) and (b)(1) (governing review of final rules) fix review of agency action exclusively in the federal courts of

not a petition for review; it was not filed in the court of appeals; and it was not filed within 60 days of the 2012 final rule's promulgation (or the 2017 order's entry), twelve (or seven) years ago. Jurisdiction for reviewing SEC rules is available only as set forth in the Exchange Act, so district courts lack power to review the SEC's final rules and orders—and certainly lack that power when review is sought years too late.  This suit must therefore be dismissed.

      1.    *This Court lacks subject-matter jurisdiction to review SEC rules.*

Plaintiffs cannot satisfy their burden of establishing subject-matter jurisdiction.  *See* Fed. R. Civ. P. 8(a)(1); *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1026 (5th Cir. 2022). The complaint invokes 28 U.S.C. §§ 1331 and 1361 as jurisdictional bases for this suit, but neither provision applies.  A challenge to a final SEC rule must be brought in a court of appeals, not in district court.  And it must be brought within 60 days of the rule's promulgation, not twelve years later.

      a.    <u>The general federal-question-jurisdiction statute is displaced by the more specific statute governing review of SEC agency action.</u>

The general-purpose grant of federal jurisdiction in 28 U.S.C. § 1331 does not apply when Congress has directed a particular avenue of review for specific claims.  *See Elgin*, 567 U.S. at 8–10; *Hinck v. United States*, 550 U.S. 501, 506 (2007); *see also Elgin*, 567 U.S. at 25 (Alito, J., dissenting) (acknowledging that Congress "may remove certain claims from the general jurisdiction of the federal courts in order to channel these claims into a system of statutory review").  With respect to review of final agency action, "[s]pecific grants of jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts." *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010).   Here, plaintiffs seek vacatur of an SEC rule (and an injunction against its

---

appeals through the petition-for-review process, so the difference is immaterial here.  *See* 15 U.S.C. § 78y(a)(1), (b)(1).

continued implementation).  The Exchange Act sets forth the exclusive route for such claims, and district courts accordingly lack jurisdiction under Section 1331 to entertain them.  *See Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (Posner, J.) ("[Plaintiffs] may not bypass the specific method that Congress has provided for reviewing adverse agency action simply by suing the agency in federal district court under [28 U.S.C. §] 1331 … ; the specific statutory method, if adequate, is exclusive.").

Section 25(b)(1) of the Exchange Act provides that "[a] person adversely affected by a rule of the [SEC] promulgated pursuant to" one of an enumerated list of sections of the Exchange Act— including Section 11A, the authority for Rule 613, *see* 15 U.S.C. § 78k-1; 2012 Final Rule, 77 Fed. Reg. at 45,804—"may obtain review of this rule in the United States Court of Appeals … by filing in such court, within sixty days after the promulgation of the rule, a written petition requesting that the rule be set aside."  15 U.S.C. § 78y(b)(1).[7]  The complaint seeks an order that Rule 613—a final SEC rule—"be set aside."  *Id.*; *see* Compl. pp. 51–52.  Under the statute, plaintiffs therefore needed to bring their legal challenges to the CAT in a petition for review in a federal court of appeals within 60 days of Rule 613's promulgation in 2012, not in a civil action in a district court over a decade later.  *See Hill v. SEC*, 825 F.3d 1236, 1243 (11th Cir. 2016) (Section 25 "makes it clear that Congress intended to preclude … federal district court litigation involving challenges" to SEC final agency action).

To be sure, the Fifth Circuit held in *Cochran v. U.S. SEC*, 20 F.4th 194 (5th Cir. 2021) (en banc), that Section 25 of the Exchange Act does not preclude district-court jurisdiction over certain *structural* challenges to ongoing SEC enforcement and investigatory actions (for instance,

---

[7]  The petitioner can file in the D.C. Circuit or the "circuit in which he resides or has his principal place of business."  15 U.S.C. § 78y(b)(1).

a challenge to the lawfulness of an administrative law judge's appointment).  *Id.* at 199–212; *see Axon Enter. v. FTC*, 598 U.S. 175, 189–96 (2023) (affirming the Fifth Circuit's judgment in *Cochran*).  But plaintiffs do not assert any structural claims against any such agency actions; they simply attack a final SEC rule.  And *Cochran* made crystal clear that district-court challenges to SEC actions are permissible only in the *absence* of a final order or rule reviewable under Section 25.  *See* 20 F.4th at 200 (emphasizing that plaintiff "ha[d] not yet received a final order" and that "[t]he statute says nothing about people … who have not yet received a final order"); *id.* at 208 (explaining that district-court review has been deemed unavailable by the Supreme Court where plaintiffs "sought substantive relief" rather than "structural relief").  As Judge Oldham explained, Section 25 "strips" district-court jurisdiction "as to '[a] person aggrieved by a final order of the [SEC].'"  *Id.* at 214 (Oldham, J., concurring) (alterations in original) (quoting 15 U.S.C. § 78y(a)(1)).  The Supreme Court made the same point plain in its affirmance, explaining that "[t]he Exchange Act … provide[s] for review of a final Commission decision in a court of appeals, rather than a district court."  *Axon Enter.*, 598 U.S. at 181.[8]

Nor does it matter whether plaintiffs were in a position to challenge the SEC's promulgation of Rule 613 in 2012.  The Exchange Act, unlike some other statutes governing review of agency action, makes no provision for the scenario when a party claims it did not have grounds to challenge the action during the original limitations period.  For instance, the Clean Air Act requires

---

[8]  For these same reasons, plaintiffs lack a cause of action by which to assert their claims.  No cause of action exists under the Constitution or the APA where, as here, Congress has "fashion[ed] … an explicit provision for judicial review of the promulgation of regulations."  *Coal River Energy, LLC v. Jewell*, 751 F.3d 659, 664 (D.C. Cir. 2014).  Indeed, the APA's text is explicit that "[t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute."  5 U.S.C. § 703.  Accordingly, the only vehicle through which plaintiffs may raise their facial attack on the SEC's rule creating the CAT is by filing a petition for review in the court of appeals within the statutorily prescribed timeframe.

petitions for review to be filed within 60 days, "except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review … shall be filed within sixty days after such grounds arise." 42 U.S.C. § 7607(b)(1); *see Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 & n.1 (D.C. Cir. 2013) (Kavanaugh, J.).  Congress's corresponding silence in the Exchange Act makes clear that review for after-arising challenges to SEC orders is unavailable.

In any event, even when statutes *do* allow after-arising challenges, those challenges must rely on some change to the legal or factual landscape governing the rule, not just on the fact that plaintiffs did not exist or lacked standing during the original limitations period.  As the D.C. Circuit has explained, courts "have not been swayed by arguments that the instant parties were not in existence back when the original rule was promulgated." *Sierra Club de P.R. v. EPA*, 815 F.3d 22, 27 (D.C. Cir. 2016).  Put simply: "For whatever reason, no one challenged this regulation back [in 2012], and [plaintiffs] cannot do so now." *Id.* at 28.[9]

Finally, the Supreme Court's recent decision in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, No. 22-1008, 2024 WL 3237691 (U.S. July 1, 2024), does not help plaintiffs.  *Corner Post* held that the catchall statute of limitations in 28 U.S.C. § 2401(a), which governs some claims against agencies, begins to run when a plaintiff is first injured. *Id.* at *6.  In arriving at that holding, the Court expressly relied upon the differences between Section 2401(a)

---

[9] "Because court of appeals review [wa]s available, this case does not implicate 'the strong presumption that Congress did not mean to prohibit all judicial review.'" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 n.8 (1994) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 672 (1986)).  Nor is equitable tolling available, as rules governing the proper Article III court in which an action is to proceed are jurisdictional limitations on the power of the court not subject to override. *See Harrow v. Dep't of Def.*, 601 U.S. 480, 488–89 (2024) (citing *Bowles v. Russell*, 551 U.S. 205, 209–10, 209 n.2 (2007)); *see also Hamer v. Neighborhood Hous. Servs. of Chi., Inc.*, 583 U.S. 17, 25 (2017).

and certain statute-specific review provisions—like Section 25 of the Exchange Act—that set forth a statute of repose that does not restart. *Id.* at \*8–9; *see id.* at \*7 (explaining that "Congress kn[ows] how to … create a limitations period that begins with the defendant's action instead of the plaintiff's injury" as evidenced by statutes, like Section 25, that allow review within a certain number of days after the final agency action). *Corner Post* thus reaffirmed that when Congress establishes a scheme for challenging the rulemaking of a particular agency in a particular way, there are no exceptions or restarts for late-arriving parties. And of course, nothing in *Corner Post* or any other case purports to excuse filing suit in the wrong court.

b.    The Mandamus Act does not support jurisdiction.

