# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

ERIK DAVIDSON, *et al.*,

              Plaintiff,

    v.

GARY GENSLER, in his official capacity
as Chairman of the U.S. Securities and Ex-
change Commission, *et al.*,

              Defendants.

Case No. 6:24-cv-00197-ADA

**SEC DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFF'S PRELIMINARY-INJUNCTION MOTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

I.      The SEC supervises self-regulatory organizations to govern securities markets......... 3

II.     The statutory framework stems from a long history of both governmental and self-regulatory oversight, leading to the advent of a national market system in 1975. .................................................................................................... 4

III.    Since 1975, the SEC has supervised and regulated national markets using its authorities under Section 17 and Section 11A. ....................................................... 7

        A.      The SEC has long heeded Congress's direction to facilitate a national market system with its Section 11A authority............................................... 7

        B.      The SEC has long used its Section 17 authority to monitor the self-regulatory organizations' audit trails and broker-dealers' investor information.............................................................................................. 8

IV.     A consolidated audit trail is needed to supervise modern securities markets. ........... 11

        A.      The SEC proposes and subsequently adopts Rule 613, mandating a consolidated audit trail. ............................................................................. 11

        B.      The SEC approves the self-regulatory organizations' plan for the Consolidated Audit Trail. ....................................................................... 12

V.      Plaintiffs now challenge the Consolidated Audit Trail long after it was proposed, adopted, and implemented. ................................................................ 14

ARGUMENT ..................................................................................................... 15

I.      This Court lacks jurisdiction to adjudicate Plaintiffs' claims. ................................ 15

        A.      Plaintiffs have sued in the wrong court....................................................... 16

        B.      Plaintiffs have sued 12 years too late.......................................................... 17

        C.      Plaintiffs have sued without plausibly alleging any injury caused by Defendants that is redressable by the Court. ............................................... 20

II.    Plaintiffs have not plausibly alleged any legal violation and cannot succeed on the merits of their claims. ...................................................................... 25

    A.    The SEC had statutory authority to establish the Consolidated Audit Trail. ....................................................................................... 25

        1.    The Exchange Act provides ample authority for the Consolidated Audit Trail. .............................................. 26

            a.    Like prior audit trails, Section 17 provides authority for the Consolidated Audit Trail. ............................................... 26

            b.    In furtherance of the national market system, Section 11A provides authority for the Consolidated Audit Trail. ............. 28

        2.    The major-questions doctrine is inapplicable or satisfied. ................ 32

    B.    The Fourth Amendment is not implicated by aggregating third-party information that Plaintiffs voluntarily disclosed. ........................................ 37

        1.    There is no search. ......................................................... 37

            a.    Plaintiffs have no property interest or privacy expectation in information voluntarily disclosed to third parties. ............. 38

            b.    Other factors also indicate that Plaintiffs have no reasonable expectation of privacy. ........................................ 43

        2.    There is no seizure. ......................................................... 46

    C.    Plaintiffs have no property interests implicating the Fifth Amendment. ........ 47

    D.    No First Amendment right is burdened by the collection of securities data. .......... 47

        1.    The First Amendment does not protect commercial associations. .................................................................. 48

        2.    Regardless, the Consolidated Audit Trail does not impose an impermissible burden. ................................................. 51

    E.    The Appropriations Clause is inapplicable to self-regulatory activities like the Consolidated Audit Trail. .............................................. 53

    F.    Plaintiffs' remaining claims are duplicative and should be dismissed for the same reasons as their other claims. ........................................ 55

III.    The federal government and the public have an overwhelming interest in having an operational Consolidated Audit Trail. ................................... 56

IV.    Plaintiffs would suffer no irreparable harm from denial of their belated motion ............................................................................................................ 58

V.    Because a class action has not been certified, any injunctive relief should be tailored to the named Plaintiffs............................................................................ 60

CONCLUSION .......................................................................................................... 62

# TABLE OF AUTHORITIES

## CASES

*AARP v. U.S. Equal Emp. Opportunity Comm'n,*
    226 F. Supp. 3d 7 (D.D.C. 2016) ................................................................ 61

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ................................................................................... 46

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ................................................................................... 35

*All. for Fair Bd. Recruitment v. SEC,*
    85 F.4th 226 (5th Cir. 2023) ..................................................................... 47

*All. for Safe, Efficient & Competitive Truck Transp. v. FMCSA,*
    755 F.3d 946 (D.C. Cir. 2014) ................................................................... 20

*Am. Stewards of Liberty v. Dep't of Interior,*
    960 F.3d 223 (5th Cir. 2020) ..................................................................... 21

*Americans for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) .................................................................. 50, 52, 53, 54

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ..................................................................... 63

*Arizona v. Hicks,*
    480 U.S. 321 (1987) ................................................................................... 47

*Ark. Times LP v. Waldrip,*
    37 F.4th 1386 (8th Cir. 2022) ................................................................... 52

*Asadi v. G.E. Energy (USA), L.L.C.,*
    720 F.3d 620 (5th Cir. 2013) ..................................................................... 30

*Barclift v. Keystone Credit Servs., LLC,*
    93 F.4th 136 (3d Cir. 2024) ....................................................................... 22

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ............................................................................. 59, 61

*Biden v. Missouri,*
    595 U.S. 87 (2022) ....................................................................... 29, 35, 36

*Biden v. Nebraska*,
 143 S. Ct. 2355 (2023) ...................................................... 34, 35, 37

*Bills v. Aseltine*,
 958 F.2d 697 (6th Cir. 1992) ......................................................... 47

*Boechler, P.C. v. Comm'r of Internal Revenue*,
 596 U.S. 199 (2022) ........................................................................ 18

*Boire v. Pilot Freight Carriers, Inc.*,
 515 F.2d 1185 (5th Cir. 1975) ...................................................... 61

*Bowlby v. City of Aberdeen*,
 681 F.3d 215 (5th Cir. 2012) ........................................................ 43

*Bradford Nat'l Clearing Corp. v. SEC*,
 590 F.2d 1085 (D.C. Cir. 1978) .................................................... 34

*Brennan v. Dickson*,
 45 F.4th 48 (D.C. Cir. 2022) ........................................................ 24

*Browe v. CTC Corp.*,
 15 F.4th 175 (2d Cir. 2021) .......................................................... 20

*Buckley v. Valeo*,
 424 U.S. 1 (1976) ............................................................... 50, 53, 54

*Business Roundtable v. SEC*,
 905 F.2d 406 (D.C. Cir. 1990) ...................................................... 31

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
 582 U.S. 497 (2017) ........................................................................ 20

*California v. Texas*,
 593 U.S. 659 (2021) ........................................................................ 21

*Carpenter v. United States*,
 484 U.S. 19 (1987) .......................................................................... 42

*Carpenter v. United States*,
 585 U.S. 296 (2018) .................................................................. 40, 43

*Chamber of Com. of United States v. SEC*,
 85 F.4th 760 (5th Cir. 2023) ..................................................... 49, 54

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d Cir. 1985) .................................................. 61

*City of Dallas v. Stanglin,*
    490 U.S. 19 (1989) ......................................................... 50, 52

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................ 21

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
    601 U.S. 416 (2024) ....................................................... 54, 55

*Corley v. United States,*
    556 U.S. 303 (2009) ........................................................ 26

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    144 S. Ct. 2440 (2024) ..................................................... 20

*Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    957 F. Supp. 1460 (N.D. Ill. 1997) ...................................... 47

*CRG Holdings LLC v. Hardman,*
    2006 WL 8436272 (W.D. Tex. Mar. 15, 2006) ........................ 43

*Dep't of Homeland Sec. v. New York,*
    140 S. Ct. 599 (2020) ...................................................... 62

*Domestic Sec., Inc. v. SEC,*
    333 F.3d 239 (D.C. Cir. 2003)............................................ 19

*Donovan v. Mehlenbacher,*
    652 F.2d 228 (2d Cir. 1981) .............................................. 44

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
    472 U.S. 749 (1985)........................................................ 49

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022)............................................ 23, 24

*Ellis v. Cargill Meat Sols.,*
    2023 WL 9547632 (N.D. Tex. Oct. 31, 2023) ........................ 22, 23

*Elrod v. Burns,*
    427 U.S. 347 (1976)........................................................ 59

*Fam. Rehab., Inc. v. Azar*,
   886 F.3d 496 (5th Cir. 2018) ...................................... 57

*FDA v. All. for Hippocratic,
   Med.*, 602 U.S. 367 (2024) ............................... 21, 24, 25

*Fedance v. Harris*,
   1 F.4th 1278 (11th Cir. 2021) ................................... 20

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019) ................................................ 26

*Frew v. Young*,
   992 F.3d 391 (5th Cir. 2021) ................................... 18

*FTC v. Am. Tobacco Co.*,
   264 U.S. 298 (1924) ............................................... 42

*Full Value Advisors, LLC v. SEC*,
   633 F.3d 1101 (D.C. Cir. 2011) ........................... 49, 54

*Gill v. Whitford*,
   585 U.S. 48 (2018) ................................................. 62

*Gonzalez v. Blue Cross Blue Shield Ass'n*,
   62 F.4th 891 (5th Cir. 2023) ................................... 24

*Green-Cooper v. Brinker Int'l, Inc.*,
   73 F.4th 883 (11th Cir. 2023) ................................. 22

*Gulf Coast Pharms. Plus v. United States*,
   2023 WL 3099873 (S.D. Miss. Apr. 26, 2023) ............ 60

*Hall v. Geiger-Jones Co.*,
   242 U.S. 539 (1917) ............................................... 45

*Hamer v. Neighborhood Hous. Servs. of Chi.*,
   583 U.S. 17 (2017) ................................................. 18

*Harper v. Rettig*,
   675 F. Supp. 3d 190 (D.N.H. 2023) ..................... 43, 48

*Harrow v. Dep't of Def.*,
   601 U.S. 480 (2024) ............................................... 19

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428 (2011) ...................................................................... 18

*Hewitt v. Helms*,
    482 U.S. 755 (1987) ........................................................................ 25

*In re Bonvillian Marine Serv., Inc.*,
    19 F.4th 787 (5th Cir. 2021) .......................................................... 19

*In re Grand Jury Subpoena*,
    696 F.3d 428 (5th Cir. 2012) .................................................... 44, 46

*In re Stewart*,
    647 F.3d 553 (5th Cir. 2011) .......................................................... 60

*Jacoby & Meyers, LLP v. Supreme Ct. of New York*,
    852 F.3d 178 (2d Cir. 2017) .................................................. 49, 50, 51

*Jones v. Lumpkin*,
    22 F.4th 486 (5th Cir. 2022) .......................................................... 21

*Kane v. De Blasio*,
    19 F.4th 152 (2d Cir. 2021) ............................................................ 63

*Kern v. SEC*,
    724 F. App'x 687 (10th Cir. 2018) .................................................. 19

*Klayman v. Obama*,
    142 F. Supp. 3d 172 (D.D.C. 2015) ................................................ 63

*Kyllo v. United States*,
    533 U.S. 27 (2001) .......................................................................... 41

*Labrador v. Poe ex rel. Poe*,
    144 S. Ct. 921 (2024) ...................................................................... 62

*Leal v. Becerra*,
    2022 WL 2981427 (5th Cir. July 27, 2022) .................................... 25

*Lewis v. Danos*,
    83 F.4th 948 (5th Cir. 2023) .......................................................... 21

*Little Sisters of the Poor v. Pennsylvania*,
    591 U.S. 657 (2020) ........................................................................ 33

*Louisiana ex rel. Landry v. Biden*,
  64 F.4th 674 (5th Cir. 2023) ..................................................... 24

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) ..................................................... 62

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................. 21

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ................................................................. 62

*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1978) ................................................................. 44

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006) ..................................................... 51

*Max-George v. Oath, Inc.*,
  2022 WL 2307387 (E.D. Tex. June 27, 2022) ........................ 23

*McIntosh v. United States*,
  601 U.S. 330 (2024) ................................................................. 18

*McKenzie v. City of Chicago*,
  118 F.3d 552 (7th Cir. 1997) ................................................... 63

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) ............................................................. 46, 58

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*,
  414 U.S. 117 (1973) .................................................................. 3

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ............................................. 44, 46

*Michigan v. EPA*,
  576 U.S. 743 (2015) ................................................................. 55

*Mirka United, Inc. v. Cuomo*,
  2007 WL 4225487 (S.D.N.Y. Nov. 27, 2007) ........................ 60

*Mont. Env't Info. Ctr. v. Thomas*,
  902 F.3d 971 (9th Cir. 2018) ................................................... 33

*Murthy v. Missouri,*
144 S. Ct. 1972 (2024) .......................................................... 23

*NAACP v. Alabama,*
357 U.S. 449 (1958).......................................................... 50, 52

*Nasdaq Stock Mkt. LLC v. SEC,*
34 F.4th 1105 (2022).......................................................... 32

*Nasdaq Stock Mkt. LLC v. SEC,*
38 F.4th 1126 (D.C. Cir. 2022) .................................*passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012).......................................................... 55

*Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,*
896 F.2d 1283 (11th Cir. 1990)...................................... 59

*NetCoalition v. SEC,*
715 F.3d 342 (D.C. Cir. 2013)........................................ 19

*New York Stock Exch. v. SEC,*
2 F.4th 989 (D.C. Cir. 2021) .......................................... 32

*Newell v. SEC,*
812 F.2d 1259 (9th Cir. 1987) ....................................... 19

*Nicopure Labs, LLC v.FDA,*
944 F.3d 267 (D.C. Cir. 2019)........................................ 51

*Nken v. Holder,*
556 U.S. 418 (2009)......................................................... 58

*Nutraceutical Corp. v. Lambert,*
586 U.S. 188 (2019)......................................................... 19

*Nuziard v. Minority Bus. Dev. Agency,*
676 F. Supp. 3d 473 (N.D. Tex. 2023)......................... 62

*N.Y. Repub. State. Comm. v. SEC,*
799 F.3d 1126 (D.C. Cir. 2015)..................................... 17

*Off. of Pers. Mgmt. v. Richmond,*
496 U.S. 414 (1990)......................................................... 55

*Ohio v. EPA*,
144 S. Ct. 2040 (2024) .................................................. 15

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)................................................49, 51

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023) ........................................ 56

*O'Leary v. TrustedID, Inc.*,
60 F.4th 240 (4th Cir. 2023) ........................................ 22

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) ....................................... 59

*Pearce v. Miele*,
2015 WL 4546114 (D. Conn. July 28, 2015).................43, 44

*Perpetual Sec., Inc. v. Tang*,
290 F.3d 132 (2d Cir. 2002) ........................................ 47

*Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*,
835 F.2d 380 (1st Cir. 1987)........................................ 60

*R J Reynolds Tobacco Co. v. FDA*,
96 F.4th 863 (5th Cir. 2024) ........................................ 54

*Renne v. Geary*,
501 U.S. 312 (1991)................................................... 25

*Rest. L. Ctr. v. Dep't of Lab.*,
2023 WL 4375518 (W.D. Tex. July 6, 2023) ................. 58

*Reves v. Ernst & Young*,
494 U.S. 56 (1990).................................................... 46

*Riley v. California*,
573 U.S. 373 (2014).................................................. 42

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984).................................................. 50

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)..............................................42, 48

*SEC v. Almagarby*,
92 F.4th 1306 (11th Cir. 2024) ..................................................................5, 45

*SEC v. Andrews*,
88 F.2d 441 (2d Cir. 1937) ....................................................................... 19

*SEC v. Jerry T. O'Brien, Inc.*,
467 U.S. 735 (1984) ................................................................................. 39

*SEC v. Olsen*,
243 F. Supp. 338 (S.D.N.Y. 1965) ......................................................... 46

*SEC v. Wall St. Pub. Inst., Inc.*,
851 F.2d 365 (D.C. Cir. 1988) ................................................................ 49

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) .............................................................. 60

*Silver v. New York Stock Exch.*,
373 U.S. 341 (1963) ................................................................................... 5

*Sloan v. Drummond Co., Inc.*,
102 F.4th 1169 (11th Cir. 2024) ............................................................. 19

*Smith v. Maryland*,
442 U.S. 735 (1979) ................................................................................. 39

*Stone v. INS*,
514 U.S. 386 (1995) ................................................................................. 20

*Stringer v. Whitley*,
942 F.3d 715 (5th Cir. 2019) .................................................................. 60

*Symetra Life Ins. Co. v. Rapid Settlements Ltd.*,
612 F. Supp. 2d 759 (S.D. Tex. 2007) .................................................... 61

*Tate v. Am. Tugs, Inc.*,
634 F.2d 869 (5th Cir. 1981) .................................................................. 59

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) .................................................................. 55

*Texas v. Johnson*,
491 U.S. 397 (1989) ................................................................................. 51

*Texas v. SEC,*
2024 WL 2106183 (5th Cir. May 10, 2024)............................................................. 24

*Touche Ross & Co. v. Redington,*
442 U.S. 560 (1979)............................................................................................. 27

*Tough Traveler, Ltd. v. Outbound Prod.,*
60 F.3d 964 (2d Cir.1995)................................................................................... 61

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)............................................................................................. 22

*Trump v. Hawaii,*
585 U.S. 667 (2018)............................................................................................. 62

*Tuberville v. FINRA,*
874 F.3d 1268 (11th Cir. 2017)............................................................................. 4

*United States v. Ackerman,*
831 F.3d 1292 (10th Cir. 2016)........................................................................... 42

*United States v. Beard,*
16 F.4th 1115 (5th Cir. 2021) ............................................................................. 47

*United States v. Franco,*
973 F.3d 465 (5th Cir. 2020) ............................................................................. 20

*United States v. Gaulden,*
73 F.4th 390 (5th Cir. 2023).........................................................................38, 39

*United States v. Gorshkov,*
2001 WL 1024026 (W.D. Wash. May 23, 2001)...............................................47, 48

*United States v. Gratkowski,*
964 F.3d 307 (5th Cir. 2020) ....................................................................39, 40, 41

*United States v. Johnlouis,*
44 F.4th 331 (5th Cir. 2022)............................................................................... 47

*United States v. Miller,*
425 U.S. 435 (1976)...............................................................................39, 41, 42, 47

*United States v. Naranjo,*
102 F.4th 280 (5th Cir. 2024) ............................................................................. 20

*United States v. Osborn*,
  2023 WL 3602331 (D. Colo. May 23, 2023) ............................................................ 43

*United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*,
  341 F.3d 404 (5th Cir. 2003) .................................................................................. 60

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................................................ 21

*United States v. Turner*,
  839 F.3d 429 (5th Cir. 2016) .................................................................................. 38

*United States v. Warshak*,
  631 F.3d 266 (6th Cir. 2010) .................................................................................. 42

*United States v. Whipple*,
  92 F.4th 605 (6th Cir. 2024) ...................................................................... 39, 40, 43

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ................................................................................................ 59

