**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ERIK DAVIDSON, JOHN RESTIVO AND NATIONAL CENTER FOR PUBLIC POLICY RESEARCH<br><br>    Plaintiffs,<br><br>v.<br><br>GARY GENSLER, *et al.,*<br><br>    Defendants. | Civil Action No. 6:24-cv-00197<br><br>**ORAL ARGUMENT NOT REQUESTED** |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE
RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND REPLY BRIEF IN
SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
<u>IN EXCESS OF PAGE LIMIT</u>**

   Plaintiffs respectfully request leave to file a "Response to Defendants' Motions To Dismiss And Reply Brief In Support Of Plaintiffs' Motion For a Preliminary Injunction" (referred to herein as "Plaintiffs' Response") that exceeds the limit for motions set forth in Local Rule CV-7(C)(2) and for replies set forth in Local Rule CV-.7(E). In support of this motion, Plaintiffs state as follows.

   Plaintiffs' Response responds to two separate combined filings:

- SEC Defendants' Motion to Dismiss and Opposition to Plaintiffs' Preliminary-Injunction Motion (63 pages); and

- Defendant Consolidated Audit Trail, LLC's Combined Motion to Dismiss and Opposition to Plaintiffs' Motion for Preliminary Injunction and Stay (49 pages).

Those filings totaled 112 pages.  These submissions by the Defendants raise a large number of arguments, including threshold jurisdiction and standing arguments, arguments challenging all of

the Complaints' claims, in the case of CAT LLC include multiple declarations and arguments that introduce substantial additional assertions in opposition the matters before this Court

Because Plaintiffs' Response addresses those submissions, in substance it contains four submissions (responses to two separate motions to dismiss, and replies that address two separate oppositions to Plaintiffs' motion for a preliminary injunction.  Accordingly, Plaintiffs request leave to file a Response totaling 122 pages.

Plaintiffs' counsel requested that counsel for the SEC Defendants and counsel for Consolidated Audit Trail, LLC consent to the additional pages.  Both counsel declined to consent and stated they would consent to 90 pages.  That is, the SEC Defendants and CAT LLC took the position that Plaintiffs should have 22 *fewer* pages than the Defendants' combined submissions whereas, compared to their combined filings, Plaintiffs now seek an additional 10 pages.

<div style="margin-left: 45%;">Respectfully submitted,</div>

<table>
<tr>
<td valign="top">

Mark D. Siegmund
State Bar Number 24117055
CHERRY JOHNSON SIEGMUND
JAMES PLLC
The Roosevelt Tower
400 Austin Avenue, 9th Floor
Waco, Texas 76701
Tel: (254) 732-2242
Fax: (866) 627-3509

</td>
<td valign="top">

/s/ Margaret A. Little
Margaret A. Little CT303494
Andrew J. Morris*
Margot J. Cleveland*
Zhonette Brown
Dan Kelly
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Tel: (202) 869-5210
Fax: (202) 869-5238
*Admitted *Pro Hac Vice*

</td>
</tr>
</table>

<div style="text-align: center;">*Counsel for Plaintiffs*</div>

**CERTIFICATE OF SERVICE**

I certify that on August 15, 2024, a true and correct copy of the foregoing document was transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

<div align="right">

/s/ Margaret A. Little
Margaret A. Little

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| ERIK DAVIDSON, JOHN RESTIVO AND NATIONAL CENTER FOR PUBLIC POLICY RESEARCH, <br><br>   Plaintiffs, <br><br> v. <br><br> GARY GENSLER, *et al.,* <br><br>   Defendants. | Civil Action No. 6:24-cv-00197 |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTIONS TO DISMISS AND REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Mark Siegmund
State Bar Number 24117055
CHERRY JOHNSON SIGMUND
 JAMES, PLLC
400 Austin Avenue
Suite 903
Waco, TX 76701
Tel: (254) 732-2242
MSiegmund@CJSLAW.com

Margaret A. Little CT303494
Andrew J. Morris*
Margot J. Cleveland*
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Tel: (202) 869-5210
Peggy.Little@ncla.legal
Andrew.Morris@ncla.legal
Margot.Cleveland@ncla.legal
*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................. 2

ALLEGATIONS OF THE COMPLAINT AND FACTS INTRODUCED IN
PLAINTIFFS' INITIAL MEMORANDUM ........................................................................ 4

PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS ................................................ 7

    I.   THIS COURT HAS SUBJECT-MATTER JURISDICTION TO DECIDE THIS CASE ........................ 7

        A.  Plaintiffs' Constitutional Challenges Are Properly Brought in the District Court ....... 8

        B.  Both the Supreme Court and This Circuit Have Recently and Explicitly
            Recognized District Court Jurisdiction to Bring These Constitutional
            Challenges ................................................................................................................ 10

        C.  SEC's Arguments for Exclusive Circuit Jurisdiction with a Sixty-Day Clock
            Wither Upon Examination of the Statutory Texts ................................................ 16

        D.  This Action Is Timely; The Commission's Contrary Argument Cannot Be
            Squared with *Corner Post* and Would Lead to Absurd Results ............................ 19

        E.  Plaintiffs Have Standing Based on the Actual, Concrete, and Continuing Harm
            They Have Suffered and Will Continue to Suffer Absent Redress by This
            Court ....................................................................................................................... 23

              1.  Injury-in-Fact .................................................................................................. 24
              2.  Traceability ...................................................................................................... 30
               3.  Redressability .................................................................................................. 31

    II.  THE COMPLAINT STATES A CLAIM, ON WHICH PLAINTIFFS ARE LIKELY TO PREVAIL,
          THAT SEC VIOLATED THE APA BY ACTING WITHOUT STATUTORY AUTHORITY ............. 33

        A.  Exchange Act § 11A Does Not Authorize the CAT ............................................... 34

        B.  SEC's Attempt to Rely on Exchange Act § 17 a Recordkeeping Provision, also
            Fails ........................................................................................................................ 39

        C.  The Major Questions Doctrine Confirms § 11A Does Not Authorize the CAT ........ 45

    III.  THE COMPLAINT STATES A CLAIM THAT SEC VIOLATED THE FOURTH AMENDMENT
           AND PLAINTIFFS ARE LIKELY TO PREVAIL ON THAT CLAIM ............................................. 50

        A.  The Trading Records CAT Seizes Are Protected Under a Privacy-Based
            Approach to the Fourth Amendment ................................................................... 51

               1.  Plaintiffs have a reasonable expectation of privacy in their stock-trading
                  histories .......................................................................................................... 51
              2.  Under *United States v. Carpenter*, the third-party doctrine does not apply
                  to the stock-trading information collected by the CAT ............................ 54
               3.  SEC's discussion of the third-party doctrine does not contradict this
                  conclusion ...................................................................................................... 60

B.  The Trading Records CAT Seizes Are Protected Under a Property-Based Approach to the Fourth Amendment .............................................................. 62

C.  The CAT Program Seizes and Searches Investors' Information and Records ........... 64

D.  SEC's Parades-of-Horribles Are Fanciful .................................................. 66

IV. Plaintiffs State a Claim for Violation of the Fifth Amendment ........................ 70

V.  Plaintiffs Have Properly Stated a First Amendment Claim .............................. 71

VI. The CAT Violates the Appropriations Laws ............................................. 78

VII.  SEC's and CAT LLC's Arguments With Respect to Counts VI and VII of the Complaint Lack Merit, Are Inharmonious, and Make No Sense .................. 86

A.  The Administrative Procedure Act ....................................................... 86

B.  Mandamus and Class Action ............................................................. 88

**PLAINTIFFS' RESPONSE TO QUESTIONS UNIQUE TO CAT LLC'S MOTION TO DISMISS** ........................................................................................... 90

I.  This Court Has Personal Jurisdiction over CAT LLC .................................. 90

A.  CAT LLC Purposely Directs Its Activities Toward Texas. ......................... 93

B.  CAT LLC's Ties to Texas Are Not Random, Isolated, Fortuitous, or of Any Other Nature that Precludes Jurisdiction. ............................... 95

C.  Other Considerations Favor Personal Jurisdiction. ................................. 98

II.  CAT LLC Is a State Actor ............................................................... 100

A.  CAT LLC's Procedural Error ............................................................ 101

B.  CAT LLC's Substantive Error ........................................................... 102

C.  CAT LLC Is Not Engaged in Self-Regulation ......................................... 103

D.  CAT LLC Is Functioning as a State Actor ............................................ 106

    1.  Compulsion ......................................................................... 106
    2.  Close Nexus ........................................................................ 107

III. CAT LLC Is a Proper Relief Defendant ................................................. 110

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** ................................................................. 111

I.  Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm ....................... 111

II.  The Balance of Equities Weighs in Plaintiffs' Favor Because SEC Does Not Identify Harm to SEC nor the Public If This Unlawful Program Is Enjoined—to the Contrary, Harm Will Be Greatly Abated, Protecting the Public Interest ................................................................................... 116

**CONCLUSION** ........................................................................................ 122

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. Paxton,*
  65 F.4th 204 (5th Cir. 2023) ................................................................................................ 24

*Admar Int'l, Inc. v. Eastrock, LLC,*
  18 F.4th 783 (5th Cir. 2021) ................................................................................................ 96

*AFPF v. Harris,*
  182 F. Supp.3d 1049 (C.D. Cal. 2016) ........................................................................ 72, 73

*Ajemian v. Yahoo!, Inc.,*
  478 Mass. 169 (2017) .......................................................................................................... 63

*All. for Hippocratic Med. v. FDA,*
  78 F.4th 210 (5th Cir. 2023) .............................................................................................. 117

*Allstate Ins. Co. v. Scarbrough,*
  No. 3:15-cv-00114, 2016 WL 10587685 (N.D. Miss. Sept. 15, 2016) ................................ 93

*Am. Petrol. Inst. v. SEC,*
  714 F.3d 1329 (D.C.Cir. 2013) ..................................................................................... 14, 16

*Am. Secs. Ass'n. v. SEC,*
  No. 23-13396 (11th Cir.) ........................................................................................... 78, 114

*Americans for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ..................................................................................................... passim

*Arizona v. Hicks,*
  480 U.S. 321 (1987) ............................................................................................................ 64

*Austin Mun. Secs., Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.,*
  757 F.2d 676 (5th Cir. 1985) ............................................................................................. 108

*Axon Enter. Inc, v. FTC and SEC v. Cochran,*
  598 U.S. 175 (2023) ..................................................................................................... 10, 14

*Bailey v. Romney,*
  359 F.Supp. 596 (D. D.C. 1972) ......................................................................................... 88

*Barilla v. City of Houston,*
  13 F.4th 427 (5th Cir. 2021) .................................................................................... 23, 27, 28

*Biden v. Nebraska,*
  143 S.Ct. 2355 (2023) ......................................................................................................... 46

*Bills v. Aseltine,*
  958 F.2d 697 (6th Cir. 1992) .............................................................................................. 65

*Bloomberg L.P. v. SEC,*
  45 F.4th 462 (D.C. Cir. 2022) ............................................................................................ 45

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ................................................................................................... 100, 107

*Boles v. Greeneville Hous. Auth.,*
  468 F.2d 476 (6th Cir. 1972) .............................................................................................. 87

*Bowlby v. City of Aberdeen,*
  681 F.3d 215 (5th Cir. 2012) .............................................................................................. 67

*Bridgeport Hospital v. Becerra,*
  108 F.4th 882 (D.C. Cir. 2024) .......................................................................................... 90

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) ............................................................................. 91, 92, 98

*Burnett v. Tolson,*
    272 F. 2d 877 (4th Cir. 1973) ....................................................................... 88

*Burton v. Wilmington Parking Auth.,*
    365 U.S. 715 (1961)..................................................................................... 101

*Business Roundtable v. SEC,*
    905 F.2d 406 (D.C. Cir. 1990).................................................... 35, 36, 37, 38

*Cal. Dump Truck Owners Ass'n v. Nichols,*
    924 F. Supp. 2d 1126 (E.D. Cal. 2012) .......................................................... 87

*Career Colls. and Schs. of Texas v. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ....................................................................... 114

*Carmona v. Leo Ship Mgmt., Inc.,*
    924 F.3d 190 (5th Cir. 2019) ........................................................................ 91

*Carpenter v. United States,*
    138 S.Ct. 2206 (2018)............................................................................ passim

*CFPB v. All Am. Check Cashing, Inc.,*
    33 F.4th 218 (5th Cir. 2022) ........................................................................ 82

*CFPB v. CFSA,*
    601 U.S. 414 (2024)...................................................................................... 81

*Chamber of Com. of U.S. v. SEC,*
    85 F.4th 760 (5th Cir. 2023) ................................................................... 45, 77

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015)...................................................................................... 53

*City of Providence v. Bats Glob. Mkts., Inc.,*
    878 F.3d 36 (2d Cir. 2017) .......................................................... 108, 109, 110

*Cmty. Nutrition Inst. v. Block,*
    698 F.2d 1239 (D.C. Cir. 1983) .................................................................... 29

*Cochran v. SEC,*
    20 F.4th 194 (5th Cir. 2021) ................................................................. passim

*Consumers Rsch. v. FCC,*
    No. 22-60008, 2024 WL 3517592 (5th Cir. July 24, 2024) ........................... passim

*Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.,*
    144 S.Ct. 2440 (2024)............................................................................ passim

*CRG Holdings LLC v. Hardman,*
    No. W-05-CA-235, 2006 WL 8436272 (W.D. Tex. Mar. 15, 2006)..................... 67

*D'Alessio v. N.Y. Stock Exch., Inc.,*
    258 F.3d 93 (2d Cir. 2001) ........................................................................ 108

*Davis v. FEC,*
    554 U.S. 724 (2008)................................................................................. 26, 31

*Def. Distributed v. Grewal,*
    971 F.3d 485 (5th Cir. 2020) .............................................................. 91, 92, 97

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019)...................................................................................... 31

*DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.,*
    409 F.3d 93 (2d Cir. 2005) ........................................................................ 109

*Donovan v. Mehlenbacher*,
   652 F.2d 228 (2d Cir. 1981) ................................................................... 53

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) ............................................................................... 76

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Srv.*,
   112 F.3d 1283 (5th Cir. 1997) ............................................................... 21

*EEOC v. Peabody W. Coal Co.*,
   610 F.3d 1070 (9th Cir. 2010) ............................................................... 88

*Elrod v. Burns*,
   427 U.S. 347 (1976) ............................................................................... 71

*Fam. Rehab., Inc. v. Azar*,
   886 F.3d 496 (5th Cir. 2018) ........................................................... 88, 89

*FDA v. All. for Hippocratic Med.*,
   144 S.Ct. 1540 (June 13, 2024) ........................................................... 117

*Flagg Bros., Inc. v. Brooks*,
   436 U.S. 149 (1978) ............................................................................. 100

*Florida v. Jardines*,
   569 U.S. 1 (2013) ............................................................................. 64, 71

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021) ..................................................................... 90, 92, 98

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
   561 U.S. 477 (2010) ..................................................................... 10, 11, 21

*Friends of DeReef Park v. Nat'l Park Serv.*,
   No. 2:13-cv-3453, 2015 WL 12807800 (D.S.C. May 27, 2015) ........................... 87

*FTC v. American Tobacco Co.*,
   264 U.S. 298 (1924) ............................................................................... 69

*Gleave v. Graham*,
   954 F. Supp. 599 (W.D.N.Y. 1997) ....................................................... 88

*GLO v. Biden*,
   71 F.4th 264 (5th Cir. 2023) ................................................................. 24

*Hanson v. Denckla*,
   357 U.S. 235 (1958) ............................................................................... 91

*Harper v. Rettig*,
   675 F. Supp. 3d 190 (D. N.H. 2023) ................................................. 64, 71

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000) ................................................................................... 41

*Hill v. SEC*,
   825 F.3d 1236 (11th Cir. 2016) ............................................................. 15

*In re Grand Jury Subpoena*,
   696 F.3d 428 (5th Cir. 2012) ................................................................. 53

*Inclusive Cmtys. Proj. v. Dep't of Treasury*,
   946 F.3d 649 (5th Cir. 2019) ....................................................... 30, 31, 32

*Inhance Techs., LLC v. EPA*,
   96 F.4th 888 (5th Cir. 2024) ........................................................... passim

*Int'l Brotherhood of Teamsters v. Peña*,
   17 F.3d 1478 (D.C. Cir. 1994) ............................................................... 18

vi

*Intercontinental Industries, Inc. v. American Stock Exchange*,
  452 F.2d 935 (5th Cir. 1971) ................................................................... 109, 110
*Jackson v. Metro. Edison Co.*,
  419 U.S. 345 (1974).............................................. 100, 102, 107, 108
*Janvey v. Adams*,
  588 F.3d 831 (5th Cir. 2009) ................................................................. 111
K. Stith,
  *Congress' Power of the Purse*, 97 Yale L. J. 1343 (1989) ...................... 78
*Katz v. United States*,
  389 U.S. 347 (1967)................................................................................. 51
*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ............................................................................ 2, 90
*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ............................................................... 26, 65
*Lee v. Verizon Commc'ns, Inc.*,
  837 F.3d 523 (5th Cir. 2016) .................................................................. 23
*Loan Syndications & Trading Ass'n v. SEC*,
  818 F.3d 716 (D.C. Cir. 2016) ................................................................ 17
*Loper Bright Enters. v. Raimondo* and *Relentless, Inc. v. Dep't of Com.*,
  144 S.Ct. 2244 (2024)................................................... 8, 15, 49, 86
*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)................................................................................. 63
*Louisiana v. Horseracing Integrity & Safety Auth., Inc.*,
  617 F.Supp.3d 478 (W. D. La. 2022) ............................................... 24, 112
*Lugar v. Edmondson Oil Co.*,
  457 U.S. 922 (1982).............................................. 101, 102, 106
*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1978)................................................................................. 53
*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006)................................................................................. 118
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*,
  414 U.S. 117 (1973)............................................................................... 104
*Mexican Gulf Fishing Co. v. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ................................................................... 53
*Murthy v. Missouri*,
  144 S.Ct. 1972 (2024)........................................................................ 29, 30
*N.Y. Repub. State Comm. v. SEC*,
  799 F.3d 1126 (D.C. Cir. 2015) .............................................................. 14
*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958)................................................................................. 72
*Nasdaq Stock Mkt., LLC v. SEC*,
  34 F.4th 1105 (D.C. Cir. 2022) ............................................................... 37
*Nat'l Ass'n for Gun Rights., Inc.*,
  No. 4:23-cv-00830, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) ......................... 112
*Nat'l Ass'n of Priv. Fund Mgrs. v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) ...................................................... 2, 45, 89

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012).................................................................................. 85
*New York Stock Exch. LLC v. SEC*,
  2 F.4th 989 (D.C. Cir. 2021)..................................................................... 37
*New York Stock Exch., LLC v. SEC*,
  962 F.3d 541 (D.C. Cir. 2020)............................................... 43, 44, 45, 49
*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447 (1978).................................................................................. 76
*OPM v. Richmond*,
  496 U.S. 414 (1990).................................................................................. 82
*Parr v. Great Lakes Exp. Co.*,
  484 F.2d 767 (7th Cir. 1973) .................................................................. 101
*Powell v. Sw. Bell Tel. Co.*,
  494 F.2d 485 (5th Cir. 1974) .................................................................. 101
*Pugin v. Garland*,
  599 U.S. 600 (2023)............................................................................ 41, 42
*Rest. L. Ctr. v. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) .................................................................. 113
*Rest. L. Ctr. v. Dep't of Lab.*,
  No. 1:21-cv-1106, 2023 WL 4375518 (W.D. Tex. July 6, 2023)........................ 116
*Riley v. California*,
  573 U.S. 373 (2014)............................................................................ 26, 63
*RLI Ins. Co. v. Roberts*,
  819 F. App'x 227 (5th Cir. 2020) .............................................................. 27
*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984)............................................................................ 63, 70
*SEC v. Jerry T. O'Brien, Inc.*,
  467 U.S. 735 (1984).................................................................................. 62
*SEC v. Olsen*,
  243 F. Supp. 338 (1965) ........................................................................... 53
*SEC v. Texas Gulf Sulphur Co.*.
  401 F.2d 833 (2d Cir. 1968) ..................................................................... 76
*SEC v. Wall St. Publ'g Inst., Inc.*,
  851 F.2d 365 (D.C. Cir. 1988) ................................................................. 76
*See v. City of Seattle*,
  387 U.S. 541 (1967)............................................................................ 68, 69
*Seville v. Maersk Line, Ltd.*,
  53 F.4th 890 (5th Cir. 2022) .................................................................... 97
*Smith v. Maryland*,
  442 U.S. 735 (1979) ...................................................................... 54, 55, 58
*Soldal v. Cook  Cnty.*,
  506 U.S. 56 (1992).................................................................................... 25
*Sparta Surgical Corp. v. Nat'l Ass'n of Secs. Dealers, Inc.*,
  159 F.3d 1209 (9th Cir. 1998) ................................................................ 109
*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) .................................................................. 117

*Texas v. Mayorkas*,
    No. 22-CV-094-Z, 2024 WL 455337 (N.D. Tex. Feb. 6, 2024)........................ 26, 31

*Texas v. SEC*,
    2024 WL 2106183 (5th Cir. May 10, 2024) .................................... 28, 29, 114, 115

*Texas Voters All. v. Dallas Cnty.*,
    495 F. Supp. 3d 441 (E.D. Tex. 2020)............................................................... 27, 28

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979).................................................................................................. 43

*United States v. Ackerman*,
    831 F.3d 1292 (10th Cir. 2016) ........................................................................ 26, 63

*United States v. Ganias*,
    755 F.3d 125 (2d Cir. 2014) .............................................................................. 65, 66

*United States v. Gaulden*,
    73 F.4th 390 (5th Cir. 2023)..................................................................................... 62

*United States v. Gorshkov*,
    No. CR00-550C, 2001 WL 1024026 (W.D. Wash. May 23, 2001) ........................ 65

United States v. Gratkowski,
    964 F.3d 307 (5th Cir. 2020) ................................................................................... 61

*United States v. Jacobsen*,
    466 U.S. 109 (1984).................................................................................................. 64

*United States v. Jefferson*,
    571 F. Supp. 2d 696 (E.D. Va. 2008) ..................................................................... 66

*United States v. Jones*,
    565 U.S. 400 (2012).......................................................................................... 55, 56

*United States v. Miller*,
    425 U.S. 435 (1976)................................................................................... 54, 60, 64

*United States v. Place*,
    462 U.S. 696 (1983).................................................................................................. 25

*United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*,
    341 F.3d 404 (5th Cir. 2003) ................................................................................. 112

*United States v. Smith*,
    No. 23-60321, 2024 WL 3738050 (5th Cir. Aug. 9, 2024) .............................. 58, 59

*United States v. Warshak*,
    631 F.3d 266 (6th Cir. 2010) .......................................................................... 26, 63

*United States v. Whipple*,
    92 F.4th 605 (6th Cir. 2024) ........................................................................... 62, 64

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)........................................................................................... 45, 49

*Villarreal v. Wells Fargo Bank*,
    814 F.3d 763 (5th Cir. 2016) ....................................................................... 6, 68, 101

*Walk Haydel & Assocs. v. Coastal Power Prod. Co.*,
    517 F.3d 235 (5th Cir. 2008) .............................................................................. 91, 99

*Waterkeeper All. v. EPA*,
    853 F.3d 527 (D.C. Cir. 2017)................................................................................. 18

*Wedge Grp., LLC v. Kiley Madison, Inc.*,
    No. 11-501, 2011 WL 2935049 (E.D. La. July 19, 2011) ...................................... 93

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ........................................................................... passim
*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.,*
    80 F.4th 536 (2023) ................................................................................ 116
*Whitman v. Am. Trucking Assn's, Inc.,*
    531 U.S. 457 (2001) .................................................................................. 41
*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) .................................................................................. 27
*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) ..................................................................... 71


**Constitutional Provisions**

U.S. CONST. amend. IV ..................................................................................... 25


**Statutes**

15 U.S.C. § 6802 ............................................................................................... 67
15 U.S.C. § 78e ............................................................................................... 108
15 U.S.C. § 78f .......................................................................................... 4, 108
15 U.S.C. § 78k-1 ...................................................................................... passim
15 U.S.C. § 78o-3 ............................................................................................... 4
15 U.S.C. § 78q .............................................................................. 39, 40, 43
15 U.S.C. § 78s ................................................................................................... 4
15 U.S.C. § 78y ................................................................... 7, 12, 13, 16
15 U.S.C.A. § 78c ............................................................................................ 103
28 U.S.C. § 2344 ............................................................................................... 19
28 U.S.C. §2401 ................................................................................................ 21
31 U.S.C. § 3302(b) .................................................................................... 78, 79
42 U.S.C. § 9613 ............................................................................................... 19
5 U.S.C. § 706(2) .............................................................................................. 86
N.Y. EST. POWERS & TRUSTS LAW § 13-A-1(i) ............................................. 63
Pub. L. No. 94-29, 89 Stat. 97 ......................................................................... 40
TEX. PROP. CODE ANN. § 111.004 (12) ........................................................... 63


**Regulations**

17 C.F.R. § 240.17a-25(a), (b), (c) ................................................................. 42
17 C.F.R. § 240.17a-3 ...................................................................................... 57
17 C.F.R. § 242.613 ................................................................. 5, 96, 105, 111
17 C.F.R. § 248.1 ............................................................................................. 51
17 C.F.R. § 248.110(a)(1) ................................................................................ 51
17 C.F.R. § 248.15(a) ....................................................................................... 51
17 C.F.R. § 248.30(a) ................................................................................. 51, 67
47 C.F.R. § 54.703(b) ....................................................................................... 79
63 Fed. Reg. 12559 (Mar. 13, 1998) ................................................................. 5
75 Fed. Reg. 32556 (June 8, 2010) .................................................................... 7
77 Fed. Reg. 45722 (Aug. 1, 2012) ........................................................... passim
81 Fed. Reg. 84696 (Nov. 23, 2016) ...................................................... 4, 45, 47
88 Fed. Reg. 62628 (Sep. 12, 2023) .......................................................... passim

89 Fed. Reg. 10850 (Feb. 13, 2024) ................................................................. 94
FINRA Rule 4512 ............................................................................................ 57
FINRA Rule 6800 series .................................................................................. 96

**Rules**
Fed. R. Civ. P 19(a)(2) ..................................................................................... 87

**Other Authorities**
11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ............................................................. 113
Asaf Shalev,
    *A New BDS Battlefront Emerges In Investing World, With Spotlight On Morningstar*, Times of Israel (Feb. 9, 2022) ................................................................... 75
CAT LLC,
    Comment Letter to SEC (June 13, 2024) ...................................................... 94
CAT NMS Plan (Nov. 15, 2016) ........................................................... passim
Chair Mary L. Schapiro,
    *Opening Statement at SEC Open Meeting: Consolidated Audit Trail* (July 11, 2012) ........ 6, 36
Citadel Securities,
    Comments on SEC Funding Proposal (Jul. 14, 2023) ................................... 47
Commissioner Hester M. Peirce,
    *Statement in Response to Rel. No. 34-88890* (May 15, 2020) .......................... 52, 61
Commissioner Mark Uyeda,
    *Statement on Consol. Audit Trail Revised Funding Model* (Sept. 6, 2023) ............. 47
Dante J. Difrancesco,
    S.E.C. Release No. 66113, 102 S.E.C. Docket 2829 (2012) ........................... 52
David Pozen,
    *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 Harv. L. Rev. 512 (Dec. 2013) ....................... 74
F. Bacon,
    *The Lord Keeper's Speech in the Exchequer* (1617), *in* 2 The Works of Francis Bacon (B. Montagu ed. 1887) ............................................................................... 15
FINRA Form 19b-4 (Jan. 2, 2024) .................................................................... 94
Frederick O. Kraus,
    S.E.C. Release No. 64221, 100 S.E.C. Docket 3046 (2011) ........................... 52, 67
Gary Gensler,
    Statement on CAT Funding (Sept. 6, 2023) .................................................. 1
*Harris and the First Amendment: The Supreme Court Rebuked Her Use of Lawfare in California*, Wall Street Journal (Aug. 4, 2024) ............................................. 73
Hester Peirce,
    *This CAT is a Dangerous Dog*, Real Clear Policy (Oct. 9, 2019) ........................ 117
Interview by Scott Pelley,
    60 Minutes, with James Comey, FBI Director, in Washington, DC (Oct. 5, 2014) ........ 48
Jesse Westbrook and Robert Schmidt,
    *FINRA's Cook Dumps on Consolidated Audit Trail*, Capitol Account, October 17, 2023 ..... 29, 121

Jonathan H. Adler & Christopher J. Walker,
  *Delegation and Time*, 105 Iowa L. Rev. 1931 (2020) ............................................. 83
Jonathan R. Macey and David D. Haddock,
  *Shirking at the SEC: The Failure of the National Market System*, 1985 U. Ill. L. Rev. 315 ... 39
N. Duxbury,
  *The Intricacies of Dicta and Dissent* (2021).......................................................... 15
SEC Enforcement Manual §3.2.2 ................................................................................ 42
SEC Rel. No. 34-79318; File No. 4-698 (Joint Industry Plan; Order Approving the National
  Market System Plan Governing the Consolidated Audit Trail) (Nov. 15, 2016) ..................... 94
Securities Exchange Act Release No. 34-98290 (Sept. 6, 2023).................................... 94
Senate Report No. 94-75 (1975) ................................................................................. 38
T. E. Gaiser, M. Sridharan & N. Cordova,
  *The Truth of Erasure: Universal Remedies for Universal Agency Action*, Chicago L. Rev.
  (forthcoming) ......................................................................................................... 90
THE FEDERALIST No. 58 (J. Madison) ...................................................................... 84
Todd Hollingshead,
  *Not a matter of it, but when*, BYU News (July 19, 2021) ...................................... 48
William Barr,
  *The SEC Is Watching You*, Wall Street Journal April 15, 2024................................ 81

## INTRODUCTION

When Rule 613 was promulgated in 2012, no American investor was or could be on notice that the Securities and Exchange Commission intended to track every American's trading activity in real time and collect personally identifiable information on investors. No audit trail had done so up to that time, and nothing in the text of Rule 613 suggested such a seismic shift in which, for the first time in 75 years, the SEC would seize and be able to search the stock investment records of every retail investor. SEC lacks authority to implement the CAT as now constituted under any of the securities laws, as amended. That is a major question that only Congress could decide, and even Congress would have to do so within the confines of the Constitution.