The complaint also alleges that the Mandamus Act, Pub. L. No. 87-748, § 1(a), 76 Stat. 744, 744 (1962) (codified at 28 U.S.C. § 1361), provides a basis for this Court's jurisdiction. Compl. ¶ 6. That, too, is mistaken. To begin, the Mandamus Act creates jurisdiction only over an "action in the nature of mandamus to compel *an officer or employee of the United States or any agency thereof* to perform a duty owed to the plaintiff." 28 U.S.C. § 1361 (emphasis added). CAT LLC is not an officer, employee, or agency of the United States, so this provision could never support jurisdiction over any claim against CAT LLC.

What's more, as the provision's text also makes clear, "[t]he common-law writ of mandamus, as codified in [Section] 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). That does not describe this case, where plaintiffs have failed to make any effort to exhaust available avenues of relief and do not invoke any nondiscretionary duty owed by either the SEC or CAT LLC (beyond the generic duty of federal actors to obey the law). Indeed, Section 1361 jurisdiction "is limited to requests that the court order the defendant to complete affirmative actions"; it "does not provide jurisdiction over requests

22

'for other types of relief—such as injunctive relief.'" *Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 505–06 (5th Cir. 2018) (quotation marks and citation omitted).  This impermissible injunctive relief is precisely what plaintiffs seek here, *see* Compl. pp. 51–52, so the Mandamus Act cannot provide jurisdiction.[10]

> 2.  *Plaintiffs' inclusion of a private-party defendant does not enable them to circumvent limits on judicial review of agency action.*

>> a.  <u>District courts lack jurisdiction over suits effectively seeking invalidation of agency action, regardless of the identity of the defendants.</u>

Plaintiffs cannot circumvent Congress's decision to vest jurisdiction to review the SEC's rules in the federal court of appeals by suing CAT LLC.  As the Supreme Court has explained, when Congress expressly sets forth a scheme for judicial review of agency action, "[l]itigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order." *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984).  Plaintiffs may not even bring "damages claims that are 'inescapably intertwined with a review of the procedures and merits surrounding an [agency] order.'" *Ligon*, 614 F.3d at 155 (quoting *Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565, 572 (5th Cir. 2001)).  Thus, what governs the availability of review is the functional effect of the relief requested; a plaintiff seeking vacatur of an agency rule cannot circumvent the proper procedures by declining to sue the agency and instead seeking a judgment against a *private* party that would have the same effect as vacatur of the rule.

Plaintiffs' inclusion of CAT LLC as a defendant, therefore, does nothing to cure the fatal deficiencies in this jurisdictionally barred challenge to SEC rulemaking.  Whether plaintiffs sued

---

[10]  Count 8 is styled as a claim for mandamus relief but relies on the premise that plaintiffs succeed on their constitutional and statutory claims.  *See* Compl. ¶¶ 204–209.  Such bootstrapping cannot create jurisdiction; otherwise, courts would have mandamus jurisdiction over *every* case seeking injunctive relief, since a victory by plaintiffs would create compliance obligations for defendants.

the SEC alone, CAT LLC alone, or both together, the gravamen of their suit is that they seek a ruling that an SEC rule is unlawful.  Artful selection of defendants cannot salvage this out-of-place and out-of-time challenge.

Indeed, limitations on review of agency action would be meaningless if plaintiffs could circumvent them by suing regulated private parties instead of the agency.  If review could be had by simply forgoing the petition-for-review process in litigation against the agency and instead suing a regulated entity in district court, parties could "effectively nullify Congress' intent" in creating a carefully reticulated review scheme.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984).  Moreover, a regulated-party defendant in such suit may have little interest—or be affirmatively disinterested—in defending the validity of the challenged rule, forcing the agency to intervene and thereby further eroding Congress's stated limits on the waiver of sovereign immunity. *See id.* (explaining that if third-party consumers could challenge an agency rule regulating dairy handlers outside the statutory review scheme, "[i]t would provide handlers with a convenient device for evading the statutory requirement[s]," since "a handler would need only to find a consumer who is willing to join in or initiate an action in the district court").

        b.      This suit must be dismissed because the SEC is a required party not amenable to suit.

As the above analysis demonstrates, at minimum, the SEC is not amenable to suit.  That is because statutory limits on review of agency action are a condition of federal agencies' general waiver of sovereign immunity in the APA.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) ("[T]he APA's waiver of immunity … does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff.  That provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." (quoting 5 U.S.C. § 702)); *see also*

*Cambranis v. Blinken*, 994 F.3d 457, 463 (5th Cir. 2021).  The SEC has waived its sovereign immunity to suits challenging its final rules only to the extent set forth in Section 25 of the Exchange Act.  The SEC thus retains sovereign immunity as to this suit, precluding this Court from exercising jurisdiction over plaintiffs' claims against the agency.  *See Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 898 (5th Cir. 2023) ("[W]here the United States has not consented to suit or the plaintiff has not met the terms of the statute the court lacks jurisdiction and the action must be dismissed." (quoting *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014))).

As a result, were there any doubt as to this Court's subject-matter jurisdiction over plaintiffs' claims against CAT LLC, those claims must be dismissed for an independent reason: The SEC is a required party over whom this Court indisputably lacks jurisdiction.  An agency whose regulation is challenged as unlawful—here, indeed, as unconstitutional—is a required party that "must be joined" under Federal Rule of Civil Procedure 19(a).  And because the SEC "cannot be joined" due to its unwaived sovereign immunity, Rule 19(b) requires dismissal of the suit.  *See* Fed. R. Civ. P. 19(b).  Courts uniformly refuse to entertain suits threatening agency interests when the agency cannot, for sovereign-immunity reasons, be made to participate in the litigation.  *See, e.g.*, *Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 479–80 (6th Cir. 1972); *Friends of DeReef Park v. Nat'l Park Serv.*, No. 13-cv-3453, 2015 WL 12807800, at *8–9 (D.S.C. May 27, 2015); *Cal. Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1149 (E.D. Cal. 2012), *aff'd*, 784 F.3d 500 (9th Cir. 2015); *Gleave v. Graham*, 954 F. Supp. 599, 613 (W.D.N.Y. 1997), *aff'd*, 152 F.3d 918 (Table), 1998 WL 352947 (2d Cir. 1998) (per curiam); *cf. EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1081–87 (9th Cir. 2010) (agency could be joined with respect to claims

seeking injunctive relief because it did not have sovereign immunity as to those claims).  The same result is warranted here.[11]

### C.      Plaintiffs Fail to State a Claim Against CAT LLC.

Even if this Court had jurisdiction (it does not), dismissal would still be warranted under Rule 12(b)(6) because the complaint does not state a claim against CAT LLC.  Plaintiffs' constitutional claims against CAT LLC fail because CAT LLC is not a state actor.  Nor may plaintiffs sue CAT LLC under the APA, as CAT LLC is not a federal agency.