*Vita-Mix Corp. v. Tristar Prod., Inc.*,
  2008 WL 11383504 (N.D. Ohio Sept. 30, 2008) .................................................... 60

*Vonderhaar v. Vill. of Evendale*,
  906 F.3d 397 (6th Cir. 2018) .................................................................................. 24

*Wanger v. SEC*,
  720 F. App'x 792 (7th Cir. 2018) ............................................................................ 19

*Webb v. Injured Workers Pharmacy, LLC*,
  72 F.4th 365 (1st Cir. 2023) ................................................................................... 22

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ..........................................................................................*passim*

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ................................................................................................ 55

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
  418 F.3d 36 (1st Cir. 2005) .................................................................................... 50

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................... 59

*Wolcott v. Sebelius*,
  635 F.3d 757 (5th Cir. 2011) ............................................ 57

*Zepeda v. INS*,
  753 F.2d 719 (9th Cir. 1983) ............................................ 60

*Zietzke v. United States*,
  426 F. Supp. 3d 758 (W.D. Wash. 2019) ........................... 43

## CONSTITUTION

U.S. Const. amend. IV ...................................................... 38

U.S. Const. amend V ........................................................ 48

U.S. Const. Art. I, § 9, cl. 7 ............................................ 54

## STATUTES

5 U.S.C. § 705 ......................................................... 15, 61

15 U.S.C. § 78b ............................................................. 27

15 U.S.C. § 78c .............................................................. 3

15 U.S.C. § 78e .............................................................. 3

15 U.S.C. § 78f ........................................................ 3, 4, 27

15 U.S.C. § 78k-1 ....................................................... *passim*

15 U.S.C. § 78o .............................................................. 3

15 U.S.C. § 78o-3 ..................................................... 3, 4, 27

15 U.S.C. § 78q ......................................................... *passim*

15 U.S.C. § 78s ....................................................... 3, 4, 27

15 U.S.C. § 78u .............................................................. 4

15 U.S.C. § 78u-2 ........................................................... 4

15 U.S.C. § 78u-3 ........................................................... 4

15 U.S.C. § 78w ............................................................ 27

15 U.S.C. § 78y ......................................................................................*passim*

15 U.S.C. § 6802 ...............................................................................42, 46

28 U.S.C. § 1361 ......................................................................................... 57

28 U.S.C. § 2344 ......................................................................................... 20

31 U.S.C. § 1341 ......................................................................................... 56

31 U.S.C. § 3302 ......................................................................................... 56

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946)............. 61

Exchange Act,
48 Stat. 881 (1934)......................................................................*passim*

Securities Acts Amendments of 1975,
Pub. L. No. 94-29, 89 Stat. 9137 .............................................................6, 27

**LEGISLATIVE HISTORIES**

S. Rep. No. 94-75 (1975), *as reprinted in* U.S.C.C.A.N. 179 .........................................*passim*

**RULES**

Fed. R. Civ. P. 12(b)...................................................................................... 15

**REGULATIONS**

17 C.F.R. § 240.17a-3 ...............................................................................28, 53

17 C.F.R. § 240.17a-4 ...............................................................................28, 53

17 C.F.R. § 240.17a-25 ...................................................................9, 28, 45, 53

17 C.F.R. § 242.300....................................................................................... 52

17 C.F.R. § 242.608........................................................................................7, 8

17 C.F.R. § 242.613....................................................................................... 52

Order Relating to the Automated Submission of Customer and Propriety Trading Data,
53 Fed. Reg. 25,029 (July 1, 1988) ............................................................... 9

Order Approving Proposed Rule Change,
63 Fed. Reg. 12,559 (Mar. 13, 1998). ....................................................... 28

Rule 17a-25,
    66 Fed. Reg. 35,836 (July 9, 2021). ........................................... 8, 9, 10, 25

Order Approving Proposed Rule Change by NYSE,
    68 Fed. Reg. 20,200 (Apr. 24, 2003) ............................................... 28

Request for Comment on Nasdaq Petition,
    68 Fed. Reg. 27,722 (May 20, 2003) ................................................ 11

Fair Administration and Governance of Self-Regulatory Organizations,
    69 Fed. Reg. 71,255 (Dec. 8, 2004) ................................................ 56

Order Approving Proposed Rule Change,
    70 Fed. Reg. 2,436 (Jan. 13, 2005). ............................................... 28

Regulation NMS,
    70 Fed. Reg. 37,496 (June 29, 2005). ......................................... 7, 28, 32

Consolidated Audit Trail,
    75 Fed. Reg. 32,556 (June 8, 2010); .....................................*passim*

Order Approving NMS Plan on Extraordinary Market Volatility,
    77 Fed. Reg. 33,498 (June 6, 2012) ................................................ 8

Consolidated Audit Trail,
    77 Fed. Reg. 45,722 (Aug. 1, 2012) .....................................*passim*

Transfer Agent Regulations: Concept Release,
    80 Fed. Reg. 81,948 (Dec. 31, 2015) .....................................5, 41

Order Approving the NMS Plan for the Consolidated Audit Trail,
    81 Fed. Reg. 84,696 (Nov. 23, 2016) .....................................*passim*

Order Granting Conditional Exemptive Relief,
    85 Fed. Reg. 16,152 (Mar. 20, 2020) .....................................13, 15, 22, 37

Amendments to the NMS Plan Governing the Consolidated Audit Trail,
    85 Fed. Reg. 31,322 (May 22, 2020) ............................................... 14

Notice,
    86 Fed. Reg. 34,293 (June 29, 2021) ............................................... 36

Order Approving an Amendment to the NMS Governing the Consolidated Audit Trail,
    88 Fed. Reg. 62,628 (Sept. 12, 2023) ......................................... 14, 29, 56

Order Granting Conditional Exemptive Relief,
    88 Fed. Reg. 77,128 (Nov. 8, 2023) .............................................................. 14

Disclosure of Order Execution Information,
    89 Fed. Reg. 26,428 (April 15, 2024). .......................................................... 8

**OTHER AUTHORITIES**

CNBC, *Want to get into investing? Start with these free stock trading platforms* (April 9, 2024),
    https://perma.cc/T6HV-UCQV ...................................................................... 24

Dep't Homeland Sec., *TSA Secure Flight Program* (March 31, 2023),
    https://perma.cc/WKS9-H5XA ...................................................................... 44

Federal Student Aid, *National Student Loan Data System (NSLDS)*,
    https://fsapartners.ed.gov/financial-aid-delivery/nslds .............................. 44

Hester Peirce, *Rethinking the National Market System*,
    43 J. Corp. L. 649 (2018). .......................................................................... 6, 7

Hilary J. Allen, *The SEC as Financial Stability Regulator*,
    43 J. Corp. L. 715 (2018) ............................................................................... 7

John I. Sanders, *Break from Tradition: Questioning the Primacy of Self-Regulation in
    American Securities Law*,
    7 Mich. Bus. & Entrepreneurial L. Rev. 93 (2017) ................................... 5, 45

Mihailis E. Diamantis, *Privileging Privacy: Confidentiality As A Source of Fourth
    Amendment Protection*, 21 U. Pa. J. Const. L. 485 (2018) ............................ 40

Ronald J. Colombo,
    *Trust and the Reform of Securities Regulation*, 35 Del. J. Corp. L. 829, 858 (2010) ............ 46

Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*,
    48 U. Pitt. L. Rev. 27 (1986) ...................................................................... 42

Stuart Banner, *What Causes New Securities Regulation? 300 Years of Evidence*,
    75 Wash. U. L.Q. 849 (1997) ..................................................................... 4, 45

SEC Enforcement Manual,
    https://www.sec.gov/divisions/enforce/enforcementmanual.pdf ................... 9

SEC Release No. 98290, Joint Indus. Plan (Sept. 6, 2023),
    https://www.sec.gov/files/rules/sro/nms/2023/34-98290.pdf.................... 23

Securities Exchange Act Release No. 50700 (Nov. 18, 2004)............................................ 56

U.S. Dep't of Treasury, *About FinCen* (last visited July 12, 2024),
https://www.fincen.gov/what-we-do .......................................................................... 44

Webster's New Collegiate Dictionary (1974) .................................................................. 30

## INTRODUCTION

The Consolidated Audit Trail is exactly what it sounds like: a *consolidated* way for the Securities and Exchange Commission and its supervised entities to monitor securities transactions, consistent with their responsibilities under the federal securities laws. Before the SEC mandated the Consolidated Audit Trail in 2012, all the same type of information was collected. But that information was collected by separate entities, making it difficult to track a transaction when it took the (increasingly common) path of traveling through multiple broker-dealers and multiple securities exchanges. The Consolidated Audit Trail was therefore meant to combine information about the lifecycle of a transaction in one place to enhance oversight, ensure the efficient functioning of markets, and boost investor confidence. And while there may have been debate about how to implement it, the industry overwhelmingly supported the need for a consolidated audit trail in modern securities markets.

Now, 12 years after the SEC required the creation of a consolidated audit trail, Plaintiffs seek emergency relief, claiming that the SEC never had the power it used in 2012 and arguing that the Consolidated Audit Trail somehow violates the Fourth Amendment rights of investors who voluntarily disclosed information to various entities while trading securities. *See* Pls.' Mot. at 12–33, ECF No. 25-3. But the Court should never reach those questions. By statute, there was only one way for plaintiffs to challenge the rule creating Consolidated Audit Trail: by filing a "written petition" in the relevant court of appeals "within sixty days." 15 U.S.C. § 78y(a) & (b). Plaintiffs have ignored both jurisdictional requirements by suing in district court almost 12 years after the SEC promulgated the rule. Beyond that, Plaintiffs lack Article III standing because their purported injuries are speculative, unsupported, and not redressable by the Court.

But even if this Court advances to the merits, all of Plaintiffs' claims fail and should be dismissed. For almost 90 years, the SEC has had the statutory authority to require national securities exchanges and registered broker-dealers to "make," "keep," and "furnish" copies of "such records" as the SEC, "by rule, prescribes as necessary or appropriate in the public

interest, for the protection of investors, or otherwise in furtherance of the purposes of" securities laws. 15 U.S.C. § 78q(a). And for almost 50 years, the SEC has also had the statutory authority to issue rules "requir[ing] self-regulatory organizations to act jointly with respect to matters as to which they share authority under" those laws. *Id.* § 78k-1(a)(3)(B)). The Consolidated Audit Trail—which requires self-regulatory organizations to jointly create a comprehensive audit trail from the same financial information that has been collected for decades—directly flows from those authorities. Plaintiffs' Fourth Amendment claim is even more tenuous. It is black-letter law that people have no property interest or expectation of privacy—and therefore no Fourth Amendment protection—for information they voluntarily provide to third parties like financial institutions that execute commercial transactions.

With those two claims rejected, the remainder also fall away. Plaintiffs have no Fifth Amendment protection for much the same reason they have no Fourth Amendment protection: there is no property interest in the information submitted to the Consolidated Audit Trail because that data comes from the business records of self-regulatory organizations and broker-dealers. Plaintiffs also have no viable First Amendment claim because purely commercial transactions do not give rise to a protected right of association. That leaves only Plaintiffs' nominal Appropriations Clause claim and several duplicative claims under the Administrative Procedure Act and Mandamus Act. The latter claims are not viable given the failure of Plaintiffs' preceding theories. And the former claim is easily dismissed because the Appropriations Clause does not apply to the Consolidated Audit Trail, which is funded by the self-regulatory organizations, not by any money from the treasury. In the end, Plaintiffs have not come close to pleading any legal violation. The Court should therefore dismiss this case and deny Plaintiffs' preliminary-injunction motion as moot.

But if the Court reaches the equitable injunction factors—irreparable harm, balance of the equities, and the public interest—they all weigh heavily in favor of the government. In a nutshell, the Consolidated Audit Trail is critically important to the government and the securities industry, enabling cross-market securities monitoring to detect wrongdoing and protect

investors. Yet it is meaningless to Plaintiffs. Contrary to Plaintiffs' overblow claims, the Consolidated Audit Trail does not collect sensitive information like social security numbers, dates of birth, and account numbers. It collects only minimal personal information (name, address, and birth year), which is stored separately from transactional data with only limited access for a small set of individuals on a need-to-know basis. More fundamentally, even if the Consolidated Audit Trail were shut down, Plaintiffs' personal and financial information would still be collected by self-regulatory organizations and broker-dealers. And all the same types of information could still be accessed by the SEC through the prior regime it used for decades, a regime that Plaintiffs themselves tout here. The Court should therefore dismiss this case and deny Plaintiffs' preliminary-injunction motion.

## BACKGROUND

**I.    The SEC supervises self-regulatory organizations to govern securities markets.**

In establishing the modern federal securities-law framework, Congress preserved "the traditional private governance of exchanges" but subjected them to "appropriate federal regulatory supervision." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127–30 (1973). Brokers and dealers that effect securities transactions must register with the SEC and become members of a national securities exchange or a registered national "securities association." 15 U.S.C. §§ 78c(a)(4)–(5), 78o(a)(1), (b)(1)(B). Every exchange must also register with the SEC as a "national securities exchange" or seek an exemption from registration. *Id.* §§ 78c(a)(1), 78e. Once registered, a national securities exchange or a national securities association is deemed a self-regulatory organization. *Id.* § 78c(a)(26). But the SEC may grant such registration only if it determines that an exchange or association has the "capacity" to "enforce compliance" by its members with the securities laws and applicable rules, and that its rules meet the statutory criteria. *Id.* §§ 78f(b), 78o-3(b). Relatedly, the SEC may suspend a self-regulatory organization's registration if it violates, is unable to comply with, or fails to enforce those laws and rules. *Id.* § 78s(g)-(h). There are currently 25 self-regulatory organizations: 24 registered national securities exchanges and one registered national securities

association, which is a Delaware non-profit corporation called the Financial Industry Regulatory Authority, or FINRA. *Tuberville v. FINRA*, 874 F.3d 1268, 1270 & n.2 (11th Cir. 2017).

By statute, self-regulatory organizations must have their own rules that, among other things, are "designed to prevent fraudulent and manipulative acts and practices" and provide for "appropriate[] discipline[]" of members that violate the securities laws and applicable rules. 15 U.S.C. § 78f(b). And self-regulatory organizations are responsible for enforcing broker-dealer compliance with federal securities laws and the regulations promulgated by both the SEC and self-regulatory organizations themselves. *Id.* §§ 78f(b), 78o-3(b), 78s(g)(1), (h)(1). But Congress has charged the SEC with not only overseeing those self-regulatory organizations' activities but also independently regulating markets and enforcing the securities laws. Self-regulatory organizations, for example, must file any proposed rule change with the SEC. Generally, the SEC "shall" approve the proposal if, after notice and comment, it finds that the proposal is "consistent with the requirements of" securities laws. *Id.* § 78s(a)–(b). The SEC may also initiate its own rulemaking to "abrogate, add to, and delete from" a self-regulatory organization's rules as it "deems necessary or appropriate . . . in furtherance of the purposes of" the law. *Id.* § 78s(c). And the SEC has independent authority to not only investigate securities violations but institute enforcement proceedings administratively or in federal court. *Id.* §§ 78u, 78u-2, 78u-3.

## II. The statutory framework stems from a long history of both governmental and self-regulatory oversight, leading to the advent of a national market system in 1975.

Governmental oversight of self-regulatory securities markets is not new. "Securities markets have existed in England and the United States for over three hundred years, and they have been regulated by governments all the while." Stuart Banner, *What Causes New Securities Regulation? 300 Years of Evidence*, 75 Wash. U. L.Q. 849, 849–50 (1997). But it was the stock-market crash of 1792 that laid the groundwork for modern securities regulation. Following the crash, New York passed the "first significant American securities regulation," *id.* at 850, while simultaneously, a small group of stockbrokers entered a private "agreement—now

known as the Buttonwood Agreement—[that] began the American securities law tradition of self-regulation," John I. Sanders, *Break from Tradition: Questioning the Primacy of Self-Regulation in American Securities Law*, 7 Mich. Bus. & Entrepreneurial L. Rev. 93 (2017).  Securities trading grew throughout the 1800s, with securities exchanges operating primarily, though not exclusively, as self-regulatory bodies with their own rules and practices.  *Id.* at 99.

Another stock market crash in 1929 spurred Congress to enact landmark legislation: the Securities Act of 1933 and the Securities Exchange Act of 1934.  *Id.*  In general, the former "regulates the registration of securities during initial public offerings," and the latter "regulates the secondary market, where existing securities are traded between members of the public."  *SEC v. Almagarby*, 92 F.4th 1306, 1318 (11th Cir. 2024).  Yet Congress's regulation of securities "was by no means one of total displacement of the exchanges' traditional process of self-regulation."  *Silver v. New York Stock Exch.*, 373 U.S. 341, 352 (1963).  Congress intended that "the initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary affairs remain with the exchanges themselves," while the SEC is "authorized to step in" if the exchanges "fail adequately to provide protection to investors."  *Id.*  To that end, as relevant here, the Exchange Act's Section 17 required national securities exchanges and registered broker-dealers to "make," "keep," and "preserve" any records that the SEC "by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors."  Exchange Act, 48 Stat. 881, 897 (1934).  And those records were "subject at any time" to "reasonable periodic, special, or other examinations by" the SEC without any extra process or judicial review.  *Id.*

Changes to the securities markets, including a significant post-war boom, prompted significant congressional action.  "As trading volume increased throughout the 1960s and early 1970s, the burdensome manual process" used to settle securities transactions "created what came to be known as the Paperwork Crisis."  *Transfer Agent Regulations: Concept Release*, 80 Fed. Reg. 81948, 81952 (Dec. 31, 2015).  At the time, that crisis was considered the most severe crisis since the Great Depression; it resulted in more than 100 broker-dealers going

bankrupt, contributed to the loss of investor confidence in the markets, and invited massive theft from investors. *Id.* In short, this paperwork crisis "shook the industry." Hester Peirce, *Rethinking the National Market System*, 43 J. Corp. L. 649, 650–51 (2018).

Responding to the crisis, Congress made landmark amendments to the securities laws in 1975. As relevant here, Congress reaffirmed the SEC's Section 17 authority to require that securities exchanges and registered broker-dealers "make and keep for prescribed periods such records" and "furnish such copies thereof" as the SEC, "by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Act]." 15 U.S.C. § 78q(a); Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 9137, 137. Congress also reaffirmed the SEC's authority to examine those records at any time. 15 U.S.C. § 78q(b); 89 Stat. at 137. But Congress also observed that "[t]he nation's securities markets [we]re in dynamic change." S. Rep. No. 94-75, at 8–9 (1975), *as reprinted in* U.S.C.C.A.N. 179, 186–87. So, to "substantially improve[]" securities markets, Congress "clearly grant[ed]" the SEC in Section 11A "broad, discretionary powers to oversee the development of a national market system" in accordance with specified findings and objectives. S. Rep. No. 94-75, at 7–9; *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1131 (D.C. Cir. 2022). Among other things, Congress found that "new data processing and communications techniques create the opportunity for more efficient and effective market operations." 15 U.S.C. § 78k-1(a)(1)(B). And Congress mandated a national market system with multiple competing markets that are linked through technology, allowing the SEC by rule "to authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under [the Exchange Act] in planning, developing, operating, or regulating a national market system." *Id.* § 78k-1(a)(3)(B). In doing so, Congress expected the SEC "to play a much larger role than it ha[d] in the past to" provide "leadership for the development of a more coherent and rational regulatory structure" and "to police effectively the new national market system." S. Rep. No. 94-75, at 2.