As recently as 2023, SEC Chair Gary Gensler called the CAT "unprecedented."[1] Which it indisputably is, because it transforms SEC's relationship with retail investors. The statutory authority SEC cites for the CAT, Section 11A of the Securities Exchange Act of 1934 (15 U.S.C. § 78k-1) only grants the SEC authority to act on specific congressional findings and carry out specific statutory objectives to facilitate that goal. *Id*. at § 78k-1(a)(2). The 1975 Congressional findings and objectives for the national market system did not include facilitating the oversight or enforcement functions of the SEC. The national market system was established to lower the costs of securities trading, increase the ability of investors and market-makers to discover prices, and make trading among the markets easier. It was not intended to make the enforcement job of the SEC and SROs easier nor to institute surveillance of investors. The CAT therefore did not fall within the SEC's authority to write rules for a national market system.

Lacking any grant from Congress, like any government actor, SEC and the SEC-created CAT LLC are prohibited from collecting ordinary citizens' private information unless they can

---

[1] Gary Gensler, Statement on CAT Funding (Sept. 6, 2023).

show good cause and comply with procedural safeguards that protect Americans' civil liberties and respects constitutional limits on government power.

The scope and reach of the CAT in 2012 were nascent and unknown to anyone. For at least four years, it lacked any operational specifications or structure at all. No one knew what entity would own and operate the CAT. Co-defendant CAT LLC, the direct, real-time overseer of the still nascent project, was not formed until August, 2019. CAT.Mem.Exh.C ¶ 6. In 2020 it began collecting Americans' personal information and tracking every one of their stock investments with no evidence of wrongdoing. Since 2020, the CAT has claimed an enforcement rationale that is utterly lacking in the '34 Act, to gather information into this colossal database of trading information so that SEC and third parties can search for leads suggesting someone, somewhere *might* have broken the law.

Recent Supreme Court and circuit decisions, including in this Circuit, confirm that vacatur is the appropriate remedy when SEC "has exceeded its statutory authority in adopting the … Rule." *Nat'l Ass'n of Priv. Fund Mgrs. v. SEC*, 103 F.4th 1097, 1114 (5th Cir. 2024). Because "an agency literally has no power to act … unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), the Constitution not only permits, but requires, unlawful agency action to be subject to vacatur.

## SUMMARY OF ARGUMENT

The CAT is properly challenged in this court under controlling Supreme Court authority and the law of this Circuit. Defendants' attempts to restrict judicial review to a 60-day window fails under the very text of the review statutes and controlling Supreme Court and Fifth Circuit precedents. Plaintiffs are suffering current, concrete and continuing harm directly traceable to the

CAT that strips them of their civil liberties now and in perpetuity under this scheme—harm that this Court can clearly redress.

No law of Congress authorizes the CAT. Nothing in the 1934 Exchange Act or its amendments in 1975 provide authority for this unprecedented surveillance and assertion of regulatory and investigatory power over all investing Americans. The SEC's evasion of the Constitution's vesting of lawmaking power in Congress, and Congress alone, is made even more egregious by the agency's arrogation of power to self-appropriate funds from self-regulatory organizations under its thumb. And both SEC and CAT LLC acknowledge that the CAT's billions in costs will be passed along to American investors. Thus, adding insult to injury, Americans will pay dearly for their own deprivation of civil liberties through this scheme of unlegislated taxation.

CAT LLC, a creation of the SEC's rulemaking, claims it is not subject to personal specific jurisdiction in this Court. But CAT LLC's purposeful decision to collect the highly-personal data from thousands of broker-dealers in Texas, about tens of thousands of Texas investors and millions of securities transactions originating in Texas alone justifies jurisdiction. Its plan to invoice Texas brokers to defray its ongoing and future operating costs, along with SEC's approval of the CAT Funding Model that will directly create current and ongoing obligations for Texan companies establishes this Court's jurisdiction over CAT LLC.

CAT LLC also seeks dismissal claiming it is merely a private limited liability company implementing Rule 613. But CAT LLC, created by a Release by the SEC, was only formed in August, 2019. It was then charged by the SEC with the duty to 1) collect individually identifiable information about every transaction on every stock exchange, 2) put that information into a central repository and 3) give the SEC unlimited and unsupervised access to this centralized database. Every aspect of this unprecedented surveillance system is directly attributable to the government.

Further, CAT LLC is not an SRO as defined by statute, and this scheme is not self-regulatory. CAT LLC functions as a state actor, its formation and obligations are compelled by SEC Rule, and its nexus with SEC as its panopticon surveilling American investors could not possibly be closer. CAT LLC must be joined as a Defendant if Plaintiffs are to secure full relief. For CAT LLC has got the goods—on everyone.

Finally, Plaintiffs have established a clear likelihood of success on the merits and will suffer irreparable harm if these continuing violations of law and American investors' civil liberties are not called to a halt. Constitutional violations like these are presumed to inflict irreparable harm that can only be addressed by a stay of the CAT scheme and enjoining its continued operation. The balance of harms weighs decidedly in favor of the Plaintiffs.

### ALLEGATIONS OF THE COMPLAINT AND
### FACTS INTRODUCED IN PLAINTIFFS' INITIAL MEMORANDUM

Because SEC's Motion to Dismiss and Opposition to Plaintiffs' Preliminary Injunction Motion (filed July 12, 2024) ("SEC.Mem.") repeatedly muddies critical facts and contradicts the Complaint, the following section summarizes three key Complaint allegations and the solid support for them.

***Before the CAT, SRO audit trails did not collect information identifying investors***

Since the 1930s, SROs have regulated certain broker-dealers, individual brokers, and other members of the securities industry. *See, e.g.*, 15 U.S.C. §§ 78f(b), 78o-3(b), 78s(g)(1) & (h)(1). Before the CAT, certain SROs maintained "audit trails." These audit trails recorded certain information about stock transactions, primarily the names of stocks traded and the terms of the stock trades. *See* 77 Fed. Reg. 45722, 45727–28 & 45727 n.48 (Aug. 1, 2012); 81 Fed. Reg. 84696, 84807 (Nov. 23, 2016) (discussing contents of SRO audit trails). The audit trails did not collect information identifying individual investors. *See* Compl. ¶¶ 11–12 (before CAT, SEC obtained

4

investor information through blue-sheet requests or subpoenas), ¶ 18 (citing Hester Peirce, Statement in Response to Release No. 34-88890; File No. S7-13-19 (May 15, 2020) (describing how CAT newly enables surveillance of investors)); Plaintiff's Memorandum in Support of Motion for Preliminary Injunction (filed May 24, 2024) ("Pl.Mem.") at 6 (citing 77 Fed. Reg. 45727–28 & 45727 n.48; 81 Fed. Reg. 84807) (same). The audit trails' purpose was to enable the SROs to enforce their rules against their own members. 63 Fed. Reg. 12559, 12560 (Mar. 13, 1998) (SRO adopting audit trail to enable it to enforce its own rules.) SEC did not have "direct access" to the SRO audit trails but could "request" limited information in connection with specific inquiries. 77 Fed. Reg. at 45729.

***The CAT collects information identifying the investors involved in every stock transaction***

The CAT changed this long history. In contrast with the SRO audit trails, the CAT collects the name of every investor involved in a stock transaction on any U.S. stock exchange. Compl. ¶¶ 11–12, 22–23, 32–36, 39–41; Pl.Mem.6–7 (citing CAT NMS Plan). The information includes the investor's name, address, and birth year. Compl. ¶¶ 39–41, 58. *See also* CAT NMS Plan §6.4(d)(ii) (Nov. 15, 2016) (describing "Customer Account Information" and "Customer Identifying Information"). The SEC CAT rule (Rule 613; 17 C.F.R. § 242.613) even requires the creation of a unique "Customer-ID" for every investor who trades on a U.S. exchange. 17 C.F.R. § 242.613(j)(5). *See* Compl. ¶ 32; *see also id*. ¶ 33. Before the CAT, no such "ID" existed. The CAT collects a real-time flow of this investor information, making it immediately available to the SEC. Compl. ¶¶ 16–18, 29; Pl.Mem.6–7 (citing CAT NMS Plan and SEC releases).

Contrary to these facts, SEC's Motion repeatedly indicates that pre-CAT SROs collected investors' names. For example, SEC's motion states (again and again), that the CAT does nothing

more than "consolidate" pre-existing audit trails maintained by various SROs.[2] Those SEC statements are impermissible attempts to rewrite the Complaint. *Villarreal v. Wells Fargo Bank*, 814 F.3d 763, 766 (5th Cir. 2016) (cleaned up) (quoting *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (the "court must accept as true the well-pled factual allegations in the complaint, and construe them in the light most favorable to the plaintiff"). They also contradict the record Plaintiffs cited in detail, including SEC's statements in the CAT Adopting Release.

SEC's efforts to muddy this central fact take various forms. For example, the second sentence of SEC's Motion states, "[b]efore the SEC mandated the Consolidated Audit Trail in 2012, all the same type of information was collected." SEC.Mem.1. *See also id.* at 27–28 (same). This statement contradicts SEC's own Chair. When SEC issued the CAT rule, then-Chair Schapiro emphasized that before then, these audit trails had "*never collected* … information such as the identity of the customers who originate orders." Chair Mary L. Schapiro, *Opening Statement at SEC Open Meeting: Consolidated Audit Trail* (July 11, 2012) ("Schapiro Stmt.") (emphasis added) (cited at Pl.Mem.6). Before the CAT, customer-identifying information remained in the files of customers' brokers (with the quantitatively *de minimis* exception of information brokers provided to SROs or the SEC pursuant to specific inquiries). *See* Compl. ¶¶ 11–12; Pl.Mem.8–9 (citing procedures for SEC to obtain limited investor information for investigations).

---

[2] *See*, e.g., SEC.Mem.1 ("The Consolidated Audit Trail is exactly what it sounds like: a consolidated way for the Securities and Exchange Commission and its supervised entities to monitor securities transactions, consistent with their responsibilities under the federal securities laws."); *id.* ("Before the SEC mandated the Consolidated Audit Trail in 2012, all the same type of information was collected."). This attempt to say the CAT does no more than weave existing audit trails together so there is "nothing to see here" is belied by the administrative record and SEC's own acknowledgement that the CAT is "unprecedented" in history.

*The Gestation of the CAT*

Approximately ten years passed from SEC's issuance of the CAT rule in 2012 to the CAT's first collection of investor data, in 2022. SEC proposed the CAT in 2010, 75 Fed. Reg. 32556 (June 8, 2010), and issued the final rule in 2012, 77 Fed. Reg. 45722. It then took years to plan and develop the CAT. The process included four years to draft a plan (approved in 2016, Compl. ¶ 37), three years to select a company to run the CAT (formed in 2019, Compl. ¶ 5), and several years to develop the program and to begin collecting investor information, a process not fully implemented until 2024, *id.* ¶¶ 84–87.

## PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

### I.   THIS COURT HAS SUBJECT-MATTER JURISDICTION TO DECIDE THIS CASE

SEC seeks dismissal of Plaintiffs' constitutional and APA claims, arguing that "[b]y statute, there was only one way for plaintiffs to challenge the rule creating [sic] Consolidated Audit Trail: by filing a 'written petition' in the relevant court of appeals 'within sixty days,' 15 U.S.C. § 78y(a) & (b)," of Rule 613's promulgation on July 18, 2012 requiring the creation of the CAT. SEC.Mem.1. SEC also claims that "[p]laintiffs lack Article III standing because their purported injuries are speculative, unsupported, and not redressable by the Court." *Id.*

CAT LLC echoes its progenitor SEC in arguing "plaintiffs have brought their grievances to the wrong court a dozen years too late," CAT LLC Motion to Dismiss at 2 (filed July 12, 2024) ("CAT.Mem."), which is to say that investors should have sued CAT LLC four years before it existed and should have sued both SEC and CAT LLC eight years before CAT first started to seize investors' personally identifiable information in 2020. CAT LLC also concedes that the CAT started collecting data in 2020, CAT.Mem.2, which is well within the applicable statute of limitations for this action. Wisely, CAT LLC does not properly raise or brief SEC's backstop (and

meritless) standing argument, instead attempting to adopt it by incorporation in a footnote. CAT.Mem.26.n.11.

The Defendants' jurisdictional arguments are unfounded, inapplicable to ordinary Americans like the Plaintiffs who are neither regulated parties subject to the SEC's authority nor challenging an order of the Commission. SEC and CAT LLC's jurisdictional arguments are based on an erroneous and inaccurate understanding of both § 78y itself and applicable Supreme Court and circuit precedent interpreting and applying its terms. SEC's standing argument likewise fails.

### A. Plaintiffs' Constitutional Challenges Are Properly Brought in the District Court

The Plaintiffs' claims here are explicitly structural because SEC is legislating. Count I alleges that SEC violates Art. I Sec. 1of the Constitution which vests all legislative powers in Congress. Congress never legislated that SEC should exert power over investors at all, much less arrogate power to promulgate a scheme that would strip them of their data, privacy and financial security. That is a major question that only Congress could legislate—within constitutional constraints. *West Virginia v. EPA*, 597 U.S. 697, 732 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)) (the "major questions doctrine" requires "'clear congressional authorization'" on the major question of "carbon emission caps based on a generation shifting approach."). Count II similarly states that the appropriations power is vested in Congress and Congress has never approved an appropriation for the CAT. Nor has it ever passed a law allowing the agency to self-fund the program through regulatory exaction of funds from the SROs.

The Supreme Court has recently reversed two circuit court opinions that deferred to agency self-funding through exaction upon regulated parties. In *Loper Bright Enters. v. Raimondo* and *Relentless, Inc. v. Dep't of Com.*, 144 S.Ct. 2244 (2024), the Supreme Court not only overruled *Chevron* but refused to defer to an agency regulation that, like here, newly required regulated

parties (Atlantic herring fishermen) to pay the agency's expenses for at-sea monitors. Even more recently, the Fifth Circuit, sitting en banc, held that not even Congress could delegate taxing or appropriations power to an administrative agency which then subdelegates such powers to a private corporation—even under a scheme that an enactment of Congress had set up. *Consumers Rsch. v. FCC*, No. 22-60008, 2024 WL 3517592 (5th Cir. July 24, 2024) (en banc). Noting that such powers are vested exclusively in Congress, which may neither delegate them to the executive branch nor allow mere administrative agencies to subdelegate such core powers to private entities, the court held "this misbegotten scheme violates Article I, §1 of the Constitution." *Id.* at *1. This precisely describes the scheme here—except the FCC was operating under a *statute* enacted by Congress.

Counts III, IV, and V address the CAT scheme's unconstitutional search and seizure violating Americans' "right … to be secure in their persons, houses, papers, and effects" under the Fourth Amendment, their due process rights under the Fifth Amendment, and their First Amendment rights of expression and association. Those manifold constitutional violations of American investors' civil liberties mean that not even Congress could legislate the CAT as it is now structured.

Counts VI, VII, and VIII invoke the APA's provision for federal district court review of agency power that is contrary to constitutional right and in excess of statutory authority which allows both for mandamus and relief under the APA. In short, because Plaintiffs maintain that the CAT violates the Constitution's separation of powers and violates civil liberties that not even Congress can take away, much less a mere administrative agency arrogating powers and funds to itself in violation of the Constitution, this court has jurisdiction under 28 U.S.C. §1331, authorizing relief under the Constitution, the APA and for mandatory return of the unlawfully seized information. Like the plaintiffs in *Axon* and *Cochran*, both of which were initiated in the district

court, Plaintiffs here maintain that the SEC's CAT, "as currently structured, [is] unconstitutional in much of [its] work." *Axon Enter. Inc, v. FTC* and *SEC v. Cochran*, 598 U.S. 175 (2023). The Supreme Court in *Axon/Cochran* unanimously reversed six circuit courts of appeals, ruling that such claims are properly brought in federal district court under 28 U.S.C. § 1331.

Count IX for unjust enrichment seeks the return of the unconstitutionally seized information from the CAT and is concededly not a structural constitutional claim. However, because it seeks remedial relief against CAT LLC for the constitutional violations and for return of information it possesses in violation of law, it is ancillary to, and dependent upon those structural and liberty-protecting constitutional provisions, and so is properly before this Court.

## B. Both the Supreme Court and This Circuit Have Recently and Explicitly Recognized District Court Jurisdiction to Bring These Constitutional Challenges

The Fifth Circuit's en banc opinion, *Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021), *aff'd sub nom*. *Axon Enter. Inc, v. FTC* and *SEC v. Cochran*, 598 U.S. 175 (2023), opened emphatically: "We first consider the text of §78y. We conclude that it did not explicitly or implicitly strip the district court of jurisdiction over Cochran's [constitutional] claim" adding, "[t]he Supreme Court has already rejected the SEC's precise jurisdictional argument under §78y, so we do the same." 20 F.4th at 199, referring to the Supreme Court's unanimous 2010 jurisdictional holding, saying: "Any doubts … were put to rest by the Supreme Court's decision in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010) (*FEF*). … [in which] the Supreme Court rejected the precise argument the SEC makes here—that the Exchange Act divests district courts of jurisdiction over [constitutional] challenges. … Hence, *Free Enterprise Fund* is squarely on point, foreclosing any possibility that § 78y strips district courts of jurisdiction over structural constitutional challenges." *Id.* at 202–02 (cleaned up).

10

*FEF*'s jurisdictional holding that "the text [of §78y] does not expressly limit [district court] jurisdiction …. Nor does it do so implicitly" was not only unanimous but was also reached on the presumption that "Congress does not intend to limit jurisdiction if … 'a finding of preclusion could foreclose all meaningful judicial review,'" the very result sought by the SEC and CAT LLC here. 561 U.S. 447 at 489 (citation in first quotation omitted) (second quotation quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1965)). Both seek preclusion before the CAT LLC even existed or any of the harm to Plaintiffs occurred or even was known to anyone—including the SEC. *FEF*'s unanimous holding that § 78y does not limit district court jurisdiction for such claims has been controlling law since 2010.

The en banc Fifth Circuit elucidated in *Cochran* why this must be the case: "Congress gave federal district courts jurisdiction over '*all* civil actions arising under the Constitution.'" 20 F.4th at 199 (quoting 28 U.S.C. § 1331). While § 78y gives "*some* jurisdiction to the courts of appeals" that does not mean that "Congress implicitly stripped *all* jurisdiction from every other court." *Id.* at 200.

The Fifth Circuit carefully identified three reasons why § 78y could not be read to relegate Cochran's structural constitutional claims to the courts of appeals, and those courts alone. It first addressed the statutory language of § 78y(a)(1), recognizing that "§ 78y provides that *only* 'person[s] aggrieved by a final order of the Commission' may petition in the relevant court of appeals to review that final order." *Id.* (alterations in original). The Court then noted that "[t]he statute says nothing about people, like Cochran, who have not yet received a final order of the Commission." *Id.* Section 78y(b)(1), as relevant here, contains nearly identical language, and should be similarly understood to read: *only* "person[s] adversely affected by a rule of the Commission … may obtain review" in the relevant court of appeals. 15 U.S.C. § 78y(b)(1)." *Id.*

Like Cochran, Plaintiffs here had not yet been "adversely affected" by the Commission's rule in 2012, and as such § 78y(b)(1) review was unavailable.

The second reason the *Cochran* court identified, and the most important in this case, is the fact that § 78y "is phrased in permissive terms." 20 F.4th at 200. Section 78y(b)(1) provides that an adversely affected person "may" obtain review in the relevant court of appeals, "[b]ut it does not say that anyone 'shall' or 'shall not' do anything. It would be troublingly counterintuitive to interpret [§ 78y(b)(1)'s] permissive language as eliminating alternative routes to federal court review, especially in the context of separation-of-powers claims of the sort at issue here." *Id.* at 200–01. Plaintiffs' challenges, whether under the Constitution or the APA, are similarly fundamental structural separation of powers constitutional challenges to the rule as violating Article I §§ 1, 7, 8, and 9, as well as the First, Fourth, and Fifth Amendments. *See* Compl. ¶¶ 114–92. While § 78y(b)(1) might *allow* for a similar plaintiff with similar claims to bring suit in the relevant court of appeals within 60 days of a rule's promulgation, § 78y(b)(1) in no sense *requires* a plaintiff to do so, particularly "in the context of separation-of-powers claims of the sort at issue here." *Cochran*, 20 F.4th at 201. Moreover, such permissive appellate jurisdiction is available only to persons "aggrieved" by the agency action, which did not occur until SEC started gathering personally identifiable information in 2020.

Finally, the Court explained that "§ 78 elsewhere uses mandatory terms—and they confirm our understanding that Congress did not strip courts of § 1331 jurisdiction over structural constitutional claims." *Id.* Much like § 78y(a)(3), § 78y(b)(3) confers jurisdiction on the relevant court of appeals, which "becomes exclusive" *only* upon: (1) the promulgation of a final rule pursuant to the enumerated subsections; (2) the filing of a petition for review by the plaintiff; and (3) the filing of the specified materials listed under § 78y(b)(2) by the Commission. *See id.*; 15

U.S.C. §§ 78y(b)(2)–(3). The Fifth Circuit correctly determined that "the use of the word 'exclusive' … shows that Congress knew how to strip jurisdiction when it wanted to—and it only highlights that Congress did not strip § 1331 jurisdiction elsewhere."[3] Moreover, the *Cochran* court recognized that to read the statute as the Commission suggests "would effectively write § 78y(b)(3) out of the statute—there would be no point in making jurisdiction 'exclusive' in the court of appeals if no other court ever had jurisdiction. We are loath to reach such a result." *Cochran*, 20 F.4th at 201.

Because Plaintiffs were not "aggrieved persons" within the first 60 days of the rule's promulgation, § 78y(b)(1)'s use of permissive language additionally fails to provide even a permissible avenue for review, much less a mandatory one. Because the courts of appeals obtain exclusive jurisdiction only upon the satisfaction of specific requirements not satisfied in this case, § 78y(b)(1) does not apply. Plaintiffs have therefore correctly brought their challenge to the Commission's rule in this Court under § 1331 which confers jurisdiction "over *all* civil actions arising under the Constitution. … Not some or most—but all." *Id.* at 199. The Cochran court added that "the Supreme Court has repeatedly told us that 'when a federal court has jurisdiction, it also has a virtually unflagging obligation … to exercise that authority.'" *Id.* (alteration in original) (numerous citations omitted). Indeed, Justice Gorsuch's concurrence in *Axon/Cochran* underscores that district court jurisdiction "follows directly from 28 U. S. C. § 1331:"

> [F]or the last 150 years Congress has afforded lower federal courts jurisdiction to hear civil disputes arising under the Constitution or laws of the United States. … Today, §1331 provides that 'district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'

---

[3] *Cochran*, 20 F.4th at 201 & n.6 ("[T]he statute's use of the linking verb 'become' adds a temporal element, telling us that the subject ('jurisdiction') is only linked to the complement ('exclusive') *after* a petition is filed. In contrast, for example, the statute could have said that jurisdiction 'is exclusive,' or that the court of appeals 'has exclusive jurisdiction.' … But the use of 'becomes' necessarily implies a transformation." (emphasis in original)).

> Not *may* have jurisdiction, but *shall*. Not *some* civil actions arising under federal
> law, but *all*. The statute is as clear as statutes get.

*Axon/Cochran*, 598 U.S. at 205 (citations omitted).

SEC devotes only a single page to this argument—that Plaintiffs have brought their APA claims in the wrong court, SEC.Mem.16–17, and the sole case it cites for the "presumption of exclusive appellate review" as a "tenet of administrative practice and … hornbook administrative law," *N.Y. Repub. State Comm. v. SEC*, 799 F.3d 1126 (D.C. Cir. 2015), is an Investment Advisors Act case that is inapplicable on its terms. The *N.Y. Repub. State Comm.* court notes that where, as here, "Congress ha[s] evinced its intention" to provide explicitly for a separate path for review of "rules" as opposed to "orders," as Congress did under the '34 Act, *id.* at 1133 (citing *Am. Petrol. Inst. v. SEC*, 714 F.3d 1329, 1333 (D.C.Cir. 2013) ("*API*")), the presumption that rules are included as "orders" subject to exclusive appellate review does not apply. That makes sense where, as here, this appeal would not be "susceptible of review on the basis of the administrative record alone" because neither the CAT NMS system nor CAT LLC nor indeed any plan to collect personal investor data was part of the 2012 record. *Id.* (citing *Investment Co. Inst. v. Bd. of Gov'rs of the Fed. Rsrv. Sys.*, 551 F.2d 1270, 1278 (D.C. Cir. 1977)). SEC inexplicably fails to note that *N.Y. Repub. State Comm.* cited to and distinguished *API*, which held that the circuit court lacked jurisdiction because the challenge was to a *rule*, so the operative provision was § 78y(b) which, as here, had to be challenged in the district court. *API*, 714 F.3d at 1335–38.

Thus, SEC argues that this Court should shoehorn Plaintiffs constitutional and APA claims into a statute that the Supreme Court and this Circuit—to say nothing of the single APA case they cite—have all recognized is inapplicable to these claims. This Court should have little trouble rejecting the Defendants' attempt to force Plaintiffs into this reviewless dead end, especially when the Supreme Court and this Circuit have so recently ruled that district courts have APA jurisdiction

and an unflagging duty to exercise jurisdiction over these constitutional claims. SEC fails to once cite or bring to the court's attention applicable Supreme Court authority from 2010 (*FEF*), 2023 (*Axon*) and controlling Fifth Circuit authority from 2022 (*Cochran*, en banc) in which the Supreme Court unanimously eviscerated Defendants' jurisdictional desideratum.

CAT LLC at least acknowledges the existence of the Fifth Circuit's holding in *Cochran* as affirmed in *Axon/Cochran*, though it unfortunately fails to recognize that Defendants are facing quintessential structural constitutional challenges. This lawsuit is a frontal constitutional challenge to the SEC's power to regulate investing Americans in this fashion at all.

Compounding error, CAT LLC gravely stumbles by citing *Hill v. SEC*, 825 F.3d 1236, 1243 (11th Cir. 2016), to this court for the proposition that "plaintiffs … needed to bring their legal challenges to the CAT in a petition for review in a federal court of appeals within 60 days of Rule 613's promulgation in 2012, not in a civil action in a district court over a decade later." CAT.Mem.19. *Hill* held nothing of the sort. That passage appears as a mere background descriptor of SEC review schemes and thus is pure dictum, what the Supreme Court recently delightfully characterized as "vapours and fumes of the law."[4] The Eleventh Circuit's *holding* in *Hill*—that a person challenging the constitutionality of SEC action was limited to circuit court review, which in *Hill*, as here, involved constitutional challenges—was *unanimously* overruled by the Supreme

---

[4] The Supreme Court has recently provided a timely primer on how to identify, distinguish, and weigh dicta versus a holding. "'Not only did different decisions carry different weight, so did different language within a decision. An opinion's holding and the reasoning essential to it (the ratio decidendi) merited careful attention. Dicta, stray remarks, and digressions warranted less weight. *See* N. Duxbury, *The Intricacies of Dicta and Dissent* 19–24 (2021). These were no more than "the vapours and fumes of law.' F. Bacon, *The Lord Keeper's Speech in the Exchequer* (1617), *in* 2 The Works of Francis Bacon 478 (B. Montagu ed. 1887)." *Loper Bright/Relentless v. Raimondo*, 144 S.Ct. at 2277 (Gorsuch, J. concurring).

Court in *Axon/Cochran*. Accordingly, *Hill*, should not be cited to this Court for any purpose much less its vaporous dictum.

## C. SEC's Arguments for Exclusive Circuit Jurisdiction with a Sixty-Day Clock Wither Upon Examination of the Statutory Texts

The Commission cites both §§ 78y(a)(1) and 78y(b)(1) to support its position that Plaintiffs were required to file in the relevant court of appeals within 60 days of the Rule's promulgation, and it contends that because Plaintiffs failed to do so their challenge is now time-barred and this court lacks jurisdiction to hear this challenge. Neither §§ 78y(a)(1) nor 78y(b)(1), which are textually distinct avenues of review, foreclose district court review of the present challenge.

Section 78y(a)(1) uses broad language to provide that "person[s] aggrieved by a final order of the Commission … may obtain review" by filing a written petition in the relevant court of appeals in which they reside, or in the D.C. Circuit, "within sixty days after the entry of the order." 15 U.S.C. § 78y(a)(1). Here, Plaintiffs are not merely seeking review to "modif[y] or set aside" a final *order* of the Commission. *Id.* Rather, Plaintiffs are challenging the Rule in its entirety.

Because Plaintiffs are challenging the Rule itself, and not just a final order of the Commission, the only section relevant to this Court's consideration is § 78y(b)(1). *See Am. Petrol. Inst*, 714 F.3d at 1333. Unlike § 78y(a)(1), which uses broad and general language, § 78y(b)(1) is textually distinct, far narrower, and more specific in its application. Section 78y(b)(1) provides for direct appellate review by filing in the relevant court of appeals or the D.C. Circuit within 60 days of a rule's promulgation. *See* 15 U.S.C. § 78y(b)(1). However, § 78y(b)(1), by its own terms, does not apply to just any rule issued by the Commission, but *only* to those "promulgated pursuant to section[s] 78f, 78i(h)(2), 78k, 78k-1, 78o(c)(5) or (6), 78o-3, 78q, 78q-1, or 78s." *Id.*

To be sure, the Commission has included a handful of these sections in its citation of statutory authority upon which the challenged rule supposedly rests. Of the ten specifically

enumerated sections that might trigger § 78y(b)'s provisions, the Commission cites only five: §§ 78f, 78k-1, 78o-3, 78q, and 78s. *See* SEC.Mem.26–32. But the Commission expressly grounds its statutory authority to promulgate the rule on §§ 78b, 78c(b), 78e, 78o, and 78w(a), *id.* at 3, 26-32—none of which is found in the limited list of specifically enumerated subsections in § 78y(b)(1). The fatal flaw in the Commission's theory is its failure to recognize that rules promulgated pursuant to mixed statutory authority do not trigger a mandatory application of § 78y(b)(1) and challenges to such rules may, as here, appropriately be brought in federal district court.