> 1.      *CAT LLC is not a state actor and cannot violate the Constitution.*

A wall of precedent recognizes that—in light of the history and tradition of self-regulation of U.S. securities markets—private entities engaged in market regulation are not state actors, even though they are pervasively regulated by the SEC in carrying out their duties.

> a.      <u>Market regulation by private entities is not state action.</u>

CAT LLC is a private entity organized under the laws of Delaware.  Compl. ¶ 5.  It is entirely owned by the SROs, themselves private entities.  *Id.* ¶ 61.  It was created by the SROs as a vehicle for carrying out their consolidated audit-trail functions.  *Id.* ¶¶ 100–103.  Plaintiffs do not allege that the SEC plays any role in the day-to-day mechanics of operating CAT LLC, other than the basic fact that the SROs are required by SEC regulations to permit the SEC to access CAT data.  *See* 17 C.F.R. § 242.613(e)(1)–(2); Compl. ¶¶ 77–79.

These features have led courts to consistently conclude that SROs, private entities engaged in regulatory activities of U.S. markets, are not state actors.  *See, e.g.*, *Epstein v. SEC*, 416 F. App'x

---

[11]  In addition to the jurisdictional arguments set forth above, plaintiffs also lack standing given the speculative and abstract nature of their purported injuries.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013) (plaintiffs lack standing based on "theories that rest on speculation about the decisions of independent [governmental] actors" regarding alleged surveillance).  CAT LLC joins the SEC's arguments on this score, which supply an independent reason that this Court lacks jurisdiction.

142, 148 (3d Cir. 2010); *Desiderio*, 191 F.3d at 206–07; *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1200–02 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997); *Bernstein*, 738 F.2d at 186 (Posner, J.); *see also Scottsdale Cap. Advisors Corp. v. FINRA, Inc.*, 678 F. Supp. 3d 88, 104 & n.7 (D.D.C. 2023) (noting that "a multitude of courts nationwide have held … that FINRA is a private entity wholly separate from the SEC or any other government agency" and collecting cases), *appeal docketed*, No. 23-5129 (D.C. Cir. argued Feb. 8, 2024). For the same reasons, CAT LLC is not a state actor.[12]

Plaintiffs offer neither a compelling reason nor an administrable rule that would permit departure from this consensus. They seem to suggest that private entities' activities might *occasionally* constitute state action, depending on the precise relationship between the SEC and the regulatory program in question. Rather than follow plaintiffs down this slippery slope—which threatens to upend centuries of self-regulation in the securities markets—this Court should instead follow the near-uniform precedent.

---

[12] CAT LLC thus bears no relationship to the athletic association in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001), where the Supreme Court held that "[t]he nominally private character of the [a]ssociation [wa]s overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." *Id.* at 298. The association in *Brentwood Academy* comprised almost entirely public institutions and its leadership was entirely public officials. *Id.* at 290–91. CAT LLC is owned and operated entirely by private entities. Ex. C ¶¶ 7, 10; *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484–85 (2010) (explaining that SROs are not "Government-created, Government-appointed entit[ies]").

CAT LLC was also *created* by private entities, and the government plays no role in selecting CAT LLC's leadership. *See* Ex. C ¶¶ 6, 10. That means the test for state action set in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), does not help plaintiffs either. *See id.* at 399 (an entity is "part of the Government" for purposes of the Constitution if "the Government creates [it] by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of [its leadership]").

          **b.**    <u>There is no "data receipt and reporting" exception to the private-action rule.</u>

Even setting aside the mountain of precedent and working from first principles, plaintiffs' efforts to show that CAT LLC's actions are state action are unpersuasive.  To establish that CAT LLC is a state actor when it receives data and makes that data available to regulators, plaintiffs must prove both (1) that the purported violation of their constitutional rights "has resulted from the exercise of a right or privilege having its source in state authority"; and (2) that CAT LLC, "who [is a] private part[y], may be appropriately characterized as [a] 'state actor[].'"  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982); *see Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 554 (5th Cir. 1988).  Plaintiffs cannot make either showing.

          **i.**    *<u>CAT LLC's conduct is an exercise of private authority.</u>*

First, plaintiffs cannot show that CAT LLC's actions reflect the exercise of a right or privilege having its source in state authority.  Plaintiffs challenge CAT LLC's receipt of data on securities transactions in U.S. markets.  As explained above, SROs—private entities—have an unbroken history as the primary regulators of markets.  When SROs engage in market regulation, they engage in traditionally private activity, neither "possessed by virtue of [federal] law" nor "made possible only because [they are] clothed with the authority of [federal] law."  *Lindke v. Freed*, 601 U.S. 187, 198 (2024) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)).  The SEC exercises—and has long exercised—power under the Exchange Act to direct aspects of how SROs carry out their functions.  But, as case after case confirms, this does not "displace[]" the SROs' "'traditional process of self-regulation'"; rather, "the SEC was given the power and the duty to make sure that the responsibility was diligently and effectively used."  *United States v. Solomon*, 509 F.2d 863, 869 (2d Cir. 1975) (Friendly, J.) (quoting H.R. Rep. No. 73-1383, at 15 (1934)); *see Silver v. NYSE*,

373 U.S. 341, 352 (1963) ("The pattern of governmental entry, however, was by no means one of total displacement of the exchanges' traditional process of self-regulation.").

Receiving data to maintain an audit-trail system is thus the exercise of private, not public, authority.  Prior to the creation of the CAT, individual SROs conducted audit-trail functions pursuant to their own rules.  *See* 2010 Proposed Rule, 75 Fed. Reg. at 32,558–63, 32,561 & n.85; Ex. E ¶ 9; Ex. F ¶¶ 9–10.  That the SEC directed the SROs to consolidate those audit functions and prescribed certain details of the CAT program does not "displace" the private nature of the activity.  *Solomon*, 509 F.2d at 869.  Whatever the nature and scope of the SEC's directives, the SROs maintained audit trails before the challenged rules, and today they use the CAT to fulfill their self-regulatory functions, monitoring markets for fraud and abuse.  As the Supreme Court has repeated, "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State," even when the "regulation is extensive and detailed."  *Jackson*, 419 U.S. at 350; *see Polk County v. Dodson*, 454 U.S. 312, 318–19 (1981) (public defenders are not state actors, though they are compelled by the State to represent defendants, because criminal defense "is essentially a private function").  The conduct plaintiffs challenge has its source in the traditionally private regulation of the securities markets, so they cannot satisfy "the first prong of the *Lugar* test."  *Howard Gault Co.*, 848 F.2d at 554–55.

### ii.    *CAT LLC is not a state actor when receiving data.*

Plaintiffs' theory that CAT LLC is a state actor fails on *Lugar*'s second prong, too.  The Fifth Circuit has noted four different "formulas" applied by the Supreme Court "to determine whether seemingly private conduct may be charged to the state."  *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241 (5th Cir. 1999); *see Doe v. United States*, 831 F.3d 309, 314 (5th Cir. 2016).  Plaintiffs' First, Fourth, and Fifth Amendment claims against CAT LLC challenge its receipt of trading data.  *See* Compl. ¶¶ 150–156, 171–175, 185–191.  But under none of these tests can this

conduct—the exercise of a function long undertaken by private entities under their own rules for their own regulatory purposes—be deemed the activity of the United States. *See Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005) (state-action inquiry "begins by identifying the specific conduct of which the plaintiff complains" (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999))).