III. **Since 1975, the SEC has supervised and regulated national markets using its authorities under Section 17 and Section 11A.**

In the years following the 1975 amendments, the SEC has repeatedly invoked its Section 11A authority and its Section 17 authority in rulemaking to further its three-part mission of protecting investors, making markets for efficient, and promoting capital formation.

A. **The SEC has long heeded Congress's direction to facilitate a national market system with its Section 11A authority.**

As Plaintiffs themselves explain, for the "first 35 years after Congress passed" Section 11A, the SEC "issued numerous rules relating to the national market system." Pls.' Mot. at 19. Early on, the SEC made substantial "progress on the reporting and clearing aspects of the national market system," although "the trading component was more difficult." Peirce, *supra* at 656. While the SEC tested "a system that allowed executions across trading venues" as early as 1978, it wasn't until 1996 that the SEC "adopted the Order Handling Rules 'to address growing concerns about the handling of customer orders for securities.'" *Id.* at 658. By 2005, the national market system "encompasse[d] the stocks of more than 5000 listed companies, which collectively represent[ed] more than $14 trillion in U.S. market capitalization." Regulation NMS, 70 Fed. Reg. 37,496, 37,497 (June 29, 2005).

That year, the SEC used its Section 11A powers to make "a significant intervention in market structure with the adoption of Regulation NMS." Hilary J. Allen, *The SEC as Financial Stability Regulator*, 43 J. Corp. L. 715, 735 (2018). Regulation NMS is "a landmark body of rules that govern all aspects of today's national market system," intended "to counter order flow fragmentation, promote equal regulation of market centers and greater order interaction, and increase displayed depth of trading interest." *Id.*

As part of Regulation NMS, the SEC retained a mechanism to effectuate joint actions by self-regulatory organizations, which are necessary to the operation and regulation of the national market system. "Any two or more self-regulatory organizations, acting jointly," may file an NMS plan or propose an amendment to an existing plan. 17 C.F.R. § 242.608(a)(1). Following notice and comment, the SEC "shall approve" a plan or amendment if the SEC

finds that it "is necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system, or otherwise in furtherance of the purposes of the Act." *Id.* § 242.608(b)(1)–(2). NMS plans approved through this process have been used for decades to facilitate a fair and efficient national market system.

Since Regulation NMS, the SEC has continued to regulate national markets as prescribed by Congress. For example, the SEC approved an NMS plan creating a market-wide mechanism to address extraordinary market volatility in individual stocks. Order Approving NMS Plan on Extraordinary Market Volatility, 77 Fed. Reg. 33,498 (June 6, 2012). And it has just recently adjusted required disclosures for order executions in national-market-system stocks. *Disclosure of Order Execution Information*, 89 Fed. Reg. 26,428 (April 15, 2024). So, in the 50 years since Section 11A's enactment, the SEC has routinely used its authority to "preserve[] and strengthen[]" the national securities markets. 15 U.S.C. § 78k-1(a)(1).

**B.** **The SEC has long used its Section 17 authority to monitor the self-regulatory organizations' audit trails and broker-dealers' investor information.**

As regulatory and technological changes transformed the structure of the securities markets after 1975, the SEC and self-regulatory organizations adjusted their oversight efforts. Two separate but related sources of information are necessary for this oversight: (1) customer and transaction information that broker-dealers were required to maintain and (2) transactional information maintained in separate audit trails by the self-regulatory organizations.

As to investor information held by broker-dealers, the SEC had long examined customer and transaction data by mailing them questionnaires (known as blue sheets due to their color) to be manually completed and mailed back. *See* Rule 17a-25, 66 Fed. Reg. 35,836 (July 9, 2021). In the late 1980s, the SEC and the self-regulatory organizations worked together to develop and implement a system with a universal electronic format, known as the "electronic blue sheet" or "EBS" system, to replace that manual process. *Id.* Around the same time, the SEC also approved rule changes requiring broker-dealers to electronically submit customer

and proprietary trading data to self-regulatory organizations upon request. *Id.* at 35836 n.3. Through that process, self-regulatory organizations "routinely request[ed]" customer trading information from broker-dealers "in connection with their market surveillance inquiries," particularly investigations into insider trading and market manipulation. Order Relating to the Automated Submission of Customer and Propriety Trading Data, 53 Fed. Reg. 25,029 (July 1, 1988); 66 Fed. Reg. at 35,837; *contra* Pls.' Mot. at 18. And by 2001, the SEC had used its Section 17 power to, among other things, codify the requirement that brokers and dealers "submit electronically to the Commission, upon request, information on customer and firm securities trading." 66 Fed. Reg. at 35837.

Notably, neither Section 17 nor the SEC's regulations impose a good-cause requirement or any other procedural limits on the SEC's access to broker-dealers' information. *Contra* Pls.' Mot. at 1, 8–9, 20. As noted above, Section 17 requires registered broker-dealers to "furnish" records as the SEC prescribes by rule, and SEC regulations likewise require broker-dealers to electronically submit securities information (including customer-identifying information) to the SEC "upon request," without qualification. *See* 15 U.S.C. § 78q(a); 17 C.F.R. 240.17a-25(a). Contrary to Plaintiffs' suggestion, nothing in the SEC Enforcement Manual changes that. *See* Pls.' Mot. at 8–9; *See* SEC Enforcement Manual § 1.1 (the Manual "is not intended to, does not, and may not be relied upon to" create any "substantive or procedural" rights), *available* [here](). While the Manual discusses the "[m]echanics" of blue-sheet requests, it does not reference any substantive standard for blue-sheet requests or prescribe any way to determine whether a standard has been met. Instead, the Manual reflects the practical reality that the SEC must specify relevant securities and time periods so that it can identify the relevant broker-dealers and those broker-dealers can then determine which records are responsive to the SEC's request. *See* Ex. E, SEC Enforcement Manual § 3.2.2, ECF No. 25-13. Unsurprisingly, the Manual itself observes that broker-dealers "are required" by statute and regulation to provide such information. *Id.* As the Manual demonstrates, the SEC has used its Section 17 authority and the blue-sheet process for decades to gather investor information in

9

support of robust market oversight. *See* 66 Fed. Reg. at 35,837.

As to the self-regulatory organizations' oversight, they eventually developed and maintained separate audit trails that allowed each organization to supervise trading by its own members on its own market. Consolidated Audit Trail, 75 Fed. Reg. 32,556, 32,558 (June 8, 2010); Compl. ¶ 22, ECF No. 1; Pls.' Mot. at 6. These audit trails primarily collected transactional data reported by each self-regulatory organization's broker-dealer members. For example, FINRA's audit trail covered equity securities listed on the Nasdaq Stock Market and contained "information covering the receipt and origination of an order, order terms, transmission, [ ] modification, cancellation, and execution." 75 Fed. Reg. at 32,559. Likewise, the New York Stock Exchange's audit trail contained "detailed information" for "the stages of an order's life, from origination and receipt and transmittal, through order modification, cancellation, and/or execution." *Id.* at 32,560. The other self-regulatory organizations had similarly insular audit trails that covered only their own members and markets. *Id.*

While these separate audit trails improved oversight within their respective markets, they were limited in monitoring trading across markets. *Id.* at 32,564. Today, trading is complex and widely dispersed across dozens of highly automated market centers, including registered exchanges, alternative trading systems, and broker-dealers' internal systems. *Id.* at 32556–57. Market participants "trade numerous products and enormous volume in mere seconds," with individual orders frequently routed through multiple markets. *Id.* But the data in self-regulatory organizations' separate audit trails ended as soon as an order was routed to another market. *Id.* at 32,564–65. On top of that, different audit trails kept differing information in differing formats. *Id.* So investigating potential violations for even a single order or market participant required a cumbersome, time-consuming process of compiling and analyzing disparate data from multiple broker-dealers and self-regulatory organizations, which might turn out to be inaccurate, incomplete, or impossible to reliably link. Consolidated Audit Trail, 77 Fed. Reg. 45,722, 45,729–30 (Aug. 1, 2012). And timely reconstructions of major

market events, such as the May 6, 2010 "Flash Crash,"[1] were not possible. *Id.*

## IV. A consolidated audit trail is needed to supervise modern securities markets.

By the early 2000s, market participants widely recognized the problem with having important market information scattered across separate audit trails and broker-dealers. In 2003, Nasdaq requested that the SEC require all self-regulatory organizations trading in Nasdaq-listed securities to have an audit trail identical to its own. Request for Comment on Nasdaq Petition, 68 Fed. Reg. 27,722, 27,723–24 (May 20, 2003). And after the SEC sought comment in two subsequent releases, many commenters agreed that existing audit trails were inadequate to supervise cross-market transactions, instead recommending a single comprehensive audit trail. 75 Fed. Reg. at 32,562–63.

### A. The SEC proposes and subsequently adopts Rule 613, mandating a consolidated audit trail.

In 2010, the SEC proposed Rule 613, which would require the self-regulatory organizations to jointly file an NMS plan to create, implement, and maintain a consolidated audit trail capturing customer and order information for exchange-traded securities across markets, from order inception through cancellation, modification, or execution. *Id.* at 32,564. While there were disagreements over specific aspects of the proposal, commenters overwhelmingly supported a consolidated audit trail. 77 Fed. Reg. at 45,723–24. For one, FINRA argued that it was "essential to ensuring the proper surveillance of the securities markets and maintaining the confidence of investors in those markets." *Id.* at 45,736. For another, the Securities Industry and Financial Markets Association, representing numerous financial intermediaries, agreed that it "would enable the SEC and the self-regulatory organizations [ ] to perform their monitoring, enforcement, and regulatory activities more effectively" and would be "a much-needed improvement over today's fragmented audit trail platforms." *Id.*

---

[1] "Flash Crash" refers to the events of May 6, 2010, when "U.S. equity and equity futures markets experienced a sudden breakdown of orderly trading, [with] broad-based indices, such as the Dow Jones Industrial Average Index and the S&P 500 Index, [falling] about 5% in just five minutes, only to rebound soon after" and "prices in over 300 stocks and exchange-traded funds falling more than 60%." 77 Fed. Reg. at 45,732.

The SEC adopted Rule 613 in July 2012. It found that "the regulatory data infrastructure on which the" self-regulatory organizations and the SEC "currently must rely generally is outdated and inadequate to effectively oversee a complex, dispersed, and highly automated national market system." *Id.* at 45,723. And it concluded that a consolidated audit trail would "substantially enhance the ability of the" self-regulatory organizations and the SEC "to oversee today's securities markets and fulfill their responsibilities under the federal securities laws." *Id.* at 45,726. Nobody questioned the SEC's authority or sought judicial review.

Rule 613 specified only the baseline requirements that were most critical to achieving the rule's regulatory objectives and gave the self-regulatory organizations significant flexibility in developing an NMS plan that met those objectives. *Id.* at 45,725–26, 45,741–42. For example, the rule permitted the self-regulatory organizations to decide whether to build on existing audit trails or design a new system, *id.* at 45,725, 45,793, and did not require real-time reporting of order information, as had been proposed, *id.* at 45,767–68. The rule also asked the self-regulatory organizations to address how they "propose to fund the creation, implementation, and maintenance of the consolidated audit trail, including the proposed allocation of" costs among the self-regulatory organizations and their members. *Id.* at 45,794.

### B. The SEC approves the self-regulatory organizations' plan for the Consolidated Audit Trail.

The self-regulatory organizations filed their NMS Plan in February 2015, and in November 2016, after public comment, the SEC approved it in a unanimous, bipartisan vote. Order Approving the NMS Plan for the Consolidated Audit Trail, 81 Fed. Reg. 84,696, 84,696 (Nov. 23, 2016). The SEC concluded that the Plan would "significantly improve regulatory efforts by the" self-regulatory organizations and the SEC, "including market surveillance, market reconstructions, enforcement investigations, and examinations of market participants," thereby "strengthen[ing] the integrity and efficiency of the markets." *Id.* at 84727. Again, nobody disputed the SEC's authority or sought judicial review.

**Governance.** The Plan takes the form of a limited liability agreement establishing a

private company jointly owned by the participating self-regulatory organizations—now called Consolidated Audit Trail, LLC—to conduct the activities of Consolidated Audit Trail. *Id.* at 84,699. CAT LLC is managed by an operating committee of representatives from each participating organization. *Id.* at 84,700. The Plan also establishes a committee, which includes representatives from the broker-dealer industry, to advise on the Consolidated Audit Trail's operation. *Id.* at 84,730. All self-regulatory organizations and their broker-dealer members who are involved in a national-market-system securities transaction must collect and report specified data to a "Central Repository" operated by a plan processor. *Id.* at 84706-07. The plan processor must validate and link all data for each order (e.g., origination, routing, modification, execution, or cancellation information) and make it available to the self-regulatory organizations and the SEC in a uniform electronic format. *Id.* at 84,713, 84,719–20.

**Data security.** The Plan requires a comprehensive information-security program that is "consistent with the highest industry standards for the protection of data." *Id.* at 84,722, 84753. The self-regulatory organizations and the SEC may access Consolidated Audit Trail data "solely for the purpose of performing their respective regulatory and oversight responsibilities." *Id.* at 84,724, 84,758. While broker-dealers submit personal information to the Consolidated Audit Trail, such information is limited to the name, address, and birth year of investors—social security numbers, for example, are not collected. *See* Order Granting Conditional Exemptive Relief, 85 Fed. Reg. 16,152, 16,156 (Mar. 20, 2020). This limited set of personal information is stored separately from all other Consolidated Audit Trail data, and its access is restricted to a limited set of authorized individuals on a need-to-know basis. 81 Fed. Reg. at 84,724–25, 84,767–68. The only customer information accessible to Consolidated Audit Trail users is a unique, anonymized customer identifier. 85 Fed. Reg. at 16,156.

**Efficiency and Funding.** The SEC determined that the Plan would improve the completeness, accuracy, accessibility, and timeliness of the regulatory data available. 81 Fed. Reg. at 84,800. This would lead to "more effective and efficient regulation of securities markets and market participants," thereby "significantly benefit[ting] investors and the integrity of the

market" and "increas[ing] capital formation, liquidity, and price efficiency." *Id.* at 84,800–01. The Plan provided for the Consolidated Audit Trail to be funded through fees assessed by the self-regulatory organizations on their members. To that end, the SEC recently approved an executed-share model, where fees are determined by executed shares and paid evenly by the self-regulatory organizations, executing brokers representing buyers, and executing brokers representing sellers. *See* Order Approving an Amendment to the NMS Governing the Consolidated Audit Trail, 88 Fed. Reg. 62,628 (Sept. 12, 2023).

In terms of costs, the SEC projected that it would cost between $37.5 million to $65 million to build the Consolidated Audit Trail and between $36.5 million and $55 million annually to maintain it. 81 Fed. Reg. at 84,854. The SEC also estimated that the nation's 1800 broker-dealers would incur approximately $2.2 billion in initial, one-time compliance costs (an average of about $1.2 million per broker-dealer). *Id.* at 84,862. Annual reporting costs were estimated at an aggregate of $1.5 billion annually for the 1800 broker-dealers (averaging about $833 thousand per broker-dealer), which is less than the $1.6 billion broker-dealers spent on pre–Consolidated Audit Trail reporting activities annually. *Id.* For self-regulatory organizations, the SEC estimated that they would incur $37.7 million in implementation costs and $114.3 million in annual costs, significantly lower than the $170.3 million that self-regulatory organizations previously spent annually on surveillance activities. *Id.* at 84,857.

## V. Plaintiffs now challenge the Consolidated Audit Trail long after it was proposed, adopted, and implemented.

Since the SEC approved the Plan in 2016, the Consolidated Audit Trail has been developed and implemented. The self-regulatory organizations and broker-dealers have revamped their systems to comply with it. They have worked through many complex issues, obtaining approval for various Plan amendments and exemptions that, among other things, address cybersecurity concerns, reduce costs, and overcome implementation challenges. *See, e.g.*, Order Granting Conditional Exemptive Relief, 88 Fed. Reg. 77,128 (Nov. 8, 2023); Amendments to the NMS Plan Governing the Consolidated Audit Trail, 85 Fed. Reg. 31,322

(May 22, 2020); 85 Fed. Reg. at 16,152. And the Consolidated Audit Trail has now been operational for years. Entities began reporting to the Consolidated Audit Trail in 2020 and, by the end of 2022, it was processing over 400 billion records per day.

Nonetheless, Plaintiffs—two individuals and one organization who invest in securities—filed this putative class-action lawsuit in April 2024. *See* Compl. ¶¶ 1–2, 105–13. In a nine-count complaint, they argue (among other things) that the SEC lacked statutory authority to mandate the Consolidated Audit Trail back in 2012, and that it is unconstitutional under the First, Fourth, and Fifth Amendments and the Appropriations Clause. *See id.* ¶¶ 114–212. Despite waiting all this time, Plaintiffs seek an injunction that stops all operation of the Consolidated Audit Trail, orders the SEC to abrogate all the self-regulatory organizations' rules related to the Consolidated Audit Trail, and expunges all data ever gathered by the Consolidated Audit Trail. *See id.* at 51–52 (prayer for relief).

About six weeks after filing their lawsuit—almost exactly 12 years since the SEC mandated the Consolidated Audit Trail—Plaintiffs filed a preliminary-injunction motion, arguing that the SEC lacks statutory authority to establish the Consolidated Audit Trail and that it violates the Fourth Amendment. *See* Pls.' Mot. at 12. Despite never seeking to certify a class action, Plaintiffs seem to demand a universal injunction (or "stay" under 5 U.S.C. § 705) barring any use of the Consolidated Audit Trail for everyone in the country. *See* Pls.' Proposed Order, ECF No. 25-2. The SEC now opposes that motion and moves to dismiss this case for lack of jurisdiction and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1) & (6).

## ARGUMENT

The Court should dismiss this case for lack of jurisdiction. Failing that, it should dismiss all of Plaintiffs' claims on the merits and deny their preliminary-injunction motion.

## I. This Court lacks jurisdiction to adjudicate Plaintiffs' claims.

The easiest way to resolve this case is to dismiss for lack of jurisdiction without reaching any other issue. Rule 613—at issue here—could only be challenged by filing a petition in the relevant court of appeals within 60 days of that rule or order. 15 U.S.C. § 78y(b)(1).