The D.C. Circuit considered a similar challenge in *Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716 (D.C. Cir. 2016). There, a trade group petitioned the D.C. Circuit, citing § 78y(b)(1), for review of a joint rule issued by the SEC, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and Office of the Comptroller of the Currency. *See id.* at 718–19. The Court held that because the challenged rule was issued pursuant to 15 U.S.C. § 78o-11—a section that is *not* included in § 78y(b)(1)—the D.C. Circuit lacked jurisdiction to hear the challenge and that "petitioners must proceed in district court." *Id.* at 724.

Critically, the D.C Circuit also found that the Commission's inclusion of various other subsections of § 78 did not help its cause. *See id.* at 721–22 (citations omitted) ("Scattershot in nature, these sections listed other statutes without explaining their relevance. … The Commission's separate codification, for instance, purported to rely on two other statutes, citing ten specific sections."). Among the other included subsections were §§ 78o and 78w. The Court concluded that § 78y(b)(1) specified only subsections 78o(5) and (6), rendering the inclusion of 78o insufficient, and it did not address the inclusion of 78w because it determined the primary statutory authority to be § 78o-11, which is not included under § 78y(b)(1). In any event, the Court

did not find that the mere inclusion of an enumerated subsection in § 78y(b)(1) sufficed to establish jurisdiction under § 78y(b)(1), much less make it mandatory as the Commission suggests.

Other appellate cases have also considered similar challenges to rules resting on mixed statutory authority with varying outcomes. In *Int'l Brotherhood of Teamsters v. Peña*, 17 F.3d 1478, 1482 (D.C. Cir. 1994), the D.C. Circuit *elected* to exercise jurisdiction over a challenge to a Federal Highway Administration (FHWA) rule pursuant to a direct appellate review provision under 28 U.S.C. § 2342, where the FHWA rested its mixed authority for the rule on one statute that was contained in the direct review provision and one statute that was not. Similarly, the D.C. Circuit also *elected* to exercise jurisdiction over a challenge to a rule involving both CERCLA and EPCRA. *See Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017). In so doing, the *Waterkeeper* court reasoned that "where, as here, a single agency action relies on multiple statutory bases, it would be a wasteful exaltation of form over substance to *require* piecemeal challenges in various courts." *Id.* (emphasis added). The court concluded that because "at least one of the statutes provides for our direct review … jurisdiction doesn't seem a problem." *Id.* (citations omitted).

It is important to note that courts have treated their jurisdiction over challenges brought pursuant to direct review provisions, where a challenged rule rests on mixed statutory authority, as *permissible*, but not *mandatory*. Additionally, the direct review provision relied on in *Waterkeeper* provides further authority for why this court has jurisdiction. In *Waterkeeper*, the court considered a statute where Congress gave the circuit courts direct review jurisdiction over CERCLA rules under 42 U.S.C § 9613(a), *id.* at 532, which required that applications for review of regulations "*shall* be made within ninety days from the date of promulgation." 42 U.S.C.

§ 9613(a) (emphasis added).[5] But even where a direct review provision uses mandatory language for challengers ("shall"), the courts need not treat the jurisdictional component as mandatory. As § 78y(b)(1) does not use "shall," but instead uses "may," this Court is secure in treating § 78y review as permissive, and not mandatory, as the en banc circuit decision in Cochran holds.

In short, SEC's claims of preclusion utterly lack merit under controlling authority.

**D. This Action Is Timely; The Commission's Contrary Argument Cannot Be Squared with *Corner Post* and Would Lead to Absurd Results**

While certain statutes operate as statutes of repose, § 78y(b)(1) is not one of them. *See Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S.Ct. 2440, 2452 (2024) (identifying the Emergency Price Control Act and the Administrative Orders Review Act (Hobbs Act) as examples of statutes that "create a limitations period that begins with the defendant's action instead of the plaintiff's injury"). For example, the Hobbs Act provides that "[a]ny party aggrieved by [a final order under this Act] may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344.

This is because statutes of repose make clear that they "generally govern[] challenges to orders adjudicating a party's own rights—what we today might call 'as-applied' challenges." *Corner Post*, 144 S.Ct. at 2454. As the Court noted in *Corner Post*, "[s]tatutes like these do not contradict the plaintiff-centric standard accrual rule, because a party subject to such an order suffers legally cognizable injury at the same time that the order becomes final." *Id.* at 2454. While

---

[5] It is also particularly noteworthy that § 9613(a), unlike § 78y(b)(1), explicitly forecloses avenues for review outside of its specific provision: "Any matter with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs." 42 U.S.C. § 9613(a). That Congress clearly knows how to require review of specific matters in the courts of appeals and foreclose review in the district courts for those same matters, which Congress did *not* do in § 78y(b)(1), should not go unnoticed.

§ 78y(a)(1) might conceivably fit into this mold, precisely because it refers to orders that inherently may result in injury at the time of the order, §78y(b)(1) does not.

By contrast, the language of § 78y(b)(1) ("A person adversely affected by a rule of the Commission … may obtain review of this rule in the [court of appeals] for the circuit in which he resides … or for the District of Columbia Circuit, by filing [a petition] within sixty days after the promulgation of the rule"), differs in a significant and unavoidable respect. The Hobbs Act's § 2344 provision refers only to "orders," which are inherently a source of instant injury to "aggrieved" parties, whereas § 78y(b)(1) refers to "rules," which may or may not cause redressable injury immediately upon promulgation. This language is designed to provide expedited appellate review for those parties "adversely affected" upon the promulgation of an agency rule, but it should not be understood to prohibit those who only later become "adversely affected" from seeking relief in federal district court. Plaintiffs were not adversely affected by the inchoate CAT until it started gathering data in 2020.

On the Commission's view, a party that is not yet injured—i.e., "adversely affected"— within those first 60 days would not have standing, and its petition would be premature. But once that party is injured, it no longer meets the 60-day requirement and is therefore too late. Such a state of affairs cannot be what Congress intended, nor can it be squared with "our 'deep-rooted historic tradition that everyone should have his own day in court.'" *Corner Post*, 144 S.Ct. at 2459 (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)). As Justice Barrett explained, this would mean that "only those fortunate enough to suffer an injury within six years of a rule's promulgation may bring an APA suit. Everyone else—no matter how serious the injury or how illegal the rule—has no recourse." *Id.* Since at least 2010, the Supreme Court unanimously recognized district court jurisdiction for constitutional claims as to which agencies lack

competence, much less expertise, which are wholly collateral to any enforcement action and where, as here, courts presume "that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review.'" *FEF*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212-13)).

The Supreme Court granted certiorari in *Corner Post* to resolve the circuit split on just this issue. Its decision, overruling in part *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Srv.*, 112 F.3d 1283 (5th Cir. 1997), observes the "equally well-settled" principle raised by Judge Jones' dissent in *Dunn-McCampbell* "that if an agency regulation is not authorized by its governing statute,[] a party injured by application of the regulation may raise the issue outside the statutory limitations period; a regulation initially unauthorized by statute cannot become authorized by the mere passage of time." *Id.* at 1289–90 (Jones, J. dissenting). By adopting the simple rule that allows suit in the district court within six years of injury, the *Corner Post* court further vindicates Judge Jones's dissent pointing out that "it is a waste of time to require as a prerequisite to suit that [a party] … manufacture 'agency action' by petitioning the [agency] … to revoke its regulations and suffering—at some time in the possibly remote future—the inevitable rebuff." *Id.* at 1290. Instead, *Corner Post* holds that when a party first becomes aggrieved by a regulation that exceeds an agency's statutory authority more than six years after the regulation was promulgated, that party may challenge the regulation without waiting for enforcement proceedings and may seek direct relief from the regulation's onerous effect within six years under the applicable statute of limitations, 28 U.S.C. §2401(a). As the *Corner Post* court put it, a "federal regulation that makes it six years without being contested does not enter a promised land free from legal challenge," (citation omitted), thus honoring our "deep-rooted historic tradition that everyone should have his own day in court." 144 S.Ct. at 2459.

Just as Corner Post was not "fortunate enough to suffer an injury" in the first six years after final rule promulgation, the Plaintiffs here would clearly have lacked standing or would have been dismissed on ripeness grounds if they had sought to challenge the Rule in that time window.[6] *Id.*

To make matters worse, *no* would-be-plaintiff was sufficiently "adversely affected" by the Rule at the time of promulgation to have standing within those first 60 days.[7] While the initial rule was promulgated in 2012, the CAT NMS plan was not approved until 2016, and the rule did not begin "adversely affecting" Plaintiffs until 2020. SEC's own brief in this case *admits* that Plaintiffs were not and could not be on notice of the legal and constitutional violations of the CAT in 2012: "Rule 613 specified only the baseline requirements that … permitted the SROs to decide whether to build on existing audit trails or design a new system … [and] did not require real-time reporting of order information." SEC.Mem.12 (citations omitted). In other words, this was a CAT of a different color, not yet even in its infancy and bearing none of the legal or constitutional markings that only emerged to harm Plaintiffs by the earliest in 2020.

Under the Commission's theory of § 78y(b)(1), no one would have been "adversely affected" and in a position to petition for review until at least 2020. Under this heads-we-win, tails-you-lose view of the review statutes, the SEC—indeed any agency with such an appellate review

---

[6] To remove any doubt on this point, SEC repeatedly raised ripeness arguments in *Cochran* throughout the district court, Fifth Circuit panel, and en banc stages of the case, claiming that Cochran had to endure the full gamut of the ALJ administrative proceeding, including appeal to the Commission, before she could challenge whether that ALJ enjoyed too many layers of tenure protection in the first place. The en banc court in *Cochran* determined the SEC's ripeness claims failed. *Cochran*, 20 F.4th at 212–13. This Court should thus have little doubt that any plaintiffs who challenged the CAT in its first 60 days on the speculative injury that the prospective system might violate their constitutional, privacy, security and Fourth Amendment rights would have met with a hasty motion for dismissal of their claims for lack of ripeness and justiciability.

[7] *See* 144 S.Ct. at 2455 n.6 ("[T]here may be cases where *no one* is injured and able to sue at the time of final agency action … [T]he Board's position cannot be reconciled even with a challenger-agnostic form of the traditional accrual rule, which at least would require that *someone* have a complete and present cause of action before the limitations period begins.").

statute—can neatly avoid any future challenge to any agency rule by simply delaying the rule's effect until 61 days post-promulgation.

This Court should therefore follow the Supreme Court's rule in *Corner Post*, and appropriately apply the standard accrual rule for claims and the default six-year statute of limitations applicable to suits against the United States. Plaintiffs are well within the six-year window for APA claims because they filed suit in 2024, only four years after it became apparent that investing Americans would begin to suffer injury.

### E. Plaintiffs Have Standing Based on the Actual, Concrete, and Continuing Harm They Have Suffered and Will Continue to Suffer Absent Redress by This Court

Defendants next seek dismissal of the Complaint framing their Motion to Dismiss as one for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) alleging that Plaintiffs' lack Article III standing to sue. However, because Defendants' standing argument does not rely on matters outside the Complaint, it represents a facial challenge to jurisdiction. *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016) (explaining a "movant mounts a 'facial attack' on jurisdiction" where he bases his challenge "only on the allegations in the complaint"). Accordingly, "the court simply considers 'the sufficiency of the allegations in the complaint because they are presumed to be true.'" *Id.* Further, the Court must construe the complaint in favor of the complaining party.

To satisfy the burden on a facial challenge to standing under Rule 12(b)(1), a Plaintiff need only "allege facts that give rise to a *plausible* claim of [Plaintiff's] standing." *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009)) (emphasis added). As detailed below, Plaintiffs' Complaint amply provided "particularized allegations of fact" that give rise to a plausible claim of standing on their APA, constitutional, and mandamus claims, establishing (1)

injury in fact; (2) Defendants "likely caused" the injury; and (3) "that the injury would likely be redressed by judicial relief." *GLO v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023) (cleaned up).

### 1. Injury-in-Fact

First, Plaintiffs' statutory injury is derived from their subjection to the Commission's unlawful and *ultra vires* rule establishing and implementing the CAT's perpetual surveillance regime. *See Louisiana v. Horseracing Integrity & Safety Auth., Inc.*, 617 F.Supp.3d 478, 500 (W. D. La. 2022) (holding that "[t]he alleged [agency] conduct in exceeding its authority given by Congress and alleged violations of the APA … constitute irreparable injury").

Second, Plaintiffs have plausibly alleged injuries based on constitutional violations arising from the Commission's unlawful surveillance program. The Fifth Circuit has recognized that "violations of constitutional rights may of course, in some instances, satisfy the injury-in-fact requirement[,]" but also that a plaintiff "must still establish a violation of his own personal rights." *Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75, 485 (1982). Here, Plaintiffs' factual allegations have established plausible claims of injury based on violations of their First, Fourth, and Fifth Amendment rights.

Specifically, Plaintiffs alleged violations of their First Amendment rights and, as detailed below, properly stated a First Amendment claim premised on the CAT scheme's infringement on their right of association. Because the Defendants do not present an independent challenge to Plaintiffs' standing under the First Amendment, the Plaintiffs' Response to Defendants' 12(b)(6) Motion to Dismiss their First Amendment claims for failure to state a claim applies equally here.

Plaintiffs' Complaint likewise alleged a strong Fourth Amendment claim that SEC Defendants caused the unreasonable seizure of Plaintiffs' private financial information, and later

searches of that information. The Complaint alleges Plaintiffs hold both property and privacy interests in their propriety information, which flows from the text of the Constitution itself: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated … ." U.S. CONST. amend. IV. As SEC *admits*: "True, a Fourth Amendment violation would be an injury-in-fact." SEC.Mem.23.

Fourth Amendment standing applies initially to the "seizure," not just to what the government does with the seized private and proprietary information thereafter. So SEC's assertion: "Yet it is entirely speculative whether the SEC will ever review Plaintiffs' data in the Consolidated Audit Trail" or that it will be "imminently 'searched' by the SEC,'" SEC.Mem.23, avails not, because the Fourth Amendment prohibits the *seizure* and has never required a plaintiff to prove that the government has made use of the seized information. *United States v. Place*, 462 U.S. 696, 716 (1983) ("Even if an item is not searched, therefore, its seizure implicates a protected Fourth Amendment interest.") (Brennan and Marshall, JJ., concurring in the result). Such a view of the Fourth Amendment would permit government to sweep homes and businesses for information and hold on to it on a "trust us, we're the Government" basis, that would only allow standing to sue when the government acts on the seized information. That is not the law. *Soldal v. Cook Cnty.*, 506 U.S. 56, 68 (1992) ("seizures … are subject to the Fourth Amendment even though no search within the meaning of the Amendment has taken place"). *See also* Part III *infra*. Moreover, and fatal to the SEC's attempt to argue it can seize with impunity, but Plaintiffs' only have Fourth Amendment standing to sue when the data is "searched," SEC releases repeatedly state that SEC is searching the entire database. *See, e.g.*, 77 Fed. Reg at 45723, 45799 (stating that CAT will "accurately track all activities in NMS securities," and SEC will "feed [CAT] data into analytical 'alert' programs designed to screen for potential illegal activities").

Though technology has advanced dramatically since the Founding, Plaintiffs' private financial data remain their papers and effects within the meaning of the Fourth Amendment. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 399, 401 (2014) (finding "digital files" stored on a smartphone to be "private effects"); *United States v. Ackerman*, 831 F.3d 1292, 1304 (10th Cir. 2016) ("After all, if opening and reviewing 'physical' mail is generally a 'search'—and it is—why not 'virtual' mail too?") (internal citation omitted) (Gorsuch, J., opinion of the Court); *accord United States v. Warshak*, 631 F.3d 266, 287 (6th Cir. 2010).

Plaintiffs have also averred a reasonable and subjective expectation of privacy in their private financial data, which continues to be violated by the CAT program. Compl. ¶ 152. The continued search and seizure of Plaintiffs' private financial data is unreasonable under the Fourth Amendment because it is "not conducted pursuant to warrants supported by probable cause, … or even a reasonable suspicion of wrongdoing." *See* Compl. ¶ 157. The continued holding of Plaintiffs' unlawfully collected data alone has been recognized as constituting a Fourth Amendment injury. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 338–39 (4th Cir. 2021) (en banc).

Moreover, the ongoing search and seizure of Plaintiffs' private financial data is not "entirely speculative" as Defendants suggest. SEC.Mem.23. Even if this were true—which it is not—such a charge is unavailing in Defendants' efforts to undermine Plaintiffs' standing at this stage. "What *is* relevant to the standing inquiry is whether Plaintiff pled a sufficient prospective injury." *Texas v. Mayorkas*, No. 22-CV-094-Z, 2024 WL 455337, at *2 (N.D. Tex. Feb. 6, 2024) (citing *Davis v. FEC*, 554 U.S. 724, 734 n.5 (2008)). And "[t]he Supreme Court has noted that a plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come

about.'" *Texas Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 454 (E.D. Tex. 2020) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

Similarly, SEC Defendants' argument that Plaintiffs lack standing because "there is no Fourth Amendment violation here," SEC.Mem.23, is misplaced. As the Supreme Court has explained, its "threshold inquiry into standing 'in no way depends on the merits of the [Plaintiffs'] contention that particular conduct is illegal[.]'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Rather, as the Fifth Circuit held in *RLI Ins. Co. v. Roberts*, 819 F. App'x 227, 229 (5th Cir. 2020), "[Defendants] cannot dispute that [Plaintiffs] suffered an Article III injury by arguing that [Plaintiffs'] claims fail on the merits."

Thus, while as their Memorandum in Support of a Preliminary Injunction establishes, Pl.Mem.27–33, Plaintiffs' Fourth Amendment claims *are* likely to succeed on the merits, an incontrovertible assurance of success is not required to establish standing at the motion to dismiss stage. Rather, at this stage of litigation to establish an injury-in-fact for purposes of standing, Plaintiffs need only plausibly alleged that such unreasonable searches have happened, are happening, and will continue to happen absent relief. *See Barilla*, 13 F.4th at 431–32. The Complaint more than satisfies that standard.

Plaintiffs have also alleged a plausible Fifth Amendment injury arising from Defendants' deprivation of their property rights in their financial information "without due process of law." U.S. CONST. amend. V. Here, Plaintiffs alleged a substantial liberty interest in the privacy of their private financial data and that the Commission deprived Plaintiffs of their protected privacy rights in violation of the Fifth Amendment by failing to provide either a pre- or post-deprivation notice and opportunity to be heard.

In addition to their injuries-in-fact, Plaintiffs have plausibly alleged a substantial financial injury arising from the costs imposed by the CAT program. While initially borne by exchanges and broker-dealers, these costs ultimately impose financial harm on investors. Again, the Commission seeks to require Plaintiffs to prove "it is literally certain that the harms they identify will come about." *Texas Voters All.*, 495 F. Supp. 3d at 454 (cleaned up). But that is not the standard at this stage of the litigation.

Defendants argue otherwise based on *Texas v. SEC*, 2024 WL 2106183, at *2 (5th Cir. May 10, 2024) (per curiam), but *Texas v. SEC* involved a factual challenge to standing under Rule 12(b)(1) and not a facial challenge. With a factual standing challenge, a Court treats the motion as one on summary judgment, and the plaintiff is required to support a claim of standing with 'specific facts in the record.'" But as noted above, Defendants in this case presented a facial standing challenge, and thus the question for the Court is whether, the facts alleged—accepted as true and read in the light most favorably to the Plaintiffs—give rise to a *plausible* claim of standing. *See Barilla*, 13 F.4th at 431–32. Moreover, SEC admits in its own words a "substantial risk" and an understanding of the certainty that Plaintiffs will bear the CAT costs. Just last year, in a release addressing the funding scheme for the CAT, SEC stated, "The Commission … cannot determine in advance the extent to which [brokers] can or will pass-through their CAT fees to investors … . But we believe that … at least some will do so." 88 Fed. Reg. 62628, 62637 (Sep. 12, 2023)

(emphasis added.)[8] FINRA, the largest participant in CAT LLC, has stated: "We will be passing along the Finra portion [of CAT LLC costs]."[9]

Moreover, because it is only intuitive that brokers-dealers and SROs will pass the billions in costs on to investors, Plaintiffs have plausibly alleged an injury. *See Texas*, 2024 WL 2106183, at *2 (holding pass-through injury "can support a claim of standing") (citing *Cent. Az. Water Conservation Dist. v. EPA*, 990 F.2d 1531 (9th Cir. 1993); *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239 (D.C. Cir. 1983), *rev'd on other grounds*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984); *see* Compl. ¶¶ 67–72, 96. To express this intuitive truth another way, it is doubtful that either SEC or CAT LLC would submit a declaration that SEC will pay for the CAT out of the funds appropriated to the agency, especially since none have been appropriated for this purpose, nor in the case of CAT LLC, that it and its member organizations will shoulder the full costs of the scheme in perpetuity with no pass-through to investors.

The Commission cites *Murthy v. Missouri*, 144 S.Ct. 1972, 1986 (2024), to argue that Plaintiffs "must face a real and immediate threat of repeated injury" to seek forward-looking relief. *Id.* (internal quotation marks and citation omitted); *see* SEC.Mem.42–43. *Murthy*, however, is inapposite because the challenge for the plaintiffs in that case concerned presenting sufficient evidence to establish the past allegedly unconstitutional conduct was ongoing. *See Murthy*, 144

---

[8] SEC made this statement when it was in conflict with brokers about the funding order. *See* SEC.Br.36, *Am. Sec. Ass'n v. United States,* No. 23-13396 (Apr. 15, 2024) (to oppose arguments that SEC order allocating CAT costs places excess burden on broker-dealers, arguing that "some or most of the costs of CAT will be passed on to investors"); *see also id*. at 34, 37 (same). To fend off broker objections, the SEC conceded that brokers can pass some of the costs along. Indeed, SEC relied on this pass-through assumption when it issued the funding order. Thus, SEC is taking conflicting positions in two different disputes. When in conflict with the brokers, it admitted to the obvious truth that such regulatory costs are passed-through. Now, in a suit by the investors, it takes essentially the opposite position.

[9] Jesse Westbrook and Robert Schmidt, *FINRA's Cook Dumps on Consolidated Audit Trail*, Capitol Account, October 17, 2023.

S.Ct. at 1993 ("But without proof of an ongoing pressure campaign, it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants.").

Here, there is no question that SEC Regulations requiring the ongoing creation of the CAT and imposing the exorbitant costs of continuing these collection efforts, plausibly passed through to Plaintiffs, injure the Plaintiffs. In short, because the Plaintiffs have plausibly alleged a substantial financial injury that has occurred, is occurring, and is likely to continue to occur, Plaintiffs have shown both sufficient past injury and "substantial risk of future injury" to establish standing. *Id.*

### 2. Traceability

The second requirement for standing is "traceability," which requires the Plaintiff to plausibly allege the injuries are fairly traceable to Defendants. Defendants present only one argument concerning traceability: that the financial burden of paying for CAT is not traceable to the government because "broker-dealers—not the government—will therefore decide whether (and if so, how) any costs are passed on to investors. SEC.Mem.42. In support of their position, Defendants again cite *Murthy*, 144 S.Ct. at 1986, arguing that because Plaintiffs only bear the cost of CAT due to "the independent action of some third party not before the court," SEC.Mem.42 (quoting *Murthy*, 144 S.Ct. at 1986 (internal quotation marks and citation omitted)), the Plaintiffs' injury is not traceable to Defendants.

Defendants' argument is misplaced. While there must exist "a causal connection between the plaintiff's injury and the defendant's challenged conduct, [traceability] doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Inclusive Cmtys. Proj. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Instead, a plaintiff satisfies traceability when

the challenged action rests not "on mere speculation about the decisions of third parties" but "on the predictable effect of [g]overnment action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). The increased costs ultimately borne by Plaintiffs *are* the predictable—indeed acknowledged—effect of Defendant SEC's actions in establishing and implementing the CAT. CAT LLC's members *insist* upon the pass-through. Thus, on a facial Rule 12(b)(1) motion, Plaintiffs remain "under no obligation to prove [their] injury actualized or to define and eliminate all possible factors contributing to it." *Mayorkas*, 2024 WL 455337, at *3; *see also Davis*, 554 U.S. at 734 ("the injury required for standing need not be actualized"). Accordingly, Defendants' claim that Plaintiffs' harm is not traceable to them fails.[10]

### 3. Redressability

Plaintiffs also satisfy the redressability requirement because "it is *likely*, as opposed to merely *speculative*, that [Plaintiffs'] injury will be redressed by a favorable decision." *Inclusive Cmtys. Proj.*, 946 F.3d at 655 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (internal quotation marks omitted)). Specifically, if this Court either enjoins the CAT scheme or sets aside the relevant illegal and unconstitutional regulations, the unconstitutional government seizure of Plaintiffs' financial records would end and the pass-through costs borne by the Plaintiffs to fund that scheme would cease as well.

In response, Defendants assert that "the SEC could … access all the same types of information from separate sources," arguing that this means "Plaintiffs' requested relief would therefore have no impact on whether their data could be 'provided to a government agency.'" SEC.Mem.24. Not so.

---

[10] Defendants do not challenge the traceability of the other injuries suffered by Plaintiffs.

CAT, unlike the pre-CAT regulations, allows for the seizure and search of financial information without any basis or suspicion. If the Court either enjoins CAT or sets aside the CAT regulations, to access Plaintiffs financial records then, the SEC will need to provide a blue-sheet or a subpoena to exchanges, brokers, and dealers. And those procedures require some level of suspicion, unlike CAT. Thus, granting the Plaintiffs relief will redress their injury. Nor does the redress need to be complete. As the Fifth Circuit has explained, "[t]he relief sought needn't completely cure the injury … it's enough if the desired relief would lessen it." *Inclusive Cmtys. Proj.*, 946 F.3d at 655.

Doing away with CAT will undoubtedly lessen the injury to Plaintiffs flowing from the undiscriminating capture of every financial transaction in U.S. securities and would certainly "affect[] the behavior of the defendant towards the plaintiffs." SEC.Mem.24 (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)). A favorable decision by this Court is substantially likely to lessen—even if not completely cure—Plaintiffs' statutory, constitutional, and financial injuries. An order from this Court setting aside and holding unlawful SEC Rule 613, enjoining Defendants from implementing or enforcing Rule 613, enjoining Defendants to abrogate all rules enacted in reference to Rule 613, and ordering Defendants to expunge all Plaintiffs' unlawfully collected private data from CAT LLC's database and any other database controlled by the Commission would favorably and completely redress Plaintiffs' present and future injuries.

In sum, because Plaintiffs have shown that: (1) they have, are, and will continue to sustain statutory, constitutional, and financial injuries, (2) such injuries are fairly traceable to Defendants, and (3) a favorable decision by this Court would redress those injuries, Plaintiffs have standing to sue.

## II.   THE COMPLAINT STATES A CLAIM, ON WHICH PLAINTIFFS ARE LIKELY TO PREVAIL, THAT SEC VIOLATED THE APA BY ACTING WITHOUT STATUTORY AUTHORITY

SEC bears the burden of showing it had "explicit Congressional authority" to create the CAT. *Inhance Techs., LLC v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024). *See also West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (agency bears the burden to show it has statutory authority). SEC cannot meet that burden as to § 11A, the statutory provision SEC relied on in its regulatory releases. SEC's Motion to Dismiss does not and cannot salvage SEC's § 11A theory.

SEC's Motion to Dismiss adds a new argument, contending for the first time that Congress authorized the CAT under Exchange Act § 17A, which established recordkeeping requirements for brokers and other securities professionals. SEC did not cite this statute as authorizing the CAT in its lengthy Adopting Release or in any of the numerous orders it has issued relating to the CAT.[11] Last year, SEC again set forth the statutory authority for the CAT, but it did not refer to § 17 at all. 88 Fed. Reg. at 62672–73.

During the long regulatory process that involved numerous orders, SEC chose not to assert it had authority based on § 17—showing that SEC considered its potential to provide lawful authority for the CAT to be weak or worse. SEC's decision to resort to this flimsy § 17 argument at this late date reveals that SEC now considers the § 11A argument untenable as well. Now that Plaintiffs have refuted the § 11A argument in establishing their likelihood of success on the merits, SEC suddenly offers a backup theory of statutory authority. Section 17 fares no better.

SEC's attempt to rely on two different provisions as authority also highlights SEC's casual approach to statutes. Although these two provisions address different subject matters, SEC contends that each provides distinct and "clear" authority for the entire CAT program. *See*, *e.g.*,

---

[11] In the Adopting Release, SEC did tuck a bare reference to § 17 into a string cite of 10 statutory sections. 77 Fed. Reg. at 45808.

SEC.Mem.36 (addressing both sections). But under "ordinary principles of statutory construction" (88 Fed. Reg. at 62673), it is impossible for two such different statutory provisions each to provide "clear" and "explicit" authority for the same specific, unprecedented program. Unsurprisingly then, as the following discussion explains, neither section does so.

### A.   Exchange Act § 11A Does Not Authorize the CAT

#### 1.   SEC fails to address the specific statutory "objectives" that limit its authority under § 11A

When SEC issued the CAT rule, it relied for authority primarily or solely on § 11A. Pl.Mem.13 (citing 75 Fed. Reg. 32556; 88 Fed. Reg. 62673). Plaintiffs' Complaint therefore focused on that provision. Compl. ¶¶ 88–92 (also asserting that no other statutory provision provided authority). Plaintiffs' Memorandum also explained in detail why § 11A did not authorize the CAT because it limits SEC's authority to advancing specific statutory "objectives." Those specific objectives are the "economically efficient execution of securities transactions," "fair competition among brokers and dealers" and "among exchange markets," "the "practicability of brokers executing investors' orders in the best market," "the linking of all markets through communication and data processing facilities," and the "best execution of orders." 15 U.S.C. § 78k-1(a)(1)(C) & (D); Pl.Mem.4–5, 14–15, 28–30 (same). The statute thus limits SEC's authority to addressing the interactions among stock-market entities and securities professionals. They have nothing whatever to do with authorizing SEC to collect information about individual investors, or with searching investors' records looking for possible legal violations.[12]

---

[12] The Court should reject SEC's argument without even reaching the limiting "objectives." Even if § 11A did not restrict SEC's authority by listing the objectives, SEC's argument still would fail because the clauses SEC relies on are far too general to justify any particular rule, much less the CAT, without some additional content in the statute. For example, SEC relies on the reference to "national market system." But as the Supreme Court explained in *West Virginia v. EPA*, 597 U.S. at 732, "almost anything could constitute … a 'system.'" In our case, SEC has not added any

SEC's Motion does not address the substance of these objectives. Instead, SEC quotes portions of two authorizing clauses—while omitting the objectives that expressly limit those clauses. SEC.Mem.28. SEC first quotes the clause that "directs" SEC "to facilitate the establishment of a national market system"—but it fails to mention that the same sentence limits SEC to acting only "in accordance with the findings and to carry out the objectives set forth" earlier in Section 11A. 15 U.S.C. § 78k-1(a)(2). SEC resorts to quoting the clause authorizing it to order SROs "to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system" while omitting the portion of the same sentence that limits SEC's authority to acting "in furtherance of the directive in paragraph (2)" which lists the objectives. 15 U.S.C. § 78k-1(a)(3). SEC's failure to address these limiting "objectives"—indeed, the great lengths to which it goes to ignore them—is fatal to its § 11A argument.