First, "[t]he 'public function test' examines whether the private entity performs a function which is 'exclusively reserved to the State.'" *Cornish*, 402 F.3d at 549 (quoting *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978)). This is an exceedingly narrow category, and securities regulation plainly does not qualify. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) ("The Court has stressed that 'very few' functions fall into th[is] category." (quoting *Flagg Bros.*, 436 U.S. at 158)). As discussed, regulation of securities markets has been a traditionally *private* function throughout our nation's history, and though the Exchange Act gave the SEC an oversight role, private entities remain the frontline market regulators. *See* pp. 6–7, 28–29, *supra*.

Second, "under the 'joint action test,'" a private entity is deemed a state actor if it is a "willful participant[] in joint action with the State or its agents." *Cornish*, 402 F.3d at 550 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). But this principle applies where the challenged conduct is jointly undertaken by government officials and private actors, such as bribing a judge to issue a corrupt injunction, *see Dennis*, 449 U.S. at 25–26, 28, or conspiring with a police officer to discriminate against a restaurant patron, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). Though the SEC plays some regulatory oversight role in CAT LLC's receipt of data—as it does in the context of other regulatory activity undertaken by SROs—the SEC is not engaged in data collection, and CAT LLC is not alleged to have conspired with the SEC. *See Barnes v. Lehman*,

861 F.2d 1383, 1387 (5th Cir. 1988) ("Procedural regulations simply do not suffice to establish the degree of joint participation required to convert private action into state action.").

Third, and relatedly, the "'nexus'" test "considers whether the State has inserted 'itself into a position of interdependence with the [private actor, such] that it was a joint participant in the enterprise.'" *Cornish*, 402 F.3d at 550 (alteration in original) (quoting *Jackson*, 419 U.S. at 357–58). This test is substantially the same as the joint-action test described above; indeed, the Supreme Court has collapsed the two into a single formulation. *See Halleck*, 587 U.S. at 809 (one of three state-action categories is "when the government acts jointly with the private entity"). This theory fails for the same reason: The SEC does not collect data or maintain the CAT.

Finally, "[u]nder the 'state compulsion test,'" a private entity's "conduct is attributable to the State when it exerts coercive power over the private entity or provides significant encouragement." *Cornish*, 402 F.3d at 549. Plaintiffs seem to suggest that because the SEC has regulated regarding the creation of the CAT—so CAT LLC is not free unilaterally to cease receiving data—CAT LLC must be "compelled" under the state-action test. *See* Compl. ¶¶ 99–104. But with or without SEC guidance, SROs must maintain some form of audit trails to engage in meaningful market oversight and surveillance. That is why, before Rule 613, SROs maintained their own audit trails. The SEC's additional regulation atop the SROs' rules and practices does not transform the performance of those functions into state action. The SROs use the CAT, just as they used predecessor audit trails, to monitor markets per their self-regulatory responsibilities.

The SRO-related precedents that resolve this case fit within broader state-action principles. "The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State." *Cornish*, 402 F.3d at 550 (alteration in original) (quoting *Blum*, 457 U.S. at 1004); *see Jarrell v. Chemical Dependency Unit of Acadiana*, 791 F.2d 373, 374 (5th Cir. 1986)

(per curiam).  In other words, the fact that the government regulates *how* a particular task is carried out, even if it regulates extensively, does not create state action.  Instead, the question is whether, when undertaking the challenged conduct, the private entity is acting on its own behalf or on the government's behalf.  That dooms plaintiffs' theory.  Again, SROs have long received data under their own rules governing audit trails, and they continue to do so using the CAT.  Yes, the SEC has regulated details of how the that data is received and mandated SEC access.  But the receipt of data remains non-state conduct—regardless how pervasively the SEC regulates it.  *Accord McGinn, Smith & Co. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011) ("The fact that FINRA shared information with the SEC does not establish that FINRA was acting on its behalf.").[13]

### iii.   *CAT LLC is not a state actor when sharing data.*

With respect to their Fourth Amendment claim, plaintiffs suggest that CAT LLC violates the Constitution not only by *receiving* data, but also by *sharing* it with the SEC.  Compl. ¶¶ 163– 166.  But this theory fares no better, for courts have consistently concluded that a private entity does not become a state actor by sharing information with federal agencies pursuant to mandatory data-sharing statutes, both in and beyond the context of market self-regulation.  *See McGinn, Smith & Co.*, 786 F. Supp. 2d at 147 (FINRA); *see also United States v. Williamson*, No. 21-cr-355, 2023 WL 4056324, at *12–13 (M.D. Fla. Feb. 10, 2023) (collecting cases).

For example, in *United States v. Miller*, 982 F.3d 412 (6th Cir. 2020), the defendant argued that Google was a state actor when it shared electronic evidence of child-pornography possession with the federal government, pursuant to a statute that made sharing mandatory.  *Id.* at 424.  That statute, like the SEC rule here, requires electronic service providers to turn over to the government

---

[13]   That plaintiffs have felt it necessary to include CAT LLC as a defendant underscores the independent nature of CAT LLC's efforts.  If CAT LLC were merely the paw of the SEC in receiving and hosting data, vacatur of Rule 613 would afford plaintiffs all the relief they want.

personal information about Google users.  *See* 18 U.S.C. § 2258A(a)–(b).  The court found no state

action, noting the wealth of authority across contexts holding that mandatory-reporting statutes do

not turn the reporter into a state actor for purposes of the Fourth Amendment.  *Miller*, 982 F.3d at

424; *see, e.g.*, *United States v. Rosenow*, 50 F.4th 715, 730 (9th Cir. 2022) ("Our caselaw is clear

that a private actor does not become a government agent simply by complying with a mandatory

reporting statute."), *cert. denied*, 143 S. Ct. 786 (2023); *Brown v. Newberger*, 291 F.3d 89, 93 (1st

Cir. 2002) ("[T]he reporting requirement under [a statute] does not create the kind of regulatory

nexus that could justify treating [the private defendant] as a state actor.").  So, too, here.  Comply-

ing with a regulatory data-sharing mandate does not transform CAT LLC into a state actor that can

violate the Fourth Amendment.[14]

### 2.   *CAT LLC is not a federal agency and cannot violate the APA.*

Plaintiffs additionally allege that CAT LLC violates the APA because the orders adopting

the plan to create the CAT are unlawful.  Compl. ¶¶ 193–197.  But only federal agencies may be

sued under the APA, and CAT LLC is not a federal agency.

The APA creates a cause of action for one who is "suffering legal wrong because of agency

action" or is "adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  The APA defines

"agency" as an "authority of the Government of the United States."  *Id.* § 701(b)(1).  At minimum,

an entity must be "part of the government" to be an agency for APA purposes.  *Callahan v. U.S.*

---

[14] To the extent plaintiffs argue that CAT LLC is a state actor when it permits SROs to search within CAT data, that theory has even less to recommend it.  These searches are conducted by CAT LLC's SRO participants in furtherance of their self-regulatory oversight and surveillance responsibilities, precluding a conclusion that CAT LLC's involvement in that process renders it a state actor.  *See United States v. Bebris*, 4 F.4th 551, 561–62 (7th Cir. 2021) ("Several of our sister circuits have recognized that a company which automatically scans electronic communications on its platform does 'not become a government agent merely because it had a mutual interest in [ferreting out wrongdoing].'" (quoting *United States v. Ringland*, 966 F.3d 731, 736 (8th Cir. 2020))).