Plaintiffs did neither. They filed this case in district court, rather than the court of appeals. This Court should dismiss for that reason alone. But beyond filing in the wrong court, Plaintiffs have also filed more than a decade too late: they challenge Rule 613, which was issued in August 2012, far outside the 60-day statutory timeframe. Beyond that, Plaintiffs lack Article III standing because they do not allege any cognizable injury that is redressable by the Court. The Court may dismiss this case on any of these independent grounds.

## A. Plaintiffs have sued in the wrong court.

When a person is "adversely affected" by a final SEC rule or order related to the Consolidated Audit Trail, there is only one way to challenge it: by filing "a written petition" in "the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit." 15 U.S.C. § 78y(a)(1) & (b)(1). Plaintiffs here challenge Rule 613, which mandated the Consolidated Audit Trail in 2012 after extensive notice-and-comment rulemaking. *See* Compl. at 1–7; *id.* ¶¶ 73–83 (highlighting the alleged legal defects of Rule 613); *id.* ¶¶ 114–209 (asserting various claims to "set aside" Rule 613); *id.* at 51–52 (prayer for relief, requesting an order "[d]eclaring that SEC's Rule 613 is null and void," "[s]etting aside and holding unlawful SEC's Rule 613," and "[e]njoining Defendants . . . from implementing and enforcing Rule 613"). So Plaintiffs should have filed a petition in the Fifth Circuit or D.C. Circuit to challenge it. 15 U.S.C. § 78y(b)(1).

Allowing review in district court would directly contravene the text and purpose of the statute. Congress amended the Exchange Act in 1975 to place exclusive review of specified rules in the courts of appeals because they are "the most appropriate forum for this review in light of the fact that the District Court's fact finding function is rarely necessary and the questions subject to review are likely to end up in the higher court anyway." S. Rep. No. 94-75 at 36–37. The same is true for other appellate-review provisions across federal law: the presumption of exclusive appellate review is a "tenet of administrative practice and is hornbook administrative law." *N.Y. Repub. State. Comm. v. SEC*, 799 F.3d 1126 (D.C. Cir. 2015).

Litigants routinely follow the path of challenging rules, as required, in the courts of

appeals. For example, a pending challenge concerning the Consolidated Audit Trail—in which Plaintiffs' counsel participated as amicus—was initiated by directly petitioning the Eleventh Circuit. *See American Securities Association v. SEC*, No. 23-13396 (Oct. 17, 2023), ECF No. 65 (New Civil Liberties Alliance amicus brief). Plaintiffs should have done that too. For this reason alone, the Court should dismiss this case for lack of jurisdiction.

**B.      Plaintiffs have sued 12 years too late.**

Even if Plaintiffs had sued in the right court, they are far beyond any applicable deadline for filing their case. Where, as here, Congress specifies a time in which Plaintiff is to bring suit, that time constitutes either a "jurisdictional deadline[]" or a "mandatory claim-processing rule." *McIntosh v. United States*, 601 U.S. 330, 337 (2024). Jurisdictional deadlines are exactly what they sound like: they go to the "court's adjudicatory authority," meaning that they "cannot be waived or forfeited, must be raised by courts sua sponte," and "do not allow for equitable exceptions." *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 203 (2022). Nonjurisdictional claim-processing rules, by contrast, "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But even then, "[i]f the affected party alerts the court to the deadline and invokes its protection, the relevant action cannot be taken after the deadline has passed." *McIntosh*, 601 U.S. at 337.

Here, whether the 60-day filing deadline is jurisdictional or mandatory, it "must be enforced." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 (2017); *Frew v. Young*, 992 F.3d 391, 396 n.3 (5th Cir. 2021). Exchange Act Section 25 requires a person "adversely affected" by a final order or rule of the SEC to file a "written petition" in the relevant court of appeals "within sixty days after the entry of the order" or "promulgation of the rule." 15 U.S.C. § 78y(a)(1) & (b)(1). Upon filing a petition, the court of appeals "has jurisdiction" and, once the SEC files the record, that court has "exclusive" jurisdiction "to affirm and enforce or to set aside" the order or rule (or to "modify" an order). *Id.* § 78y(a)(3) & (b)(3).

Congress has therefore "clearly state[d]" that the 60-day filing deadline is

jurisdictional. *Boechler*, 596 U.S. at 199. The statute authorizes review by a federal court of appeals—without exception—only upon the filing of a petition "within sixty days." 15 U.S.C. § 78y(a)(1) & (b)(1). It appears in a statutory section titled "Court review of orders," as enacted. 48 Stat. at 901. And it references not only the court's "jurisdiction" but the court's "exclusive" jurisdiction to affirm or set aside SEC orders and rules. *Id.* § 78y(a)(3) & (b)(3). Unsurprisingly, then, this statutory provision has been treated as jurisdictional from the outset. *See SEC v. Andrews*, 88 F.2d 441, 441–42 (2d Cir. 1937) (per curiam). And courts of appeals have routinely held or assumed the same for almost 90 years. *See, e.g.*, *Kern v. SEC*, 724 F. App'x 687, 688 (10th Cir. 2018) (per curiam); *Wanger v. SEC*, 720 F. App'x 792, 793 (7th Cir. 2018); *Newell v. SEC*, 812 F.2d 1259, 1260–61 (9th Cir. 1987). For example, the D.C. Circuit—which handles much of the nation's direct SEC review—has "long viewed section 25 as jurisdictional." *NetCoalition v. SEC*, 715 F.3d 342, 353 (D.C. Cir. 2013).

As that court has bluntly stated: "Failure to file a timely petition for review deprives this Court of subject matter jurisdiction." *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 245 (D.C. Cir. 2003). To be sure, "most time bars are nonjurisdictional." *Harrow v. Dep't of Def.*, 601 U.S. 480, 484 (2024). But that's not true where, as here, "the statutory provision speaks in jurisdictional terms or refers to jurisdiction, is placed within a jurisdictional section of the statute, or is part of a scheme that is not designed to be flexible for claimants but instead places strict requirements on them." *Sloan v. Drummond Co., Inc.*, 102 F.4th 1169, 1175 (11th Cir. 2024); *id.* at 1176 (finding a time bar jurisdictional and noting that the time bar in *Harrow* was not jurisdictional because there was "no mention" of jurisdiction in that provision); *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 793 (5th Cir. 2021) (finding a statute nonjurisdictional where its "phrasing makes no explicit reference to (much less any clear statement regarding) jurisdiction" and it was not near provisions "that allocate jurisdiction"). Because the statutory provision at issue here meets those criteria, it is a jurisdictional requirement.

But even if the 60-day filing deadline was nonjurisdictional, it wouldn't matter here. "The mere fact that a time limit lacks jurisdictional force" does "not render it malleable in

every respect." *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 192 (2019). "Though subject to waiver and forfeiture, some claim-processing rules are mandatory—that is, they are unalterable if properly raised by an opposing party." *Id.* And "[r]ules in this mandatory camp are not susceptible of" equitable exceptions. *Id.* The filing requirement here is just such a rule. Section 25 authorizes review by a court of appeals only upon the filing of a petition "within sixty days after the entry of the order" or "promulgation of the rule." 15 U.S.C. § 78y(a)(1) & (b)(1). That is a clear statute of repose, which "puts an outer limit on the right to bring a civil action." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024); *id.* (explaining that statutes of repose set "a filing deadline of 60 days from the 'entry' of the agency order"). And statutes of repose are, by definition, mandatory rules that are not subject to equitable exceptions.[2] *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 508 (2017); *Browe v. CTC Corp.*, 15 F.4th 175, 191 (2d Cir. 2021); *Fedance v. Harris*, 1 F.4th 1278, 1284 (11th Cir. 2021). So Section 25's 60-day deadline must be applied.

Plaintiffs have not come close to meeting that mandatory 60-day deadline. Again, Plaintiffs here challenge Rule 613, which established the Consolidated Audit Trail in August 2012. *See* Compl. at 1–7; *id.* ¶¶ 73–83; *id.* ¶¶ 114–209; *id.* at 51–52. Their 60-day deadline to petition the court of appeals therefore expired *twelve years ago* in October 2012. And even though Plaintiffs inappropriately go beyond their complaint in an attempt to enjoin the SEC's

---

[2] Not surprisingly, courts have found similar provisions mandatory. *See, e.g.*, *Stone v. INS*, 514 U.S. 386, 405 (1995) (time limit for petitioning after a Board of Immigration Appeals decision is jurisdictional because "statutory provisions specifying the timing of [such] review . . . are, as we have often stated, mandatory and jurisdictional, and are not subject to equitable tolling"); *All. for Safe, Efficient & Competitive Truck Transp. v. FMCSA*, 755 F.3d 946, 950 & n.2 (D.C. Cir. 2014) (60-day deadline under Hobbs Act, 28 U.S.C. § 2344, which "lower court decisions have uniformly held . . . is jurisdictional"). And the Fifth Circuit has found statutory provisions to be mandatory even when they do not, as here, reference the court's jurisdiction. *See United States v. Naranjo*, 102 F.4th 280, 284 (5th Cir. 2024) (finding mandatory a provision that "[n]o court shall entertain a motion made under this section to reduce a sentence if," among other things, "the sentence was previously imposed or previously reduced"); *United States v. Franco*, 973 F.3d 465, 468 (5th Cir. 2020) (finding the First Step Act's exhaustion requirement to be mandatory).

March 2017 order, they are still seven years past the deadline for challenging *that* order. *See* Pls.' Proposed Order, ECF No. 25-2. So none of the challenged SEC orders or rules fall anywhere near the 60-day deadline.[3] *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 229 (5th Cir. 2020). Plaintiffs' case is untimely and should be dismissed.

## C. Plaintiffs have sued without plausibly alleging any injury caused by Defendants that is redressable by the Court.

This Court also lacks jurisdiction for a third reason: Plaintiffs lack Article III standing. "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, 599 U.S. 670, 676 (2023); *California v. Texas*, 593 U.S. 659, 668 (2021) (plaintiffs bear the burden to plausibly allege each of these elements). "An injury in fact must be 'concrete,' meaning that it must be real and not abstract." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). And a "threatened injury must be certainly impending to constitute injury in fact"; "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "The second and third standing requirements—causation and redressability—are often flip sides of the same coin." *All. for Hippocratic Med.*, 602 U.S. at 380. So a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, they have not. Plaintiffs point to three possible injuries: (1) there is a risk that cyberattacks of the Consolidated Audit Trail may disclose their information, (2) they are indirectly "forced to incur" the cost of the Consolidated Audit Trail, and (3) their information has been "searched, seized, or otherwise provided

---

[3] Even if the statute at issue were *not* a jurisdictional and mandatory statute of repose, Plaintiffs have no equitable grounds to excuse their 12-year delay. Equitable tolling, for example, "is a narrow exception that should be applied sparingly," which is appropriate only "when the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Lewis v. Danos*, 83 F.4th 948, 955 (5th Cir. 2023). Here, Plaintiffs do not allege that they have been "pursuing [their] rights diligently" for the last 12 years or that "some extraordinary circumstance stood in [their] way and prevented timely filing." *Jones v. Lumpkin*, 22 F.4th 486, 490 (5th Cir. 2022).

to a government agency" absent "compliance with the mandates of the Fourth Amendment." *See* Compl. ¶¶ 93–98. None of these alleged injuries satisfy Article III.

Plaintiffs' first alleged injury is that their "information could be disclosed either through a cyberbreach or through accidental disclosure by one of the thousands of people with access to the CAT database." Compl. ¶ 97. But any harm from a hypothetical data breach is entirely speculative, especially because the Consolidated Audit Trail collects only minimal personal information (name, address, and birth year), such information is stored separately from transaction data to minimize the risk of cyberattacks, and there are various "restrictions for accessing" personal information. *See* Order Granting Conditional Exemptive Relief, 85 Fed. Reg. 16152 (March 20, 2020). Regardless, it is well established that even an *actual* data breach is insufficient for standing. *See, e.g.*, *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889 (11th Cir. 2023) ("We typically require misuse of the data cybercriminals acquire from a data breach because such misuse constitutes both a 'present' injury and a 'substantial risk' of harm in the future."); *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 244 (4th Cir. 2023) ("[W]e've held that being subjected to a data breach isn't in and of itself sufficient to establish Article III standing without a nonspeculative, increased risk of identity theft."); *Ellis v. Cargill Meat Sols.*, 2023 WL 9547632, at *5 (N.D. Tex. Oct. 31, 2023) ("[W]hile the circuit courts are split on the question whether an increased risk of identity theft after a data breach is sufficient to confer standing, the cases in which they do confer standing at least include allegations of actual misuse of the plaintiff's data by a nefarious third party."). So Plaintiffs' pure speculation about an imaginary *future* data breach cannot remotely satisfy Article III.

The Supreme Court recently rejected analogous conjecture. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 438 (2021) (no standing where plaintiffs "claimed that '[the credit report company] could have divulged their misleading credit information to a third party at any moment'"). And lower courts have uniformly done the same. *See Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 148 (3d Cir. 2024) ("[T]he mere assertion that [a company's] employees could access and broadcast" plaintiff's "personal information to the public is far too

speculative to support standing."); *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 373 (1st Cir. 2023) (explaining that there is no standing where the alleged harm is "unanchored to any actual incident of data breach"); *Ellis*, 2023 WL 9547632, at *5 (no standing where plaintiff alleges that his data "was potentially exposed" but "avers no further factual detail" that "his data was ever actually stolen"); *Max-George v. Oath, Inc.*, 2022 WL 2307387, at *1 (E.D. Tex. June 27, 2022) (no standing where "plaintiff has failed to identify any third party to whom data or information was exposed"). This theory of injury is easily rejected.

The same is true of Plaintiffs' second injury theory: that "[e]ach Plaintiff has been and will continue to be forced to incur substantial monetary expenses" because the costs of the Consolidated Audit Trail are "impose[d] primarily on exchanges and broker-dealers, but ultimately borne by investors." Compl. ¶ 96. This theory is both legally and factually deficient. Plaintiffs are investors. *See* Compl. ¶¶ 1–2. And it is undisputed that self-regulatory organizations and broker-dealers, not investors, will be charged the fees to fund the Consolidated Audit Trail. *See* Compl. ¶ 134; *id.* ¶¶ 137–39; SEC Release No. 98290, Joint Indus. Plan (Sept. 6, 2023), *available* here. Broker-dealers—not the government—will therefore decide whether (and if so, how) any costs are passed on to investors. So any investor costs are not traceable to Defendants due to "the independent action of some third party not before the court." *Murthy v. Missouri*, 144 S. Ct. 1972 (2024); *see E.T. v. Paxton*, 41 F.4th 709, 721 (5th Cir. 2022).

In the same vein, Plaintiffs proffer no plausible allegations that they have borne any Consolidated Audit Trail–related costs. *See* Compl. ¶¶ 67, 96. Nor do they offer any actual evidence of such costs in their four declarations with 10 total paragraphs. *See* Davidson Decl. ¶¶ 1–3, ECF No. 25-40; Restivo Decl. ¶¶ 1–3, ECF No. 25-42; Shepard Decl. ¶¶ 1–4, ECF No. 25-44. They do not explain who their brokers are, what fees they are charged, whether those fees have ever changed, or how they would know if any fee change were attributable to the Consolidated Audit Trail. And they certainly never explain how they may be charged fees *in the future*. *Murthy v. Missouri*, 2024 WL 3165801, at *8 (U.S. June 26, 2024) ("[B]ecause the plaintiffs request forward-looking relief, they must face a real and immediate threat of

repeated injury."). That's important because many brokers do not charge commission fees for trading securities, which is the primary way brokers would pass operating costs to investors. *See, e.g.*, CNBC, *Want to get into investing? Start with these free stock trading platforms* (April 9, 2024) (listing brokers with no commission fees), *available* here. Because it is possible that Plaintiffs may never pay Consolidated Audit Trail–related costs, they have failed to plausibly allege an injury that is causally connected to Defendants' conduct and likely to be redressed by a favorable decision. *See Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 902 (5th Cir. 2023); *E.T.*, 41 F.4th at 721. *Texas v. SEC*, 2024 WL 2106183, at *2 (5th Cir. May 10, 2024).

Plaintiffs' final theory of injury is equally meritless. They claim that they have a "property right in confidential and personally identifiable information relating to their respective investments and their business records," and their information has been "searched, seized, or otherwise provided to a government agency" absent "compliance with the mandates of the Fourth Amendment." Compl. ¶¶ 94–95. True, a Fourth Amendment violation would be an injury in fact. *All. for Hippocratic Med.*, 602 U.S. at 381. But, setting aside that there is no Fourth Amendment violation here, *see* pp. 37–47, *infra*, there are more specific reasons this theory fails. For example, Plaintiffs claim that the SEC's review of the Consolidated Audit Trail "constitutes a search." Pls.' Mot. at 27. Yet it is entirely speculative whether the SEC will ever review Plaintiffs' data in the Consolidated Audit Trail. And indeed, they submit no allegations or evidence that their information—especially their personal information that is segregated in the Consolidated Audit Trail—will be imminently "searched" by the SEC. *See* Compl. ¶¶ 93–98; Davidson Decl. ¶¶ 1–3; Restivo Decl. ¶¶ 1–3; Shepard Decl. ¶¶ 1–4. Because "[a]llegations of possible future injury will not suffice" for standing, Plaintiffs fail to satisfy that Article III requirement. *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 680–81 (5th Cir. 2023); *see, e.g.*, *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018) (no standing where plaintiffs did not "have a 'certainly impending' risk that the Village of Evendale will conduct a warrantless search of one of their properties"); *Brennan v. Dickson*, 45 F.4th 48, 65 (D.C. Cir. 2022) (no standing where "it remains to be seen whether the government will

ever use the challenged legal authority unlawfully"). So Plaintiffs have not adequately alleged a Fourth Amendment injury in fact.

More fundamentally, though, Plaintiffs cannot assert standing based on the idea that the government is obtaining their data because they seek only to enjoin the Consolidated Audit Trail. *See* Compl. at 51–52 (prayer for relief). But self-regulatory organizations and broker-dealers collected—and the SEC could review—all the same types of information available *before* the Consolidated Audit Trail was created. *See* pp. 8–10, *supra*. The only difference was that the information was previously scattered amongst self-regulatory organizations and broker-dealers, making the markets less efficient and making transactions harder to track. *See id.* So even if the Consolidated Audit Trail were shut down tomorrow, the SEC could nonetheless access all the same types of information from separate sources. *See* 66 Fed. Reg. at 35,837 (requiring brokers and dealers to "submit electronically to the Commission, upon request, information on customer and firm securities trading"). Plaintiffs' requested relief would therefore have no impact on whether their data could be "provided to a government agency." Compl. ¶ 95. That means their purported injury is not redressable because any judicial pronouncement will not "affect[] the behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987); *see Renne v. Geary*, 501 U.S. 312, 319 (1991) (finding it doubtful that an injury caused by a state constitutional provision could be redressed when an unchallenged state statute could cause the same injury); *Leal v. Becerra*, 2022 WL 2981427, at *2 (5th Cir. July 27, 2022) (collecting cases).