In its effort to avoid the objectives, SEC tries to brush aside *Business Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990), where the court applied these objectives to vacate another guardrail-jumping SEC rule. Although SEC contends that *Business Roundtable* "said little about [§] 11A," SEC.Mem.30, quite to the contrary, that court squarely addressed the scope of SEC's authority under § 11A(a)(2)—the same provision SEC cites to justify the CAT. In *Business Roundtable*, SEC had "invoke[d] its power under § 11A(a)(2)" as authority for the rule at issue, which addressed listing requirements for stocks on national exchanges. 905 F.2d at 416. Recognizing that SEC authority was "constrained" by the requirement that SEC "use its authority 'in accordance

---

statutory context to inform the meaning of "system" or the other general language it cites. As the *West Virginia v. EPA* court concluded regarding EPA's effort to rely on a statutory reference to the "best system of emission reduction," "[s]uch a vague statutory grant is not close to the sort of clear authorization required by our precedents." *Id.* at 732, 734. This conclusion applies equally to § 11A and the CAT.

with the findings and to carry out the objectives set forth' in [§ 11A(a)(2)]", the court concluded that the rule was not authorized because it was not within the scope of the objectives. *Id*. at 416–17. SEC's Motion is unable to distinguish *Business Roundtable*.

Still avoiding the text of the limiting objectives, SEC tries the tactic of quoting at length from its own regulatory releases, where it stated its goals of using the CAT for enforcement against ordinary investors. SEC.Mem.30 (quoting 77 Fed. Reg. at 45730 and 81 Fed. Reg. at 84727). But SEC's regulatory releases are not, of course, legal authority.

SEC then deflects to a series of irrelevant topics, in particular sowing confusion about the facts. It states, for example, that "the collection of trade and order data is one of the 'matters as to which [SROs] share authority under'" the Securities Act. SEC.Mem.28–29 ("The [SROs] have long required their broker-dealer members to report trade and order data … ."). But "trade and order data" did *not* include investor names or any other information identifying investors, as even SEC's Adopting Release makes clear. *See* 77 Fed. Reg. at 45728, 45730. Nor did SROs collect such data.

SEC mischaracterizes the CAT as nothing more than "coordination of self-regulatory systems." SEC.Mem.31 (quoting S. Rep. No. 94-75). This mischaracterization contradicts the pre-litigation SEC statements cited to establish the likelihood of success on the merits,[13] and more importantly, is not true. Although SEC works hard to obscure this fact, the CAT did *not* merely consolidate preexisting audit trails maintained by various SROs. Rather, *for the first time*, the CAT collected information identifying the *investors* involved in stock transactions. This distinction is set out in the Complaint (which SEC must accept as true) Compl. ¶¶ 11–12, 22–23, 32–36, 39–41,

---

[13] 77 Fed. Reg. 45722, 45727-28, 45727 n.48; Chair Mary L. Schapiro, Opening Statement at SEC Open Meeting: Consolidated Audit Trail (July 11, 2012) (SRO audit trails did not contain information identifying investors)

and is further explained in Plaintiffs' Memorandum, with supporting citations to the CAT Plan and SEC's pre-litigation statements, Pl.Mem.6–7.

Perpetuating the misimpression that SROs or SEC collected investor names *before the CAT*, SEC avers that it has issued various "national market-system plans" relating to matters such as "stock quotation and transaction information." SEC.Mem.31. But none of the matters SEC cites had anything to do with collecting information that identifies *investors*. The same is true of the two cases SEC cites, which are irrelevant for that same reason. *See Nasdaq Stock Mkt., LLC v. SEC*, 34 F.4th 1105, 1106–07 (D.C. Cir. 2022) (addressing collection of stock trading data but no information identifying investors); *New York Stock Exch. LLC v. SEC*, 2 F.4th 989, 990 (D.C. Cir. 2021) (addressing collection of transactional information but nothing identifying investors).

Pre-CAT rules and orders are relevant here, but only because they contradict SEC's arguments. They show that, for 35 years after Congress passed § 11A, it never occurred to SEC that § 11A gave it the authority to order the mass collection of information identifying *investors*. SEC tries to wave off this inconvenient history as "simply irrelevant," SEC.Mem.32, but this kind of regulatory history is highly relevant to the United States Supreme Court. The Supreme Court considers such a history powerful evidence that the agency did not believe it possessed the authority it now is claiming. *West Virginia v. EPA*, 597 U.S. at 725 (the lack of "assertion of power by those who presumably would be alert to exercise it" provides significant evidence of the extent of power conveyed by general statutory language) (citation omitted).

SEC also attempts to rewrite the history of § 11A itself. As Plaintiffs have explained, Congress passed § 11A in 1975 as deregulatory legislation intended to link various stock exchanges and enhance competition. *See Business Roundtable*, 905 F.2d at 416; *see also*

Pl.Mem.4, 15. In SEC's revisionist telling, however, this legislation was a grant of vast power to SEC—limited only by SEC's own assertions of regulatory authority. *E.g.*, SEC.Mem.6, 31–32.

SEC supports this revisionism by quoting selectively from the Senate Report—to no avail. That report leaves no doubt that SEC's role in the national market system was to facilitate its development and to oversee compliance *by the securities industry*. This purpose fits precisely with the "objectives" Congress wrote into the statute itself. SEC's Motion lifts the words "police effectively" out of the Senate Report but fails to mention that the words refer to policing *the SROs*. Senate Report No. 94-75 (1975), at 2 ("1975 Report") (in the same sentence, referring to SEC's "ensur[ing] … self-regulatory performance"). SEC also fails to mention that the same paragraph states that the legislation addresses "the powers of the self-regulatory organizations and the *oversight authority of the SEC with respect to these organizations*." *Id*. (emphasis added). Far from supporting SEC's novel reading of § 11A, the Senate Report reinforces that the scope of its § 11A authority is limited to the specific objectives contained in the statute.

SEC attempted a similar revisionist history of § 11A in *Business Roundtable*, and the court rejected it out of hand: "To argue that Congress's 'equal regulation' mandate supports SEC control over corporate governance through national listing standards is to gamble that the court will accept a Commission spin on a statutory fragment without even a glance at its context. Wrong court, bad gamble." 905 F.2d at 416. *Business Roundtable* responded to SEC's characterizations of snippets from the Senate Report by saying, "[SEC's] theory is … a rather odd reading of what was a cornerstone in Congress's 1975 desire to establish a national market system and 'to break down the unnecessary regulatory restrictions … which restrain competition among markets and market makers.'" *Id.* (quoting 1975 Senate Report at 12–13). *See also* Jonathan R. Macey and David D. Haddock, *Shirking at the SEC: The Failure of the National Market System*, 1985 U. Ill. L. Rev.

315, 315 (1975 amendments were essentially "deregulatory legislation")." (both cited in 905 F.2d at 416). SEC should not be permitted to spin this deregulatory legislation to claim the vast power to create a vast new uber-regulatory system to surveil ordinary investors.

**B.      SEC's Attempt to Rely on Exchange Act § 17 a Recordkeeping Provision, also Fails**

SEC's Motion newly advances Exchange Act § 17, 15 U.S.C. § 78q as an alternate basis for statutory authority. This is the primary recordkeeping statute governing the securities industry. This argument fails at the outset, not coming close to providing the necessary "explicit Congressional authority" for the CAT. *Inhance Techs., LLC v. EPA*, 96 F.4th at 893.

**1.      SEC specifically relies on § 17(a)**

This subparagraph first identifies the securities-industry entities and professionals it covers (referred to below as "covered entities and professionals"):

> Every national securities exchange, member thereof, *broker* or dealer who transacts a business in securities … , registered securities association, registered broker or dealer, registered municipal securities dealer[,] municipal advisor,[] registered securities information processor, registered transfer agent, nationally recognized statistical rating organization, and registered clearing agency and the Municipal Securities Rulemaking Board … .

Section 17(a) defines the obligation of these covered entities and professionals regarding certain records and reports which is that they:

> shall *make and keep* for prescribed periods such *records*, *furnish such copies* thereof, and make and disseminate such reports … .

Finally, § 17(a) authorizes SEC to "prescribe" which records and reports are covered:

> as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act].

15 U.S.C. § 78q(a)(1) (footnote in first block quotation omitted) (emphases added).

Congress passed § 17 in 1934 as part of the original Securities Exchange Act. Pub. L. No. 73-291, 48 Stat. 881, 897. Congress amended it in 1975, making changes not relevant here except that Congress added the words "furnish such copies." *See* Pub. L. No. 94-29, 89 Stat. 97, 137. Before Congress made this change, the only means the statute provided for SEC and SROs to review the required records was by conducting examinations—now copies of certain records would be provided. The "examinations" provision, now located in § 17(b), states that the required records "are subject … to such reasonable periodic, special, or other *examinations* by … the Commission and the appropriate [SRO]." 15 U.S.C. § 78q(b)(1) (emphasis added).

SEC's § 17 theory is that, when the 1975 Congress added the three words "furnish such copies," it granted SEC authority to conjure up the colossal CAT. These three words granted it authority to require every entity or person covered by § 17(a) to send the SEC, in real time, a copy of *every* required record the covered entity or person creates. *See* SEC.Mem.6, 9 (stating there are not "any … procedural limits" on SEC's access to broker-dealer information, and that SEC can require broker-dealers to submit records "without qualification"), 26–27. Baldly put, SEC claims the authority to require every covered stock exchange, brokerage firm, broker, and others in the securities industry to send it a flow of *all* their required records in real time as they create those records. Even narrowing this just to brokers, SEC claims the authority to require every registered broker to send it, in real time, every required record the broker creates without any limitation, including but not limited to the *investor* information required by the CAT. *See id*.

SEC's radical new theory has no recognizable basis in § 17's text, much less the required "explicit" basis. *Inhance Techs., LLC*, 96 F.4th at 893 (quoting *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019)). The theory lifts "furnish such copies" out of context, without identifying anything in the statute that Congress intended these words as a transformative,

unbounded grant of power when enacted. The Supreme Court's teaching in *West Virginia v. EPA*, 597 U.S. at 732, applies here: "shorn of all context, the word" furnish "is an empty vessel." "Such a vague statutory grant is not close to the sort of clear authorization required by our precedents." *Id*.

SEC's theory also violates other fundamentals of statutory interpretation. It is hard to imagine a more extreme example of Congress choosing to "hide" an unusually large "elephant[]" in an especially tiny—and unrelated—"mousehole[]." *Whitman v. Am. Trucking Assn's, Inc.*, 531 U.S. 457, 468 (2001). Under SEC's alchemy, Congress added three words to a *broker* record-keeping provision that will now authorize SEC to establish direct surveillance and investigatory power over millions of ordinary *investor*s. A minor amendment to § 17 in 1975 is the vehicle by which Congress authorized SEC to establish a direct relationship with ordinary investors in the 21st century, where previously it had no direct relationship at all. And at the same time, under SEC's theory, authorizing SEC to create possibly the largest database in the world allowing SEC to surveil and monitor tens of millions of private citizens. This theory not only violates the "[no] elephants in mouseholes" rule, *Whitman*, 531 U.S. at 468, it violates the venerable canon against interpreting statutes to produce results that are, simply put, absurd. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000).

The SEC's theory fares still worse when one considers that Congress added those three words to § 17 in 1975. A statute's words must be given their ordinary meaning at the time Congress used them and understood in that time's background context. *See Pugin v. Garland*, 599 U.S. 600, 604–06 (2023). No one in the mid-1970s contemplated that future technology would make it possible for SEC to order the real-time production of a massive flow of records generated across the securities industry. It follows that no one contemplated it would be possible for every registered

broker in the United States to send the SEC *every* covered record the broker generated, so that SEC could scour the resulting massive database using then-futuristic analytical tools.

The background understanding of the 1975 amendment to § 17(a) also includes the mid-1970s practices for "furnish[ing]" copies of records to SEC. *See Pugin*, 599 U.S. at 605–06. At that time, SEC reviewed or obtained records from brokers, including customer information, only by conducting on-site examinations or making discrete requests for copies of records. SEC.Mem.9. SEC's own Motion confirms that these practices were the "practical reality" until SEC created the CAT. *Id.* Until then, as SEC itself states, SEC obtained copies of records from brokers only by making requests that "specif[ied] relevant securities and time periods." *Id*.

SEC's motion specifically discusses one of these regulations, § 17a-25 (SEC.Mem.8, 9, 27), which SEC issued in in 2001 to enable broker-dealers to respond in electronic format to SEC's blue-sheet requests. This regulation ties brokers' production of customer records to specific SEC "requests." 17 C.F.R. § 240.17a-25(a), (b), (c). The blue-sheet process limits SEC to specific requests "for specific securities during specified timeframes," according to SEC's Adopting Release for the CAT. 77 Fed. Reg. at 45727 (quoted at Compl. ¶ 24). *See also* Pl.Mem.9. This is consistent with the relevant portion of the *SEC Enforcement Manual* (cited at Compl. ¶¶ 11–12, 26), which documents that SEC required a basis for an investigation before making a blue-sheet request. Manual §3.2.2 ("It may be appropriate to obtain and review Bluesheet data in a variety of investigations … .").[14]

## 2.    SEC's Motion conspicuously fails to cite any precedent suggesting § 17 authorizes the CAT

---

[14] Plaintiffs did not suggest that the Manual created any rights, contrary to SEC's characterization of that argument. SEC.Mem.9. Plaintiffs' Memorandum explained that the Enforcement Manual "documents" the requirements. Pl.Mem.8.

SEC only highlights the absence of such precedent when it cites *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979). That case addressed "§ 17(a) reports," *id.* at 570, that consisted of a brokerage firm's audited financial statements, *id.* at 562, holding there is no implied right of action for damages under § 17(a), *id.* at 567–68. Consistent with § 17's purpose of monitoring securities-industry professionals, these financial statements provide information that enables SEC to "monitor the financial health of brokerage firms." *Id.* at 570. The *Touche Ross & Co.* case says nothing about SEC's authority to require covered actors to "furnish … copies," and it contains no suggestion that § 17 authorizes SEC to monitor individual investors.

SEC attempts to salvage its unbounded reading of § 17(a) by citing its discretion-granting clauses, without any context or any other textual clue they might justify SEC's radical theory. Those clauses, as set out above, authorize SEC to "prescribe" the kinds of reports that covered entities and professionals must furnish, "as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]." 15 U.S.C. § 78q(a)(1). *See* SEC.Mem.26–28. SEC does not, however, bother to say which of the three distinct components of that discretion-granting clause it purports to rely on. It appears to simply invoke all three as an undifferentiated lump, which somehow together grant SEC unlimited power over securities-industry records. SEC.Mem.26, 28.

SEC's argument fails because language of that generality cannot, without some other evidence in the statute, justify any particular rule. The D.C. Circuit illustrated this kind of failure in *New York Stock Exch., LLC v. SEC*, 962 F.3d 541, 554–55 (D.C. Cir. 2020), where it vacated a rule that imposed certain fees on stocks trades. The Court explained that "a 'necessary or appropriate' provision"—the same wording SEC relies on here— "does not necessarily empower the agency to pursue rulemaking that is not otherwise authorized" in a statute. *Id.* at 556. The court

also rejected SEC's reliance on other general language: "to facilitate the establishment of a national market system" with "due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets." *Id.* at 546–47 (cleaned up) (quoting 15 U.S.C. § 78k-1(a)(2)). This also matches or approximates the language SEC relies on in § 17. SEC's argument for the CAT is even farther afield than in *New York Stock Exchange*, because here it is citing general language from a statute enabling SEC to monitor *brokers* (and other security-industry professionals), to justify an "unprecedented"[15] power grab to track the activities of ordinary *investors*.

SEC's various other arguments about § 17 are irrelevant, rest on factual errors about pre-CAT practices, or both. For example, SEC's Motion errs outright when it states, referring to § 17, that "the SEC exercised *this* (and other) authority to require that self-regulatory organizations enhance their audit trails." SEC.Mem.27 (emphasis added). That statement is inaccurate, because the three audit-trail orders the Motion cites were *not* based, even in part, on authority from § 17. *See* SEC.Mem.27. The statement also is irrelevant to the CAT, because these orders did not require brokers, or anyone else, to provide information identifying *investors*. *Id.*

SEC then compounds the same factual error (and improper effort to contradict the Complaint) that it makes throughout its motion, asserting that brokers sent investor information to the SRO audit trails *before* the CAT. SEC's Motion states, "*Like its predecessor audit trails*, the Consolidated Audit Trail *requires ... broker-dealers* to 'maintain' and 'preserve' transactional data and customer information, and ... *to 'provide' copies of those records* to the Consolidated Audit Trail ... ." *Id.* (source of quotations is not clear) (emphases added). That is just not so. The assertion

---

[15] Chair Gary Gensler, Statement on CAT Funding (Sep. 6, 2023) (quoting Mary Schapiro, "Opening Statement at SEC Open Meeting: Consolidated Audit Trail," (July 11, 2022)).

contradicts the Complaint and SEC's own statements in the regulatory releases. *See*, *e.g.*, 77 Fed. Reg. 45727–28 & 45727 n.48 (describing the limits of [blue-sheet] data and noting that equity cleared reports did not receive customer information); 81 Fed. Reg. at 84807 (SRO audit trails did not receive customer information). As these sources establish, the pre-CAT SRO audit trails did *not* possess customer-identifying information. *See also* Schapiro Stmt.

This casual approach to statutes is part of a larger pattern at the SEC. In just the last five years, courts have rejected at least four significant SEC rules. Courts vacated two rules because SEC lacked statutory authority to issue them, *Nat'l Ass'n of Priv. Fund Mgrs.*, 103 F.4th 1097; *N.Y. Stock Exch.*, 962 F.3d 541, and held that SEC violated the Administrative Procedure Act when it issued at least two others, *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760 (5th Cir. 2023); *Bloomberg L.P. v. SEC*, 45 F.4th 462 (D.C. Cir. 2022). The CAT should be added to this list of wayward SEC rules rejected by the courts.

As is the case with SEC's deficient § 11A argument, SEC has identified nothing in § 17 that implicitly—much less "explicit[ly,]" *Inhance Techs.*, LLC, 96 F.4th at 893, or "clearly," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("UARG")—authorized it to create the CAT program. The Complaint thus pleads a claim that SEC violated the APA by issuing the CAT rule without statutory authority. Compl. Count VII. And Plaintiffs are likely to prevail on that claim, for the reasons set out in Plaintiffs' Memorandum in support of their Motion for Preliminary Injunction discussed above.

### C.  The Major Questions Doctrine Confirms § 11A Does Not Authorize the CAT

The Complaint states that even assuming *arguendo* that Congress could enact such a scheme—it cannot—the decision to do so would be a major question. Compl. ¶¶91, 92. The Major Questions Doctrine confirms the conclusion that § 11A did not authorize the CAT rule. The CAT

cannot even come close to meeting the standard under that doctrine which requires "clear congressional authorization," *Biden v. Nebraska*, 143 S.Ct. 2355, 2375 (2023) (quoting *West Virginia v. EPA*, 597 U.S. at 723) (internal quotation marks omitted). SEC's Motion conflictedly contends the Major Questions Doctrine does not even apply, but § 11A meets its exacting standard by providing the required "clear" authorization for the CAT. SEC.Mem.32–36.

SEC first argues that the CAT is not important enough to bring the Major Questions Doctrine into play. SEC.Mem.33–34. SEC rests this argument on the improper and inaccurate assertion (again) that the CAT is merely a consolidation of decades-old SRO audit trails. That assertion misstates the facts, improperly tries to rewrite the Complaint, and contradicts SEC's own statements in the CAT Adopting Release. *See* Statement of Fact, *supra*. Compl. ¶¶ 11–12, 16–19 (citing 77 Fed. Reg at 45722–23); Pl.Mem.6 (citing 77 Fed. Reg. at 45727–28 & 45727 n.48). In the same inaccurate vein, SEC asserts that the CAT merely continues the same "long-used and specific procedural mechanisms" SEC has used for decades, and that the CAT merely collects "the same type of information" SEC always had access to. SEC.Mem.33–34. To the contrary, before the CAT, neither the SROs nor SEC collected investor information on stock transactions (with *de minimis* exceptions for specific investigations). SEC even asserts that, under the CAT, SEC's "relationship with investors is not functionally different than in the 1980s." *Id*. at 34. This claim also is inaccurate and contrary to the Complaint, and SEC's pre-litigation statements. The CAT transforms SEC's relationship with investors because for the first time in SEC's long history, it subjects ordinary investors to direct surveillance by an enforcement agency. If this massive scheme infringing multiple constitutional rights is not a major question, it is hard to imagine what is.

SEC next contends that the CAT program is not economically significant. SEC.Mem.35. But SEC does not dispute that the CAT has and will continue to impose costs in the

billions of dollars, including at least $2.4 billion in implementation costs for broker-dealers. 81 Fed. Reg.at 84860. SEC contends the estimated annual costs of $1.5 billion approximate pre-CAT costs, *id.*, but SEC fails to mention that retiring pre-CAT systems will cost an additional $2.6 billion. 81 Fed. Reg. at 84866 n.2607. (Although the estimates do not use consistent categories of costs, in 2016, SEC estimated that "[d]uring the years of duplicative reporting … market participants would spend $3.3 billion in regulatory data reporting.") SEC's Motion also fails to mention that the 2016 figures it cites are badly outdated. In the eight years since 2016, costs have ballooned—according to SEC Commissioner Uyeda, they have risen "precipitously." Commissioner Mark Uyeda, *Statement on Consol. Audit Trail Revised Funding Model* (Sept. 6, 2023). For example, by 2023, costs to build the CAT climbed to more than fifteen times the 2016 estimate SEC provided in its motion, reaching at least $1 billion. Citadel Securities, Comments on SEC Funding Proposal, at 1, 16 (Jul. 14, 2023). Ongoing annual CAT costs rose to at least five times the estimate cited in SEC's Motion. 88 Fed. Reg. at 62655 ("The Commission acknowledges the comments expressing concern about increases to the CAT operating budget, particularly why it is now five times the amount estimated in the CAT NMS Plan Approval Order.") The estimated CAT budget was $1.1 billion for fiscal year 2010 when SEC first proposed the CAT and is $2.2 billion for fiscal year 2024. Pl.Mem.11–12).

SEC's attempts to assert the CAT is not *politically* significant strains credulity and is inconsistent with its own Adopting Release. SEC argues that "[t]here is simply nothing 'politically significant' about *combining preexisting audit trails* and *broker-dealer information* into one database." SEC.Mem.35 (emphasis added). SEC repeats this same sleight of hand throughout its motion. Again, as explained above, the CAT differs from pre-CAT SRO audit trails because it collects *investor* information and provides that information directly to SEC. Compl. ¶¶ 11–12, 22–

23, 32–36, 39–41, 39–41, 58; Pl.Mem.6–7 (citing CAT NMS Plan). Nothing could be more seismic or have a greater impact upon Americans' financial privacy, security and prospects than this expansion of SEC surveillance and regulatory power over ordinary Americans.

SEC also tries to brush aside the political controversy about the cyber-hacking risks the CAT imposes on ordinary investors, disparaging the risk as "entirely speculative." SEC.Mem.36. But a host of cybersecurity experts, brokers, Senators, Members of Congress, States, and others disagree. Former FBI Director James Comey issued a warning in 2014: "There are those who've been hacked by the Chinese and those who don't know they've been hacked by the Chinese." Interview by Scott Pelley, 60 Minutes, with James Comey, FBI Director, in Washington, DC (Oct. 5, 2014);[16] Todd Hollingshead, *Not a matter of it, but when*, BYU News (July 19, 2021).[17] These cybersecurity risks have triggered years of heated political controversy. *See* Compl. ¶¶ 45, 53–57.

Finally, SEC contends that its § 11A argument satisfies the Major Questions Doctrine's demanding legal standard. SEC.Mem.33. The § 11A language it relies on? Clauses directing it to "facilitate the establishment of a national market system," 15 U.S.C. § 78k-1(a)(2), and authorizing it to order SROs "to act jointly," 15 U.S.C. § 78k-1(a)(3). SEC contends this language gave it "*broad and clear*" authority, SEC.Mem.33, and also "*directly* authoriz[ed]" the CAT, *id*. at 36 (emphasis added) (citations omitted).

This argument fails for at least two reasons. First, the clauses SEC quotes are expressly limited by the detailed statutory objectives. When these objectives are given their limiting effect, neither clause can possibly be read to permit SEC to create the CAT. Second, even putting aside

---

[16]   *Available   at*   https://www.cbsnews.com/news/fbi-director-james-comey-on-threat-of-isis-cybercrime/.

[17]   *Available   at*   https://news.byu.edu/not-a-matter-of-if-but-when-byu-cybersecurity-expert-on-how-to-protect-yourself-your-data

the limiting objectives, SEC's argument contradicts itself. By definition, statutory language that is "broad" cannot also "directly" address a specific subject. Nor can that "broad" language provide the required "explicit" statutory authority for any particular rule. *Inhance Techs.*, 96 F.4th at 893. *See also N.Y. Stock Exch.*, 962 F.3d at 556 (general authorizing language in § 11A does not, without more, authorize the specific rule at issue). Here, the highly general language SEC cites is neither "clear" nor "direct" with regard to the CAT.

SEC fails to engage with the animating purpose behind the MQD. And that is that the people must have a say in the laws that govern them. The economic, political, and security displacements of the CAT have been imposed by distant, unaccountable bureaucrats who may be just as fallible as any politician as to the wisdom of such a massive economic, privacy, and personal impact on nearly every American. This is why lawmaking is and must be hard and made through a combination of powers of the two politically accountable branches. Only Congress is equipped to hold hearings and hear from all Americans, and to do so in the context of respecting their civil liberties.

Congress did not and could not possibly have intended to authorize SEC to "facilitate the establishment of a national market system" as invasive and undiscriminating as the CAT scheme. 15 U.S.C. § 78k-1(a)(2). The Exchange Act contains no language even suggesting that SEC is authorized to create a surveillance program of such "vast economic and political significance." *Util. Air Regul. Grp.*, 573 U.S. at 324. The Supreme Court in *Loper Bright/Relentless* held that "agencies have no special competence in resolving statutory ambiguities" or silence, especially those bearing on "the scope of an agency's own power." It is therefore not enough for the Commission to claim that its interpretation of § 78k(1) is "reasonable:" "In the business of statutory interpretation, if it is not the best, it is not permissible." 144 S. Ct. at 2266. The

Commission's virtually limitless reading of § 78k(1) which it argues allows it to require joint SRO action in the guise of a private limited liability company to create and fund the agency's surveillance and enforcement operations as long as the Commission deems them necessary "to protect investors"—can hardly be described as the "best" reading of that statutory provision.

Rather, CAT transforms a statutory directive to "facilitate the establishment of a national market system for securities" into a license to create a mass surveillance regime. This paradigm shift constitutes a "fundamental revision of the statute, changing it from [one sort of] scheme" of … regulation into an entirely different kind. *West Virginia v. EPA*, 597 U.S. at 728 (cleaned up).

### III. THE COMPLAINT STATES A CLAIM THAT SEC VIOLATED THE FOURTH AMENDMENT AND PLAINTIFFS ARE LIKELY TO PREVAIL ON THAT CLAIM

SEC's motion contends that Plaintiffs fail to state a claim for violation of the Fourth Amendment. SEC argues, in sum, that Plaintiffs have no property right or expectation of privacy in their investment records, that the third-party doctrine defeats any Fourth Amendment protection, and that in any event there have been no searches and seizures. *See* SEC.Mem.37. In response, the following section explains why Plaintiffs' information is protected under a privacy-based approach to the Fourth Amendment, and why the third-party doctrine does not apply here to destroy that protection. The information is likewise protected under a property-based approach to the Fourth Amendment, where the third-party doctrine is irrelevant. Finally, it explains why the CAT's automatic collection of all Americans' stock-trading information constitutes ongoing searches and seizures.