*Dep't of Health & Hum. Servs. ex rel. Azar*, 434 F. Supp. 3d 1319, 1343 (N.D. Ga. 2020).  It is thus "well settled that suits under the APA may not be pursued against *nonfederal* entities, nor may federal courts enjoin nonfederal entities based on the conduct of federal agencies held to run afoul of the APA."  *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 358 (5th Cir. 2017); *accord Corner Post*, 2024 WL 3237691, at *16 (Kavanaugh, J., concurring) ("[T]he APA does not authorize suits against private parties."); *Karst Envtl. Educ. & Prot.*, 475 F.3d at 1298 ("[N]othing in the APA authorizes claims against nonfederal entities[.]").  This principle holds true, too, when nonfederal agencies implement federal programs.  *See, e.g.*, *Doe ex rel. Doe v. Bush*, 261 F.3d 1037, 1054–55 (11th Cir. 2001) (state Medicaid agencies are not agencies under the APA).  Even when a private actor meets the Supreme Court's tests for state action, it *still* cannot be sued under the APA; an entity can be sued under the APA only if it is a literal federal agency.  *See Callahan*, 434 F. Supp. 3d at 1371 ("the Supreme Court has made clear that the test for state action is broader" than that for APA agency status).

CAT LLC is not a federal agency.  It is a private limited-liability company whose owners are private organizations (*i.e.*, the SROs).  Therefore, it is not subject to suit under the APA.[15]

3.      *CAT LLC cannot be included in this suit as a relief defendant.*

Plaintiffs allege in the alternative that CAT LLC, even if not a state actor, is nonetheless a "Relief Defendant" that can be ordered to divest itself of data on an unjust-enrichment theory.  Compl. ¶¶ 210–212.  This theory is incorrect.

Relief defendants (or "nominal defendants") are sometimes included in lawsuits involving disputes over the ownership of specific property in the relief defendant's possession.  The relief

---

[15]  As noted, plaintiffs' APA claims fail for the additional reason that the APA does not supply a cause of action where, as here, it is displaced by a statute-specific review provision.  *See* note 8, *supra*.

defendant "has no ownership interest in the property that is the subject of litigation but may be joined in the lawsuit to aid the recovery of relief." *Janvey*, 588 F.3d at 834.  Typically, the concept arises in fraud cases where the defendant's ill-gotten monetary gains—which are subject to disgorgement—are in a third party's hands.  The relief defendant "is not accused of wrongdoing, but a court may order equitable relief against such a person where that person (1) has received *ill-gotten funds*, and (2) does not have a legitimate claim to *those funds*."  *Id.* (emphasis added).

For starters, CAT LLC's status as a relief defendant depends on plaintiffs' succeeding on their claims against the SEC.  The premise of the relief-defendant doctrine is that the plaintiff *has* a judgment against a wrongdoer for ill-gotten funds, but the relief defendant possesses the wrongdoer's ill-gotten funds, so the plaintiff needs to add the relief defendant to the case as a means of obtaining relief.  For the reasons set forth in Part II.A and in the SEC's brief, plaintiffs have failed to state a claim against the SEC.  If the SEC is dismissed, CAT LLC cannot be a relief defendant, for there is no defendant left against whom plaintiffs could succeed on their claims.

In any event, the concept of a "relief defendant" is inapplicable here.  There are no funds (or other specific *res*) the possession of which plaintiffs are being deprived by CAT LLC's wrongful possession, so there is no basis to include CAT LLC as a relief defendant.[16]  Moreover, plaintiffs' assertion that CAT LLC has been "unjustly enriched" through the possession of information in the CAT is baseless.  CAT LLC is a nonprofit entity that does not itself use the data, and the SROs are prohibited from using CAT data for commercial purposes (or any purpose other than

---

[16]  Plaintiffs argue in their preliminary-injunction brief that CAT LLC might be bound by an injunction issued against the SEC under Federal Rule of Civil Procedure 65(d)(2)(C).  *See* PI Br. 38.  Even if that contention had merit (though it does not, *see* p. 47, *infra*), it would be no basis for including CAT LLC as a relief defendant.  Not every entity potentially affected by an injunction is a proper defendant.  That is why Rule 65(d)(2) exists—to clarify that an injunction may bind nonparties.  *See* Fed. R. Civ. P. 65(d)(2)(B)–(C).

regulatory).  *See* 17 C.F.R. § 242.613(e)(4)(i)(A).  In truth, the SROs that own CAT LLC have expended *hundreds of millions of dollars* for the design, implementation, and maintenance of the CAT, with hundreds of millions of dollars more expected.  *See* 2023 Funding Order, 88 Fed. Reg. at 62,652 n.524, 62,662 n.749.  The notion that the CAT is an instrument for enriching either CAT LLC or the SROs that own it is absurd.

## II.   Plaintiffs Are Not Entitled to a Preliminary Injunction or a Stay.

A preliminary injunction is an "extraordinary remedy never awarded as of right."  *Abbott v. Biden*, 70 F.4th 817, 825 (5th Cir. 2023) (quoting *Winter*, 555 U.S. at 24).  A plaintiff seeking a preliminary injunction must "make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Starbucks Corp. v. McKinney ex rel. NLRB*, 144 S. Ct. 1570, 1575 (2024) (quoting *Winter*, 555 U.S. at 20).  The inquiry for purposes of a stay of agency action involves the same four factors.  *See Ohio v. EPA*, Nos. 23A349 etc., 2024 WL 3187768, at *6 (U.S. June 27, 2024) (citing *Nken*, 556 U.S. at 434); *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024).

The point of a preliminary injunction is to "preserve the relative positions of the parties" pending a resolution on the merits.  *Starbucks*, 144 S. Ct. at 1576 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  Here, however, plaintiffs seek preliminary relief that would drastically disturb the status quo, upending a regulatory program that has been running for years and wreaking havoc on the U.S. securities markets.  Nor would preliminary relief provide a significant benefit to plaintiffs, who have been subjected to the same supposed—but abstract—injury from the reporting of data for years.  The four traditional factors all point to the same clear conclusion: No preliminary relief is warranted.

**A.     Plaintiffs Have No Likelihood of Success on the Merits Against CAT LLC.**

For the reasons set forth in Part I above, plaintiffs cannot show they are likely to succeed on the merits.  The jurisdictional barriers are insurmountable and dispositive.  There is no route to review in this Court, and, in any event, plaintiffs cannot succeed as against CAT LLC, a private entity not subject to personal jurisdiction in Texas.  The probability of success is far from likely; it is zero.  Emergency relief is off the table.

**B.     Plaintiffs' Claims of Irreparable Harm Are Belied by Their Yearslong Delay in Bringing Suit.**

1.     *Claims of constitutional injury do not suffice to establish irreparable harm in the face of years of delay in seeking relief.*

Plaintiffs assert that they face irreparable harm because the CAT purportedly violates their constitutional rights.  PI Br. 34.  But "a showing that the plaintiff unreasonably delayed in seeking preliminary injunctive relief" overcomes even a presumption of irreparable harm.  *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 952 (N.D. Ill. 2018); *see Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) ("It is generally recognized that a long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm …." (quotation marks omitted)); *id.* at 835 (Feinerman, J., dissenting) (collecting cases); *see also, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is *presumed*." (emphasis added) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012))); *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 149 (N.D.N.Y. 2022) (finding irreparable harm because the "presumption" thereof in cases of constitutional injury "has not been rebutted").