In the end, this Court is not a "legislative assembly, a town square, or a faculty lounge" and "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *All. for Hippocratic Med.*, 602 U.S. at 382. Because Plaintiffs do not plausibly allege any injury caused by Defendants and redressable by a court order, their case should be dismissed.

## II. Plaintiffs have not plausibly alleged any legal violation and cannot succeed on the merits of their claims.

In seeking a preliminary injunction, Plaintiffs claim they have a likelihood of success on only two of their claims: that the SEC lacks statutory authority to establish the Consolidated Audit Trail and that it violates the Fourth Amendment. Pls.' Mot. at 12–33; Compl. ¶ 202 (Count VII) *and id.* ¶¶ 143–68 (Count III). Plaintiffs are wrong; those claims fail and should be dismissed. That is also true for Plaintiffs' Fifth Amendment, First Amendment, and Appropriations Clause claims. *See id.* ¶¶ 169–78 (Count IV); *id.* ¶¶ 179–92 (Count V); *id.* ¶¶ 127–42 (Count II). And Plaintiffs' remaining claims are simply duplicative and should be dismissed for the same reasons as the others. *See id.* ¶¶ 114–26 (Count I); *id.* ¶¶ 193–97 (Count VI); *id.* ¶¶ 204–09 (Count VIII). So even if this Court has jurisdiction, all claims should be dismissed and Plaintiffs' preliminary-injunction motion should be denied as moot.

### A. The SEC had statutory authority to establish the Consolidated Audit Trail.

Plaintiffs claim that the SEC did not have any authority to require the creation of the Consolidated Audit Trail 12 years ago. *See* Pls.' Mot. at 13. They are wrong. "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). And "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). In that vein, a statute should "be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009). Here, the text, structure, and history of the Exchange Act demonstrates that the Consolidated Audit Trail fits squarely within the SEC's authority. That's why, from Rule 613's proposal in 2010 until 2023, no one questioned that authority. *See* 77 Fed. Reg. at 45,722. And while the parties seem to agree that the Court need not employ the major-questions doctrine, *see* Pls.' Mot. at 22, that doctrine is inapplicable in any event. Plaintiffs' claims should be dismissed. Compl. ¶¶ 198–203 (Count VII).

### 1. The Exchange Act authorizes the Consolidated Audit Trail.

The Exchange Act charges the SEC with ensuring that the self-regulatory organizations "ha[ve] the capacity to be able to carry out" their regulatory duties, 15 U.S.C. §§ 78f(b), 78o-3(b), and authorizes it to sanction self-regulatory organizations that violate, are unable to comply with, or fail to enforce the securities laws, *id.* § 78s(h)(1). To make sure the SEC's ability to carry out this oversight is "reasonably complete and effective," *id.* § 78b, the Act grants additional authority. The SEC may, for example, "abrogate, add to, and delete from" the self-regulatory organizations' rules as it "deems necessary" in furtherance of the Act's purposes. *Id.* § 78s(c). And it has the power "to make such rules" as "may be necessary or appropriate to implement the provisions of" the Act, including its oversight of self-regulatory organizations. *Id.* § 78w(a)(1). These authorities, in conjunction with Sections 17 and 11A, fully support the SEC's mandate of a consolidated audit trail.

### a. Like prior audit trails, Section 17 provides authority for the Consolidated Audit Trail.

When the Exchange Act was enacted in 1934, it required national securities exchanges and registered broker-dealers to "make," "keep," and "preserve" any records, and "make such reports," as the SEC "by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors." 48 Stat. at 897. This provision was amended to its present version in 1975: national securities exchanges and registered broker-dealers must "make and keep for prescribed periods such records" and "furnish such copies thereof" as the SEC, "by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Act]." 15 U.S.C. § 78q(a); 89 Stat. at 137. These "reports and records provide the regulatory authorities with the necessary information to oversee compliance with and enforce the various" securities laws. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979). To that end, all records "are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by" the SEC as it "deems necessary or appropriate in the public interest, for the

protection of investors, or otherwise in furtherance of the purposes of [the Act]." 15 U.S.C. § 78q(b); 48 Stat. at 897 (same). This "self-executing" power "is, of course, essential to any effort by the [SEC] to discharge its responsibilities under the Act." S. Rep. No. 94-75 at 120.

Prior to the Consolidated Audit Trail, the SEC exercised this (and other) authority to require that self-regulatory organizations enhance their audit trails in light of changing market conditions. *See* Order Approving Proposed Rule Change, 70 Fed. Reg. 2,436, 2,437 (Jan. 13, 2005); Order Approving Proposed Rule Change by NYSE, 68 Fed. Reg. 20,200, 20,200–01 (Apr. 24, 2003); Order Approving Proposed Rule Change, 63 Fed. Reg. 12,559, 12,560 (Mar. 13, 1998). Similarly, the SEC has long required broker-dealers to maintain detailed customer information and to electronically provide those records to the self-regulatory organizations or the SEC upon request. *See* 17 C.F.R. §§ 240.17a-3, 240.17a-4, 240.17a-25; 75 Fed. Reg. at 32,557–58; *see* pp. 8–10, *supra*. Plaintiffs in fact tout this prior regime, never once suggesting that the SEC's decades-long use of its statutory authority to supervise separate audit trails and broker-dealers was unlawful. *See* Pls.' Mot. at 6, 8.

And that makes sense. Section 17 requires national securities exchanges and registered broker-dealers to "make," "keep," and "furnish" copies of "such records" as the SEC, "by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Act]." 15 U.S.C. § 78q(a). To "make" means (among other things) "to create," and to "keep" means "to preserve or maintain." *Make*, Webster's New International Dictionary of the English Language (Harris & Allen Eds. 1930); *id.* (defining "keep"). Importantly, to "furnish" means to "provide for; to provide what is necessary for; to fulfill or satisfy the needs of" or to "provide; supply; give; afford." *Id.* (defining "furnish"). Like its predecessor audit trails, the Consolidated Audit Trail requires self-regulatory organizations and broker-dealers to "maintain" and "preserve" transactional data and customer information, and requires both to "provide" copies of those records to the Consolidated Audit Trail, while allowing the SEC to "examin[e]" them as it "deems necessary or appropriate." *See* 15 U.S.C. § 78q(a) & (b).

And the SEC has "prescribe[d]" the Consolidated Audit Trail "as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Act]." *Id.* "In performing their oversight responsibilities" before the Consolidated Audit Trail, regulators were forced to "cobble together disparate data from a variety of existing information systems lacking in completeness, accuracy, accessibility, and/or timeliness." 77 Fed. Reg. at 45,723. That model "neither support[ed] the efficient aggregation of data from multiple trading venues nor yield[ed] the type of complete and accurate market activity data needed for robust market oversight." *Id.* So the Consolidated Audit Trail was meant "to address shortcomings in those existing systems and create an audit trail system that would provide" regulators "with timely access to a comprehensive set of trading data sufficient to oversee modern markets." 88 Fed. Reg. at 62,672.

Notably, Plaintiffs do not address the SEC's Section 17 authority. But the Consolidated Audit Trail is consistent with the text, structure, and long history of Section 17.

### b. In furtherance of the national market system, Section 11A provides authority for the Consolidated Audit Trail.

Other statutory provisions provide further support for the Consolidated Audit Trail. At the same time Congress expanded the SEC's authority to oversee self-regulatory organizations in 1975, it mandated in Section 11A that the SEC use its authority under the Exchange Act "to facilitate the establishment of a national market system" in furtherance of Congress's findings and objectives and with "due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets." 15 U.S.C. § 78k-1(a)(2). To that end, Congress empowered the SEC to "authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under [the Act] in planning, developing, operating, or regulating a national market system." *Id.* § 78k-1(a)(3)(B).

The Consolidated Audit Trail "fits neatly within th[at] language." *Biden v. Missouri*, 595 U.S. 87, 93 (2022). It is undisputed that the collection of trade and order data is one of the "matters as to which [self-regulatory organizations] share authority under [the Act]." 15

28

U.S.C. § 78k-1(a)(3)(B); *see Nasdaq*, 38 F.4th at 1138 (explaining that such matters include "protect[ing] investors and the public interest" and the "obligations to 'comply' and 'enforce compliance' with the provisions of the Exchange Act"). The self-regulatory organizations have long required their broker-dealer members to report trade and order data in furtherance of their statutory duty to comply (and enforce their members' compliance) with securities laws. 75 Fed. Reg. at 32,558–61. And the SEC routinely used that data both in its own enforcement and in supervising self-regulatory organizations. 81 Fed. Reg. at 84,807. So the Consolidated Audit Trail falls well within the matters for which the SEC may require self-regulatory organizations to "act jointly." 15 U.S.C. 78k-1(a)(3)(B).

And that's exactly what Rule 613 did. Plaintiffs claim that the statutory term "act jointly" had "a specific purpose, which was to empower the" self-regulatory organizations "to collaborate without risking antitrust liability." Pls.' Mot. at 16–17. That may have been one reason Congress enacted the "act jointly" provision. *See Nasdaq*, 38 F.4th at 1137–38. But the scope of that authority is defined by the statutory text. And where, as here, "the statutory text is plain and unambiguous," courts "must apply the statute according to its terms." *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013). To "act" means "to take action" or "to perform a specified function." *Act*, Webster's New Collegiate Dictionary (1974). And "joint" means "involving the united activity of two or more," coinciding with "jointly," which means "in a joint manner; together." *Id.* (defining "joint" and "jointly"). So, under Section 11A, the SEC may require two or more self-regulatory organizations to perform a united activity "as to which they share authority under [the Act]." 15 U.S.C. 78k-1(a)(3)(B). Rule 613 directly flowed from this statutory authority: it required the self-regulatory organizations to jointly file a plan to create, implement, and maintain a consolidated audit trail "that provides regulators with the accurate, complete, accessible, and timely market activity data they need for robust market oversight." 77 Fed. Reg. at 45,743.

So too is the Consolidated Audit Trail "in accordance with the findings" and "objectives" of Congress. 15 U.S.C. 78k-1(a)(2); *contra* Pls.' Mot. at 13–16. It allows "regulators to

perform surveillance and investigations for illegal activities such as insider trading, wash sales, or manipulative practices" by, among other things, "facilitating risk-based examinations" and providing "more accurate and faster surveillance for manipulation." 77 Fed. Reg. at 45,730. It "significantly improve[s] the ability of regulators to reconstruct broad-based market events" (like the flash crash), so that "the public may be informed" and "regulators can begin reviewing an event to determine what, if any, regulatory responses might be required." *Id.* at 45,732. It "also significantly improve[s] the ability of regulators to monitor overall market structure, so that both the [SEC] and the [self-regulatory organizations] can be better informed in their rulemakings." *Id.* at 45733. And it "reduce[s] the number and types of ad hoc requests made by regulators to market participants" because regulators can simply access the Consolidated Audit Trail instead of "requesting data from market participants." *Id.* In sum, the Consolidated Audit Trail "strengthen[s] the integrity and efficiency of the markets," which "enhance[s] investor protection and increase[s] capital formation." 81 Fed. Reg. at 84,727. These benefits plainly implement Congress's findings and objectives: they "preserve[] and strengthen[]" securities markets, increase the "efficien[cy] and effective[ness]" of market operations using "[n]ew data processing" techniques, and assure "fair competition" among brokers, dealers, and exchange markets. 15 U.S.C. § 78k-1(a)(1).

Those findings and objectives could hardly be considered "limited [in] scope." Pls.' Mot. at 15. Plaintiffs cite *Business Roundtable* for that proposition. *Id.* (*citing Bus. Roundtable v. SEC*, 905 F.2d 406, 416 (D.C. Cir. 1990)). But that non-binding case dealt with whether the SEC had authority under Section 19 to require that all exchanges impose certain corporate governance requirements on their listed companies. *Bus. Roundtable*, 905 F.2d at 407; *accord* Pls.' Mot. at 15. It said little about Section 11A, and what little it did say had nothing to do with the SEC's power to "authorize or require self-regulatory organizations to act jointly." *Compare Bus. Roundtable*, 905 F.2d at 415–16, *with* 15 U.S.C. § 78k-1(a)(3)(B). Unsurprisingly, then, Plaintiffs' out-of-context quotes from that opinion relate only to Section 14 and other parts of Section 11A. *Compare* Pls.' Mot. at 15, *with Bus. Roundtable*, 905 F.2d at 412, 416.

More to the point, history demonstrates the *breadth* of the SEC's Section 11A author-ity. By 1975, "[t]he nation's securities markets [we]re in dynamic change." S. Rep. No. 94-75, at 8–9. To "substantially improve[]" securities markets, Congress therefore thought it "best to allow maximum flexibility" by "clearly granting" the SEC in Section 11A "broad, discretionary powers to oversee the development of a national market system." *Id.*; *Nasdaq*, 38 F.4th at 1131 (same); *see also* S. Rep. No. 94-75 at 7 (identifying "coordination of self-regulatory systems" as one of the "goals of the national market system"); *id.* at 23 (describing the SEC's "responsibility to correct self-regulatory lapses" as "unmistakable"); *id.* at 30–31 (legislation "greatly expand[s] the [SEC's] direct regulatory powers over the nation's trading markets and participants in those markets"). Put simply, Congress expected the SEC "to play a much larger role than it ha[d] in the past to" provide "leadership for the development of a more coherent and rational regulatory structure" and "to police effectively the new national market system." *Id.* at 2.

And it has. As Plaintiffs themselves admit, for the "first 35 years after Congress passed" Section 11A, the SEC "issued numerous rules relating to the national market sys-tem." Pls.' Mot. at 19; *see* pp. 7–8, *supra*. And in 2005, when the national market system "collectively represent[ed] more than $14 trillion," 70 Fed. Reg. at 37497, the SEC used its Section 11A powers to promulgate Regulation NMS, which changed the regulatory of the U.S. equity markets in critical respects. *See* pp. 7–8, *supra*. If the SEC can use its Section 11A power to restructure trading markets, it can use the same power to take the far-less-drastic step of ordering a comprehensive monitoring system. In fact, the SEC has approved various nation-market-system plans over the years that, not unlike the Consolidated Audit Trail, "govern the collection, processing and distribution of stock quotation and transaction infor-mation," including by having "centralized securities-information processors receive limited categories of data from the exchanges, compile it, and transmit it to subscribers." *Nasdaq*, 38 F.4th at 1106; *New York Stock Exch. LLC v. SEC*, 2 F.4th 989, 990 (D.C. Cir. 2021).

Especially given the statutory text and extensive history of Section 11A regulation, it

is simply irrelevant that the "SEC never sought to collect information on individual investors under the guise of § 11A authority" before 2010. Pls.' Mot. at 19; *see id.* 17–21. It is undisputed that self-regulatory organizations previously maintained their own separate audit trails and broker-dealers "maintained material amounts of customer-identifying information." *See* pp. 10, *supra*; Compl. ¶ 22; Pls.' Mot. at 6, 8. And it is undisputed that the SEC had statutory authority to access that data. *See* pp. 26–28, *supra*; *see* 15 U.S.C. § 78q(a) & (b). So, for decades, the SEC never *needed* to use its Section 11A authority for a consolidated audit trail. *See* 77 Fed. Reg. at 45,727–30. But the whole point of the Consolidated Audit Trail is that the prior system became "outdated and inadequate to effectively oversee a complex, dispersed, and highly automated national market system." *Id.* at 45,723. It is therefore unsurprising that, on top of its long-used Section 17 authority, the new consolidated audit trail *also* implicated the SEC's Section 11A authority to have self-regulatory organizations "act jointly" in aid of the national market system. *See Mont. Env't Info. Ctr. v. Thomas*, 902 F.3d 971, 979 (9th Cir. 2018) (endorsing an agency's ability to use "multiple statutory tools" to "rectify" the same problem). Pre-2010 surveillance practices say nothing about the SEC's statutory authority to require a consolidated audit trail under Section 11A.

Given the "state of market development and technological innovation," Congress determined that "it is best to allow maximum flexibility" by granting the SEC "broad, discretionary powers to oversee the development of a national market system." S. Rep. No. 94-75 at 7. But Plaintiffs' cramped version of Section 11A disregards "Congress's deliberate choice" to issue "broad general directive[s]" to the SEC. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 679 (2020). Worse yet, it disregards the plain statutory text that straightforwardly authorizes the SEC to require a consolidated audit trail in the interests of market competition and investor protection. Plaintiffs' argument should be rejected.

### 2. The major-questions doctrine is inapplicable or satisfied.

The parties seem to agree that the Court can resolve Plaintiffs' claim by examining the Exchange Act's text, structure, and history without resorting to the major-questions doctrine.

*See* Pls.' Mot. at 22. That is the correct approach because the major-questions doctrine is inapplicable here. That doctrine is reserved for "extraordinary cases" in which an agency asserts "an unheralded power representing a transformative expansion in [its] regulatory authority" by means of "a radical or fundamental change to a statutory scheme." *West Virginia*, 597 U.S. at 722–25; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2372–73 (2023) (agency exercised "never previously claimed powers"). This is not one of those extraordinary cases.

In directing self-regulatory organizations to create a single comprehensive, accessible audit trail, the SEC did not rely on "vague," "cryptic," "ancillary," or "modest" statutory language. *West Virginia*, 597 U.S. at 721–24. It cited core provisions of the Exchange Act that confer broad authority to oversee the self-regulatory organizations and broker-dealers. 77 Fed. Reg. at 45808. That includes Section 17, which the SEC has used for decades to examine the same type of information—separate audit trails of the self-regulatory organizations and customer data from broker-dealers—that resides in the Consolidated Audit Trail now. *See* pp. 26–28, *supra*. It also includes Section 11A, a major statutory provision that confers "intentionally broad and clear power and discretion to shape the" national market system. *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1095 (D.C. Cir. 1978); *Nasdaq*, 38 F.4th at 1131–32. The SEC has repeatedly relied on these provisions to require the self-regulatory organizations to enhance their regulatory tools and to develop the national-market-system regulatory framework. *See* pp. 28–32, *supra*.