### A. The Trading Records CAT Seizes Are Protected Under a Privacy-Based Approach to the Fourth Amendment

#### 1. Plaintiffs have a reasonable expectation of privacy in their stock-trading histories

Plaintiffs have a reasonable expectation of privacy in their investment decisions. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (explaining reasonable expectation of privacy); *see also Carpenter v. United States*, 138 S.Ct. 2206, 2217 (2018) (same). The reasonableness of this expectation is obvious to any reader of SEC's own CAT rule and the related SEC releases, which repeatedly acknowledge the confidential nature of the information the CAT is collecting. *See*, *e.g.*, Rule 613(e)(4) (requiring SROs to implement "appropriate safeguards to ensure the confidentiality of [CAT] data"); 77 Fed. Reg. at 45725 (requiring "rigorous protection of confidential information collected by the central repository"); CAT NMS Plan, App. C § A.4. (addressing "The Security and Confidentiality of the Information Reported to the Central Repository (SEC Rule 613(a)(1)(iv))"). The CAT NMS Plan further acknowledges the highly sensitive nature of this information by expressly limiting the categories of CAT user who are authorized to see customer-identifying information. *See*, *e.g.*, CAT NMS Plan, App. D § 4 (Data Security). Further showing that investors' expectations of privacy are reasonable, applicable laws require brokers to maintain the confidentiality of this information, with limited exceptions.[18] Indeed, SEC routinely sanctions regulated parties who

---

[18] *See*, *e.g.*, SEC Regulation S-P, 17 C.F.R. § 248.1; 17 C.F.R. § 248.30(a) (requiring broker-dealers to adopt written policies safeguarding customers' "records and information" to ensure the customers' "security and confidentiality" and "[p]rotect against unauthorized access … of customer records"); § 248.110(a)(1) (limiting disclosure of clients' "nonpublic personal information"); § 248.15(a) (exception to comply with governing law or valid subpoenas).

breach the confidentiality of the trading information that is entrusted to them as a necessity for investors' market participation.[19]

Here, Plaintiffs' selection of stocks were confidential communications to their brokers, with whom they have confidential relationships. The brokers did not disclose their clients' identities to the stock exchanges or the SEC. *See, e.g.*, 77 Fed. Reg. at 45730 (stating that exchanges possess information identifying the broker handling an order but not the customer). Now, because of the CAT, SEC and SROs can apply advanced analytical tools to identify personal and private details of each person's financial life or investment strategy. As stressed by one SEC Commissioner who opposes the CAT, investment choices "offer a window into a person's deepest thoughts and core values," "and are a rich form of value expression." Commissioner Hester M. Peirce, *Statement in Response to Rel. No. 34-88890* (May 15, 2020) ("Peirce Stmt."). Like the cell phone location data in *Carpenter*, discussed below, this information about investors' investment choices (and charitable stock transfers) provides the government otherwise private insights into topics including investors' "political, professional, religious, and sexual associations." *Carpenter*, 138 S.Ct. at 2217.

Although SEC's own pre-litigation statements attest to the confidential, sensitive nature of investors' stock-trading histories, SEC now disputes that investors have a reasonable expectation of privacy in this information. But its argument proves far too much. SEC makes the sweeping contention that the existence of a "statutory scheme" eliminates any expectation of privacy for people who are affected by that scheme. *See* SEC.Mem.43.

---

[19] For example, SEC sanctions brokers and broker-dealers for improperly transferring customer information in violation of Regulation S-P of the Securities Exchange Act of 1934. *See, e.g.*, Dante J. Difrancesco, S.E.C. Release No. 66113, 102 S.E.C. Docket 2829 (2012) (sustaining FINRA decision); Frederick O. Kraus, S.E.C. Release No. 64221, 100 S.E.C. Docket 3046 (2011).

SEC's citation to *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978), only strengthens Plaintiff's Fourth Amendment claim—not SEC's case for dismissal. SEC quotes the Supreme Court's statement that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist." *Id.* But SEC fails to note that the Court was referring to the very few "pervasively regulated [industries]," such as liquor and firearms which involve "unique circumstances" so that warrantless searches are permitted. *Id.* The only two other industries the Supreme Court has designated "pervasively regulated" are mining and certain junkyards. *City of Los Angeles v. Patel*, 576 U.S. 409, 424 (2015). That body of law is not relevant to the entirely lawful and unregulated activity of Americans investing in the financial markets. SEC also cites *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 969 (5th Cir. 2023), but that court refused to extend the exception for pervasively regulated industries to include the charter fishing industry. *Id.*

To justify its jaw-dropping overreach, SEC contends that every investor's stock-trading records have a "public aspect" and therefore can be seized by the CAT without any legal process or limitation. SEC.Mem.43–44. But the precedents SEC cites address narrow, limited sets of documents obtained by subpoena or through focused litigation by SEC.[20] No case suggests a regulator can abuse an industry's recordkeeping rules by—without any legal process whatever—vacuuming up every legally required record in the entire industry, then searching that mass of records for possible violations of law. That, of course, is what SEC does through the CAT.

---

[20] *See Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2d Cir. 1981) (applying the "required records doctrine," which is specific to valid subpoenas for specific information); *In re Grand Jury Subpoena*, 696 F.3d 428, 433 (5th Cir. 2012) (same); *SEC v. Olsen*, 243 F. Supp. 338, 339 (1965) (SEC suit against investment advisor).

SEC asserts that stock-market investors cannot have an expectation of privacy because regulations require brokers to maintain records of stock transactions. *See* SEC.Mem.44 (citing the § 17 requirement that brokers maintain certain records, which are subject to periodic examination by the SEC). But as the Complaint alleges, Compl. ¶¶ 11–12, 2–27, SEC's access to investor names was limited to narrow circumstances governed by established procedures. The fact that the government might have targeted access to someone's papers or property under limited circumstances doesn't license SEC to stream-seize a universal, real-time record of every stock transaction by every investor in the American financial markets.

### 2. Under *United States v. Carpenter*, the third-party doctrine does not apply to the stock-trading information collected by the CAT

SEC also contends that Plaintiffs cannot have protected privacy expectations in their confidential information because of the "third-party doctrine." SEC.Mem.37–41, 43–46. Articulated in two 1970s cases, this doctrine holds that a person has no legitimate expectation of privacy in information voluntarily turned over to third parties. *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *United States v. Miller*, 425 U.S. 435 (1976). But much more recent Supreme Court authority, particularly *Carpenter v. United States*, 138 S.Ct. 2206, establishes that the third-party doctrine does not apply to the automatic, encyclopedic accumulation of data such as the stock-trading information the CAT seizes from Plaintiffs' brokers.

In *Miller*, the government identified a tax-evasion suspect, then obtained grand jury subpoenas compelling two banks to produce four months of his checks and related records. 425 U.S. at 437. The Supreme Court held that the suspect had no privacy interest in the bank records, both because he had disclosed the information they contained to his banks and because he had disclosed the checks to third parties beyond his bank. *Id*. at 443. *See also Carpenter*, 138 S.Ct. at 2216 (noting these two rationales in *Miller*). In *Smith*, the police identified a robbery suspect, then

placed a pen register on his home telephone to record the numbers he dialed. 442 U.S. at 737. The Supreme Court held that the suspect could not reasonably expect to keep those numbers private, mainly because he knew that by dialing them, he was disclosing them to the telephone company. *Id*. at 742. *See Carpenter*, 138 S.Ct. at 2216.

About 40 years later, in its 2018 *Carpenter* decision, the Supreme Court limited the scope of the third-party doctrine. The Court held that the doctrine does not apply to a cell phone user's location history data, which was stored at the user's wireless carriers. 138 S.Ct. at 2217. Drawing the distinction that was central to its decision, the Court contrasted the limited information involved in *Miller* and *Smith* with the far greater accumulation of digital information involved in *Carpenter*. Cell phone location records were "qualitatively different" from the information in *Miller* and *Smith*, the Court explained, because the cell phone data was "detailed, encyclopedic, and effortlessly compiled." *Id*. at 2216. The Court identified this automatic accumulation of information as a "new phenomenon," *id*., made possible by "seismic shifts in digital technology," *id*. at 2219.

The Court contrasted the digital data accumulated in that case with the limited information involved in the 1970s-era cases: "There is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today." 138 S. Ct at 2219. This "qualitative difference" gave the cell phone user a heightened privacy interest in his location information: The "detailed chronicle," the Court concluded, "compiled every day, every moment, over several years … *implicates privacy concerns far beyond* those considered in *Smith* and *Miller*." *Id*. at 2220 (emphasis added). *See also United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., joined by

Ginsburg, Breyer, and Kagan, JJ., concurring) (explaining that modern methods of continuous surveillance violate expectations of privacy, where traditional, "short-term monitoring" did not).

The Court then held that Carpenter had not forfeited Fourth Amendment protection for this heightened expectation of privacy by disclosing his location to third-party wireless carriers. In the digital age, the Court explained, individuals cannot reasonably function without disclosing confidential information to third-party service providers such as these carriers. 138 S.Ct. at 2219–20. Because cell phones are "indispensable to participation in modern society," it wrote, and cell phone users have "no way to avoid" disclosing their location to their wireless carriers, the Court concluded that the third-party doctrine did not apply. *Id*. at 2220.

Two steps in the *Carpenter* court's reasoning are critical here. First, in contrast with *Miller*, the extreme quantitative difference in amassing encyclopedic data causes a qualitative difference and therefore a stronger privacy interest in the sheer volume of data. And second, it recognized that increased reliance on commercial relationships where the third party stores data means that an individual no longer forfeits Fourth Amendment protection simply because the third party possesses the individual's information.

The *Carpenter* court's conclusion—that the third-party doctrine did not apply to that case's digital surveillance context—is in line with an earlier statement by Justice Sotomayor that the entire third-party doctrine is outdated. Concurring in the judgment in *United States v. Jones*, she wrote that the third-party doctrine is "ill-suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks." 565 U.S. at 417 (Sotomayor, J., concurring).

*Carpenter* limited the third-party doctrine's reach so it does not extend to the CAT. Like the defendant in *Carpenter*, investors in the U.S. stock market have a high expectation of privacy

in their trading data which many investors consider proprietary. Like the technology in *Carpenter*, the accumulation of the encyclopedic data that the CAT seizes is a "new phenomenon," *Carpenter*, 138 S.Ct. at 2216, made possible by the same "seismic shifts in digital technology" discussed in *Carpenter*, *id*. at 2219. "Prior to the digital age," *id*. at 2217, the government could not have thought of creating a "comprehensive surveillance database," Peirce Stmt., by vacuuming up a real-time record of every stock transaction by every investor on every U.S. stock exchange. Now, however, the CAT's collection of investor information "is remarkably easy, cheap, and efficient compared to traditional investigative tools." *Carpenter*, 138 S.Ct. at 2218. Also like the technology in *Carpenter*, the CAT accumulates individuals' data automatically and "for years and years." *Id*. at 2219. Before the CAT, investors had no reason to expect that by investing in the stock market, they were "assum[ing] the risk of turning over a comprehensive dossier" of every one of their investments directly to the government. *Carpenter*, 138 S.Ct. at 2220 (cleaned up). This "unprecedented" CAT (according to two SEC chairs) violates investors' pre-CAT expectations of privacy.[21]

Also as in *Carpenter*, where the Court stressed that owning a cell phone is "indispensable to participation in modern society," 138 S.Ct. at 2220, for millions of Americans investing in the stock market is essential to financial security. And investing in the stock market unavoidably generates confidential trading records maintained by investors' brokers, whom SEC requires to maintain detailed records of stock transactions. *See, e.g.*, 17 C.F.R. § 240.17a-3 (requiring broker-dealers to maintain a record of all purchases and sales of securities); FINRA Rule 4512 ("Customer

---

[21] Referring to the CAT as "unprecedented," *see* Chair Gary Gensler, Statement on CAT Funding (Sep. 6, 2023), *available at* https://www.sec.gov/news/statement/gensler-statement-cat-funding-090623 (last visited May 22, 2024) (quoting Mary Schapiro, "Opening Statement at SEC Open Meeting: Consolidated Audit Trail," July 11, 2012)).

Account Information") (requiring brokers to maintain certain information about customers and securities transactions).

It follows that, under *Carpenter*, the third-party doctrine does not extend to the investment information possessed by investors' brokers. In fact, CAT's violations of privacy expectations are far worse than the violation the Court found impermissible in *Carpenter*. There, the government sought to seize only a single customer's data, and only for the finite period of four months. 138 S.Ct. at 2212. The government even obtained court approval in advance—and yet, when the matter reached the Supreme Court, the Court *still* found a Fourth Amendment violation. *Id*. at 2220.

These conclusions receive fresh support from a new Fifth Circuit opinion, *United States v. Smith*, No. 23-60321, 2024 WL 3738050 (5th Cir. Aug. 9, 2024). *Smith* involved a geofence warrant served on Google for location records from accounts that had opted into location tracking. *Id*. at *1. The warrant required Google to search its database for records relating to a specific timeframe and location. *Id*. at *3. That is, like the CAT program described above, the warrant "'*work[ed] in reverse*' from traditional search warrants," because rather than "authorizing surveillance of a known suspect," it "conduct[ed] sweeping searches of" the entire database. *Id.* at *3 (emphasis added).

The court held that customers had a privacy interest in this information and had not waived that interest by opting to share the information with Google. *Id*. at *13. The court specifically distinguished *Smith v. Maryland*, 442 U.S. 735, because of the "digital age" need for the customers to share the information with commercial third parties: "Given the ubiquity—and necessity—in the digital age of entrusting corporations like Google, Microsoft, and Apple with highly sensitive information, the notion that users voluntarily relinquish their right to privacy and 'assume[ ] the

risk' of this information being divulged *to law enforcement* is dubious." 2024 WL 3738050 at *13 (quoting *Smith*, 442 U.S. at 745) (emphasis added). It held that the third-party doctrine did not apply. *Id*. at *13.

The Court held that, when law enforcement had sought the data from Google, it had conducted a search. *Id*. at 14. It then explained that no warrant could authorize searching this large database, because that search was "the exact sort of 'general, exploratory rummaging' that the Fourth Amendment was designed to prevent." *Id.* at *15 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). "Accordingly," the court concluded, "we hold that geofence warrants are general warrants categorically prohibited by the Fourth Amendment." *Id*. at *16.

The parallels with the CAT are obvious. *Smith* specifically distinguishes the third-party doctrine as outdated in cases—like this CAT case—involving large, encyclopedic databases maintained by third parties. It also reiterates that searching such a massive, comprehensive database for violations by unknown violators—again like the CAT—violates the Fourth Amendment.

The CAT scheme is many times worse than the facts that the Fifth Circuit found unconstitutional in *Smith*. The CAT does not merely search an existing commercial database, it uses government power to *create* a massive database for the government to search. Then, where *Smith* does not permit the government to search the relevant database even with a warrant, the CAT searches the artificially created database without any legal process at all. It continuously seizes comprehensive stock records not only for one person, but for *millions* of investors—totaling more than 400 *billion* records every day. SEC.Mem.15. The CAT *begins* by seizing a vast database. It then *works backward* and enables SEC to choose its targets from among the tens of millions of investors whose investment histories it has seized. This backwards approach enables

SEC to apply advanced data analytics to search for arguable legal violations. Because the CAT establishes this backwards surveillance regime—first seize *everyone's* data, then select targets—it lies much further outside the scope of the *Miller* third-party doctrine than the modest data collection that *Carpenter* held unconstitutional. The post-*Carpenter* third-party doctrine does not apply here. SEC's seizure of Plaintiffs' information without any legal process violates investors' reasonable expectations of privacy—and thus the Fourth Amendment.

### 3. SEC's discussion of the third-party doctrine does not contradict this conclusion

That discussion rests entirely on cases addressing technology on the *Miller* side of the digital revolution described in *Carpenter*. No cited cases address facts resembling the CAT. SEC relies primarily on *Miller*. SEC.Mem.38. But as discussed above, the *Miller* subpoena sought records for a single individual whom the government suspected of fraud, for a limited period of time, and after the government went to court and obtained advance permission. 425 U.S. at 437–438. By contrast, the CAT works automatically and continuously, assembling a "comprehensive dossier," *Carpenter*, 138 S.Ct. at 2220, of every stock transaction any investor executes. The CAT carries out the universal collection of every transaction, not only for one particular investor, but for every investor in the U.S. stock markets. The government in *Miller* could not have sought records for all customers of Miller's bank, much less from customers of every bank in the United States, based on their belief that some may have committed fraud. This difference is critical. Investors might reasonably expect the government might obtain a limited portion of their records, but only after following established legal procedures. (Similarly, homeowners know police could enter a house in unusual circumstances that could justify a search warrant, but no renter or homeowner would expect to have to turn over all of their financial records to the government as the price of occupancy.) Likewise, investors do not expect that government will seize a record of

*every* transaction they ever enter into, without court approval, and search that mass of information to determine whether the investor did something wrong—as a condition of investing their money.

Further distinguishing the CAT from the limited seizure of records in *Miller*, the CAT's mass collection of information, in real time and without any time limits, provides an intimate window into a person's life in the way the seizures in *Miller* and other cases did not. A current SEC Commissioner emphasized this intrusion when she criticized the CAT for violating "Americans' liberty and privacy." Peirce Stmt. One reason CAT would do so, she explained, is that citizens' investment choices "offer a window into a person's deepest thoughts and core values," and "are a rich form of value expression." *Id*. SEC now disputes Commissioner Peirce's view. It contends that the CAT provides no such "intimate window into a person's life" because, according to SEC, the data CAT collects "is nearly identical to the personal and financial data at issue in *Miller* and [*United States v. Gratkowski*, 964 F.3d 307, 310, 312 (5th Cir. 2020)]." SEC.Mem.40.

There is nothing "identical" about the CAT. SEC's argument ignores the factual gulf between *Gratkowski* and *Miller* on one hand, and the CAT and *Carpenter* on the other. *Gratkowski* involved a very narrow subpoena, limited to Bitcoin payments the account holder made to one specific payee (a child pornography website). 964 F.3d at 309. And *Miller* was distinguished by the *Carpenter* Court precisely because *Miller* did not involve the "qualitatively different," "detailed and comprehensive record" of activity the Court was addressing. 138 S.Ct. at 2216–17. The CAT's "detailed and comprehensive record" of every trade, without limitation, is "qualitatively different" from the relatively minor collection of records in *Miller*.

For the same reason, the other decisions SEC cites are inapposite. None of those cases involves a continual and comprehensive seizure of information anything like that carried out by

the CAT.[22] SEC also cites Plaintiffs' declarations addressing their stock transactions and expectations of privacy. SEC.Mem.40. But those declarations do not, as SEC characterizes them, say that Plaintiffs did not have an expectation of privacy when they engaged in transactions through brokers. The declarations indicate the understanding that brokers do not disclose investors' personal information to execute the transaction. This expectation was entirely consistent with the facts about the execution of those transactions, because before the CAT brokers did not disclose investor identities. *See, e.g.*, Compl. ¶¶ 11–12 (before CAT, SEC obtained investor information through blue-sheet requests or subpoenas), Pl.Mem.6 (citing SEC releases and statement of SEC Chair Schapiro), 18–19 (same) (showing that, to execute stock transactions, investors' identities were not disclosed beyond the broker). Nor could any plaintiff or investor have any expectation that their broker would turn over their investing information to the government.

## B. The Trading Records CAT Seizes Are Protected Under a Property-Based Approach to the Fourth Amendment

Plaintiffs' trading histories also should be protected under the property-based approach to the Fourth Amendment. Although authorities applying this approach have not addressed the unique facts of the CAT program, Fourth Amendment principles dictate that the information the CAT seizes should be protected as property. This information is the equivalent of the confidential business information addressed in *Carpenter v. United States*, 484 U.S. at 25–26, where the Court held that defendants' misappropriation of financial information possessed by *The Wall Street*

---

[22] *United States v. Gaulden*, 73 F.4th 390, 391 (5th Cir. 2023), involved a camera memory card, created by a third party and never even previously seen by the defendant. *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735 (1984), addressed a subpoena SEC served on unidentified "third parties" for "financial records" the Court did not describe. *Id*. at 738–39. And *United States v. Whipple*, 92 F.4th 605, 611 (6th Cir. 2024), applied the third-party doctrine where Walmart responded to a subpoena limited to information about purchases of two specific products during a period of up to seven days. These cases have nothing in common with the facts of our case.

*Journal* deprived it of "money or property" for purposes of the mail and wire fraud statutes. *See also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984) (recognizing confidential business data as property protected by the Takings Clause). And the information is protected regardless of format; it is well-established that Fourth Amendment protection applies to confidential information in digital format. *See*, *e.g., Riley v. California*, 573 U.S. 373, 399 (2014) ("digital files" stored on a smartphone were protected under the Fourth Amendment as "private effects").[23]

Investors' trading histories also have protections specific to their nature. Investors have substantial rights to exclude others from access to their information. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (the right to exclude "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights"). For example, as noted above, privacy laws prohibit brokers from disclosing their clients' nonpublic personal information to third parties, generally absent consent or unless disclosure is required by law. Investors' trading histories also are protected under various state laws, including legislation, that identify digital information as property.[24]

---

[23] *See also Carpenter*, 138 S.Ct. 2271 (Gorsuch, J., dissenting on other grounds) (referring to email as the "modern analogue" to paper records); *United States v. Warshak*, 631 F.3d 266, 285 (6th Cir. 2010) (referring to e-mails held by an Internet service provider as analogous to a paper letter) (cited in *Carpenter*, 138 S.Ct. at 2230 (Kennedy, J., dissenting on other grounds)); *United States v. Ackerman*, 831 F.3d 1292, 1304–06 (10th Cir. 2016) (Gorsuch, J.) (holding that accessing email, protected as "papers or effects," implicated Fourth Amendment and constituted a search); *Ajemian v. Yahoo!, Inc.*, 478 Mass. 169, 170 (2017) (an email account "is a form of property often referred to as a digital asset") (cited in *Carpenter,* 138 S.Ct. at 2270 (Gorsuch, J., dissenting on other grounds).

[24] *See, e.g.,* N.Y. EST. POWERS & TRUSTS LAW § 13-A-1(i) (addressing "electronic record[]s" as "[d]igital asset[s]"); TEX. PROP. CODE ANN. § 111.004 (12) (addressing "property held in any digital or electronic medium").

SEC's Motion disputes that Plaintiffs have a property-based interest in this information. SEC.Mem.41–42. But the cases SEC relies on are distinguishable based on the specific features of investors' stock-trading information and the unique facts of the CAT program.[25] None of the cited cases rules out protecting Plaintiffs' information under the property-based approach.

Finally, SEC's argument based on the third-party doctrine is irrelevant under the property-based approach. That doctrine comes into play only where the asserted Fourth Amendment protection rests on a person's expectation of privacy. *Florida v. Jardines*, 569 U.S. 1, 11 (2013).

### C.  The CAT Program Seizes and Searches Investors' Information and Records

Plaintiffs plead a Fourth Amendment claim as long as they plead a search or a seizure. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). SEC appears to dispute that the Complaint pleads a search, SEC.Mem.46. But precedent establishes that SEC's automated accessing or reading investors' information constitutes a search. *See*, *e.g.*, *Carpenter* (the government performed a search when it acquired a copy of cell-site records. 138 S.Ct. at 2220–21; *Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (in the defendant's home, police recorded the serial numbers

---

[25] *Miller* relied exclusively on *Katz*'s expectation of privacy test. 425 U.S. at 440. *United States v. Whipple*, 92 F.4th at 608, 611, did not address the property basis of the Fourth Amendment. In *Harper v. Rettig*, 675 F. Supp. 3d 190, 203 (D. N.H. 2023), where the court declined to find a protected interest in Bitcoin account records held by a virtual currency exchange, the plaintiff argued the records were "papers" but did not argue they were protected as property. The opinion does not suggest this account had the same features as an investor's account with his confidential broker, and it does not address the automatic, continual and unlimited collection of *all* of a person's information. *Zietzke v. United States*, 426 F. Supp. 3d 758 (W.D. Wash. 2019), involved facts similar to those in *Harper*, *id*. at 762, and the court concluded the defendant did not have an expectation of privacy, *id*. at 767. The court did not consider whether the records were property. *Id*. at 767–68. In *United States v. Osborn*, No. 15-cr-00058, 2023 WL 3602331, at *2 (D. Colo. May 23, 2023), the court found there was no expectation of privacy in certain bank records but did not address a property-based argument. In *Pearce v. Miele*, No. 3:13-cv-01580, 2015 WL 4546114 (D. Conn. July 28, 2015), the court applied *Miller* to hold that an account holder did not have an expectation of privacy in his bank records. *Id*. at *1. The court erroneously cited *Miller* as also stating that the account holder did not have a property interest. *Id*. at 2.

on stereo equipment); *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992) (law enforcement's photographing of defendant's property while executing a lawful search warrant constituted a search); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 338–39 (the continued holding of unlawfully collected data constitutes Fourth Amendment injury). Plaintiffs' Complaint pleads, for example, that "[u]pon information and belief, SEC searched Plaintiffs' electronically stored financial papers and business records." Compl. ¶ 164; *see also id*. ¶ 77, 156, 163, 165–68, and SEC releases state repeatedly that SEC is searching the entire database. *See, e.g.*, 77 Fed. Reg 45723 (stating that CAT will "accurately track all activity in NMS securities," and SEC will "feed [CAT] data into analytical 'alert' programs designed to screen for potential illegal activities" *Id*. at 45799).

SEC also disputes that Plaintiffs have pleaded any seizures, because, in SEC's view, the CAT does not interfere with a "possessory interest" in investors' information, SEC.Mem.46. SEC cites a single 20-year-old district court case holding that copying digital files from defendant's computer was not a seizure. *United States v. Gorshkov*, No. CR00-550C, 2001 WL 1024026, at *1 (W.D. Wash. May 23, 2001). But that court did not rely on any authority relating to digitized files, did not provide significant discussion to support its conclusion, and did not consider the significance of the government's interference with the defendant's right to exclude others from its files. *Id*. at *1–3. SEC otherwise relies only on cases addressing low-tech narrow factual scenarios and specific physical objects.

SEC does not mention, however, that at least two courts have held that copying information does constitute a seizure. Both cases concluded that copying information does interfere with possessory rights. In one decision, by the Second Circuit, law enforcement had copied a defendant's computer hard drive. *United States v. Ganias*, 755 F.3d 125, 128 (2d Cir. 2014), *rev'd*

*on other grounds*, 824 F.3d 199, 225–26 (2d Cir. 2016) (en banc). That court explained that this copying and retention of the data "deprived [the defendant] of exclusive control over those files for an unreasonable amount of time." *Id*. at 137. This deprivation, the court held, was "a meaningful interference with [the defendant's] possessory rights in those files and constituted a seizure within the meaning of the Fourth Amendment." *Id*.

Another court held that photographing and taking notes about a document interferes with a possessory interest, and therefore was a seizure. In *United States v. Jefferson*, 571 F. Supp. 2d 696, 699–700 (E.D. Va. 2008). The court emphasized in language that applies directly to the CAT, that to hold otherwise "would allow the government to ignore a narrowly circumscribed warrant in searching a premises containing volumes of documents by simply photographing the documents without removing them, and then reviewing the documents at length back at the station house." *Id*. at 704 (emphasis added). That is the same procedure the CAT uses, except multiplied millions of times over. This Court should adopt the reasoning of *Ganias* and *Jefferson*, and it should conclude that the CAT's mass collection of copies of investors' trading history constitutes both a search and a seizure.

### D.  SEC's Parades-of-Horribles Are Fanciful

Finally, SEC predicts several parades of horribles—with "staggering implications," SEC.Mem.42—if this Court concludes that CAT implicates investors' Fourth Amendment interests. Even if SEC's dire predictions were credible, they would not justify the agency's mass violations of the Constitution. Government's frustration with constitutional limitations does not justify or excuse Constitutional violations. *See* discussion at Pl.Mem.29–30. In any event, SEC's doomsaying does not survive even a cursory review.

SEC first warns that protecting Plaintiffs' stock-trading information would "open up the entire securities industry to significant liability." *Id*. But SEC fails to back this this dire warning by citing a single securities case or even a reasonable factual context for such an alarming claim. It cites *CRG Holdings LLC v. Hardman*, No. W-05-CA-235, 2006 WL 8436272 (W.D. Tex. Mar. 15, 2006), which involved a claim for breach of contract and conversion relating to sale of a manufactured home. *Id*. at \*1. The opinion states the unremarkable rule that one who "wrongful[ly]" takes control of property "to the exclusion of and inconsistent with the owner's rights" is liable for conversion. *Id*. at \*2. SEC's warning is unpersuasive for another reason, which is that stockbrokers already are exposed to liability if they mishandle their clients' records. 17 C.F.R. § 248.30(a); *see also* 15 U.S.C. § 6802. *See*, *e.g*., Frederick O. Kraus, 100 SEC Docket 3046 (under 15 U.S.C. § 6802, fining brokerage firm for transferring customers' account information to another firm without prior consent). Despite this potential liability, the sky has not fallen.

SEC then warns of possible doom for federal government programs. "Worse yet," it states, "any government program or database could be shut down." SEC.Mem.42. Again, however, its examples do not bear out this dire prediction. It first cites *Bowlby v. City of Aberdeen*, 681 F.3d 215, 224 (5th Cir. 2012), a case that involved an owner of a snow-cone stand, who sued a city alleging violations of her Fifth and Fourteenth Amendment due process rights. *Id*. at 220–21 (holding that business owner had a property interest in zoning permits and was denied due process). We are at a loss as to how this informs the question before the Court. The examples of federal programs it warns could be "shut down," SEC.Mem.42, are no more persuasive. SEC lists three programs, but it does not even attempt to say why they are like the CAT, or why they could be "shut down" if the Fourth Amendment protected stock investors against the CAT's mass seizures

of information about their stock transaction. (Moreover, SEC's citation to the three programs cannot support a motion to dismiss because they lie outside the scope of the Complaint. *Villarreal*, 814 F.3d at 766).

Finally, SEC makes the even broader warning that applying the Fourth Amendment protection against the CAT would be a "threat to the public welfare." SEC.Mem.45. If this Court acknowledges this constitutional protection, SEC contends, securities would be "left unregulated," leading to "serious abuses in a largely unregulated securities market" and even "economic calamity." *Id.* at 45 (citations omitted). This kind of doomsaying should not be credited. For SEC's first eight or more decades, it performed its role *without* violating the Constitution by conducting mass, ongoing seizures of investor information. During those eight decades, the securities markets were not "left unregulated," and no "economic calamity" resulted from requiring SEC, like all other government actors, to respect the Constitution.

There are, however, two *real* parades of horribles in this case, and they arrived when SEC began the continuous tracking of confidential information about every investor in the U.S. stock markets. The first is legal. Longstanding Supreme Court authority establishes that such an agency effort—to collect information without limitation—violates the Fourth Amendment. The Court has repeatedly stated that, even when an agency uses a subpoena (which SEC does not do in the CAT program), the Fourth Amendment forbids the agency from gathering material without limitation. *See, e.g., See v. City of Seattle*, 387 U.S. 541, 544 (1967) ("Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome") (collecting authorities). The Court has not defined the Fourth Amendment limit with precision, but it has repeatedly stated that the agency

violates the Constitution if it demands information without a limitation tethered to the purpose of the inquiry. *Id.*

The Court applied this reasoning when it took the FTC to task for attempting to scoop up documents, then searched them for evidence of legal violations. *FTC v. American Tobacco Co.*, 264 U.S. 298 (1924) (Holmes, J.). An agency would violate the Fourth Amendment, Justice Holmes wrote, if it "direct[ed a] fishing expeditions into private papers on the possibility that they may disclose evidence of crime." 264 U.S. at 306. That teaching dovetails with the Court's more recent decision in *Carpenter,* that the government violated the Fourth Amendment when it accessed a "detailed chronicle" of one suspect's activity, "compiled every day, every moment, over several years. 138 S.Ct. at 2220. The concerns that motivated the Supreme Court in *American Tobacco* and *Carpenter* are equally present in the CAT, except many times over: The CAT violates the Fourth Amendment on an industrial scale, churning out millions of times the number of violations found in those two cases.