Indeed, far shorter delays have been found to preclude preliminary relief, even when constitutional injury is asserted.  For instance, in *Ng v. Board of Regents of the University of Minnesota*, 64 F.4th 992, the Eighth Circuit found a 13-month delay between learning of a constitutional

injury and seeking an injunction to be dispositive of the irreparable-harm prong. *Id.* at 998–99. Key to that conclusion was the fact that, as here, the delay was unreasonable and resulted in a request for preliminary relief at a time when it was no longer possible to preserve the status quo. Similarly, the district court in *Preston v. Board of Trustees of Chicago State University*, 120 F. Supp. 3d 801 (N.D. Ill. 2015), rejected the argument that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" because plaintiff's 17-month "delay in pursuing an injunction undermine[d] the severity of these purported harms." *Id.* at 805–06 (quotation marks omitted); *see also, e.g.*, *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 383 (D.N.J. 2002) (one-year delay "knocks the bottom out of any claim of immediate and irreparable harm"). In this Circuit, "courts generally consider anywhere from a three-month delay to a six-month delay enough to militate against issuing injunctive relief." *VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 659 F. Supp. 3d 736, 743 (N.D. Tex. 2023) (quotation marks omitted); *see Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 17-cv-3200, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases in which delays of one year or less undercut claims of irreparable harm).

The SEC promulgated the final rule announcing a consolidated audit trail in 2012, and in 2016 the SEC finalized the CAT's creation. *See* p. 8, *supra*. The CAT has been operational and receiving data on market orders and transactions from broker-dealers since 2020, Ex. A ¶ 20, and by 2022, the CAT was receiving customer and account information, *id.* ¶ 23. At the very latest, plaintiffs were active investors as of June 2020 (though it appears, given the careful wording of their brief and declarations, that they may have been investors before then, as well). *See* PI Br.

11; Dkt. 25-40, ¶ 2; Dkt. 25-42, ¶ 2; Dkt. 25-44, ¶ 2.[17]  Plaintiffs thus not only were on notice of the CAT, but also were personally trading through broker-dealers subject to CAT reporting requirements for at least four years before filing this action.  All told, plaintiffs sat by beginning in 2012 while the CAT was designed, built, and brought online, and since 2020 while broker-dealers nationwide came into compliance with their reporting obligations.  After that, plaintiffs waited *nearly four more years* before bringing this suit (and over a month after that before claiming they needed preliminary relief).[18]  Given that history, it is not credible to claim irreparable injury requiring *immediate* relief.

This Court need go no further.  "[D]elay alone may justify denial of a preliminary injunction."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (quotation marks omitted).

2.    *Plaintiffs' other theories of irreparable harm lack merit.*

Plaintiffs also assert two other theories of irreparable harm: (1) that they are "subjected to … an unlawful rule," PI Br. 33–34; and (2) that they suffer "irreparable financial harm … in the form of the increased costs" the CAT program allegedly imposes on investors, *id.* at 34–35.  Both theories are self-defeated by plaintiffs' delay and, in any event, lack merit.

---

[17]  Plaintiffs assert in their brief that they have purchased stocks "[s]ince June 2020," PI Br. 11, and they state the same in their affidavits, *see* Dkt. 25-40, ¶ 2 ("[s]ince June 2020"); Dkt. 25-42, ¶ 2 (same); Dkt. 25-44, ¶ 2 (same).  The choice of June 2020 appears to be pegged to the month during which broker-dealers were required to report order and transaction data to the CAT.  *See* PI Br. 10; Ex. A ¶ 20.  But plaintiffs have *not* represented that they had never traded at all before June 2020.

[18]  Plaintiffs' claims of emergency are further belied by the fact that broker-dealers have long been required to collect and maintain even more data—including addresses, telephone numbers, dates of birth, and tax identification numbers.  *See* 17 C.F.R. § 240.17a-3(a)(1), (3), (17).  And as plaintiffs concede, broker-dealers, via the blue-sheet process, were always required to electronically share that information to the SEC "upon request."  *Id.* § 240.17a-25(a)–(c).  Likewise, trade data was previously collected via the OATS audit-trail system.  *See* Exhibit D, Declaration of Alexander Ellenberg ¶¶ 22–24 ("Ex. D"); FINRA Rule 7440 (deleted Sept. 1, 2021).

As for the first putative injury, plaintiffs suffer no harm whatsoever—much less irreparable harm—from the rules they seek to enjoin because none of those rules requires plaintiffs to do anything. The CAT program imposes obligations on broker-dealers, not investors. *See* 2016 CAT Order, 81 Fed Reg. at 84707. And plaintiffs, investors whose conduct is not altered in any respect by the CAT, lack standing to assert any purported injuries suffered by broker-dealers through whom they trade. The only possible harm inflicted on plaintiffs is the asserted abstract constitutional harms addressed above.

The second alternative theory relies on rank speculation. Plaintiffs have no evidence substantiating the idea that the current operation of the CAT affects their wallets. Plaintiffs acknowledge that "the dollar amount of the harm to Plaintiffs remains uncertain"—a state of affairs questionably attributed to "the CAT program's still-evolving nature"—but they nonetheless assert that "it is established that the CAT program has imposed and will continue to impose additional costs on stock investors." PI Br. 34. To this point, however, the costs of building and operating the CAT have been entirely borne by the SROs. Ex. C ¶ 23. An SEC order assigning a share of costs to broker-dealers is under review in the Eleventh Circuit. *See* 2023 Funding Order; Petition for Review, *Am. Sec. Ass'n*, No. 23-13396 (11th Cir. Oct. 17, 2023), ECF No. 1. Thus, to date, neither broker-dealers nor their customers have paid one penny to fund the CAT. Ex. C ¶ 23. Plaintiffs unsurprisingly cannot point to *any* costs the CAT "has imposed" on them. PI Br. 34.

Moreover, to the extent plaintiffs assert any injury beyond the actual receipt and retention of data, that injury is far too speculative to support preliminary relief. Plaintiffs, for instance, argue that a *search* of CAT trading data would violate their Fourth Amendment rights, and they also contend that the risk of a data breach implicates the Fourth Amendment. PI Br. 31–32. Even if these dubious theories had merit, there is no evidence to support the notion that either the SEC or

any other government agency will actually search data relating to plaintiffs' trading activities.  *See* note 11, *supra*; *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  Likewise, vague concerns about a hacker breaching the CAT are pure speculation, wholly insufficient to justify the extraordinary remedy of preliminary relief.

### C.      The Balance of the Equities and Public Interest Strongly Disfavor Relief.

Plaintiffs mount no real argument on the balance of the equities and the public interest, instead flatly asserting that (1) because the SEC is a government agency, it has no interest in continuing an unlawful program; and (2) there is no broader public interest whatsoever.  PI Br. 35.[19] Plaintiffs' scant treatment ignores what an injunction would mean to private defendant CAT LLC, its SRO owners, and the U.S. securities markets.  Plaintiffs' insistence that they seek to preserve the "status quo," *id.* at 37, by enjoining a longstanding program makes no sense.  And plaintiffs' blithe assertion that the only downside is "minor costs" to the SEC, *id.* at 36, blinks reality.