The Consolidated Audit Trail also does not accomplish a "transformative expansion in [the SEC's] regulatory authority." *West Virginia*, 597 U.S. at 724. Although the market overseen by the SEC is broad, it has invoked long-used and specific procedural mechanisms: Section 17's authority to require national securities exchanges and registered broker-dealers to "make," "keep," and "furnish" copies of "such records" as the SEC deems "necessary or appropriate," and Section 11A's authority to order join action by self-regulatory organizations in furtherance of specifically enumerated findings and objectives. 15 U.S.C. 78k-1(a); *see* pp. 26–32, *supra*; Pls.' Mot. at 19 (Plaintiffs conceding that for the "first 35 years after

Congress passed" Section 11A, the SEC "issued numerous rules relating to the national market system"). For that reason, there has been no change in the "SEC's role in the national market system" through the creation of a purported "direct relationship" with investors. Pls.' Mot. at 22–23. As explained above, the SEC *always* had access to investor information through broker-dealers—the same type of information it can now access when those same broker-dealers instead submit it to the Consolidated Audit Trail. *See* pp. 8–10, *supra*. So the SEC's current relationship with investors is not functionally different than in the 1980s when it used the identical statutory authority to examine investor information through the blue-sheet process. *Id.* Similarly, the SEC has been using its Section 11A authority for decades, including on rules (like Regulation NMS and other efforts) that have wide-ranging impacts on the national market system. *See* pp. 31–32, *supra*.

So this case is far afield from previous major-questions cases where an agency interpretation gave it "virtually unlimited power to rewrite the" statute, *Nebraska*, 143 S. Ct. at 2373, empowered it to "substantially restructure the American energy market," *West Virginia*, 597 U.S. at 724, or identified "no limit" on measures "outside [its] reach," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764–65 (2021). And it is equally far afield from major-questions cases where the agency is regulating "outside its wheelhouse," *Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring), or lacks "comparative expertise in making [the relevant] policy judgments," *West Virginia*, 597 U.S. at 729. Monitoring securities markets and ensuring that self-regulatory organizations can carry out their statutory responsibilities in a national market system "is what [the SEC] does." *Missouri*, 595 U.S. at 95. The Consolidated Audit Trail, in fact, was the SEC's direct response to inadequacies in the prior regime that significantly impeded its ability to carry out those core functions.

That is enough to render the major-questions doctrine inapplicable. Contrary to Plaintiffs' suggestions, the Supreme Court has never treated that doctrine as a license for courts to override statutory text simply because an agency's action may be politically or economically consequential. *See Nebraska*, 143 S. Ct. at 2374 (emphasizing presence of additional

"indicators"). And the Court has often decided challenges to major policy decisions without invoking the doctrine. *See, e.g.*, *Missouri*, 595 U.S. at 93; *Little Sisters*, 591 U.S. at 676–77.

In any event, Plaintiffs' arguments about the Consolidated Audit Trail's supposed political and economic significance are baseless. Starting with the latter, Plaintiffs argue that the "costs to build and operate the CAT are [ ] indisputably 'significant.'" Pls.' Mot. at 23–24. But the major-questions doctrine is built in part on "separation of powers principles." *West Virginia*, 597 U.S. at 723. And there is no separation-of-powers concern here: as discussed below, the Consolidated Audit Trail—funded entirely by private self-regulatory organizations and industry members—does not implicate Congress's appropriations power at all. *See* pp. 53–55, *infra*. Tellingly, Plaintiffs' argument relies on misleading cost estimates. *See* Pls.' Mot. at 23. For example, Plaintiffs place much weight on the estimated $1.5 billion in aggregate annual broker-dealer compliance costs. Pls.' Mot. at 23–24. But broker-dealers spent approximately $1.6 billion annually on regulatory reporting *before* the Consolidated Audit Trail. 81 Fed. Reg. at 84862. And, of course, the Consolidated Audit Trail is meant to replace those duplicative systems. *See* Notice, 86 Fed. Reg. 34,293 (June 29, 2021). Plaintiffs also vastly overstate the SEC's estimates of the cost to build and operate the Consolidated Audit Trail. They do this by misleadingly including broker-dealer *compliance* costs in the annual operation costs and then double counting those same costs as "additional compliance costs." Pls.' Mot. at 11–12. The SEC's actual estimates were a small fraction of Plaintiffs' inflated figures. *See* p. 14, *supra*.

Nor is the Consolidated Audit Trail politically significant. Notably, Plaintiffs identify no public controversy over the *creation* of a consolidated audit trail. Unlike other major-questions case, no one challenged Rule 613's adoption in 2012 or Plan approval in 2016. *Cf. Missouri*, 595 U.S. at 95 (regulated parties' support "suggest[ed]" agency "did not exceed" authority). And until last year, no one questioned the SEC's authority to take either step. There is simply nothing "politically significant" about combining preexisting audit trails and broker-dealer information into one database. Relatedly, the "more than 100 million

Americans" who trade securities—like Plaintiffs here—knowingly disclose their information to execute securities transactions, just as they did prior to the Consolidated Audit Trail. *Compare* Pls.' Mot. at 24–25, *with* pp. 38–43, *infra*. So it could hardly be said that significant "liberty and privacy" interests are at stake. *Contra* Pls.' Mot. at 25.

The remainder of Plaintiffs' argument relies primarily on perceived cybersecurity risks to the Consolidated Audit Trail. *See* Pls.' Mot. at 25–26. But that concern is entirely speculative. *See* pp. 21–22, *supra*. And as Plaintiffs themselves readily admit, cyberattacks are a routine (if unfortunate) part of modern life. *See* Compl. ¶ 44 (explaining that by 2017 "hackers had breached numerous databases containing private financial information, including databases at sophisticated tech companies, large financial firms, and major government agencies"); *id.* ¶ 45 (noting that "SEC itself fell victim to hacking in 2016"). So it is difficult to understand how cybersecurity risks could qualify as more "politically significant" for the Consolidated Audit Trail than any other large aggregation of information—including the predecessor audit trials and broker databases—in either the public or private sector.[4]

Finally, even if the major-questions doctrine applied, the Exchange Act provides the "clear congressional authorization" that the doctrine demands. *West Virginia*, 597 U.S. at 723. None of the major-questions cases "requires an unequivocal declaration from Congress authorizing the precise agency action under review." *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring). Rather, as discussed above, any "initial skepticism" here is "overcome" by both "text directly authorizing [the Consolidated Audit Trail]" and "context demonstrating that the [SEC's] interpretation is convincing." *Id.* at 2381. The Court should therefore either reject the major-questions doctrine and find the Consolidated Audit Trail within the SEC's powers, or find that doctrine satisfied by the plain statutory text, structure, and history.

---

[4] It bears repeating that the Consolidated Audit Trail collects only minimal personal information (name, address, and birth year), which is stored separately from transaction data and accessible to only a small set of individuals on a need-to-know basis. *See* Order Granting Conditional Exemptive Relief, 85 Fed. Reg. 16152 (March 20, 2020); *contra* Pls.' Mot. at 22.

**B.    The Fourth Amendment is not implicated by aggregating third-party infor-
mation that Plaintiffs voluntarily disclosed.**

Plaintiffs' Fourth Amendment claim also fails.  The Fourth Amendment protects
"[t]he right of the people to be secure in their persons, houses, papers, and effects[] against
unreasonable searches and seizures."  U.S. Const. amend. IV.  But the Fourth Amendment
does not apply where there is no government "search" or "seizure" in the first place.  Fourth
Amendment protection therefore turns on whether someone "has a constitutionally protected
property interest or a judicially conferred reasonable expectation of privacy in the place or
thing searched or seized."  *United States v. Gaulden*, 73 F.4th 390, 392–93 (5th Cir. 2023).  And
the latter requires "that a person have exhibited an actual (subjective) expectation of privacy"
and "that the expectation be one that society is prepared to recognize as reasonable."  *United
States v. Turner*, 839 F.3d 429, 434 (5th Cir. 2016).  In all events, "[t]hose invoking the Amend-
ment can vindicate only their personal security against unreasonable searches and seizures,
not security in the property of someone else."  *Gaulden*, 73 F.4th at 392–93.

Plaintiffs here contend that the "SEC ordered the collection of investors' records,
which is a seizure under the Fourth Amendment" and "SEC's later review of those records
constitutes a search."  Pls.' Mot. at 27; Compl. ¶¶ 143–68 (Count III).  Both contentions are
wrong.  There was no search or seizure because Plaintiffs voluntarily disclosed their infor-
mation to third parties, and they have no property right or expectation of privacy in the third-
party business records that self-regulatory organizations and broker-dealers contribute to the
Consolidated Audit Trail.  Plaintiffs' Fourth Amendment claims are therefore easily rejected.

**1.    There is no search.**

As noted above, Fourth Amendment protection turns on whether someone "has a
constitutionally protected property interest or a judicially conferred reasonable expectation of
privacy in the place or thing searched or seized."  *Gaulden*, 73 F.4th at 392–93.  Plaintiffs have
no such interest or expectation here.

### a. Plaintiffs have no property interest or privacy expectation in information voluntarily disclosed to third parties.

The third-party doctrine fatally undermines Plaintiffs' Fourth Amendment claim. "Under the third-party doctrine, a person generally has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *United States v. Gratkowski*, 964 F.3d 307, 310 (5th Cir. 2020) (quoting *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979)).

Almost 50 years ago, the Supreme Court squarely held in *United States v. Miller* that individuals have neither a property interest nor a reasonable expectation of privacy in personal and financial information given to third parties (in that case, a bank). 425 U.S. 435, 440–43 (1976); *see SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735 (1984) (applying *Miller* in the securities context). As to the property aspect, it was undisputed that "the records kept by the banks" were "merely copies of personal records that were made available to the banks for a limited purpose." *Miller*, 425 U.S. at 442. But those records are not a customer's "private papers"; they are "the business records of the banks," and a bank customer "can assert neither ownership nor possession" over them. *Id.* at 440. Likewise, a bank customer has no reasonable expectation of privacy in their banking records because they "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 442. As the Court explained, "[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.* at 443. Quite simply, the Fourth Amendment "does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.*

That was true in 1976 and it remains true today. *See United States v. Whipple*, 92 F.4th 605, 611 (6th Cir. 2024) (applying the third-party doctrine to the "tracking of purchasing history"); *Gaulden*, 73 F.4th at 393 ("[T]he fact remains that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *United States v.*

*Gratkowski*, 964 F.3d at 310 (applying *Miller* and the third-party doctrine). Plaintiffs' own cited law-review article even recognizes as much. *Compare* Pls.' Mot. at 29, *with* Mihailis E. Diamantis, *Privileging Privacy: Confidentiality As A Source of Fourth Amendment Protection*, 21 U. Pa. J. Const. L. 485, 494 (2018) (explaining that *Miller*'s "holding stands today, despite widespread recognition in the law that people have privacy interests in their financial information"). To be sure, the Supreme Court's decision in *Carpenter* "explained that the automatic, *involuntary* disclosure of cellphone-geolocation data is not subject to the third-party doctrine." *Whipple*, 92 F.4th at 611 (discussing *Carpenter v. United States*, 585 U.S. 296 (2018)). But "the Court was careful not to disturb the application of the traditional third-party doctrine to voluntary disclosures." *Id.* "In other words, what a person knowingly exposes to the public is not subject to Fourth Amendment-warrant protection." *Id.*; *id.* at 611 n.6 (collecting cases for the proposition that "there are numerous cases dealing with knowing and voluntary disclosures as related to the third-party doctrine").

That's exactly what the Fifth Circuit held in applying the third-party doctrine to virtual-currency transactions. Gathering information about such transactions, the Fifth Circuit explained, "does not provide agents with 'an intimate window into a person's life'" because "it provides only information about a person's virtual currency transactions."[5] *Gratkowski*, 964 F.3d at 312 (quoting *Carpenter*, 585 U.S. at 311). And, most importantly, transacting virtual currency "requires an affirmative act on part of the user." *Id.*

So too here. The Consolidated Audit Trail collects only records of the self-regulatory organizations and broker-dealers, not investors themselves. *See* Ex. C, App. C-4–5; Pls.' Mot.

---

[5] The Supreme Court in *Carpenter* expressly stated that its decision "is a narrow one," and "do[es] not disturb the application of *Smith* and *Miller*." 585 U.S. at 315–16. As Plaintiffs' cited article explains, *Carpenter* hinged on "the unique nature of cell phone location records." Diamantis, *supra* at 496. "It is unclear what, if any, other sort of data shares that nature" and "its 'uniqueness' suggests the answer may be none." *Id.* "Indeed, after *Carpenter*, even cell-site location records are excepted from Fourth Amendment protection by the third-party doctrine so long as they cover less than seven days of data." *Id.* (collecting cases).

at 10; Compl. ¶¶ 62 (noting that the Consolidated Audit Trail receives data "from national securities exchanges and broker-dealers"); *id.* ¶¶ 84–87. Just like the bank records in *Miller* or the virtual-currency records in *Gratkowski*, the records of the self-regulatory organizations and broker-dealers "contain only information voluntarily conveyed to" them by investors through "an affirmative act." *Miller*, 425 U.S. at 442; *Gratkowski*, 964 F.3d at 312. Plaintiffs also readily admit that they "expected that [their] broker would" disclose their "personal or other information to any third party" as "necessary to execute [securities] transactions." Davidson Decl. ¶ 3; Restivo Decl. ¶ 3 (same); Shepard Decl. ¶ 4 (same). So they have no "subjective expectation of privacy," much less one "that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Plaintiffs knowingly took "the risk, in revealing [their] affairs to another, that the information will be conveyed by that person to the Government." *Miller*, 425 U.S. at 443. And, of course, the personal and financial data in the Consolidated Audit Trail is nearly identical to the personal and financial data at issue in *Miller* and *Gratkowski*, which does not provide "an intimate window into a person's life" but "only information about a person's [securities] transactions." *Gratkowski*, 964 F.3d at 312; *see Miller*, 425 U.S. at 438. So just as in *Miller* and *Gratkowski*, Plaintiffs have no expectation of privacy in their personal or financial data voluntarily shared with third parties. *Id.* at 442; *Gratkowski*, 964 F.3d at 313.

In fact, Plaintiffs readily admit that they "expected that [their] broker would" disclose their "personal or other information to any third party" as "necessary to execute [securities] transactions." Davidson Decl. ¶ 3; Restivo Decl. ¶ 3 (same); Shepard Decl. ¶ 4 (same). So Plaintiffs have no "subjective expectation of privacy," much less one "that society recognizes as reasonable." *Kyllo*, 533 U.S. at 33. And this goes far beyond the third-party doctrine blessed by *Miller*. While the type of banking transaction in *Miller* may involve disclosing information solely to a third-party bank, a securities transaction involves disclosing information to multiple other parties—fourth, fifth, and sixth parties, at least—including one or more brokers, one or more exchanges, a transfer agent, a clearing or settlement intermediary, and custodian financial institutions. *See* Transfer Agent Regulations, 80 Fed. Reg. 81,948, 81,956–

60 (Dec. 31, 2015). Federal law recognizes as much: the Gramm-Leach-Bliley Act addresses access to personal information in financial transactions and explicitly permits the disclosure of nonpublic personal information to a variety of intermediaries, government regulators, and self-regulatory organizations. *See* 15 U.S.C. § 6802. The statute even mandates that investors receive disclosures regarding (the lack of) privacy. *Id.* It would make a mockery of the Fourth Amendment to find an expectation of privacy in data that Plaintiffs themselves knew, and federal law observes, would be disclosed many times over.

Nor do investors have any property interest in Consolidated Audit Trail data. As *Miller* made clear long ago, account and transactional records held by a financial institution—like the records that self-regulatory organizations and broker-dealers submit to the Consolidated Audit Trail—are "the business records of" the institution, not a customer's "private papers." *Miller*, 425 U.S. at 440. Plaintiffs cite *Boyd* for the proposition that financial papers are protected by the Fourth Amendment. *See* Pls.' Mot. at 28. But *Miller* itself expressly superseded *Boyd*: "unlike the claimant in *Boyd*," a bank customer could "assert neither ownership nor possession" over his account records.[6] *Miller*, 425 U.S. at 440; *see* Samuel A. Alito,

---

[6] Almost none of Plaintiffs other cited cases grapple with the third-party doctrine, much less speak to whether an investor's financial information can be protected by the Fourth Amendment when voluntarily transmitted to third parties as part of a commercial transaction. *See* Pls.' Mot. at 28–29; *Riley v. California*, 573 U.S. 373, 378 (2014) (considering whether the police may search digital information on a cell phone seized from an individual who has been arrested); *Carpenter v. United States*, 484 U.S. 19, 25 (1987) (finding that a newspaper's *confidential* business information can be considered "property" protected by the mail and wire fraud statutes); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (holding that trade secrets can be considered "property" for Fifth Amendment purposes, but not when "an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information"); *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (declining to interpret a statute as authorizing "fishing expeditions into private papers"); *United States v. Ackerman*, 831 F.3d 1292, 1304 (10th Cir. 2016) (expressly declining to consider the third-party doctrine where an entity "opened [defendant's] email, found four attachments, and proceeded to view each of them"); *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (resisting application of the third-party doctrine and holding that "a subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial" internet-service provider).

Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. Pitt. L. Rev. 27, 38 (1986) (explaining that "*Boyd*'s reliance on the fourth amendment was glaringly unsound"). And courts have adhered to that holding in analogous circumstances ever since. *See, e.g.*, *Whipple*, 92 F.4th at 611 (applying *Miller* to the "tracking of purchasing history"); *Harper v. Rettig*, 675 F. Supp. 3d 190, 203 (D.N.H. 2023) (applying *Miller* and finding no protected property interest or expectation of privacy in financial records); *United States v. Osborn*, 2023 WL 3602331, at *2 (D. Colo. May 23, 2023) (same); *Zietzke v. United States*, 426 F. Supp. 3d 758, 769 (W.D. Wash. 2019) (same); *Pearce v. Miele*, 2015 WL 4546114, at *3 (D. Conn. July 28, 2015) (same).

As one court put it, "[f]rom a property rights perspective," account and transactional information is "no different from the many other kinds of business records the Government has a lawful right to obtain by compulsory process" because the account holder does "not own, possess, control, or use the records." *Harper v. Rettig*, 675 F. Supp. 3d 190, 203 (D.N.H. 2023) (citation omitted); *Carpenter*, 585 U.S. at 382 (Alito, J., dissenting) (explaining that *Miller* "rejected an argument that would have disregarded the clear text of the Fourth Amendment and a formidable body of precedent"). Simply put, investors like Plaintiffs have no property interest in Consolidated Audit Trail data, which comes from the "business records" of self-regulatory organizations and broker-dealers.