The second parade of horribles is factual. Virtually every informed critic of the CAT knows that a massive security breach is not a matter of "if" but "when." The accumulation of all investment data will make the CAT the prime target for foreign and domestic cyberhackers. Why bother hacking a brokerage when the government is providing one-stop shopping? We know the SEC knows this, and the members of CAT LLC know this, because they spent years bickering over whether the SROs could cap their liability exposure to the princely sum of … $500. Compl.¶63 ("CAT LLC proposed an extremely low liability cap of either $500 or the amount of fees the suing party had paid CAT LLC during the relevant year," which SEC declined to include as part of the NMS plan.)

But, both SEC and CAT "LLC" know the dance around liability is a dark charade. First, this scheme sets up a putatively "private" corporation that claims all the legal protections of an LLC with SEC's participation and blessing. And the sole purpose of the scheme *is to run SEC's surveillance and enforcement operations by a private company*, an unheard-of innovation in political design that will hopefully have a short and infamous life after court review. But at the end of the day, as SEC and CAT LLC all-too-well know, both entities have and will claim sovereign immunity. *See infra* p.97. Defendants will have no liability for the losses sure to be inflicted on American investors. A more cynical, calculated, unconstitutional—and heartless—scheme is hard to imagine.

Because of the CAT's unique facts, this Court should deny SEC's Motion to Dismiss Count III, and find that Plaintiffs are likely to prevail on that claim.

## IV.   PLAINTIFFS STATE A CLAIM FOR VIOLATION OF THE FIFTH AMENDMENT

SEC disputes that Plaintiffs have sufficient property interest to support a Fifth Amendment claim, citing SEC's argument addressing the Fourth Amendment claim. SEC.Mem.47. For the reasons Plaintiffs explained in Part III.B *supra*, which sets forth in detail Plaintiffs' property interests in their stock trading, this Court should conclude that Plaintiff stock-trading histories are protected as Plaintiffs' property. Indeed, Plaintiffs' Complaint avers that "Plaintiffs also possess a substantial liberty interest in maintaining the privacy of their personal and financial records." Compl. ¶ 173.

SEC's Fifth Amendment argument also contends that *Ruckelshaus v. Monsanto*, 467 U.S. 986, means that any disclosure of confidential information destroys a property right in it. But *Ruckelshaus* states that is so only when "an individual discloses his trade secret to others *who are under no obligation to protect the confidentiality of the information … .*" *Id*. at 1002 (emphasis

added). As noted in the preceding section, Plaintiffs' brokers are under obligations to protect the confidentiality of the relevant information. SEC also cites *Harper v. Rettig*, 675 F. Supp. 3d at 203, for its reference to the third-party doctrine. As Plaintiffs also established above, however, the third-party doctrine does not apply to property-based rights. *Florida v. Jardines*, 569 U.S. at 11.

## V.   PLAINTIFFS HAVE PROPERLY STATED A FIRST AMENDMENT CLAIM

SEC Defendants argue Plaintiffs' First Amendment claims should be dismissed, although they do not specify whether they seek dismissal under Rule 12(b)(1) or Rule 12(b)(6). However, because their analysis is limited to the merits of the claims and does not address jurisdiction under Rule 12(b)(1),[26] the Motion to Dismiss the First Amendment claims is properly analyzed under Rule 12(b)(6). Under Rule 12(b)(6), this Court must accept as true Plaintiffs' allegations. *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir. 1981). And dismissal is appropriate only if, as a matter of law, Plaintiffs fail to state a claim. *Id.*

In seeking dismissal of Plaintiffs' First Amendment claim, Defendants posit that dismissal is appropriate because the First Amendment does not protect commercial associations. SEC.Mem.48. Not so.

As the Supreme Court recently explained in *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021), the Court has "'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Id.* at 606 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). The *Bonta* court added that "[p]rotected association furthers 'a wide variety of political, social, economic, educational,

---

[26] SEC Defendants do not argue Plaintiffs lack standing to present a First Amendment claim. *See* SEC.Mem.40–49. Nor would such an argument succeed because the deprivation of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.*

Government demands for compelled disclosure of private association lists or financial donations have an ugly history. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), is one of the canonical rulings of the civil-rights era—and remains essential to the rights of *all* organizations to keep their membership, dues and donor lists private from government officials. *NAACP*'s holding is seminal because it was essential to protecting those who would promote the cause of racial equality. That holding extends equally to other persons whose beliefs may provoke hostility and opposition, or entities whose members, donors, or investors could be deterred from donating or affiliating if the government were to compel a government database of Americans' financial investments (and stock donations). The Constitution promised that such lawful, ordinary, and private financial decisions cannot be the subject of compelled disclosure, search, or seizure.

The Supreme Court's recent decision in *Bonta* revealed that the abuse of government power the high court halted in *NAACP* was not limited to the civil-rights era. In *Bonta*, under the guise of financial regulation, California Attorney-General Kamala Harris threatened to punish nonprofit organizations that refused to reveal their donor information. Without any statutory authority to require such disclosures, AG Harris (and her successors) self-legislated this power and claimed that such disclosures "allow[ed] her to determine whether an organization has violated the law, including laws against self-dealing, improper loans, interested persons, or illegal or unfair business practices." *AFPF v. Harris*, 182 F. Supp.3d 1049 (C.D. Cal. 2016), *rev'd and vacated by AFPF v. Becerra*, 903 F.3d 1000 (9th Cir. 2018), *rev'd and remanded by AFPF v. Bonta*, 594 U.S. 595 (2021). Seeking to protect their associational rights, several nonprofits challenged the mandated disclosures, with the Supreme Court eventually striking California's regulation which compelled

nonprofits to disclosure their donors because it posed a risk to Americans' First Amendment rights, chilled speech and donations, and infringed upon their associational interests. *Bonta*, 594 U.S. at 618.

The lower court record in *Bonta* dispels the notion that merely asserting a governmental interest in financial regulation is enough to overcome First Amendment associational rights. Notwithstanding the government's asserted regulatory interest, the district court in *Bonta* could not find "even a single, concrete instance in which pre-investigation collection of a Schedule B [donor list] did anything to advance the Attorney General's investigative, regulatory or enforcement efforts." *AFPF v, Harris*, 182 F.Supp.3d at 1055. The district court added, "If heightened scrutiny means anything, it at least requires the Government to convincingly show that its demands are substantially related to a compelling interest, including by being narrowly tailored to achieve that interest." *Id.* The colossal, all-sweeping CAT cannot survive such scrutiny.

Indeed, *Bonta* highlights the risk to citizens' information when in the hands of the government: Even though California promised it would protect donor information, nearly 2000 donor schedules were "inadvertently posted to the Attorney General's website," exposing donors to threats, retaliation and intimidation. [27] SEC's own dismal record of data security, *see* Compl. ¶¶ 45–49, makes this risk anything but theoretical. Further, the CAT exposure of data to 3,000 people inside and out of the government makes the CAT a prime target for faithless government, contractor and outside personnel, examples of which have disgraced our government agencies, imperiled our national security, and traduced laws that prohibit misuse of government information,

---

[27] *Harris and the First Amendment: The Supreme Court Rebuked Her Use of Lawfare in California*, Wall Street Journal (Aug. 4, 2024) Available at https://www.wsj.com/articles/kamala-harris-california-attorney-general-lawfare-americans-for-prosperity-foundation-v-bonta-supreme-court-611a96f7?st=3rm6xtrrilvx48m&reflink=desktopwebshare_permalink

with regularity over the years.[28]

The decision to invest in certain securities inherently includes a choice by the Plaintiffs to associate with the issuing company. That the company is a for-profit company changes nothing: associating to further the economic ends of a business alone remains a valid and constitutionally protected interest and in no way justifies SEC's demand for data. The *Bonta* Court stressed this point, noting that it had "explained in *NAACP v. Alabama*, 'it is immaterial' to the level of scrutiny 'whether the beliefs sought to be advanced by association pertain to political, *economic*, religious or cultural matters." *Bonta*, 594 U.S. at 618 (quoting *NAACP*, 357 U.S. at 460–61) (emphasis added). "Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny," the Supreme Court held. *Id.*

Further, investment decisions today can often represent much more than a choice to associate with a company or to further the economic pursuits of a company. Stockholders associate with—or disassociate from—companies for a variety of social and cultural reasons. The various "divest" initiatives in recent years demonstrate the wide variety of associational interests that can be represented by securities ownership, from the Boycott, Divestment, and Sanctions (BDS) movement, which promotes divestment from companies that support Israel, *see, e.g.*, Asaf Shalev, *A New BDS Battlefront Emerges In Investing World, With Spotlight On Morningstar*, Times of

---

[28] Booz Allen's disclosure of Charles Littlejohn's tax return and the espionage cases against Edward Snowdon, John Lindh, and Julian Assange provide apt illustrations of the risk Americans face when rogue actors release information in the government's possession. *See also* David Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 Harv. L. Rev. 512 (Dec. 2013). (documenting massive leaking primarily from the executive branch, the absence of serious sanctions against leakers and the "government's instrumental use of the press.")

Israel (Feb. 9, 2022),[29] to boycotts of companies like Target or Bud Light and meme-stock volatility in securities such as happened with Gamestop and AMC.[30]

The rise of the Internet and social media aggravates these modern-day threats to minority opinion and unpopular organizations and those who associate with them. The Internet makes it easy to spread the word by exposing a donor or an investor and encouraging retaliation. The ease by which information can now be shared makes compelled disclosures an even greater threat to First Amendment freedoms than they were at the time of *NAACP v. Alabama*, with government compelled disclosures of Plaintiffs' investment decisions putting them at risk of the insinuations, guilt-by-association, and the cancellation culture that plagues our information society.

Turning then to SEC Defendants' contention that "Courts have long viewed the 'exchange of information about securities' as 'commercial activity' that can be 'regulated without offending the First Amendment,'" SEC.Mem.67, several fallacies are clear. First, that proposition ignores the Supreme Court's holding and analysis in *Bonta*, which held that "regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny" because it matters not whether the association seeks to advance "political, economic, religious or cultural matters." *Bonta*, 594 U.S. at 618 (quoting *NAACP*, 357 U.S. at 460–61). Relatedly, the cases SEC Defendants cite are from a time when the First Amendment protections for commercial speech were far less than the Supreme Court requires today and either ignored or predate *Bonta*.[31]

---

[29] *Available at* https://www.timesofisrael.com/a-new-bds-battlefront-emerges-in-investing-world-with-spotlight-on-morningstar/.

[30] https://finance.yahoo.com/news/target-and-bud-light-become-cautionary-tales-after-political-boycotts-093020210.html;  https://www.investors.com/research/meme-stock-bed-bath-are-meme-stocks-a-buy-now/

[31] Both *Bonta* and the Supreme Court's more recent jurisprudence on the protection afforded commercial speech, suggest a higher standard governs Plaintiffs' First Amendment claim. In this circuit, "commercial speech receives First Amendment protection" if it "is not false, deceptive or

Further, the cases relied upon by SEC Defendants are out-of-circuit and involved "information about securities" where there were clear torts or crimes. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) involved an attorney tricking vulnerable potential clients into agreement, while *SEC v. Texas Gulf Sulphur Co.*. 401 F.2d 833 (2d Cir. 1968), involved insider trading. *See also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 n.5 (1985) (false statements in a credit report not protected); *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) (injunction of articles that did not disclose payments *after full judicial review* permitted). And even then, the Supreme Court found the Plaintiffs were "entitled to some constitutional protection." *See, e.g., Ohralik,* 436 U.S. at 456. The courts merely concluded that the regulation was "in furtherance of important state interests"—what the Court described, for instance, in *Ohralik*, as "particularly strong."

None of the cases cited, however, come close to the massive data collection unmoored to either civil or criminal wrongdoing at issue in the CAT. Further, those cases all recognized at least a minimal First Amendment right at issue, but one which the government overcame under the circumstances of the case. In contrast, the CAT scheme offends the First Amendment by mandating the collection of a list of every entity the Plaintiffs choose to associate with through the purchase of securities without even a suspicion of wrongdoing. And, as in *Bonta*, SEC Defendants cannot withstand First Amendment scrutiny by intoning an "asserted regulatory interest" without "concrete" evidence the CAT scheme does anything to advance the SEC's "investigative, regulatory or enforcement efforts" beyond what the current subpoena and blue-sheet process.

---

misleading." *U.S. v. Simpson*, 741 F.3d 539, 550 (5th Cir. 2014). Since the associational decisions of Plaintiffs are presumptively not false, deceptive, or misleading, such information merits heightened scrutiny, as well as the protection from compelled government disclosure required under *Bonta*.

Further, the First Amendment includes both the right to speak and the right to remain silent. *Chamber of Com.*, 85 F.4th at 769. And here the government lacks any legitimate state interest in collecting data regarding every security transaction executed on any American stock exchange without even a sliver of suspicion of illegality. Nothing could be more burdensome. Nor in the age of boycotts and divestments in which we live can the wholesale collection of data concerning what entities in which Plaintiffs seek to associate or disassociate be considered "uncontroversial," particularly given the ability for the government and more than three thousand individuals to mine that data with artificial intelligence and then act on those automated findings.

The CAT scheme is thus different, not just in degree, but also in kind, from the blue-sheet or subpoena process by which SEC obtains information about individuals' trades. There, at least the government's investigation into potentially illegal conduct may justify the need to obtain narrow investment information related to a suspicion of potential illegality.

In sum, Plaintiffs have properly stated a First Amendment claim that SEC Defendants' CAT scheme violates their constitutionally protected rights of association.[32] The violation is doubly in play when SEC mandates the collection of information capable of revealing evidence of securities gifted to nonprofit organizations. Such potential disclosures[33] reveal Plaintiffs' further association with charitable and activist organizations deserving heightened scrutiny. Indeed, a later decision by SEC to search the CAT database—or allow bots or algorithms to do so—may represent

---

[32] Similarly, that Plaintiffs understand their brokers will comply with a subpoena or blue-slip proceeding does not eliminate their interest in keeping the government from obtaining a list of every organization in whom they seek to associate by investing in securities. Nor does the Plaintiffs' willingness to allow their brokers to be privy to that information mean the Plaintiffs have no right to object to the government and thousands of other individuals from having access to a list of all such associations.

[33] Whether the CAT database collects stock donations depends on whether the brokers treat the donation as a stock exchange, in which case the gift would be reported to CAT.

a further infringement on Americans' associational rights because such a search would, by definition, be overbroad, over-inclusive, and insufficiently focused to pass constitutional muster. For all these reasons, dismissal of Plaintiffs' First Amendment claims is inappropriate.

## VI.   THE CAT VIOLATES THE APPROPRIATIONS LAWS

SEC's CAT, as now structured, indisputably cost billions to build and will impose billions of deadweight costs on American financial markets in perpetuity to finance the agency's surveillance operations. That funding allocation among SROs was only recently set out in a regulation under which is exacts from SROs financing of the CAT in perpetuity. The legality of that scheme is under review. *See Am. Secs. Ass'n. v. SEC*, No. 23-13396 (11th Cir.).

The Miscellaneous Receipts statute, 31 U.S.C. § 3302(b), requires that federal agencies must deposit money received for the government into the Treasury. That statute is one of two complementary laws necessary to effectuate the legislature's power of the purse, the other being the prohibition of any public expenditures without a lawful legislative appropriation. These "twin pillars" of the "Principle of the Public Fisc" have been defined as follows: "All funds belonging to the United States—received from whatever source, however obtained, and whether in the form of cash, intangible property or physical assets—are public monies, subject to public control and accountability." *See generally* K. Stith, *Congress' Power of the Purse*, 97 Yale L. J. 1343, 1356 (1989). If there could be 'public money' that is not deposited in 'the Treasury' prior to expenditure," *id.* at 1357, the Congress's power of the purse is rendered "an empty shadow." *Id.* at 1357 n. 64 (quoting 19 ANNALS OF CONG. 1330–31 (1809) (statement of Rep. J. Randolph)). SEC plans to collect billions of dollars to fund its wholly unauthorized surveillance operation without depositing these enormous receipts into the Treasury. Far from being an "inverse-Appropriations-Clause" theory, SEC.Mem.54, Plaintiffs' claims are firmly rooted in the

Constitution and statutes that provide for removal from office and forfeiture of funds for public officials who fail—as is proposed here—to comply with the fiscal laws. 31 U.S.C. § 3302(d).

### Congress Itself Could Not Delegate These Powers

This Circuit recently considered a very similar scheme of agency self-appropriation through *Congressional* subdelegation of taxing power to a private corporation in *Consumers' Research v. FCC*, No. 22-60008, 2024 WL 3517592 and held that it violated Art. I, § 1 of the Constitution, which reserves taxing and appropriations power to Congress, and Congress alone. *Id.* at *8. In *Consumers' Research*, *Congress* had passed legislation that set up FCC to administer as "necessary and appropriate" a scheme that levied billions of dollars in exactions upon Americans to be collected by the Federal Communications Commission (FCC). *Id.* at *2. FCC in turn, by regulation set up a private corporation, the Universal Services Administrative Company ("USAC") to manage and administer the program. *See* 47 C.F.R. § 54.703(b) which provides for the composition of USAC's board. Here's what the en banc court had to say about such a scheme. Noting that while it "is emphatically the province of Congress to make such policy choices. …"

> it is our judicial duty to ensure that Congress pursued its goal through lawful means … Congress's instructions are so ambiguous that it is unclear whether Americans should contribute $1.37 billion, $9 billion, or any other sum to pay for universal service. Second, private entities bear important responsibility for universal service policy choices. And third, it is impossible for an aggrieved citizen to know who bears responsibility for the USF's serious waste and fraud problems. All three of those things implicate bedrock constitutional principles.

*Consumers' Rsch..* at *4.

The en banc Fifth Circuit warns: "Think about the consequences of FCC's position:

- Congress could fund Medicare and Medicaid without "taxing" anyone. It could simply allow hospital executives to set the Medicare-Medicaid budget, then have HHS rubber-stamp the hospitals' healthcare taxes, which could then be passed through to consumers' hospital bills.
- Congress could fund the Supplemental Nutrition Assistance Program ("SNAP") without "taxing" anyone. It could simply allow grocery store executives to set

the SNAP budget, then have USDA rubberstamp the grocers' SNAP taxes, which could then be passed through to consumers at the checkout register.

- Congress could fund affordable housing without "taxing" anyone. It could simply allow real estate companies to set the affordable housing budget, then have HUD rubber-stamp the companies affordable housing taxes, which could then be passed through to consumers as new line items at closing or in monthly surcharges for rent.

We could go on. But you get the point: All of these are obviously taxes. So while '[d]istinguishing a tax from a fee often is a difficult task,' *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021) (citation omitted), the analysis here is straightforward. Congress has bestowed upon FCC the power to levy taxes, and we accordingly conclude that it has delegated its taxing power."

*Id.* at *9.

It takes no effort at all to add the CAT to this list of hypothetical usurpations of power: SEC could fund its CAT without having to bother with the pesky appropriations process. It can simply require SROs to fund whatever surveillance and enforcement schemes SEC deems appropriate "to protect investors," SEC.Mem.44, without any statutory authority at all. The only salient difference is that unlike the USF scheme, no American will have participated in the decisionmaking about his or her surveillance, exposure to risk, regulation, or taxation because, unlike *Consumers' Research*, Congress has passed no statute authorizing any such scheme.

The *Consumers' Research* court concluded:

American telecommunications consumers are subject to a multibillion-dollar tax nobody voted for. The size of that tax is *de facto* determined by a trade group staffed by industry insiders with no semblance of accountability to the public. And the trade group in turn relies on projections made by its private, for-profit constituent companies, all of which stand to profit from every single tax increase. This combination of delegations, subdelegations, and obfuscations of the USF Tax mechanism offends Article I, § 1 of the Constitution.

*Id.* at *31.

The *Consumers' Research* case is so devastatingly on point to the CAT that one despairs where to stop block quoting from it. So we will for now. But underscoring all of these observations

80

that are fatal to the CAT, one must remember that at least Congress *set up* the Universal Service Fund ("USF") that this Circuit held clearly violated the nondelegation doctrine. Here, there is no such Congressional delegation, no representative participation in the legislative decisionmaking, no appropriations viz *CFPB v. CFSA*, 601 U.S. 414 (2024) ("*CFSA*") no law at all. Instead, just the raw exercise of SEC power.

The Fifth Circuit noted that at least the USF had the "laudable objective," *Consumers' Rsch.*, 2024 WL 3517592 at *2, of subsidizing voice and internet services in rural communities. Whereas here, SEC's objectives of Orwellian surveillance and greasing the wheels of enforcement by ignoring constitutional constraints are neither laudable nor endorsed by Congress. In fact, the Constitution prohibits them. *See* William Barr, *The SEC Is Watching You*, Wall Street Journal April 15, 2024.[34] ("But the whole point of the Fourth Amendment is to make the government less efficient by making it jump through hoops when it seeks to delve into private affairs. For an agency to argue that it should be able to avoid these hoops to make investigations easier is to assert that it should be exempt from the Fourth Amendment.")

SEC's brief opposition to this fundamental, structural constitutional claim is to optimistically aver that "the Appropriations Clause is inapplicable to self-regulatory activities like the [CAT.]" *See* SEC.Mem.53–55. The only authority it cites for this revolutionary proposition is the Supreme Court's decision in *CFSA*., 601 U.S. 416, which it claims holds that the Clause only "applies to money 'drawn from the Treasury.'" To the contrary, *CFSA* only makes plaintiffs' fiscal statutory and constitutional arguments stronger.

---

[34]   *Available    at*   https://www.wsj.com/articles/the-securities-and-exchange-commission-is-watching-you-surveillance-4e782f82?st=2bzjr6izmhl7fsb&reflink=desktopwebshare_permalink

*CFSA* held that *Congress* may adopt a broad range of funding mechanisms through "statute," as it did for the CFPB in Dodd-Frank. By contrast, Congress did not authorize the CAT at all, much less any funding mechanism. The question presented by the plaintiffs is whether a nominally independent commission in the *Executive Branch* can order third parties to create a limited liability company and fund the Commission's surveillance and enforcement scheme completely outside the appropriations and receipts laws without any express authorization from Congress. Precisely because the Constitution gives Congress control over the public fisc, the Executive Branch may not self-appropriate, collect, and spend billions of dollars it exacts from the SROs unless "expressly authorized" by Congress. *OPM v. Richmond*, 496 U.S. 414, 426 (1990) (internal quotation marks and citation omitted). Indeed, under the reading of *CFSA* advanced by SEC, agencies could remove new or controversial operations from Congressional oversight altogether through the simple expedient of promulgating regulations that conscript the SROs or other regulated entities into funding the agencies' operations. Nothing in *CFSA* supports such an evasion of the Constitution's command that firmly places the appropriations and spending power in Congress.

The en banc Fifth Circuit in *Consumers' Research* was especially troubled by the breadth, scope, and size of Congress's delegation of the multi-billion USF program to FCC "because the statute insulates FCC from the principal tool Congress has to control FCC's universal service decisions—the appropriations power. … Ordinarily, when Congress delegates broadly, it retains a residuum of control over agency action because the agency is powerless to act without a congressional appropriation of funds." 2024 WL 3517592 at *13 (citation omitted). Indeed, the Fifth Circuit in *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 232 (5th Cir. 2022) (en banc) found appropriations control was key to saving the CFPB's congressional funding scheme.

("Congress's supremacy in fiscal matters makes the executive branch dependent on the legislative branch for subsistence, thereby forging a vital line of accountability between the executive branch and the legislative branch and, therefore, the people. Recent history confirms that Congress's appropriations powers have proven a forcible lever of accountability: Congress has tightened the purse strings to express displeasure with an agency's nefarious activities and even to end armed combat." (Jones, J., concurring.). Scholars justifying administrative power agree that Congress's inviolable retention of appropriations power serves to rein in administrative power and ensure that agencies remain subservient to the will of the people as expressed through their elected representatives. *See* Jonathan H. Adler & Christopher J. Walker, *Delegation and Time*, 105 Iowa L. Rev. 1931, 1957 (2020) ("[l]imiting appropriations is an effective way to limit an agency's exercise of delegated power.").[35]

In *Consumers' Research*, the FCC "concluded that 47 U.S.C. § 254 constitutes 'a permanent indefinite appropriation,'" at which the court looked askance. 2024 WL 3517592 at *13 n.10. But the petitioners in *Consumers' Research* did not formally raise an appropriations clause claim in that matter, *id*., likely because the USF scheme at least had an initial Congressional stamp of approval. Nonetheless, the Fifth Circuit directly addressed appropriations, noting that the FCC USF scheme was "wholly immunized from the oversight Congress exercises through the regular appropriations process." *Id*. at *16. Whereas, here, the CAT is funded by a renegade, unlimited scheme of perpetual self-appropriation without a shred of initial Congressional authority for the evasion.

---

[35] *See also* Christopher J. Walker, *Restoring Congress's Role in the Modern Administrative State*, 116 Mich. L. Rev. 1101, 1116 (2018) (explaining the tools Congress has, including the appropriations power, "to rein in the administrative state and prevent federal agencies from abusing their consolidated lawmaking and law-execution powers").So, yes.

### *Congress Itself Cannot Delegate Taxing Power to Agencies*

The appropriations power was not the only concern of *Consumers' Research*. The court turned to foundational principles that establish that "limitations on the taxing power have long been the mechanism through which the people curb the excesses of unelected power. *See* THE FEDERALIST No. 58 (J. Madison): ("[The House], in a word, hold[s] the purse that powerful instrument by which we behold, in the history of the British Constitution, an infant and humble representation of the people gradually enlarging the sphere of its activity and importance, and finally reducing, as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government.") *Consumers' Rsch.*, 2024 WL 3517592 at *16 n.13. This is all the more true when an agency is self-funding its expanded surveillance operations and regulatory power to reach ordinary Americans. SEC cannot legislate this sea change.

### *Nor Can Agencies Subdelegate Taxing Power to Private Entities They Establish by Regulation*

Describing the USF fee-setting program as both private delegation and "de facto abdication," *Consumers' Research*, 2024 WL 3517592 at *19, notes that FCC has not delegated to private entities "a trivial, fact-gathering role," *id.* at *21:

> It has delegated the power to dictate the amount of money that will be exacted from telecommunications carriers (and American consumers in turn) to promote "universal service." In other words, it has delegated the taxing power. And the delegation is not even "to an official or an official body, presumptively disinterested," but rather to private persons vested with no government power and with interests that "often are adverse" to those whom they are taxing.

*Id.* (citation omitted).

Liberty requires accountability. Where do American investors go to raise their concerns about the invasion of their account information, the threat to the privacy and security of their investments posed by the CAT, and the SEC's expansion of regulatory power to the surveillance and oversight of ordinary Americans' perfectly legal trading in securities?

*Taxation and Appropriations by any other name…*

SEC attempts to characterize the financial side of this multi-billion-dollar surveillance scheme as "compliance costs," *e.g.*, SEC.Mem.14, but fails to cite any precedent for an agency setting up a limited liability company to conduct the agency's own surveillance and enforcement operations. There simply is no precedent for the CAT or its LLC, a scheme which also unlawfully imposes a tax on the financial markets that will be borne by all investing Americans.

Arguing "[t]hat is not how courts understand taxes for constitutional purposes, *see, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012) (noting that "the essential feature of any tax [is that] [i]t produces at least some revenue for the Government" or regulates conduct), SEC precisely makes Plaintiffs' point for them. The CAT brings in billions in *revenue* to pay for the SEC's CAT operations which also lawlessly collects information on Americans' perfectly lawful *conduct* in trading on the securities market.

Finally, it is one thing for self-regulatory organizations to fund "'their frontline responsibility to supervise their members' compliance with their own rules and the federal securities laws,'" SEC.Mem.54 (quoting 88 Fed. Reg. at 62,672), and quite another for the Government to establish by regulation a limited liability company to set up and operate the Government's multi-billion-dollar panopticon in perpetuity. The CAT is an unprecedented innovation in political design worthy of a pre-constitutional autocracy. The only "radical" issue before the court is the legality of such a Congressionally unauthorized scheme.

## VII. SEC's and CAT LLC's Arguments With Respect to Counts VI and VII of the Complaint Lack Merit, Are Inharmonious, and Make No Sense

### A. The Administrative Procedure Act

Grasping at straws, SEC argues that Plaintiffs' APA claims in Counts VI and VII are duplicative of their constitutional claims and should accordingly be dismissed. SEC.Mem.55–56. This makes no sense. And SEC cites no authority whatsoever for this novel proposition.

The APA provides that a court must "hold unlawful and set aside agency action … found to be … contrary to constitutional right" as plaintiffs plead in Count VI, and that courts "must hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). It is common practice to plead constitutional, statutory and APA claims in tandem, and the Federal Rules specifically provide for pleading in the alternative. *See* Fed. R. Civ. P. 8(a)(3). As just one example of why SEC cannot be correct on its duplicity argument, the Supreme Court recently considered constitutional, statutory, and APA claims pleaded in tandem in *Loper Bright Enters. v. Raimondo* and *Relentless, Inc. v. Dep't of Com.*, 144 S.Ct. 2244 (2024) and opted to decide the case under the APA. Nothing in Rule 12 allows the Defendants to control what claims Plaintiffs may bring before the court on duplicity grounds.