1.      *Immediate relief would create a regulatory vacuum, harming virtually every actor in the U.S. securities markets.*

The effects of an immediate injunction ordering the CAT offline would be drastic.  It would take a substantial period for the SROs to build new market-surveillance systems or revive legacy systems—which the SROs began to retire years ago in reliance on the CAT.[20]  *See* Exhibit D,

---

[19]  Overlooking that they have also sued CAT LLC, a private entity, plaintiffs note that the balance-of-equities and public-interest factors "merge when the Government is the opposing party."  PI Br. 35 (quoting *Nken*, 556 U.S. at 435).  That principle is inapplicable here, where it is not just the government on the other side of the "*v.*"

[20]  The retirements of certain predecessor systems were themselves the subject of SEC orders, which plaintiffs also declined to challenge.  *See* 17 C.F.R. § 242.613(a)(1)(ix) (requiring the SROs to make a "plan to eliminate existing rules and systems ... that will be rendered duplicative by the consolidated audit trail"); *see also* Notice of Filing and Immediate Effectiveness of a Proposed

Declaration of Alexander Ellenberg ¶¶ 22–24 ("Ex. D"); Exhibit E, Declaration of Stephen Larson ¶¶ 14–15 ("Ex. E"); Exhibit F, Declaration of Jeffrey S. Davis ¶ 12 ("Ex. F").  CAT data is a material resource for audit-trail information used in SRO surveillance programs, and, in some cases, is the only source currently available to monitor certain market activity.  As a result, if the CAT were ordered offline for a period, the SROs would lack data and related tools to effectively surveil the markets.  Ex. D ¶ 26; Ex. E ¶ 16; Ex. F ¶¶ 16–20.  Indeed, numerous SROs, including FINRA and Nasdaq, have incorporated CAT data into their surveillance patterns, so they rely heavily on the CAT's data inputs to track trading activity.  Ex. D ¶¶ 17–19; Ex. F ¶¶ 13–15.  For instance, without CAT data, some SROs would be unable to effectively evaluate conduct that occurs on other markets (cross-market activity), that, taken together, evinces a pattern of manipulative trading, such as spoofing or layering.  Ex. D ¶¶ 16–17, 25–26; Ex. E ¶ 15; Ex. F ¶¶ 14, 19.  Worse still, bad actors seeking to defraud the markets could knowingly exploit that oversight blackout and cause even greater harm.

The public harm encompasses more than just a lack of market security in the absence of an audit-trail system.  It includes the harm to broker-dealers, too, who will have to scramble to comply with whatever makeshift systems the SROs would be forced to assemble to provide market surveillance.  *See* Ex. D ¶¶ 23–26.  That shift will carry significant financial costs to both the SROs and broker-dealers.

Adding insult (and more injury) to injury, the extreme consequences of the injunction plaintiffs seek are attributable to their delay.  *See Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam) (explaining that "a party requesting a preliminary injunction must generally show

---

Rule Change Relating to the Retirement of FINRA's Order Audit Trail System, Exchange Act Release No. 92,239, 86 Fed. Reg. 34,293 (June 29, 2021).

reasonable diligence" to prevail on the equities portion of the preliminary-injunction test).  Had plaintiffs timely challenged the CAT, the SROs' legacy audit-trail systems could have been maintained, allowing for a smooth transition were the CAT to be held unlawful.  But naturally, when many years went by without legal challenge—during which time the CAT became operational and replaced prior audit-trail systems, Ex. D ¶ 22—the SROs had little reason to think that the mandate to have a consolidated audit trail would suddenly be pulled from under them.  The SROs can hardly be blamed for not maintaining legacy audit trails and other systems that the CAT had rendered redundant and that the SEC directed the SROs to decommission. *See* 17 C.F.R. § 242.613(a)(1)(ix) (requiring a "plan to eliminate existing rules and systems (or components thereof) that will be rendered duplicative by the consolidated audit trail").  It would be deeply inequitable to now throw the SROs and the markets into confusion because these plaintiffs have decided at long last to challenge a program a dozen years in the making and well into its operation, especially in light of a congressional provision requiring challenges to be brought within 60 days. *See Benisek*, 585 U.S. at 161 (preliminary injunction was unwarranted because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and the injunction plaintiffs sought would upend the status quo (quoting *Camenisch*, 451 U.S. at 395)).

## 2.    *The harm from an erroneous injunction would be enormous.*

In considering the equities, this Court must also account for the enormous damage to CAT LLC, the SROs, broker-dealers, and the public if an injunction were first to issue but later be deemed erroneous.  Indeed, this damage should figure substantially here, given that (1) it is plaintiffs who seek to upend the status quo; and (2) plaintiffs are particularly *un*likely to succeed on the merits, making it altogether plausible that a preliminary injunction would give rise to *two* massive industry shifts. *See Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 212 (W.D. Tex. 2020).  In a

typical case, these risks are mitigated by an injunction security "proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c); *see Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 379 (5th Cir. 2008) (emphasizing the importance of the Rule 65(c) bond requirement).  Here, the costs of an erroneous injunction would be astronomical, making it impossible for plaintiffs to post a bond protecting against the damages of an erroneous injunction.  And with no other way to mitigate these risks, denial of the preliminary injunction is the proper course.  *See In re Abbott*, 954 F.3d 772, 794 (5th Cir. 2020) ("In other cases, a surety bond may ensure that a party wrongfully enjoined can be compensated for any injury caused. … Those methods would be woefully inadequate here."), *vacated as moot sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) (mem.).

Start with the SROs.  As explained above, a preliminary injunction would force the SROs to devise or revive and install different audit-trail and reporting systems.  If CAT were ultimately deemed lawful—or, the far more likely outcome, if this case were ultimately dismissed for lack of jurisdiction—the expenditures associated with these temporary systems would be for nought.

Further, re-operationalizing the CAT after a period of latency would be extraordinarily burdensome and costly for CAT LLC.  Every day, CAT LLC receives *hundreds of billions* of records from thousands of reporting entities across the country and uploads them into CAT's database.  Ex. B ¶ 11.  Simply *retrieving* that data from broker-dealers after a period of not functioning would be incredibly complex, and actually loading it into the CAT database would incur severe costs.  *See id.* ¶ 12.  Yet it would be equally unthinkable to simply allow the persistence of a months-long gap in the market data upon which regulators rely to investigate anomalies and abuse.

The harm to broker-dealers would also be significant.  After incurring costs to comply with interim audit-trail systems (and that coming after the costs incurred to come into compliance with

the CAT in the first place), broker-dealers would be tasked with reworking their data-reporting systems once again to re-comply with the CAT. *See* Ex. D ¶¶ 23–26. This regulatory whiplash would impose enormous expense and inconvenience on the industry at large.

Plaintiffs complain about the costs of the CAT and invoke those costs as a reason for preliminary relief. PI Br. 36. The parties can debate the cost-effectiveness of the CAT compared to predecessor systems, but it is undeniable that an industrywide move away from the CAT, followed by a retreat *back* to the CAT if an injunction were later lifted, would impose deadweight compliance costs on the SROs and broker-dealers.

3. *Any benefits to plaintiffs are dwarfed by harms to CAT LLC and the public.*

Against these weighty harms that a preliminary injunction would bring about is the harm to plaintiffs in having information about their trading activity exist in a database alongside information about millions of others. Plaintiffs' significant delay in initiating litigation suggests that the magnitude of their alleged harm is comparatively slight.

Plaintiffs' asserted Fourth Amendment injury from the receipt by the CAT of certain trading data is abstract where it is not downright speculative.[21] To the extent plaintiffs complain about the "seizure" of trading data, PI Br. 27–28, they do not explain how this seizure affects them in any concrete way. And they forthrightly admit that the CAT's existence has not prevented plaintiffs from trading. *Id.* at 11. Nor, obviously, does the receipt of digital information about plaintiffs' trading deprive plaintiffs of that information, in the way seizure of a physical object might deprive the owner of its use. Moreover, plaintiffs acknowledge that the pre-CAT "blue-sheet process" for

---

[21] Plaintiffs also allege a violation of their First and Fifth Amendment rights, *see* Compl. ¶¶ 169–192, but they do not present any argument that they are entitled to a preliminary injunction with respect to their First or Fifth Amendment claims, *see* PI Br. 12. Plaintiffs have therefore forfeited any argument that their purported First and Fifth Amendment injuries are the relevant irreparable harm for purposes of their preliminary-injunction motion.

obtaining investor information largely provided regulators the same information available through the CAT—and plaintiffs concede the lawfulness of that process. *Id.* at 8–9; *see* Compl. ¶ 11.