Indeed, finding that investors retain a property interest in personal financial information even after voluntarily sharing it with intermediaries would have staggering implications. For starters, it could open up the entire securities industry to significant liability. *See CRG Holdings LLC v. Hardman*, 2006 WL 8436272, at *2 (W.D. Tex. Mar. 15, 2006) (explaining that conversion is "the unauthorized and wrongful assumption and exercise of dominion and control over the property of another," which entitles a plaintiff to damages "necessary to compensate" them). Worse yet, in Plaintiffs' telling, any government program or database could be shut down for violating the Fourth Amendment, in addition to triggering the Fifth Amendment's Due Process and (presumably) Takings Clauses. *See Bowlby v. City of Aberdeen*, 681 F.3d 215, 224 (5th Cir. 2012) (interaction of takings and due process). This could include

the Secure Flight program used to check airline-provided information against terrorist watch-lists, the National Student Loan Data System used to provide information about loans and grants awarded to students, and the FinCen database used to detect and deter financial crime, among many others. *See* Dep't Homeland Sec., *TSA Secure Flight Program* (March 31, 2023), *available* here; Federal Student Aid, *National Student Loan Data System (NSLDS)* (last visited July 12, 2024), *available* here; U.S. Dep't of Treasury, *About FinCen* (last visited July 12, 2024), *available* here. Under Plaintiffs' theory, virtually any information that the government can access—even if assembled with voluntarily disclosed third-party information—could be deemed unconstitutional. The Court should not countenance such a catastrophic result.

"This is not to say that" the SEC "may haphazardly disclose" Consolidated Audit Trail information "to random individuals." *Pearce*, 2015 WL 4546114, at *3. Such activity can be (and is) regulated by federal statutes and regulations. "And a government official who lawfully comes into possession of [Consolidated Audit Trail] records might well violate some federal or state law by disclosing the records to third parties." *Id.* "The lesson from *Miller* is simply that these activities—however improper—do not implicate" Plaintiffs' "protectable interests under the Fourth Amendment." *Id.*

> **b. Other factors also indicate that Plaintiffs have no reasonable expectation of privacy.**

This lack of any privacy expectation is reinforced by the history of securities regulation and the statutory scheme. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) ("Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist."); *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 969 (5th Cir. 2023) (same); *Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2d Cir. 1981) ("[R]ecords required to be kept pursuant to valid regulatory programs have a 'public aspect' for purposes of constitutional analysis, and thus are not private papers entitled to the protection of the fourth or fifth amendments."); *In re Grand Jury Subpoena*, 696 F.3d 428, 433 (5th Cir. 2012) (same under the Fifth Amendment). Whatever the label, all factors indicate a lack of privacy here.

Start with history. "Securities markets have existed in England and the United States for over three hundred years, and they have been regulated by governments all the while." Stuart Banner, *What Causes New Securities Regulation? 300 Years of Evidence*, 75 Wash. U. L.Q. 849, 849–50 (1997); *see* pp. 4–6, *supra*. "By 1700, there was English legislation specially designed 'to protect investors against unscrupulous manipulation by stock jobbers and stock brokers.'" Sanders, *supra* at 93. And the "first significant American securities regulation" was passed by New York in 1792. Banner, *supra* at 850. By 1863, the New York Stock Exchange instituted a rule requiring listed companies to "disclose financial information, operate with more transparency, associate with local bankers, and issue annual reports." Sanders, *supra* at 98. States then began to regulate securities as well, and by 1927, 46 of the 48 States had adopted (and the Supreme Court had blessed) securities regulations known as Blue Sky Laws. *Id.* at 100; *see Hall v. Geiger-Jones Co.*, 242 U.S. 539, 551 (1917). As discussed above, the 1929 stock market crash spurred Congress to enact the landmark Securities Act of 1933 and the Securities Exchange Act of 1934. *See* pp. 5–6, *supra*. "Generally speaking, the Securities Act regulates the registration of securities during initial public offerings, and the Exchange Act regulates the secondary market, where existing securities are traded between members of the public." *SEC v. Almagarby*, 92 F.4th 1306, 1318 (11th Cir. 2024).

As relevant here, the Exchange Act, from the beginning, required national securities exchanges and registered broker-dealers to "make," "keep," and "preserve" any records as the SEC "by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors." 48 Stat. at 897; *see* 15 U.S.C. § 78q(a). And those records have always been "subject at any time" to "reasonable periodic, special, or other examinations by" the SEC without any additional process or judicial review. 48 Stat. at 897; *see* 15 U.S.C. § 78q(b); *see* 17 C.F.R. § 240.17a-25(a)(2) (providing for electronic submission of securities-transaction information). For this reason, one court has gone so far as to say that records "required by the SEC under the statute and regulations" are considered "quasi-public records." *SEC v. Olsen*, 243 F. Supp. 338, 339 (S.D.N.Y. 1965); *see* Ronald J. Colombo, *Trust*

*and the Reform of Securities Regulation*, 35 Del. J. Corp. L. 829, 858 (2010) (explaining that "[b]roker-dealers are heavily regulated" because they are "subject to a panoply of rules and requirements, hailing from the Securities Exchange Act of 1934, FINRA," and state law). And, as explained above, the SEC has been using this 90-year-old authority for decades to access the same information at issue here. *See* pp. 8–10, *supra*. Not to mention that the current statutory scheme permits the disclosure of nonpublic personal information to a variety of organizations and government regulators, and even mandates investor disclosures about (the lack of) privacy. *See* 15 U.S.C. § 6802. In light of this history and statutory regime, no reasonable investor could expect privacy for the information that they voluntarily disclosed to execute securities transactions. There is simply no protection for "the individual who enters upon a regulated activity knowing that the maintenance of extensive records available for inspection by the regulatory agency is one of the conditions of engaging in the activity." *In re Grand Jury Subpoena*, 696 F.3d at 433.

This is reinforced by not only the "extensive regulatory scheme" but also the "threat to the public welfare if" securities were "left unregulated." *Mexican Gulf Fishing*, 60 F.4th at 969. "The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006). "From the inception of federal securities legislation in the 1930s," it "has long been understood that in the face of economic calamity, the restoration and/or preservation of trust—especially investor trust—is paramount in our financial institutions and markets." Colombo, *supra* at 830. So "[t]he fundamental purpose undergirding the Securities Acts is to eliminate serious abuses in a largely unregulated securities market." *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972). And without the Consolidated Audit Trail, regulators would be forced to revert to "a model that neither supports the efficient aggregation of data from multiple trading venues nor yields the type of complete and accurate market activity data needed for robust market oversight." 77 Fed. Reg. at 45,723. In this historically

regulated area, with an extensive regulatory regime where records are required to be kept and furnished, there is no expectation of privacy in data used to execute securities transactions.

### 2. There is no seizure.

The lack of any "search" also demonstrates why there is no "seizure" here. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Beard*, 16 F.4th 1115, 1119 (5th Cir. 2021). But Plaintiffs have no possessory interest in Consolidated Audit Trail data: the account and transactional records submitted to the Consolidated Audit Trail are the "business records of" the self-regulatory organizations and broker-dealers, not an investor's "private papers." *Miller*, 425 U.S. at 440; *see* pp. 39–43, *supra*.

Even if Plaintiffs had a possessory interest, though, the "act of copying the data" is "not a seizure under the Fourth Amendment because it d[oes] not interfere with [Plaintiffs'] or anyone else's possessory interest in the data."[7] *United States v. Gorshkov*, 2001 WL 1024026, at *3 (W.D. Wash. May 23, 2001); *see Arizona v. Hicks*, 480 U.S. 321, 324 (1987) (copying of serial number for suspected stolen equipment was not a seizure because it did not "meaningfully interfere with [a] possessory interest in either the serial number or the equipment"); *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992) (same holding as applied to photographing a crime scene). "The data remain[s] intact and unaltered." *Gorshkov*, 2001 WL 1024026, at *3.

---

[7] This argument assumes the dubious proposition that self-regulatory organizations and broker-dealers submitting data to the Consolidated Audit Trail are governmental actors for constitutional purposes. *See United States v. Johnlouis*, 44 F.4th 331, 335 (5th Cir. 2022) (explaining that the Fourth Amendment "proscrib[es] only governmental action" and holding that even a government employee was not a governmental actor for Fourth Amendment purposes). Plaintiffs advance no such allegations, which would also be at odds with their argument that only the "SEC's later review of [Consolidated Audit Trail] records"—not any review by self-regulatory organizations—"constitutes a search." Pls.' Mot. at 27. And courts have consistently held that self-regulatory organizations are not governmental actors. *See, e.g., All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226, 240 (5th Cir. 2023), *reh'g en banc granted, opinion vacated* (5th Cir. Feb. 19, 2024); *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 138 (2d Cir. 2002); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F. Supp. 1460, 1466 (N.D. Ill. 1997). Regardless, their argument fails for the reasons explained here.

And it "remain[s] accessible to" Plaintiffs for them to use, retain, or share as they wish. *Id.* So "[t]he copying of the data ha[s] absolutely no impact on [their] possessory rights" and does not effect a Fourth Amendment "seizure." *Id.*

No court has ever held that the creation of a government database that collects information from third parties—let alone information freely given by an investor to complete a financial transaction—results in a seizure of that information. This Court should not be first. Plaintiffs' Fourth Amendment claim should be dismissed.

**C.    Plaintiffs have no property interests implicating the Fifth Amendment.**

Plaintiffs' Fifth Amendment claim fails for much the same reason as their Fourth Amendment claim. *See* Compl. ¶¶ 169–78 (Count IV). The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. And Plaintiffs here contend that they are "depriv[ed]" of "their protected property rights, namely their electronically stored personal papers and business records," without "either pre- or post-deprivation notice and an opportunity to be heard." Compl. ¶ 174 (Count IV). But, again, Plaintiffs have no property interest in the information submitted to the Consolidated Audit Trail; that data comes from the business records of self-regulatory organizations and broker-dealers. *See* pp. 39–43, *supra*; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (an individual's "property right is extinguished," even for a trade secret, if it is disclosed to others); *Harper*, 675 F. Supp. 3d at 206 (no Fifth Amendment property interest where third-party doctrine defeated Fourth Amendment claim). Nor are they "deprived" of anything; they have full access to their own personal and financial information. *See* p. 46, *supra*. So Plaintiffs have no property interest protected by the Fifth Amendment.

If Plaintiffs' Fifth Amendment theory were correct, numerous other government programs would be called into question. *See* p. 43, *supra*. Like Plaintiffs' Fourth Amendment claim, the Court should reject Plaintiffs' Fifth Amendment claim too.

**D.    No First Amendment right is burdened by the collection of securities data.**

Plaintiffs' efforts to challenge the Consolidated Audit Trail under the First

Amendment fare no better. *See* Compl. ¶¶ 179–92 (Count V). Courts have long viewed the "exchange of information about securities" as "commercial activity" that can be "regulated without offending the First Amendment." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 n.5 (1985) (noting this distinction); *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("securities regulation is a form of regulation distinct from the more general category of commercial speech," and "is subject only to limited First Amendment scrutiny" (discussing cases)). And this "principle applies *a fortiori*" when it comes to rules requiring disclosure of information to the SEC, rather than the public at large. *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108–09 (D.C. Cir. 2011). For First Amendment purposes, such rules are sustained with minimal scrutiny and "indistinguishable from other underlying and oft unnoticed forms of disclosure the Government requires for its 'essential operations.'" *Compare id.* (analyzing rule requiring "disclosure to [SEC] alone" under standard "akin to the general rational basis test"), *with Chamber of Com. of United States v. SEC*, 85 F.4th 760, 768 (5th Cir. 2023) (sustaining SEC rule compelling public disclosure because it "reasonably relate[s] to a legitimate state interest and is not unjustified or unduly burdensome" (cleaned up)).

Seeking to evade this framework, Plaintiffs claim that aggregation of information in the Consolidated Audit Trail burdens their right of *association*. Compl. ¶¶ 180–89. But Plaintiffs' securities trading is not a form of protected association. And, in any event, the Consolidated Audit Trail does not infringe on any cognizable interest.

### 1.    The First Amendment does not protect commercial associations.

"The right to associate freely is not mentioned in the text of the First Amendment." *Jacoby & Meyers, LLP v. Supreme Ct. of New York*, 852 F.3d 178, 185 (2d Cir. 2017). Rather, courts have derived it "from the insight that expressive rights explicitly guaranteed by the First Amendment 'could not be vigorously protected from interference'" absent a "'a correlative freedom to engage in group effort toward those ends.'" *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005); *see also Americans for Prosperity Found. v. Bonta*, 594 U.S.

595, 606 (2021) (the Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate"). For this reason, there is "a right to associate *for the purpose of* engaging those activities" the Amendment specifically identifies: "speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984) (emphasis added). But, to "merit protection" under the First Amendment, an association must "offer a means to serve [those] First Amendment" ends. *Jacoby*, 852 F.3d at 188. There "is no right of association in the abstract." *Wine & Spirits Retailers*, 418 F.3d at 50.

Not surprisingly, the Supreme Court has recognized associational rights for groups that seek to further a wide variety of political, social, educational, and cultural purposes. *See, e.g. NAACP v. Alabama,* 357 U.S. 449, 460 (1958) (political and social advocacy organization); *Buckley v. Valeo*, 424 U.S. 1, 68-69 (1976) (political parties and candidates); *Ams. for Prosperity Found.*, 594 U.S. at 602 (considering burden on associational rights of "a public charity that is 'devoted to education and training" and a "a public interest law firm"). But no such solicitude is extended to commercial associations that implicate pecuniary rather than expressive purposes. *See, e.g.*, *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (ordinance establishing age restrictions for dance halls "simply do[es] not involve the sort of expressive association that the First Amendment has been held to protect"); *see generally Roberts*, 468 U.S. at 634, 638 (O'Connor J., concurring in part) ("[T]here is only minimal constitutional protection of the freedom of commercial association" and "no First Amendment interest stands in the way of a State's rational regulation of economic transactions by or within a commercial association."). Indeed, courts have expressly rejected claims that businesses have a "First Amendment right" to engage in "business activities" that cannot be characterized "as speech or expressive conduct." *Wine & Spirits Retailers*, 418 F.3d at 50–51. And they have declined to recognize a First Amendment associational right for "a for-profit law partnership or PLLC" to receive certain types of investments, "[d]istinguishing the pursuit of expressive activity from the pursuit of commercial interests." *Jacoby*, 852 F.3d at 186–87. There is simply no legal

basis for a First Amendment right to associate for commercial transactions.

Here, of course, the Consolidated Audit Trail definitionally tracks only information related to *commercial* affiliation—namely, the purchase and sale of stock in for-profit entities. *See* pp. 11–14, *supra*. Such trading is paradigmatically conducted to serve pecuniary purposes; it has no more "expressive content" than any other type of commercial transaction like shopping at a preferred grocer or depositing money at a preferred bank. Compl. ¶ 189. Tellingly, Plaintiffs do not identify what expressive purpose they pursue with their trades. Nor do they allege that any unidentified entities in which they invest are engaged in any expressive conduct, much less that their stock trades support any such purpose.

Ultimately, Plaintiffs' claims boil down to the idea that any financial interaction can be inherently expressive. But this "extraordinary argument, if accepted, would extend First Amendment protection to every commercial transaction." *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 291 (D.C. Cir. 2019). Every banking regulation, every regulation of service contracts, and every regulation of prices could be seen as "affect[ing] access to products or services" and thus preventing people from associating with companies that offer them. *Id.*

That is not the law. *See, e.g.*, *id.* (rejecting argument that providing free samples of tobacco products is expressive); *Ohralik*, 436 U.S. at 459 (holding that lawyer soliciting clients did not involve "an exercise of associational freedom" and that "procurement of remunerative employment is a subject only marginally affected with First Amendment concerns"); *see generally Mastrovincenzo v. City of New York*, 435 F.3d 78, 95 (2d Cir. 2006) ("[W]here an object has a dominant non-expressive purpose, it will be classified as a 'mere commercial good[ ],'" the sale of which likely falls outside the scope of the First Amendment."). Indeed, courts have long "rejected the view that an apparently limitless variety of conduct can be labeled 'speech'" even when "the person engaging in the conduct intends thereby to express an idea." *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see also Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1394 (8th Cir. 2022) (holding that state law requiring public contracts to include certification that contractor will not boycott Israel prohibits "commercial decisions [that] are invisible to observers

unless explained" and thus "are not inherently expressive and do not implicate the First Amendment"). After all, it "is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas*, 490 U.S. at 25.

To be sure, Plaintiffs also appear to allege that the Consolidated Audit Trail would capture their "donations of stock" to "non-profit entities" and thereby impede on their "association with" them. Compl. ¶ 186. But Plaintiffs do not identify those entities or make any allegations sufficient to establish that their donations are part of an expressive enterprise. *Id.* And, in any event, Plaintiffs' arguments are misguided because the donation or transfer of stocks to non-profits is not an "order" that has to be reported to the Consolidated Audit Trail. *See* 17 C.F.R. 242.613(j); 17 C.F.R. 242.300(e). So Plaintiffs' use of securities to support non-profits simply does not implicate Rule 613.

Put simply, there is no legal basis to extend the First Amendment right of association to the type of activity covered by the Consolidated Audit Trail.

### 2. Regardless, the Consolidated Audit Trail does not impose an impermissible burden.

In any event, even if Plaintiffs were able to identify some associational interest in their portfolio investments, their claims of associational injury would still fail on their own terms. The underlying principle of Plaintiffs' cited cases—*NAACP* and *Americans for Prosperity*—is that associational freedom can be infringed by required disclosure of otherwise *confidential* information. *See NAACP*, 357 U.S. at 462 ("[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action."); *Ams. for Prosperity*, 594 U.S. at 606–07 (same); *see generally Roberts*, 468 U.S. at 622–23 (government "may unconstitutionally infringe upon" freedom of association by "attempt[ing] to require disclosure of the fact of membership in a group seeking anonymity"). As the Supreme Court has explained, disclosure of such

information can create dramatic "chilling effect[s]" where there is a demonstrated "risk of reprisals if their affiliation with [an] organization bec[o]me[s] known." *Ams. for Prosperity*, 594 U.S. at 606–07. But no such principle is implicated here: Plaintiffs already voluntarily disclose their data to third parties in order to execute securities transactions.

As detailed above, the data recorded in the Consolidated Audit Trail consists of data that Plaintiffs voluntarily conveyed to third parties. *See* pp. 39–43, *supra*. This conveyance destroys any expected anonymity they may have in their investments. Indeed, the SEC has long required brokers to maintain detailed information on their customers' activities and to provide those records to the self-regulatory organizations or the SEC upon request. *See* pp. 43–45, *supra* (detailing history of security regulation); *see also* 17 C.F.R. §§ 240.17a-3, 240.17a-4, 240.17a-25; 75 Fed. Reg. at 32557–58. So, as Plaintiffs themselves admit, when making trades they "expect[] that [their] broker would" disclose their "personal or other information to any third party" as "necessary to execute [securities] transactions." Davidson Decl. ¶ 3; Restivo Decl. ¶ 3 (same); Shepard Decl. ¶ 4 (same). This is the antithesis of Plaintiffs' attempting to maintain "'privacy in [their] associations.'" *Ams. for Prosperity*, 594 U.S. at 606.