CAT LLC, on the other hand, re-asserts SEC's argument that Plaintiffs were permitted to challenge the CAT rule only by complying with 15 U.S.C. § 78y(a) or (b), which permit persons aggrieved by an agency order or rule to petition the relevant court of appeals within 60 days after the agency issued the rule. CAT LLC contends that, because plaintiffs did not file such a petition, SEC retains its sovereign immunity. But Plaintiffs explained above why this suit is properly filed in the district court. *See supra* sections I.A & B.

CAT LLC, however, persists in arguing that 15 U.S.C. § 78y precludes jurisdiction in this court, so that SEC retains sovereign immunity and from this leverages a novel defense contending

that SEC is a required party that "must be joined" under Fed. R. Civ. P. 19(a)—and that because SEC cannot be joined, Rule 19(b) requires dismissal of the case against CAT LLC.

CAT LLC's recast argument is puzzling. First, Rule 19(a) only applies "[i]f a person has not been joined as required." Fed. R. Civ. P 19(a)(2). There is no dispute that Plaintiffs sued both SEC and its Chairman in his official capacity. CAT LLC proffers no argument otherwise. Instead, by projecting an illusory immunity, it seeks to construct a scenario with a missing co-defendant and thus conjure up a case for its own dismissal.

In support of this hypothetical case for dismissal for failure to join a necessary party, CAT LLC first cites *Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 479–80 (6th Cir. 1972) which is wholly inapposite. There, on appeal, the Sixth Circuit stated that to decide the case, it "would be compelled to hold…that [a non-party agency] misinterpret[ed] its own guidelines … [and also] misconceived its function and prerogatives" under an act of Congress. *Id*. Hesitant to rule without affording the agency the opportunity to be heard, the circuit court dismissed without prejudice to allow the plaintiffs to join the agency, because it was "permissible for the appellants to join HUD as a defendant and assert their claims again in the district court." *Id*. Sovereign immunity makes no appearance in *Boles* nor does the case stand for the proposition for which it is cited.

*Friends of DeReef Park v. Nat'l Park Serv.*, No. 2:13-cv-3453, 2015 WL 12807800, at *8–9 (D.S.C. May 27, 2015) and *Cal. Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1149 (E.D. Cal. 2012), *aff'd*, 784 F.3d 500 (9th Cir. 2015) are also inapposite. In both, the district courts determined that federal agencies *that had not been sued* were necessary parties. In *DeReef*, the Quiet Title Act conferred statutory immunity on the Park Service and in *Cal. Dump Truck*, the Clean Air Act had a federal court jurisdiction-stripping provision that made circuit review "exclusive." But recall, here the Fifth Circuit and the Supreme Court have already decided that

87

§78y is not exclusive and that SEC can be sued in district court. Because both the Supreme Court and the Fifth Circuit have recognized that the '34 Act raises no such bar and confers no such immunity, CAT LLC's attempted retread of exclusive circuit review has no traction.[36]

Controlling Supreme Court and Fifth Circuit authority eviscerates these "exclusive review" claims and puts to rest SEC and CAT LLC's odd and inharmonious last-ditch arguments.

## B. Mandamus and Class Action

CAT LLC's arguments with respect to mandamus are both incorrect and premature. In *Bailey v. Romney*, 359 F.Supp. 596, 599 (D. D.C. 1972), a plaintiff pleading substantial questions under the Constitution and federal laws, including promulgating unlawful regulations, was found to be entitled to mandamus relief, and jurisdiction under 28 U.S. 1361. And a district court was found to have mandamus jurisdiction in a class action to enjoin government violations of the First Amendment. *Burnett v. Tolson*, 272 F. 2d 877 (4th Cir. 1973).

It is true that statutory mandamus under 28 U.S.C. §1361 is available only against government actors. But at this stage of pleading, Plaintiffs maintain both Defendants are just that. CAT LLC is SEC's creation, its Rule 613 "Surveillance, LLC." In the only mandamus case cited by CAT LLC, the court held that because the plaintiff had not pleaded a mandamus count, the court found no mandamus jurisdiction. *Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 506–07 (5th Cir. 2018). The government had also argued that no mandamus jurisdiction could exist because

---

[36] *Gleave v. Graham*, 954 F. Supp. 599, 613 (W.D.N.Y. 1997), *aff'd*, 152 F.3d 918 (2d Cir. 1998) (per curiam) also has no relevance here. That case merely held that where the constitutionality of regulations was not challenged, the agency was not a necessary party and, accordingly "joinder of the [agency] as an indispensable party was not required" and the complaint "may not be dismissed." *Id.* Here, constitutionality *is* at stake and SEC was a party from the outset. CAT LLC's *cf.* cite further underscores the irrelevance of this line of argument. *EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1081–87 (9th Cir. 2010) stands for the propositions that agencies *can* be joined to claims seeking injunctive relief where, as here, they lack sovereign immunity.

plaintiff had not exhausted administrative remedies. The court rejected that argument at the pleading stage, however, indicating that exhaustion is not a requirement to establish mandamus jurisdiction. *Id*. at 506. So, the case indicates (in dictum) that mandamus jurisdiction lies wherever a plaintiff seeks "to compel an officer ... to perform an allegedly nondiscretionary duty owed to the plaintiff," the very remedy sought here against the state actors. Thus, the availability of mandamus relief—whether statutory or a yet-to-be pleaded common-law action for mandamus, should await another day. Fed. R. Civ. P. 8(a)(3)'s liberal pleading standards apply to "a demand for the relief sought, which may include relief in the alternative or different types of relief."

Finally, CAT LLC's arguments, improperly raised only in a footnote, CAT.Mem.47.n.23 regarding when Plaintiffs should move to certify a class also lack merit and have no bearing on this Court's decisions on preliminary stay or relief, or upon dismissal of these claims. This argument evidences a profound misunderstanding of both class actions and the relief sought here under the APA. CAT LLC cites no authority that a class must be certified before a preliminary injunction is sought. Moreover, recent Supreme Court and circuit decisions, including in this Circuit, confirm that vacatur is the appropriate remedy when SEC "has exceeded its statutory authority in adopting the … Rule." *Nat'l Ass'n of Priv. Fund Mgrs.*, 103 F.4th at 1114: "Under section 706 of the APA, when a court holds that an agency rule violates the APA, it 'shall'—not may—'hold unlawful and set aside' [the] agency action.' … Because the promulgation of the Final Rule was unauthorized, no part of it can stand. Accordingly, we VACATE the Final Rule." *Id*.

As a recent law review article elucidates:

Courts, litigants, and scholars should not be confused by the ongoing debate about nationwide or so-called "universal" injunctions: the proper scope of remedies under the Administrative Procedure Act and other statutes providing for judicial review of agency action is erasure. … [The APA ] instructs courts to "set aside" an unlawful "rule," … [and] similarly authorizes universal preliminary relief from agency action.

89

T. E. Gaiser, M. Sridharan & N. Cordova, *The Truth of Erasure: Universal Remedies for Universal Agency Action* at 1–3, Chicago L. Rev. (forthcoming).[37]

That article observes that the APA offers the "universal remedies of stay and vacatur, which are distinct from preliminary and permanent injunctions." *Id.* at 19. "[T]o 'set aside' a rule is to vacate it." *Corner Post*, 144 S.Ct. at 2463 (Kavanaugh, J., concurring); *see also id.* at 2462 ("The APA prescribes the same 'set aside' remedy for all categories of 'agency action.'"); *Bridgeport Hospital v. Becerra*, 108 F.4th 882, 890–91, n.6 (D.C. Cir. 2024) (Walker, J.) (Vacatur is the normal and correct remedy for unlawful agency action.) Because "an agency literally has no power to act … unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n*, 476 U.S. at 374, "the Constitution not only permits, but requires, unlawful agency action to be subject to vacatur." Gaiser, et al., at 2. Vacatur of Rule 613, the remedy provided by law, sets aside the rule for everyone, not just the parties to the case, which means no nationwide injunction is necessary. For that reason as well, it doesn't matter whether that relief is granted before or after seeking certification of the class.

## PLAINTIFFS' RESPONSE TO QUESTIONS UNIQUE TO CAT LLC'S MOTION TO DISMISS

### I.   THIS COURT HAS PERSONAL JURISDICTION OVER CAT LLC

Specific personal jurisdiction exists when a defendant "purposefully avails itself of the privilege of conducting activities within the forum state," and the litigation relates to those activities, such that the exercise of jurisdiction does not violate due process.[38] *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Hanson v. Denckla*, 357 U.S.

---

[37] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4830962.

[38] "[T]exas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment …" *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020).

235, 253 (1958)). In determining specific personal jurisdiction, a court evaluates: "(1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)).[39]

At the motion to dismiss stage, unless a court holds an evidentiary hearing, plaintiffs need only present evidence sufficient to support a prima facie case of personal jurisdiction *See Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) (reversing dismissal where district court applied preponderance of the evidence standard without conducting an evidentiary hearing); *Def. Distributed*, 971 F.3d at 490 (A court accepts "the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolve[s] all controverted allegations in the plaintiff's favor.") (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001)).

CAT LLC made the purposeful decision to direct its activities toward Texas and this Court may exercise specific personal jurisdiction for claims related to CAT's operation.

The United States Supreme Court has stated that "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (quoting *Travelers Health Ass'n v. Virginia*, 339

---

[39] "If the plaintiff establishes the first two prongs, the burden shifts to the defendant to make a 'compelling case' that the assertion of jurisdiction is not fair or reasonable." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019).

U.S. 643, 647 (1950)). The "constitutional touchstone" of specific personal jurisdiction is "whether the defendant purposefully established 'minimum contacts' in the forum State." *Id*. at 474 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). When a defendant "has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there … ." *Id*. 471 U.S. at 475–76 (cleaned up) (quoting *Travelers Health Ass'n*, 339 U.S. at 648). Moreover, when a defendant purposefully directs its activities towards residents of a forum, the defendant's lack of physical contact with the forum will not defeat jurisdiction. *Id*. at 476.

In contrast, personal jurisdiction is not created when a plaintiff is the only connection between a defendant and forum, *Def. Distributed*, 971 F.3d at 495, when the defendant's contacts with the forum are "random, isolated, or fortuitous," *see Ford Motor Co.*, 592 U.S. at 359, or when the defendant's relationship with the forum results from the "unilateral activity" of someone other than the defendant, *see Burger King Corp.*, 471 U.S. at 475.

Here, CAT LLC collects highly personal data from thousands of broker-dealers in the State of Texas, about tens of thousands of Texas investors and millions of securities transactions originated or completed in the State of Texas. Further, CAT LLC seeks to fund its formation and operations by issuing invoices to broker-dealers, including the thousands of broker-dealers in Texas. The individual Plaintiffs' claims relate to CAT LLC's collection of data involuntarily provided and intended to be funded in part by Texas investors, thus this Court has jurisdiction over CAT LLC.

## A.    CAT LLC Purposely Directs Its Activities Toward Texas.[40]

CAT LLC admits that broker-dealers have been reporting to the CAT on a daily basis since 2020 and it has been receiving customer, account, and other "materially identical" data from brokers since 2022. CAT.Mem.1, 11. The CAT "incorporates hundreds of billions of records each day." *Id*. at 9. "[B]roker-dealers are *required* to report data on each order, modification, cancellation, and executed transaction in which they play a part." *Id*. "That data flows into the CAT's order-and-transaction database…" *Id*. "Broker-dealers *must* also report … [to] a separate CAT database." *Id*. at 9–10.

Upon information and belief, there are tens of thousands of broker-dealers in Texas who are required to report information to CAT LLC databases. Investing Texans use Texas broker-dealers to facilitate their trades. One of CAT LLC's participants, FINRA, provides a public "BrokerCheck" website that allows investors to verify whether a broker-dealer is registered with FINRA. *See https://brokercheck.finra.org*. Searching the FINRA BrokerCheck for brokers in Texas yields a list of over 56,000 individuals and over 4,000 brokerage firms.[41] Thus, thousands of Texas brokerages have been reporting data on millions of securities transactions originated or completed in Texas to CAT LLC for years and will continue to do so barring relief from this Court.

---

[40] While CAT LLC faults Plaintiffs for not pleading the facts establishing personal jurisdiction, such affirmative pleading is not required. *See Allstate Ins. Co. v. Scarbrough*, No. 3:15-cv-00114, 2016 WL 10587685, at *3 (N.D. Miss. Sept. 15, 2016) (relying on authority interpreting F.R.C.P. 8(a)(1) to find that plaintiff "was not required to plead the basis for personal jurisdiction over the parties in its complaint."); *Wedge Grp., LLC v. Kiley Madison, Inc.*, No. 11-501, 2011 WL 2935049, at *1 (E.D. La. July 19, 2011) ("Courts have established that detailed pleading with respect to personal jurisdiction is not required.").

[41] *See* Exh. A, Decl. of Thomas Curro.

Further, but for administrative delays, in April 2024 CAT LLC would have started issuing monthly invoices to the Texas brokers reporting on Texas-based trades.[42] CAT LLC intends to bill Executing Brokers not merely to defray its ongoing and future operating costs, but to fund its very formation and the creation of the CAT program. SEC already approved the CAT Funding Model, which mandates allocating CAT costs to Executing Brokers. *See* Securities Exchange Act Release No. 34-98290 (Sept. 6, 2023), 88 Fed. Reg. 62628 ("CAT Funding Model Approval Order"). The Chair of the CAT LLC Operating Committee has represented that failure to approve imposing costs on industry members/brokers "jeopardiz[es] the continued viability of CAT." *See* CAT LLC, Comment Letter to SEC at 3 (June 13, 2024).[43]

The CAT was created with the intention that it would obtain data from Texas, as well as from every other state. The SEC ordered the CAT into existence with the purpose that it collect data about every eligible securities trade. Compl. ¶¶ 100–03; CAT NMS Plan §§ 2.6, 6.4, App. C, App. D. The NMS CAT Plan was adopted by order of the SEC.[44] The CAT was not designed, and CAT LLC was not formed, with the notion that CAT activities would be limited only to the states of CAT LLC's choosing. CAT cannot perform the function the SEC demanded without obtaining

---

[42] *See* FINRA Form 19b-4 filed with the SEC on Jan. 2, 2024 (proposing immediate effectiveness to rule that would allow CAT LLC to impose fees on Industry Members, specifically Executing Brokers for the buyer and Executing Brokers for the seller, beginning in April 2024 based on March 2024 trading to recover historical costs associated with the CAT Plan). *Available at* https://www.finra.org/sites/default/files/2024-01/sr-finra-2024-002.pdf; SEC Release No. 34-99363, SR-FINRA-2024-002, Jan. 17, 2024 (suspending proposed rule change and instituting related proceeding) *available at* 89 Fed. Reg. 10850 (Feb. 13, 2024) and https://www.sec.gov/files/rules/sro/finra/2024/34-99363.pdf.
Regarding CAT LLC's invoicing all participating brokers, *see also* CAT NMS Plan § 11.4 (Collection of Fees).
[43] *Available at* https://www.sec.gov/comments/sr-finra-2024-002/srfinra2024002-482411-1380614.pdf.
[44] SEC Rel. No. 34-79318; File No. 4-698 (Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail) (Nov. 15, 2016). The CAT NMS Plan is Exhibit A to this Order.

data from Texas brokers about Texas-based trades, the majority of which are likely transacted at the direction of Texas investors.

CAT LLC collects data about tens of thousands of Texas investors such as the Individual Plaintiffs and its funding model depends on billing the thousands of Texas Executing Brokers who are required to provide millions of lines of data about Texas-associated trades. The Court thus cannot accept CAT LLC's self-serving claim that "CAT LLC has no … regular activity in Texas." CAT.Mem.11.

### B. CAT LLC's Ties to Texas Are Not Random, Isolated, Fortuitous, or of Any Other Nature that Precludes Jurisdiction.

CAT LLC is haled into this Court based on its own intentional activities, not due to inadvertent, random, isolated, fortuitous, or otherwise inconsequential contacts with Texas.

CAT argues that there cannot be jurisdiction merely because Plaintiffs live here; that it cannot be subject to jurisdiction based on the "unilateral activity" of others. CAT.Mem.16. That is true enough, but also a non-sequitur. CAT's business design and Funding Model mandate that it collects data from Texas brokers about Texas investors and that it issues monthly invoices to Texas businesses. It is the purposeful decision of CAT LLC and the other Defendants to obtain millions of data inputs from Texas every business day. Certainly, Plaintiffs have not chosen to do business with CAT LLC and are not responsible for CAT's involvement with Texas or its aggregation of data about Texas investors and brokers. Nor did Texas brokers seek out CAT LLC's services. The connections CAT LLC has with Texas are the intentional choice of CAT LLC and its creators; they cannot now disclaim an intention to direct CAT LLC's activities toward Texas markets.

Nor are CAT LLC's attempts to compare itself to a private commercial company apt. In resisting jurisdiction, CAT LLC notes that it does not advertise or solicit business in Texas.

CAT.Mem.16. Under that logic, no state would have specific personal jurisdiction over CAT LLC. CAT LLC is a creature of SEC's making. SEC created CAT LLC by rule to perform or facilitate a national regulatory function. CAT LLC does not have to advertise or solicit business anywhere, because brokers are required by regulation to provide data to CAT LLC. Nor is CAT LLC a hapless purveyor, surprised when the goods it introduced into the stream of commerce find their way to Texas; rather CAT's very mission could not be accomplished unless it directs its activities at Texas brokers and investors.

Further, given its universal market surveillance and intended monthly billing of Texas broker-dealers, CAT LLC's attempt to cast itself as the host of a passive website or to analyze its conduct as "the flow of digital information," is misplaced. *See* CAT.Mem.16–17. Generally, if an entity "enters into contracts with the residents of [a] foreign jurisdiction that involve the knowing and repeated transmission of computer files over the internet," the entity is subject to jurisdiction for claims arising out of or relating to those contracts or files. *Admar Int'l, Inc. v. Eastrock, LLC*, 18 F.4th 783, 786 (5th Cir. 2021). If the entity has a "passive" website that only universally transmits information, that conduct alone does not provide a basis for jurisdiction. *Id.* For anything in between, courts evaluate the level of interactivity and the nature of the exchanged information to determine whether a defendant has availed itself of the forum. *Id.*

This paradigm either favors Plaintiffs or is inapposite; CAT LLC has a relationship with Texas entities that involves the knowing and repeated transmission of files between Texas entities and CAT LLC. First, because of CAT LLC's unique function in the regulatory scheme, CAT LLC does not need to "enter into contracts." Indeed, CAT LLC is much better situated because brokers are required by law to provide data to CAT LLC. 17 C.F.R. § 242.613(a)(3)(v); FINRA Rule 6800 series (Consolidated Audit Trail Compliance Rule). The brokers do not get to pick and choose the

terms of their dealings. Without contracts, Texas actors are forced into a legally obligated relationship with CAT LLC "that involve[s] the knowing and repeated transmission of computer files over the internet," – thousands of files, every business day. CAT LLC acknowledges that the CAT receives "hundreds of billions of records each day." CAT.Mem.9.

Second and relatedly, CAT LLC is not the sort of "passive" website envisioned by *Admar* and other similar cases. In the prototypical passive website case, it is the plaintiff or another actor who makes the choice to interact with the website. In that situation, there is no indication of the website host specifically intending to do business wherever the plaintiff/purchaser might be located. Here, Texas brokers are mandated to do business with CAT LLC and CAT LLC cannot, by its very purpose, make a choice NOT to project its activities into Texas. CAT LLC's interactions with Texas entities are purposeful and certainly not random, isolated, or fortuitous.

Third, CAT LLC conveniently ignores that its expenses will be recouped from the monthly invoices it electronically sends to broker-dealers, including in Texas. Brokers are compelled by governing rules to pay these invoices. *See* CAT NMS Plan § 11.4 (Collection of Fees); FINRA Rule 6898. That intended invoicing and creation of obligations in Texas to fund collection of Plaintiffs' data will also involve "knowingly and repeatedly transmi[tting] computer files over the internet" to bind Texas entities. CAT LLC has and will "purposely direct[] its activities toward" Texas and "purposefully avail[] itself of the privileges of conducting activities" here. *Seville v. Maersk Line, Ltd.*, 53 F.4th 890, 895 (5th Cir. 2022).

Here CAT LLC is less like a commercial actor and more like the New Jersey Attorney General over whom the Fifth Circuit confirmed personal jurisdiction when he "projected himself across state lines and asserted a pseudo-national executive authority." *Def. Distributed*, 971 F.3d at 493.

Further, it is indisputable that Plaintiffs' claims relate to the CAT's operation and CAT LLC's activities in Texas. Because these claims are directly related to CAT LLC's surveillance activities in Texas, jurisdiction over CAT LLC is appropriate.

### C.  Other Considerations Favor Personal Jurisdiction.

In addition to the traditional specific personal jurisdiction factors, other considerations weigh in favor of this Court's exercising personal jurisdiction over CAT LLC. For example, once minimum contacts are established, "courts … may evaluate 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' *Burger King Corp.*, 471 U.S. at 476–77 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). These factors can "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. *See id*. (citing *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 780 (1984); *Calder v. Jones*, 465 U.S. 783, 788–789 (1984)). Likewise, the Supreme Court has found it appropriate to evaluate the States' respective interests in a case such "that States with 'little legitimate interest' in a suit" not encroach on other "States more affected by the controversy." *Ford Motor Co.*, 592 U.S. at 360 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 263 (2017)).

Here, the Individual Plaintiffs have a strong interest in having their constitutional claims heard and a remedy provided in their home state. Texas has an equal or much stronger interest in this case than Delaware, the only state where CAT LLC seems to admit personal jurisdiction is appropriate, or Ohio or Virginia, where CAT LLC claims to store its data via a third-party host. *See* CAT.Mem.14 n.4 (arguing CAT LLC has no principal place of business); *id*. at 10 (data is on

Amazon servers in Ohio and Virginia). Further, CAT LLC's arguments that it does not advertise, solicit, or ship goods in or to Texas would preclude personal jurisdiction in nearly every state, despite the fact that CAT LLC was created and intended to direct its activities at every state. Finally, the most efficient resolution of this case and the judicial system's interest in effectively enforcing the Constitution weigh in favor of this Court's exercising jurisdiction. The alternative, allowing a federal agency to delegate regulatory activity to an allegedly private entity and then shield that entity's national activities from jurisdiction in all but one state, would create dangerous precedent further impeding plaintiffs from enforcing their rights.

In the alternative, if the Court finds that Plaintiffs have not presented prima facie evidence sufficient to sustain personal jurisdiction over CAT LLC, Plaintiffs request the opportunity for jurisdictional discovery to identify, at a minimum, the number, total amounts, and recipients of invoices CAT LLC purposefully transmits to executing brokers in Texas, the taxes that CAT LLC pays (or not) for activity within Texas, contracts that CAT LLC has entered into in Texas, whether CAT LLC was qualified or required to do business in Texas, even if it has not, and other contacts CAT LLC has with the State of Texas. *See Walk Haydel & Assocs.*, 517 F.3d at 241 (a court has discretion as to the type and amount of jurisdictional discovery to allow; without conducting an evidentiary hearing, a court should not act as fact finder of jurisdictional facts); *id.* (evidentiary hearing on jurisdiction is intended to serve as substitute for resolution of factual issues at trial, as such both parties must be allowed to submit affidavits and employ all forms of discovery directed to jurisdictional questions and subject to court's discretion).

## II.   CAT LLC Is a State Actor

The Constitution generally operates as a constraint on governments, not private individuals or organizations.[45] There are, however, circumstances in which the actions of those private individuals and organizations are so bound up with the government that they must be treated as though they were of the government's own doing.[46] When those circumstances obtain, the private organization must respect constitutional limitations to the same extent as the government itself.[47] Such is the case here.

CAT LLC, of course, disagrees. It says its actions cannot be attributed to the government because it is a private organization that just passively receives data and makes them available for analysis. Implementing Rule 613, it claims, is nothing more than the private action of a private company supporting the self-regulation duties of its parent organizations. So, because it concludes it is not engaging in state action, and the Complaint's constitutional causes of action (all but Count IX) lie only against state actors, it maintains its entitlement to dismissal. With respect, CAT LLC errs on both procedural and substantive grounds.

In this challenge, the plaintiffs focus on three novel aspects of Rule 613, 17 C.F.R. § 242.613, all of which are founded in the exercise of government power, as opposed to an SRO's self-regulatory activity. The first is the requirement that the consolidated audit trail attach the investor's individually identifiable information to each and every transaction on every stock

---

[45] *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978) ("[M]ost rights secured by the Constitution are protected only against infringement by governments.").

[46] *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (State action occurs when "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.").

[47] *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.").

exchange. Compl. ¶¶ 11–12, 22–23, 32–36, 39–41, 103. The second is the collection of that information in a central repository. Compl. ¶¶ 100, 103. And the third is the mandate that the SEC must have unlimited and unsupervised access to the entirety of the centralized database. Compl. ¶ 100. Each of these aspects is individually unprecedented, and collectively they confer on the SEC an omniscience beyond the SROs' ability to create, and a relationship between the SEC and American investors that has never before existed.

### A.   CAT LLC's Procedural Error

As a procedural matter, CAT LLC's request to be dismissed from these proceedings is premature. "[A] motion to dismiss a complaint," of course, "should not be granted if material issues of fact are unresolved." *Powell v. Sw. Bell Tel. Co.*, 494 F.2d 485, 489 (5th Cir. 1974). And there are a multitude of cases teaching that the court must "accept[] as true the well-pled factual allegations in the complaint, and construe[] them in the light most favorable to the plaintiff." *Villarreal*, 814 F.3d at 766 (quotation marks omitted). So, dismissal at this stage is appropriate only when "it appears that in no event would the pleader be able to prove an actionable claim." *Parr v. Great Lakes Exp. Co.*, 484 F.2d 767, 770 (7th Cir. 1973).

That's a daunting burden for CAT LLC to carry, especially when the question is whether it has engaged (or will engage) in action fairly attributable to the SEC. The Supreme Court says this is a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982); *see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.").

Calling the inquiry "fact-bound" is something of an understatement. The Court says its cases "reflect a two-part approach to this question of 'fair attribution.'" *Lugar*, 457 U.S. at 937.

The first part involves determining whether the claimed constitutional violation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id*. The second part inquires into whether "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Id*. The Court acknowledged it has formulated a variety of tests for evaluating this requirement. *Id*. at 939. For instance, it said a state actor may be "a state official" or, instead, a private party who "has acted together with or has obtained significant aid from state officials." *Id*. at 937. It also noted that a state actor may be someone acting under government "compulsion." *Id*. at 939 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 170 (1970)). Additionally, state action may occur when there is a "close nexus between the State and the challenged action of the regulated entity" such that "the action of the latter may be fairly treated as that of the State itself." *Jackson*, 419 U.S. at 351 (cited by *Lugar*, 457 U.S. at 939). Finally, the Court suggested that this is not an exhaustive recitation of methodologies when it observed that state action may also be present if the private party's "conduct is otherwise chargeable to the State." *Lugar*, 457 U.S. at 937.

Further, Count IX pleads unjust enrichment against CAT LLC as a relief defendant, and that count does not require state action. Thus, CAT LLC's dismissal motion will not remove it from the case.

While CAT LLC may not agree with this factually based characterization of its activities, a bare rejection is a categorically insufficient basis for dismissal. Instead of clearing away factual disputes, it creates them, which will be apparent in our discussion of CAT LLC's substantive error.

## B.  CAT LLC's Substantive Error

CAT LLC's claim that its activity not only is not fairly attributable to the SEC, but *cannot* be, is based on an incomplete accounting of what the company is and does. The reality is that the

company is the distilled essence of Rule 613. It exists solely to act as the government's all-seeing eyes in the securities market. Compl. ¶¶ 100–04. Its unblinking stare reaches outside of the SROs far enough to see personally identifiable information about every single investor who participates in a securities market—information that was not included in their pre-CAT audit trails. Compl. ¶¶ 11–12, 32–34, 39–41, 58. It stores everything it surveils in its inexhaustible memory and reports back to the SEC so that, without oversight or permission, the government may peruse literally every single investment decision anyone makes in any American stock exchange. It has no other purpose or function, and this is not even debatable.

CAT LLC is answerable to the Constitution because the nature of its functions, and the inseparable tie between those functions and the SEC, make it a state actor. This is so for two reasons. First, at least with respect to the three novel aspects of Rule 613 the Plaintiffs challenge, CAT LLC is not engaging in self-regulatory activity. Second, these functions are fairly attributable to the government under either the "compulsion," or "close nexus" formulations of the state action rule.

### C. CAT LLC Is Not Engaged in Self-Regulation

CAT LLC is not an SRO,[48] nor are its duties and functions emblematic of a self-regulatory organization. Instead, its creation and operation reveal it to be the cat's paw by which the SEC effectuates its pan-market surveillance system. Governance of securities markets in the modern era is accomplished through a hybrid model that combines both self and governmental regulation. SEC has supervised SROs since 1934, exercising "direct authority." *Merrill Lynch, Pierce, Fenner*

---

[48] CAT LLC does not fit in any of the statutorily-defined categories that are recognized SROs: "The term 'self-regulatory organization' means any national securities exchange, registered securities association, or registered clearing agency, or (solely for purposes of sections 78s(b), 78s(c), and 78w(b) of this title) the Municipal Securities Rulemaking Board established by section 78o-4 of this title." 15 U.S.C.A. § 78c(a)(26).

*& Smith, Inc. v. Ware*, 414 U.S. 117, 129 (1973). Rule 613 is an example of the government's decision to engage in direct regulation, and CAT LLC is nothing but the vehicle by which that regulation takes place.[49]

The "self" in "self-regulatory organization" is a helpful point of entry for explaining why CAT LLC is engaging in state action, not self-regulation. When an SRO engages in the latter, it is both the author and the object of the imposed requirements. The reflexiveness of an SRO's regulations is the whole point of the exercise: They arise from those to whom they apply. That's what makes them *self*-regulatory. Without that reflexive tie between author and object, self-regulation is just a polite fiction.

With respect to the novel aspects of Rule 613, the SEC is the Rule's author, and it could not be otherwise. Neither CAT LLC nor its SRO parents proposed Rule 613—it is wholly attributable to the SEC alone. The Rule unquestionably requires creation of the consolidated audit trail and describes CAT LLC's every function in mandatory terms. And the Rule's objects—the ones governed by its requirements—are not the author, but instead the SROs and individual investors. Nor does the fact that the SROs had previously performed what it and SEC claim to be similar functions diminish the SEC's authorship of (or responsibility for) the Rule's novel aspects, which collectively form the operative basis of the Plaintiffs' claims.