Nor should the possibility of a search for data about plaintiffs carry significant weight in the balancing. While the harm associated with a regulator's (allegedly) unlawfully accessing (allegedly) private data may be greater than the harm associated with that data's mere existence in a database, it is entirely speculative that an SRO, the SEC, or any other government or nongovernment actor will actually view data related to plaintiffs' trading activities. Likewise, the risk of a cybersecurity breach is entirely speculative. Even if these risks were enough to support standing (though that is doubtful, *see* note 11, *supra*), they are plainly insufficient to justify a preliminary injunction—especially given the grave opposing interests.[22]

## III.   Any Preliminary Relief Should Be Properly Tailored.

Plaintiffs seek extraordinary emergency relief to which they are not entitled—full stop. If this Court were nevertheless to entertain their requests for relief, further briefing is needed on the scope of plaintiffs' overbroad and confused ask for a preliminary injunction. Plaintiffs' peculiar further reference to a stay is a nonstarter.

### A.   Further Briefing Would Be Needed to Clarify the Scope of Any Preliminary Injunction.

In the event this Court determines a preliminary injunction is warranted, CAT LLC requests the opportunity to brief proposals for an injunction that would cure plaintiffs' alleged harms while causing the least damage to the operation of the CAT and the SROs' regulatory activities. Plaintiffs' proposed order alone necessitates such briefing. It mysteriously keys relief to FINRA

---

[22]  Perhaps plaintiffs' apathy toward the extreme harm that would be caused by the relief they seek comes from their misunderstanding that "the injunction and stay relate to a program that is not even fully in operation." PI Br. 35-36. Again, the CAT has been receiving data for years. Ex. A ¶ 20. As outlined, the ramifications of pausing the CAT would be huge.

Rule 6800 Series, *see* Dkt. 25-2, which has little relevance to the supposed harms about which plaintiffs complain in their brief.  And two major legal issues informing the appropriate scope of any preliminary injunction necessitate further analysis based on the Court's legal conclusions.

For one thing, an injunction "is overbroad if it is not 'narrowly tailor[ed] … to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam) (alterations in original) (quoting *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).  Accordingly, even if plaintiffs are entitled to preliminary relief, that relief must be tailored, to the extent possible, to afford relief to plaintiffs themselves—rather than a preliminary injunction that would stop the CAT program *in toto* across the country.  Tailored relief would be particularly appropriate here given the significant harms that would ensue if CAT were enjoined nationwide.[23]

In addition, plaintiffs suggest that an injunction against the SEC would bind CAT LLC by operation of Federal Rule of Civil Procedure 65(d), which makes injunctions binding on a party's "agents" and on "other persons who are in active concert or participation" with a party.  Fed. R. Civ. P. 65(d)(2)(B)–(C); *see* PI Br. 38.  But Rule 65(d) cannot justify relief against CAT LLC.  An injunction against the SEC would fully cure any constitutional injuries plaintiffs have alleged regarding state action, since, again, CAT LLC is a private entity that cannot violate the Constitution.

**B.     There Is No Basis for a Stay.**

Plaintiffs puzzlingly also ask for a stay of SEC rules creating and implementing CAT, despite the fact that the SEC's rules and related orders have been in effect for years.  It is unclear

---

[23] It would be particularly improper to grant nationwide relief in this case given that plaintiffs have brought this suit as a class action, *see* Compl. ¶¶ 105–113; *id.* pp. 7, 51, but did not seek to certify the class before seeking a preliminary injunction. *See United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring in the judgment) (observing that universal injunctions "encourage parties to … circumvent rules governing class-wide relief").

what plaintiffs believe a stay would accomplish, or how that relief would differ from a preliminary injunction.  And because plaintiffs seek to upend—not preserve—the status quo, the text of the APA plainly precludes a stay.  *See* 5 U.S.C. § 705 (authorizing a stay "to postpone the effective date of an agency action *or to preserve status or rights* pending conclusion of the review proceedings" (emphasis added)).

Nevertheless, plaintiffs insist that courts "routinely stay already-effective agency action." PI Br. 37.  The examples plaintiffs cite, however, do not involve decade-old agency action that has been operating on the ground for years.  Instead, plaintiffs misunderstand the difference between the "effective date" of an agency rule (the date on which it attains the force of law) and the date by which it requires compliance, which is more relevant for purposes of equitable relief.  For instance, the rule at issue in *West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem.), was stayed in February 2016, about 7 weeks after its technical effective date, but that rule did not require compliance until 2022.  *See* Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64,662, 64,664 (Oct. 23, 2015).  The rule at issue in *BST Holdings v. OSHA*, 17 F.4th 604 (5th Cir. 2021), was stayed a week after its promulgation and several weeks before its earliest compliance date.  *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402, 61,462 (Nov. 5, 2021).[24]  None of these cases involved a suit brought outside of the petition-for-review process years after an agency announced a rule and compliance was complete.  There is no precedent for plaintiffs' ask.

---

[24]  The other two cases plaintiffs invoke are further afield.  The challenger in *Wages & White Lion Investments, L.L.C. v. United States FDA*, 16 F.4th 1130 (5th Cir. 2021), brought a petition for review in the court of appeals and received an immediate administrative stay pending review.  *Id.* at 1135.  And *Texas v. United States EPA*, 829 F.3d 405 (5th Cir. 2016), involved a timely petition for review of an agency rule in the ordinary course.  *Id.* at 416–17.

## CONCLUSION

The motion to dismiss should be granted and this action should be dismissed for lack of subject-matter jurisdiction.  In the alternative, CAT LLC should be dismissed from the action either for lack of personal jurisdiction or because the complaint fails to state a claim against it.  The motion for a preliminary injunction and a stay should be denied.

Dated:  July 12, 2024

Respectfully submitted,

/s/ Ian Heath Gershengorn

| | |
|---|---|
| Gregory M. Boyle (*pro hac vice*) | Ian Heath Gershengorn (*pro hac vice*) |
| Michael F. Linden (*pro hac vice*) | Adam G. Unikowsky (*pro hac vice*) |
| JENNER & BLOCK LLP | Elizabeth B. Deutsch (*pro hac vice*) |
| 353 N. Clark Street | Jonathan J. Marshall (*pro hac vice*) |
| Chicago, IL 60654 | JENNER & BLOCK LLP |
| Tel: (312) 222-9350 | 1099 New York Avenue, N.W., Suite 900 |
| Fax: (312) 527-0484 | Washington, DC 20001 |
| gboyle@jenner.com | Tel: (202) 639-6000 |
| mlinden@jenner.com | Fax: (202) 661-4967 |
| | igershengorn@jenner.com |
| David N. Deaconson | aunikowsky@jenner.com |
| Tex. Bar No. 05673400 | edeutsch@jenner.com |
| PAKIS, GIOTES, BURLESON | jmarshall@jenner.com |
| & DEACONSON, P.C. | |
| 400 Austin Avenue | |
| Waco, TX 76701 | |
| Tel: (254) 297-7300 | |
| Fax: (254) 297-7301 | |
| deaconson@pakislaw.com | |

49

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas, Waco Division, using the CM/ECF system, which will send a notice of filing to all counsel of record who have consented to service by electronic means.

Dated:  July 12, 2024                                    */s/ Ian Heath Gershengorn*

50