Unsurprisingly, then, Plaintiffs fail to allege any concrete effects from the disclosure of their trading activity to the SEC. *See* Compl. ¶¶ 179–92. Instead, they vaguely assert in one passing phrase that such disclosure "exposes them to cancellation"—meaning, presumably, public criticism or censure. *Id.* ¶ 187. But as the Supreme Court explained, absent a demonstrated "record of harassment" or reprisal, "any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors is highly speculative," and does not establish a First Amendment violation. *Buckley*, 424 U.S. at 69–70. Notably, the Court made that statement in the context of a requirement to disclose campaign contributions to certain political candidates, information that was confidential and pertained to an indisputably expressive purpose. *Id.* None of that is true here.

On the other side of the ledger, the SEC has a longstanding interest in overseeing and maintaining the integrity of securities markets. *See* pp. 5–10, *supra*. And, as the SEC

explained in issuing Rule 613, its "ability to fulfill its statutory mission" is primarily determined by the data it has available. 77 Fed. Reg. at 45,727. The Consolidated Audit Trail was specifically designed to address serious shortcomings in prior data and enable SEC to better "identify patterns of trading and order activity that pose risks to the securities markets"; "improve its understanding of how markets operate and evolve"; and facilitate its ability to respond to "atypical or novel market events." *Id.*

Under any applicable level of scrutiny, these interests are more than sufficient to outweigh Plaintiffs' speculative claims of interference with some nebulous associational interest. *Compare Ams. for Prosperity*, 594 U.S. at 607 (compelled disclosure of donors to charitable organizations subject to "'exacting scrutiny'"), *with Chamber of Com.*, 85 F.4th at 768 (finding SEC rule compelling public disclosure of information "reasonably relate[d] to a legitimate state interest and is not unjustified or unduly burdensome") *and Full Value Advisors*, 633 F.3d at 1109 ("[c]ompelling disclosure" of information to the SEC is "a rational means of achieving" the SEC's statutory goals). Because any (hypothetical) harm from a disclosure requirement is "minimal and the benefit significant," the requirement would survive constitutional review. *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 886 (5th Cir. 2024).

### E. The Appropriations Clause is inapplicable to self-regulatory activities like the Consolidated Audit Trail.

Nor have Plaintiffs stated a plausible Appropriations Clause challenge. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. I, § 9, cl. 7. The Supreme Court recently confirmed that the Clause only "applies to money 'drawn from the Treasury'" in some way. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (*CFPB*); *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (same). Yet Plaintiffs themselves admit—as they must—that the Consolidated Audit Trail is *not* funded with Treasury money; rather, it is funded by the self-regulatory organizations. Compl. ¶¶ 134, 137. Because the money supporting the Consolidated Audit Trail is not "otherwise destined for the general

fund of the Treasury," the Appropriations Clause is irrelevant here. *CFPB*, 601 U.S. at 425.

Unable to evade the "straightforward and explicit command of the Appropriations Clause," *Richmond*, 496 U.S. at 424, Plaintiffs try to bend it. In their telling, any money expended in pursuit of "a program mandated" by the government constitutes "public funds" that must be appropriated by Congress. Compl. ¶¶ 139–41. But Plaintiffs identify no authority for this type of inverse-Appropriations-Clause theory. *See generally id.* And for good reason. Nearly every regulatory program can be characterized as a government "mandate[]." *Id.* And many, if not most, regulated entities expend some amount of money to comply with agency regulations, which agencies may not even be required to consider. *Compare, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 466–68 (2001) (various compliance costs not relevant to agency's promulgation of air quality standards), *with Michigan v. EPA*, 576 U.S. 743, 759 (2015) ("The Agency must consider cost—including, most importantly, cost of compliance—before deciding whether [a certain category of] regulation is appropriate and necessary."). Under Plaintiffs' theory, such compliance costs should always be deemed "public funds" that could not be lawfully imposed on private parties, and thus grounds for striking down a regulation. No court, to Defendants' knowledge, has ever adopted such a radical view. *See, e.g., Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016) (explaining that not every type of type of compliance cost constitutes irreparable injury).[8]

Plaintiffs' suggestion that the Constitution *requires* the public to bear the cost of the Consolidated Audit Trail is all the more inapt given that self-regulatory organizations have "long funded their frontline responsibility to supervise their members' compliance with their own rules and the federal securities laws." 88 Fed. Reg. at 62,672; *see also* Securities Exchange

---

[8] The same fact defeats Plaintiffs' suggestion that establishing the Consolidated Audit Trail constitutes an unlawfully imposed "tax." Compl. ¶ 139. Simply put, the Consolidated Audit Trail is an expenditure made by private organizations to comply with a regulation. That is not how courts understand taxes for constitutional purposes. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012) (noting that "the essential feature of any tax [is that] [i]t produces at least some revenue for the Government" or regulates conduct).

Act Release No. 50700 (Nov. 18, 2004), Fair Administration and Governance of Self-Regulatory Organizations, 69 Fed. Reg. 71,255, 71,267–68 (Dec. 8, 2004) (discussing the historical funding structure of the self-regulatory system). This model predates the Exchange Act of 1934 and has been repeatedly reaffirmed in the years since "as a fundamental component of [the] U.S. market." 88 Fed. Reg. at 62,672 & n.948–51 (detailing legislative history). Indeed, in "case after case, the courts have upheld this arrangement," finding that it reflects a constitutional model for regulation. *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023). The Consolidated Audit Trail reflects nothing more than a continuation of this framework which seeks "to address shortcomings in [the self-regulatory organizations'] existing systems" and establish a system that would have "utility to both the [self-regulatory organizations] and the Commission." 88 Fed. Reg. at 62,672.

In short, Plaintiffs identify no authority for their radical position that the Consolidated Audit Trail must be funded with Treasury money. And the fact that the expenditures for the Consolidated Audit Trail come from the self-regulatory organizations also means that neither the Anti-Deficiency Act nor the Miscellaneous Receipts Act—which only regulate money originating from or headed to the Treasury—have any bearing on this case. Compl. ¶¶ 133–34; *see generally* 31 U.S.C. § 1341 (liming how public funds can be expended or obligation); 31 U.S.C. § 3302(a) (regulating the use of "public money"). Plaintiffs' Appropriations Clause claim should therefore be dismissed.

## F. Plaintiffs' remaining claims are duplicative and should be dismissed for the same reasons as their other claims.

Plaintiffs' three remaining claims should be dismissed because they hinge entirely on the issues discussed above. While Plaintiffs do not claim to be raising their "Vesting Clause" claim, Pls.' Mot. at 12, their version of that claim is wholly dependent on whether the Consolidated Audit Trail is unconstitutional and/or the SEC exceeded its statutory authority. *See* Compl. ¶ 125 (Count I claiming that any "delegation" to the SEC "would be unconstitutional" because it "exceeds Congress' authority by violating the Bill of Rights"); *id.* ¶ 126

(Count I claiming that "Rule 613 [ ] exceed[s] SEC's authority in violation of Article I's Vesting Clause"). The same is true of Plaintiffs' remaining APA and mandamus claims. *See* Compl. ¶¶ 193–97 (Count VI claiming that the Consolidated Audit Trail scheme "should be invalidated and set aside" because it "violates Plaintiffs' constitutional rights"); *id* ¶ 206 (Count VIII seeking mandamus relief because "all Defendants have a clear, indisputable, and non-discretionary duty to comply with the Constitution and other governing laws including the Exchange Act and the Administrative Procedure Act"). Because the SEC had statutory authority to establish the Consolidated Audit Trail, and because it fully complies with the Constitution, these tagalong claims fail for reasons explained above.

Plaintiffs' backup mandamus claim fails for other reasons too. Mandamus jurisdiction only "exists if the action is an attempt to compel an officer or employee of the United States or its agencies to perform an allegedly nondiscretionary duty owed to the plaintiff." *Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 505–06 (5th Cir. 2018). "Such jurisdiction is limited to requests that the court order the defendant to complete affirmative actions." *Id.* Conversely, there is no jurisdiction "over requests for other types of relief—such as injunctive relief." *Id.* at 505–06 (citing 28 U.S.C. § 1361). Here, Plaintiffs' complaint seeks injunctive relief and "asks the court to prohibit the defendants from acting in a certain manner in the future rather than compel the defendants to affirmatively perform a presently existing duty." *Id.*; Compl. at 51–53 (prayer for relief). The Court therefore lacks mandamus jurisdiction. And even if that were not true, for the reasons explained above, Plaintiffs cannot come close to showing that they have "a clear right to relief," that Defendants have "a clear duty to act," and that "no other adequate remedy exists." *Wolcott v. Sebelius*, 635 F.3d 757, 768 (5th Cir. 2011). For all these reasons, Plaintiffs' mandamus claim should be dismissed.

## III.     The federal government and the public have an overwhelming interest in having an operational Consolidated Audit Trail.

If the Court reaches the remaining injunction factors, they weigh entirely in favor of the SEC. *See Ohio v. EPA*, 144 S. Ct. 2040 (2024) (injunction factors also govern a stay

application under 5 U.S.C. § 705). If the Consolidated Audit Trail were enjoined, the harm to the government and the public interest from an injunction would be grave and immediate. *See generally Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that harm to opposing party and weighing the public interest "merge" when relief is sought against the government). The Supreme Court has made clear that "[t]he magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." *Merrill Lynch*, 547 U.S. at 78. And the Consolidated Audit Trail is a critically important tool in that endeavor.

As detailed above, Consolidated Audit Trail was specifically designed to address serious shortcomings in prior data to enable both the SEC and the self-regulatory organizations to better fulfill their statutory missions. 77 Fed. Reg. at 45,727–34. In the face of advancing technology and evolving national markets, the prior de-centralized systems were inefficient, lacked crucial information, and left both the industry's and the SEC's evolving needs unaddressed. *Id.* This wasn't just the SEC's assessment: the industry overwhelmingly agreed that a new system was needed to monitor modern markets. *Id.* at 45,736.

Shutting down or impeding this system *12 years* later will result in a less efficient and less stable market, contrary to what Congress intended. That is serious injury to the agency and the public. *Rest. L. Ctr. v. Dep't of Lab.*, 2023 WL 4375518, at *14 (W.D. Tex. July 6, 2023) ("There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce."). Not to mention that Plaintiffs would receive no benefit: even if the Consolidated Audit Trail were shut down tomorrow, all the same type of information would be collected by the self-regulatory organizations and broker-dealers. *See* pp. 8–10, 24, *supra*; 88 Fed. Reg. at 62,672. And the SEC could gain access to it. *Id.* An injunction would therefore provide almost no benefit to Plaintiffs while disallowing a 12-year-old program that ensures a fair, healthy securities market that is tremendously important to the public interest. The balance of equities lies firmly with the government.

**IV.    Plaintiffs would suffer no irreparable harm from denial of their belated motion.**

On the other hand, Plaintiffs are far from showing any irreparable injury here.  The "limited purpose" of a "preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  As a result, an "indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury."  *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981).  No such injury exists here.  Plaintiffs' primary argument is that their injury is irreparable because, without an injunction, "they will continue to be subject to" an allegedly unlawful regulatory regime.  Pls.' Mot. at 33.  But this merely collapses the irreparable harm inquiry with the merits.  And courts, including the Supreme Court, have cautioned against doing so.  *See, e.g.*, *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) ("As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy.").

Nor are Plaintiffs correct that an irreparable injury must be presumed here because they have raised the specter of a constitutional violation.  Pls.' Mot. at 34.  Their argument rests on two cases that involved asserted First Amendment violations.  *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (presuming irreparable harm from a church's claims under the First Amendment and Religious Land Use and Institutionalized Persons Act).  But, as courts have repeatedly recognized, First Amendment violations are unique because of the irreparable quality of chilled expression or association, concerns which do not translate to other constitutional contexts.  *See, e.g.*, *Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (explaining that the "only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence"); *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000)

("Plaintiffs [] contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far"); *Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (rejecting argument that alleged due process violation automatically establishes threat of irreparable injury).

Plaintiffs have not sought a preliminary injunction based on any First Amendment argument. *See* Pls.' Mot. at 12. Rather, Plaintiffs sought an injunction based on their Fourth Amendment claims. But the Fourth Amendment is much less hospitable to Plaintiffs' constitutional-harms theory. Indeed, courts routinely reject claims that the government's access to illegally seized documents constitutes irreparable harm. *See, e.g.*, *United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003) (no irreparable harm "from the grand jury's reliance on the illegally seized evidence"); *Gulf Coast Pharms. Plus v. United States*, 2023 WL 3099873, at *6 (S.D. Miss. Apr. 26, 2023) (discussing cases finding no irreparable injury from illegal search); *Mirka United, Inc. v. Cuomo*, 2007 WL 4225487, at *7 (S.D.N.Y. Nov. 27, 2007) (a "party can rarely, if ever, demonstrate that the seizure of business records or documents caused irreparable harm if the government either makes copies available or retains copies and returns the originals"). This is especially true here, where Plaintiffs have not plausibly alleged that they will suffer *future* searches and the SEC could continue to access all the same types of information if the Consolidated Audit Trail were enjoined. *See* p. 24, *supra*; *In re Stewart,* 647 F.3d 553, 557 (5th Cir. 2011) ("[p]ast exposure to illegal conduct does not in itself show" entitlement to relief).

Similar reasons defeat Plaintiffs' efforts to show irreparable harm based on the supposed "increased costs of the CAT program." Pls.' Mot. at 34. As discussed above, Plaintiffs have failed to plausibly allege that they will bear *any* increased costs at all, let alone that there is a "*substantial* risk that they will" incur such costs "absent their requested relief." *Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019)*; see* pp. 22–22, *supra*.

Meanwhile, Plaintiffs' own litigation conduct undermines their assertions of irreparable harm. The Supreme Court has emphasized that "a party requesting a preliminary

injunction must generally show reasonable diligence." *Benisek*, 585 U.S. at 159; *see also* 11A Wright, Arthur & Miller, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("A delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Yet Plaintiffs have displayed no such urgency: Plaintiffs have known about the Consolidated Audit Trail *since 2012*.

Courts around the country have rejected claims of irreparable harm after delays measured in *months*, not years. *See, e.g., Tough Traveler, Ltd. v. Outbound Prod.,* 60 F.3d 964, 968 (2d Cir.1995) (four months); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) (ten weeks); *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1193 (5th Cir. 1975) (three months); *AARP v. U.S. Equal Emp. Opportunity Comm'n*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) (five months); *Vita-Mix Corp. v. Tristar Prod., Inc.*, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) (collecting cases). So Plaintiffs' decision to wait more than a decade to bring this action categorically "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759, 774 (S.D. Tex. 2007).

## V.    Because a class action has not been certified, any injunctive relief should be tailored to the named Plaintiffs.

For the reasons explained above, Plaintiffs' preliminary-injunction motion should be denied and their case should be dismissed. But if the Court were to enter an injunction, that relief should be no broader than necessary to remedy any demonstrated harms of the named Plaintiffs. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). And "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Here, Plaintiffs seem to demand a universal injunction (or "stay" under 5 U.S.C. § 705) barring any use of the Consolidated Audit Trail for everyone in the country. *See* Pls.' Proposed Order, ECF No. 25-2. That demand is improper, as Plaintiffs implicitly admit by filing a putative class action. *See* Compl. ¶¶ 105–13.

For starters, when a court orders "the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J., concurring). Such universal injunctions defy "foundational principles" that "a federal court may not issue an equitable remedy more burdensome to the defendant than necessary to redress the plaintiff's injuries."[9] *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., joined by Thomas & Alito, JJ., concurring); *see also id.* at 931 (Kavanaugh, J., joined by Barrett, J., concurring) ("prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law"). That's why the Fifth Circuit has counseled "judicial restraint" in this area. *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021); *Nuziard v. Minority Bus. Dev. Agency*, 676 F. Supp. 3d 473, 485 (N.D. Tex. 2023) (Fifth Circuit law allows universal injunctions only "if there's a (1) concern that a geographically limited injunction would fail to prevent a plaintiff's harm or (2) a constitutional command for a consistent national policy"). "At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).

More to the point, "[t]he law already has a mechanism for applying a judgment to third parties. That is the role of class actions, and Civil Rule 23 carefully lays out the procedures for permitting a district court to bind nonparties to an action." *Id.* Plaintiffs here indeed filed a putative class action to represent an estimated 100 million people. Compl. ¶ 108. But

---

[9] Plaintiffs' invocation of a stay under 5 U.S.C. § 705 only reinforces these principles. The plain text of that provision allows a court to "preserve status or rights pending conclusion of the review proceedings" only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. This requires courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the plaintiff. Indeed, the House Report for the APA indicates that relief under § 705 should "normally, if not always, be limited to the parties complainant." Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946).

they did not move to certify a class before seeking injunctive relief. And "[b]ecause a class has not been certified, the only interests at stake are those of the named plaintiffs." *McKenzie v. City of Chi.*, 118 F.3d 552, 555 (7th Cir. 1997); *Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021) ("[T]he rule that injunctive relief should be narrowly tailored to prevent harm to the parties before the court applies with special force where, as here, there is no class certification."); *Zepeda v. INS*, 753 F.2d 719, 727, 730 n.1 (9th Cir. 1983) (holding that "the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs"). "Why else bother with class actions?" *McKenzie*, 118 F.3d at 555.

Any injunctive relief should therefore be limited to the three named Plaintiffs here. Courts have done so in closely analogous circumstances. *See, e.g.*, *Klayman v. Obama*, 142 F. Supp. 3d 172, 198 (D.D.C. 2015) (enjoining the government from collecting metadata from the only two plaintiffs' accounts through the NSA's Bulk Telephony Metadata Program). Any injunctive relief should also preclude only the collection of Plaintiffs' *personal* (as opposed to transactional) data in the Consolidated Audit Trail. *See* Pls.' Mot. at 1 (complaining that the Consolidated Audit Trail "collects the name and personally identifiable information of every individual investor"); *id.* at 18 (taking issue with the collection of only "investor-identifying information" or "customer-identifying information"); *id.* at 31 (complaining that "every one of the more than 20 stock exchanges has access to personal information identifying every investor who invests through any one of the other exchanges"). Determining how to structure such relief would require additional briefing to ensure that the injunction does not improperly intrude on aspects of the Consolidated Audit Trail that do not affect Plaintiffs. But the Court need not get there because Plaintiffs claims fail outright.

## CONCLUSION

For the reasons explained above, this case should be dismissed and Plaintiffs' preliminary-injunction motion should be denied as moot.

DATED:  July 12, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         LESLEY FARBY
                                         Assistant Director, Federal Programs Branch

                                         _/s/  Stephen Ehrlich_____
                                         STEPHEN EHRLICH
                                         ALEXANDER V. SVERDLOV
                                         Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         Peter W. Rodino, Jr. Federal Building
                                         970 Broad Street, 7th Floor
                                         Newark, NJ 07102
                                         Phone:  (202) 305-9803
                                         Email:   stephen.ehrlich@usdoj.gov

                                         *Attorneys for the SEC Defendants*