---

[49] That CAT LLC exists for the sole purpose of implementing Rule 613 is apparent from the "Purposes and Powers" section of the CAT NMS Plan, which says: "The Company may engage in: (a) the creation, implementation, and maintenance of the CAT pursuant to SEC Rule 608 and SEC Rule 613; and (b) any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purpose … ." CAT NMS Plan § 2.6 (Exhibit A to SEC Rel. No. 34-79318; File No. 4-698 (Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail) (Nov. 15, 2016).

It is true that the SROs had previously maintained their own audit trails, which tracked the information each of the SROs individually determined was needful for maintaining orderly markets and complying with SEC rules and regulations. Compl. ¶¶ 11–12, 18. But they didn't include the investor's personally identifiable information. Now, however, thanks to Rule 613, all that personally identifiable information gets vacuumed up and attached to securities transactions in such a way that it transforms the SEC into an omniscient observer of every individual's every move in the securities markets. *See* 17 C.F.R. § 242.613(c)(3)–(7); Compl. ¶¶ 22–23, 32–36, 39–41. And that creates an entirely new role for the SEC and a heretofore unknown relationship between the SEC and American investors.

The Rule is also novel in that the SROs had never before acted jointly to sweep the entire universe of that transactional information into a central repository, which they now must do. 17 C.F.R. § 242.613(a)(1). And finally, the SROs had never previously granted the SEC permission to engage in unlimited and unconditional perusal of every investment decision made by every investor in every American securities market, which Rule 613 now requires.[50] Because the author of all of these decisions is the SEC, not CAT LLC or the SROs, the identity between author and object that is necessarily inherent in self-regulatory activity does not exist. Therefore, CAT LLC's activity cannot be understood as *self*-regulatory in nature—at least not with respect to the Rule's novel elements.

---

[50] The Rule is clear that SEC will have access to all information the CAT collects. "The national market system plan submitted pursuant to this section shall provide that such access to and use of such data by each national securities exchange, national securities association, and the Commission for the purpose of performing its regulatory and oversight responsibilities pursuant to the federal securities laws, rules, and regulations *shall not be limited*." 17 C.F.R. § 242.613(e)(2) (emphasis supplied).

### D.  CAT LLC Is Functioning as a State Actor

The *Lugar* two-part formulation for discerning the presence of state action neatly describes CAT LLC's activity. With respect to the first part of the analysis, the constitutional violations recounted in Plaintiffs' complaint were, in the Court's words, "caused by … a rule of conduct imposed by the state … ." *Lugar*, 457 U.S. at 937. As described above, the SEC, through Rule 613, imposes on CAT LLC the duty both to seize the Plaintiffs' personally identifiable information regarding their investment activity and provide it to the SEC for its unlimited and unconditional inspection. And it does so without due process (as required by the Fifth Amendment) and without a warrant or circumstances making a warrant unnecessary (as required by the Fourth Amendment). Therefore, because the SEC is the author of Rule 613 and CAT LLC carries out its mandates, it necessarily follows that the violations were caused by a "rule of conduct imposed by the state."

The second part of the inquiry addresses whether CAT LLC "may fairly be said to be a state actor." *Id.* In light of the foregoing, just stating the inquiry suggests the answer. The "compulsion" and "close nexus" standards for assessing this part of the test confirm the suggestion. There is substantial overlap between the two formulations, and the Court has observed that they may be "simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court" when determining whether a private party may be classified as a state actor. *Id.* at 939. But each helpfully highlights a different aspect of the relationship between the government and the private actor that indicates the latter's actions should be ascribed to the former.

#### 1.  Compulsion

The "compulsion" standard focuses on the source of the initiative. That is, it asks whether the government is the motive force for the private party's action or has instead merely acquiesced to something the private party initiated. State action exists in the former circumstance, but not the

latter. Thus, simply accepting a private party's decision "where the [government] has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the [private party] and approved by the [government] into 'state action.'" *Jackson*, 419 U.S. at 357. However, there *is* state action "when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004.

The SEC is exercising coercive power through Rule 613, which compels CAT LLC to engage in the activity that violates Plaintiffs' constitutional rights. It was not the SROs' decision to attach personally identifiable investor information to every market transaction included in an audit trail. That was the SEC's decision, as expressed and mandated in the SEC-created CAT NMS plan as it ultimately developed over time. Nor was it the SROs' decision to consolidate all that information in a central repository and turn it over to the government for its unlimited and unconditional perusal. Those are features commanded by the SEC's rule. So, to the extent CAT LLC faithfully implements Rule 613, it is impossible to attribute the motive force of the challenged activities to any source *other* than the government.

### 2. Close Nexus

The "close nexus" formulation of *Lugar*'s second element focuses more on the degree of intertwinement between the government and the private party with respect to the challenged activity. Under this approach, the Court will find state action even if the private party is the initiator so long as "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson*, 419 U.S. at 351. And while it is true that heavy regulation of the private party does not, by itself, result in state action, it is a plus factor: "It may well be that acts of a heavily regulated

107

utility with at least something of a governmentally protected monopoly will more readily be found to be 'state' acts than will the acts of an entity lacking these characteristics." *Id*. at 350–51. Securities markets are certainly heavily regulated, and they enjoy "at least *something* of a governmentally protected monopoly" because market-making organizations cannot operate without registering with the SEC and meeting its requirements. 15 U.S.C. §§ 78e, 78f.

There is an exceedingly close nexus between the SEC and CAT LLC's implementation of the novel aspects of Rule 613. Indeed, it is probably necessarily so inasmuch as CAT LLC (as described above) is responding to the SEC's initiative and acting under its compulsion. But even if CAT LLC were acting under its own initiative, its position, and duties in the regulation of the securities markets are so intertwined with the SEC that there could hardly be anything *but* a "close nexus" between the two.

Even if CAT LLC were an SRO (it isn't), that status could not insulate it from a conclusion that its nexus with the SEC is more than sufficient to make its actions fairly attributable to the government. That nexus is so tight that courts have said SROs essentially become the government's alter ego when they engage in regulatory activity (as distinct from their private business activity). Interestingly, SROs not only admit this—they *insist* on it. At least, that is, when they seek immunity from damages claims related to their regulatory functions. And they routinely succeed specifically because they correctly and accurately tell courts that, when they regulate, they are using delegated governmental power[51] that makes the identity between them and the

---

[51] *See, e.g.*, *Austin Mun. Secs., Inc. v. Nat'l Ass'n of Secs. Dealers, Inc*., 757 F.2d 676, 680 (5th Cir. 1985) (SRO and its officers entitled to absolute immunity when using delegated power as a regulator); *City of Providence v. Bats Glob. Mkts., Inc.*, 878 F.3d 36, 46 (2d Cir. 2017) (SRO entitled to immunity when it "stands in the shoes of the SEC" and "engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder."); *D'Alessio v. N.Y. Stock Exch., Inc*., 258 F.3d 93, 105–06 (2d Cir. 2001) (same).

government so complete that they occupy the government's own shoes: "SROs effectively stand in the shoes of the SEC because they perform regulatory functions that would otherwise be performed by the SEC … ."[52]It's impossible to get a closer nexus than that.

The reality is that SROs, when exercising regulatory functions, add to their market-participant status a second persona — that of a quasi-governmental regulator. When acting in this capacity, SROs are "rightly considered quasi-governmental authorities"[53] because they are "fulfilling [their] regulatory role and [are] not acting as a regulated entity."[54] Its quasi-governmental status is the result of a statutory scheme that so inextricably intertwines the SRO with the government that it loses its independent identity when it regulates: "The legislative history of the 1975 amendments [to the Exchange Act] underscored that self-regulatory organizations 'are intended to be subject to the SEC's control and have no governmentally derived authority to act independently of SEC oversight.'"[55]

And if that were not enough, the Fifth Circuit has specifically concluded that this inextricably close relationship between SROs and the government make the former subject to constitutional limitations when they act in a regulatory capacity. In *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), the petitioner asserted it had not received constitutionally required due process before the American Stock Exchange struck its

---

[52] *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc*., 409 F.3d 93, 95 (2d Cir. 2005) (internal marks and cite omitted) (quoting *D'Alessio*, 258 F.3d at 105).

[53] *Id*. (cleaned up); *Bats Glob. Mkts., Inc*., 878 F.3d at 46.

[54] *Bats Glob. Mkts., Inc.*, 878 F.3d at 46. *See also Sparta Surgical Corp. v. Nat'l Ass'n of Secs. Dealers, Inc*., 159 F.3d 1209, 1214 (9th Cir. 1998) (recognizing the difference between an SRO acting "under the aegis of the Exchange Act's delegated authority" as opposed to "conducting private business[.]"), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016).

[55] *Sparta Surgical Corp.*, 159 F.3d at 1214 (quoting H.R.Rep. No. 123, 94th Cong., 1st Sess., 48–49 (1975)).

stock registration. The court said the exchange's argument that constitutional requirements do not constrain its regulatory actions "is clearly contrary to numerous court decisions." 452 F.2d at 941. It said this was so because "[t]he *intimate involvement* of the Exchange with the Securities and Exchange Commission brings it within the purview of the Fifth Amendment controls over governmental due process." *Id*. (emphasis supplied). The court then conducted an extensive analysis of the process International Industries received prior to the delisting—an exercise that would have been pointless if it were not entitled to due process.[56]

The inquiry described by *Lugar* demonstrates that CAT LLC is engaged in state action when it implements the challenged elements of Rule 613. And that is true whether one employs either the "compulsion" or "close nexus" formulations of the test's second aspect. CAT LLC is compelled by the SEC to engage in the challenged actions, and it also "stands in the shoes of the SEC" as it "engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder." *Bats Glob. Mkts.*, 878 F.3d at 46. Consequently, CAT LLC is answerable to the Constitution because its actions are fairly attributable to the government itself.

## III.   CAT LLC IS A PROPER RELIEF DEFENDANT

CAT LLC contends that it cannot be joined as a relief defendant, arguing that relief defendant status is limited to parties holding *fund*s relevant to providing the Plaintiff complete relief. CAT.Mem.34. But CAT LLC misunderstands the nature of a relief defendant, which is not limited to one holder of funds. A relief defendant is anyone who "has no ownership interest

---

[56] While it is true that a panel of the Fifth Circuit subsequently questioned the continuing force of the holding in *Intercontinental,* that panel decision is now vacated, and that case is now awaiting an en banc decision. *All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226, 241 (5th Cir. 2023), *reh'g en banc granted, opinion vacated,* No. 21-60626, 2024 WL 670403 (5th Cir. Feb. 19, 2024).

in the *property* that is the subject of litigation but may be joined in the lawsuit to aid the recovery of relief." *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009) (citing *SEC v. Cavanagh*, 445 F.3d 105, 109 n.7 (2d Cir. 2006) (emphasis added)). In *Cavanagh*, for example, the relevant property held by the relief defendants was shares of stock. In determining who are proper relief defendants, courts do not limit their application to any particular category of asset. The relief-defendant device is an exercise of a court's equitable powers, as necessary to provide a plaintiff "complete relief." *Id.* at 834 (quoting *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191–92 (4th Cir. 2002) (explaining the theory behind relief defendants)).

Here, CAT LLC holds a massive database of stock-trading histories for millions of investors. It has no ownership interest in or legitimate claim to the information, which it obtained only because of SEC's unlawful CAT rule, 17 U.S.C. § 242.613. Compl. ¶¶ 61–63, 100–04, 211–12. Plaintiffs cannot obtain "complete relief" unless CAT LLC expunges their information from its database. Compl., Prayer for Relief, ¶ K. It is irrelevant that CAT LLC is a non-profit entity, or that it spent money to build the CAT database. CAT LLC obtained the trading information in its database because of the unlawful CAT rule, making it an appropriate relief defendant.

### PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

I.   **ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM**

Plaintiffs' Memorandum (at 33–35) explained that Plaintiffs will suffer irreparable harm from being subjected to a surveillance regime that is unlawful, that inflicts ongoing Fourth Amendment violations, and imposes costs on them. Parties subjected to an unlawful rule suffer irreparable harm, Pl.Mem.33–34, citing *Louisiana v. Horseracing Integrity & Safety Auth., Inc.*,

111

617 F. Supp.3d at 500 (holding that "[t]he alleged [agency] conduct … in exceeding its authority given by Congress and alleged violations of the APA … constitute irreparable injury."); *see also Nat'l Ass'n for Gun Rights., Inc.*, No. 4:23-cv-00830, 2023 WL 6613080, at *18 (N.D. Tex. Oct. 7, 2023) (finding irreparable non-economic harm because, among other things, plaintiffs would be subject to a rule that violates the APA).

SEC's Motion ignores these authorities, instead quoting some highly general language from inapposite cases. SEC.Mem.58. Those cases do not refute Plaintiffs' showing that, because the CAT will continue to subject them to its unlawful surveillance regime, they will continue to suffer irreparable injury.

Second, Plaintiffs' Memorandum explained that Plaintiffs will suffer irreparable harm because the CAT violates their Fourth Amendment rights. Plaintiffs cited authority establishing that deprivation of a constitutional right constitutes irreparable injury, Pl.Mem.34. SEC responds by asserting that only violations of the First Amendment qualify as irreparable injury. SEC.Mem.58–59. But that is not the law.

Courts also recognize Fourth Amendment violations as a proper basis for a possible preliminary injunction. Last year, for example, the Fifth Circuit considered an alleged Fourth Amendment violation as an appropriate basis for a preliminary injunction. *Anibowei v. Morgan*, 70 F.4th 898, 902–03 (5th Cir. 2023) (on the facts of that case, concluding that past searches did not establish probable future violations and therefore did not establish future harm). *See also United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003) (recognizing Fourth Amendment violations as an appropriate basis for irreparable harm). Courts recognition of various constitutional violations as a basis for irreparable harm is confirmed by 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice*

112

*and Procedure* § 2948.1, n.26 (2d ed. 1995), which cites various constitutional rights other than the First Amendment as a basis for irreparable harm. *See* Pl.Mem.34.

When parties seeking preliminary injunctions attempt to rely on Fourth Amendment violations to establish irreparable injury, courts deny injunctions where the violation is a past search, because a past search does not establish future harm. This explains the cases Plaintiffs relied on. Pl.Mem.59.[57] But CAT differs from those cases, because the CAT is a program that will continue to violate the Fourth Amendment every time an investor engages in a stock-market transaction. The CAT will continue to make seizures by obtaining copies of investors' records. It will continue to conduct searches of the database as well. These certain future violations constitute certain future irreparable harm.

Third, Plaintiffs' Memorandum explained that Plaintiffs will suffer irreparable harm absent an injunction because the CAT program will force them to pay future costs. They cannot recover those costs because of SEC's sovereign immunity from monetary damages. In response, SEC does not dispute that "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (citing *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). But SEC argues that Plaintiffs have not shown a "*substantial* risk that they will" incur any costs because of the CAT. SEC.Mem.59 (quoting *Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019)).

This argument fails because SEC's own words show not only a "substantial risk" Plaintiffs will bear CAT costs; they show SEC's understanding that investors are certain to bear CAT costs.

---

[57] This distinction applies to the various cases SEC cites. SEC.Mem.59 (citing *United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003); *Gulf Coast Pharms. Plus v. United States*, 2023 WL 3099873, at *6 (S.D. Miss. Apr. 26, 2023); *Mirka United, Inc. v. Cuomo*, 2007 WL 4225487, at *7 (S.D.N.Y. Nov. 27, 2007).

Just last year, in a release addressing the funding scheme for the CAT, SEC stated, "The Commission … cannot determine in advance the extent to which [brokers] can or will pass-through their CAT fees to investors … . But we believe that … that *at least some will do so*." 88 Fed. Reg. at 62637 (emphasis added.) At least one knowledgeable commenter (an electronic trading platform) confirmed that investors will pay some portion of CAT costs. *Id.* at 62648 (DASH Financial Technologies, Comment Letter (stating that smaller brokers will pass *all* CAT costs on to investors).

As the quotation from SEC shows, the amount investors will bear remains uncertain, but through no fault of the investors. As of September 2023, SEC "[could] not determine in advance the extent to which [brokers] can or will pass-through their CAT fees to investors." *Id*. at 62637. The primary reason for this uncertainty is that SEC *still* has not resolved the plan for stock exchanges and brokers to make their direct payments to CAT LLC. *See Am. Sec. Ass'n & Citadel Sec. LLC v. SEC*, No. 23-13396 (11th Cir.) Until that issue is resolved, investors cannot be expected to provide any additional specificity about the amount of the CAT costs they will bear. In any event, "[a]lleged compliance costs need only be 'more than de minimis.'" *Career Colls. and Schs. of Texas v. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuitoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). In light of the CAT's startup costs of at least $2.4 billion and ongoing annual costs of at least $1.5 billion, Plaintiffs easily meet that low threshold.

This showing of certain future costs more than meets the standard the Fifth Circuit recently articulated when it addressed similar pass-through costs. In *Texas v. SEC*, No. 23-60079, 2024 WL 2106183 (May 10, 2024), investors in mutual funds challenged an SEC rule requiring mutual funds to disclose votes on ESG matters. The investors contended that the rule would cause the funds to

incur higher costs, which the investors ultimately would bear. *Id.* at \*2. The court held that pass-through costs suffice to establish standing if plaintiff investors show it is "likely" or there is a "substantial risk" they will bear pass-through costs. *Id.* (finding the investors' showing insufficient because they showed "only speculation about the possibility" that costs would be passed through to them). The CAT Plaintiffs easily meet this standard.

SEC's Motion also asserts that Plaintiffs unduly "delayed" in filing suit, and that the alleged delay undermines Plaintiffs' arguments that they will suffer cognizable irreparable injury. SEC.Mem.59–60. But the timing of Plaintiffs' lawsuit does nothing to undermine the irreparable injuries of the nature Plaintiffs assert. That timing does not lessen the future harm from the surveillance that Congress did not authorize, from the industrial-scale searches and seizures that will violate the Fourth Amendment, nor from the massive and unrecoverable CAT costs to be imposed on Plaintiffs.

Moreover, SEC's Motion vastly overstates what it characterizes as a "delay" in challenging the CAT. SEC contends that Plaintiffs were required to sue in 2012, as soon as SEC issued the CAT rule. But that argument ignores the CAT program's long, uncertain, and winding timeline. After SEC issued the rule in 2012, 10 years passed before the CAT first collected information identifying investors. *See* Compl. ¶¶ 37–72 (summarizing major milestones in the 12 years it took to develop the CAT). During that time, it was impossible to know how the CAT would affect investors. If Plaintiffs had tried to sue earlier, SEC would have objected that they lacked standing due to ripeness concerns.

SEC also overstates the significance of any delay. The law does not, as SEC suggests, presume that an alleged delay longer than some number of "months" rules out a preliminary injunction. Length of "delay" must be considered along with the governing factors for a

preliminary injunction. Just last year, the Fifth Circuit affirmed a preliminary injunction where the plaintiff had delayed for an unspecified number of "years" before filing suit. *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536, 546 (2023) (addressing a trademark infringement claim). The court agreed with the district court that any inference from this years-long delay was outweighed by the plaintiffs' showing that it was likely to prevail on the merits. *Id*. at 545–46.

By raising this "delay" argument, SEC is trying to hide behind its own decision to create a massive program that is technologically and legally complex. That decision led to more than a decade of uncertainty about possible challenges to it. SEC should not be permitted to create this massive but illegal program, subject investors to this decade of uncertainty, then plead—once the specifics of the CAT finally came into focus—that the CAT program is "too big to fail." To put the point bluntly: Don't build the behemoth without any authority, and then assert that it is too big to fail. It is SEC's own doing that CAT has involved such a drawn-out timeline.

## II. THE BALANCE OF EQUITIES WEIGHS IN PLAINTIFFS' FAVOR BECAUSE SEC DOES NOT IDENTIFY HARM TO SEC NOR THE PUBLIC IF THIS UNLAWFUL PROGRAM IS ENJOINED—TO THE CONTRARY, HARM WILL BE GREATLY ABATED, PROTECTING THE PUBLIC INTEREST

SEC also argues that the balance of equities is in its favor. This argument is misplaced for several reasons. The preceding section just explained why SEC errs when it disputes that Plaintiffs have established irreparable harm on their side of the balance. SEC also errs by arguing on the premise that the CAT rule is lawful. SEC recites, for example, the irrelevant principle that "[t]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce." *Rest. L. Ctr. v. Dep't of Lab.*, No. 1:21-cv-1106, 2023 WL 4375518, at *14 (W.D. Tex. July 6, 2023). This is irrelevant. Congress never enacted any law authorizing the CAT. The *Rest. L.* court was addressing regulations it had determined were *lawful*. *Id.* at *15. That is the opposite of the case at hand where the starting point

116

for the preliminary injunction is that Plaintiffs are likely to prevail in showing the CAT rule was unlawful.

This showing that the rule is unlawful—because it is incontrovertible that Congress never conferred such power on the SEC—gives considerable weight to Plaintiffs' side of the balance, because there is an important public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (per curiam) (quotation omitted). Indeed, "neither [the government] nor the public has any interest in enforcing a regulation that violates federal law.'" Pl.Mem.35 (citing *Louisiana v. Biden*, 55 F.4th at 1035 ("There is generally no public interest in the perpetuation of unlawful agency action.")).[58] The sooner this rogue program ceases, the better for all parties—to say nothing of the rule of law. SEC's Motion ignores these authorities.

Instead of addressing the governing legal framework, SEC sounds the alarm that enjoining the CAT will trigger widespread disaster. It contends that an injunction would cause "harm to the government and the public interest" that would be "grave and immediate." SEC.Mem.57. This doomsaying should not be credited. SEC regulated for 88 years (from 1934 to 2022) before it began the mass collection of ordinary investors' names. During those years, SEC functioned well, performing activities including the pursuit of many enforcement actions. *See* Hester Peirce, *This CAT is a Dangerous Dog*, Real Clear Policy (Oct. 9, 2019) ("[O]ur enforcement division already is very successful at locating and bringing to justice wrongdoers in our markets and … SEC already has sufficient tools to get the information it needs to pursue credible leads about market misconduct

---

[58] Plaintiffs also cited *All. for Hippocratic Med. v. FDA*, 78 F.4th 210 (5th Cir. 2023), which was reversed on other grounds after Plaintiffs filed their motion. *See FDA v. All. for Hippocratic Med.*, 144 S.Ct. 1540 (June 13, 2024).

and to do so quickly.")[59] SEC offers no facts suggesting the sky will fall if it is required to return to practices it followed until just two years ago.

To support its dire predictions, SEC quotes a sweeping statement from *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006), about the "magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities." That statement, however, has nothing to do with the CAT or the SEC. *Merrill Lynch* addresses federal preemption of state law in private securities class actions. The sentence SEC quotes addresses the importance of the Securities Act of 1933 and the Securities Exchange Act of 1934 in *private securities litigation*. *Id.* It has no relevance here.

CAT LLC also recites a litany of costs and difficult transitions back to lawful operation that will ensue if Plaintiffs prevail in this action. Those costs will undoubtedly be high–for a limited time—and will require significant disruption. But that is the direct result of SEC and CAT LLC's arrogation of power to legislate a multi-billion-dollar program without a shred of Congressional authority or seeking a lawful appropriation to build the CAT. This is exactly why Congress alone holds lawmaking power and the power of the purse. Had SEC sought Congressional lawmaking to institute the CAT, its constitutionality, conformance with law, operation parameters, and eye-popping perpetual costs would have been a matter of public debate. Had SEC sought an appropriation, that, too, would have been subject to budgetary scrutiny, criticism, and control by those accountable to American investors who would bear prohibitive deprivations of liberty and wealth.

---

[59] *Available at* Real Clear Policy,
https://www.realclearpolicy.com/articles/2019/10/09/this_cat_is_a_dangerous_dog_111285.html

The costs and adjustments required to restore the agency and the LLC it created to lawfulness are—and were—the foreseeable price of Defendants' joint adventuring outside of SEC's regulatory guardrails. Those short-term costs, weighed in the balance of the costs to Americans who would otherwise be forced to pay many billions of dollars in perpetuity for the privilege of having their civil liberties stripped away, shrink to a mere footnote in history—an awkward and embarrassing lesson in the principles of American government.

SEC does not identify any particular possible harm, much less harm that would be "grave and immediate." SEC.Mem.57. It offers only vague and unsupported statements, such as the opinion that ending the CAT would "result in a less efficient and less stable market." *Id*. But it never says why this would be so. Some of these assertions make little sense—for example, that the stock markets will be less efficient, or less "stable," if the government does not have the name of the investors connected with every stock transaction. In addition, the costly and onerous CAT is sure to drive investment from American exchanges to foreign markets, thus destabilizing an already volatile market.

SEC then reverts to the now-familiar sleight-of-hand that runs through its Motion. On the one hand, it conflates a fictional consolidation of the various pre-CAT SRO audit trails with, on the other hand, beginning the unprecedented practice of collecting the names of *investors*. Conspicuously, SEC's warnings of "harm" address only the professed need to consolidate the SRO audit trails. *See*, *e.g.*, SEC.Mem.57 (describing problems from "decentralized" self-regulatory "systems"). SEC never even asserts, much less demonstrates, that it has a strong interest in collecting *investor* names, or that losing its access to the real-time flow of investor names and other identifying information would harm its ability to carry out its mission.

119

SEC contends that commenters expressed "overwhelming support" for what SEC calls "a new system." SEC.Mem.57. But those comments pertain only to consolidating the pre-CAT audit trails—but do *not* express support for collecting investor names. SEC.Mem.57 (citing 77 Fed. Reg. 45727–34, 45736). It airbrushes out of this history the heated Congressional hearings and public debate about collecting personally identifiable information.

Likewise, SEC claims that "many commenters agreed that existing audit trails were inadequate to supervise cross-market transactions." SEC.Mem.11 (citing 75 Fed. Reg. at 32562–63). This cited section of the Federal Register summarizes submitted comments that were requested by the SEC in 2003 and 2004, long before collection of investor-identifiable information was on the table. SEC thus characterizes support for consolidating preexisting SRO audit trails, which did not collect investor names, as support for taking the unprecedented step of collecting investor names. But neither the SEC's requests for comments nor the comments themselves mention anything about collecting customer-identifying information. The comments tell us nothing about the transformative addition to the audit trails of individual investor names and information.

SEC next overstates, by several times, how long the CAT has been operational. SEC protests against "[s]hutting down or impeding this system *12 years* later," SEC.Mem.57 (italics in original). *See also id.* (referring to the CAT as a "12-year program"). In fact, however, CAT did not begin collecting investor information until two years ago, in 2022, and did not begin collecting any information until 2020. Compl. ¶ 84, CAT.Mem.1.

Finally, SEC asserts that an injunction would provide "no benefit" to Plaintiffs. SEC.Mem.57. To that end, SEC contends that "even if the Consolidated Audit Trail were shut down tomorrow, all the same type of information would be collected by the self-regulatory

organizations and broker-dealers," so that "Plaintiffs would receive no benefit" from ending the CAT. *Id.* This is nonsense. If the Court concludes that the CAT is unlawful, then investors will benefit because CAT LLC will *not* collect investor information, and SEC will not have access to the database compiling it.

SEC's related statement that investor information "would be collected by … broker-dealers," SEC.Mem.57, is more hocus pocus. Without the CAT, brokers would not "collect" investor information. They would do what they have always done, which is to maintain confidential information about their own clients. Without the CAT rule and the FINRA rules that depend on it, brokers would not be required to submit any customer information to the SROs. And there would, of course, be no CAT to provide the information to SEC. Even FINRA President Robert Cook, expressing deep concern about widespread legal objections to the CAT, has suggested "[I]t's never too late to do the right thing."[60]

All of this means that investors would benefit from a court ruling that the CAT is unlawful. Investors would be freed from the CAT's seizure of their personal information and tracking of their every investment decision. They would be freed from SEC's continuous oversight of their investment decisions. And they would be freed from the other constitutional violations that follow, including SEC's searching the database for possible legal violations, and its ability to distribute investors information to another federal agency or any of the more than 100 other law enforcement agencies SEC has now organized into the Interagency Securities Council.[61]

---

[60] Jesse Westbrook and Robert Schmidt, *FINRA's Cook Dumps on Consolidated Audit Trail*, Capitol Account, October 17, 2023.
[61] *See* SEC's recent press release of July 19, 2024 announcing that SEC has just launched an "Interagency Securities Council" coordinating enforcement efforts across federal, state, and local agencies consisting of "more than 100 departments and agencies, including federal agencies, state offices of attorneys general and state police, and local police departments and sheriff's offices." https://www.sec.gov/newsroom/press-releases/2024-86.

Administrative power is only legitimate if approved in advance by Congress. The CAT was not. It must be subject to independent judicial review if statutory and constitutional guardrails on administrative power are to be faithfully observed. "[T]he judicial department has ... the solemn duty to interpret the laws, in the last resort; and ... in cases where its own judgment shall differ from that of other high functionaries, it is not at liberty to surrender, or to waive it." *United States v. Dickson*, 40 U.S. 141, 161–62 (1841) (Story, J.). "This duty of independent judgment is perhaps 'the defining characteristi[c] of Article III judges.'" *Stern v. Marshall*, 564 U. S. 462, 483 (2011) (both quoted in *Loper Bright*/*Relentless*, 144 S.Ct. at 2247, 2283 (Gorsuch, J. concurring)).

## CONCLUSION

For the reasons detailed above, the Court should DENY SEC and CAT LLC's Motions to Dismiss and GRANT Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted,

Mark D. Siegmund
State Bar Number 24117055
CHERRY JOHNSON SIEGMUND
JAMES PLLC
The Roosevelt Tower
400 Austin Avenue, 9th Floor
Waco, Texas 76701
Tel: (254) 732-2242
Fax: (866) 627-3509

/s/ *Margaret A. Little*
Margaret A. Little CT303494
Andrew J. Morris*
Margot J. Cleveland*
Zhonette Brown
Dan Kelly
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Tel: (202) 869-5210
Fax: (202) 869-5238
*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on August 15, 2024, a true and correct copy of the foregoing document was transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Margaret A. Little
Margaret A. Little