# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

|  |  |  |
|---|---|---|
| ERIK DAVIDSON, *et al*., | § § § § | |
| Plaintiffs, | § § | Civil Action No. 6:24-cv-00197-ADA |
| v. | § § | |
| GARY GENSLER, in his official capacity As Chairman of the U.S. Securities and Exchange Commission, *et al*., | § § § § | |
| Defendants. | § § | |

## BRIEF OF THE CATO INSTITUTE AND INVESTOR CHOICE ADVOCATES NETWORK IN SUPPORT OF PLAINTIFFS' PRELIMINARY INJUNCTION MOTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

4857-3729-8394.4

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

STATEMENT OF INTEREST OF AMICI ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 2

ARGUMENT ....................................................................................................................... 6

   I.    THE CREATION OF THE CAT SYSTEM AND CAPTURE OF INVESTOR
       AND BROKER DATA IS STATE ACTION. ....................................................... 6

   II.   MANY CAT SYSTEM RECORDS DO NOT SATISFY THE REQUIRED
       RECORDS TEST AND IMPLICATE THE FIFTH AMENDMENT. ............................. 7

   III.  THE CAT SYSTEM IMPLICATES THE FOURTH AMENDMENT. ...........................11

       A.     The SEC's use of the CAT System is akin to a search of investors' and
              brokers' papers or effects. ...................................................................... 12

       B.     The CAT System Records do not fall within the third-party doctrine. ................. 15

       C.     Searches of investors' and brokers' papers or effects are unreasonable. ............. 16

CONCLUSION ................................................................................................................... 17

CERTIFICATE OF SERVICE .......................................................................................... 18

4857-3729-8394.4

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Boyd v. United States*,
116 U.S. 616 (1886)...............................................................................................................4

*California Bankers Ass'n v. Shultz*,
416 U.S. 21 (1974)............................................................................................................14, 15

*Carpenter v. United States*,
138 S. Ct. 2206 (2018)........................................................................................... *passim*

*Fisher v. United States*,
425 U.S. 391 (1976) (Brennan, J., concurring)...............................................................8, 9, 10

*In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*,
670 F.3d 1335 (11th Cir. 2012) ..........................................................................................10

*Grosso v. United States*,
390 U.S. 62 (1968)................................................................................................................9

*Kentucky v. King*,
131 S. Ct. 1849 (2011)........................................................................................................16

*Kyllo v. United States*,
533 U.S. 27 (2001)..............................................................................................................13

*Los Angeles v. Patel*,
576 U.S. 409 (2015)............................................................................................................14

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982).............................................................................................................6

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019).........................................................................................................6

*Marchetti v. United States*,
390 U.S. 39 (1968)..............................................................................................................10

*People v. Seymour*,
2023 CO 53, slip op. (Colo. Supreme Court 2023) ............................................................12

*Riley v. Cal.*,
573 U.S. 373 (2014)..................................................................................................11, 16, 17

*Shapiro v. United States*,
335 U.S. 1 (1948)..................................................................................................................9

4857-3729-8394.4

*Smith v. Md.*,
   442 U.S. 735 (1979)........................................................................................6, 15

*Texas Blockchain Council v. Dep't of Energy*,
   No. W-24-CV-00099-ADA, 2024 WL 990067 (W.D. Tex. Feb. 23, 2024)............................7

*United States v. Chadwick*,
   433 U.S. 1 (1977)..................................................................................................13

*United States v. Doe*,
   465 U.S. 605 (1984)..............................................................................................10

*United States v. Hubbell*,
   530 U.S. 27 (2000).................................................................................................8

*United States v. Miller*,
   425 U.S. 435 (1976)........................................................................................15, 16

*Utility Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014)............................................................................................4, 5

*Vernonia School Dist. v. Acton*,
   515 U.S. 646 (1995)..............................................................................................16

*Whitman v. Am. Trucking Assoc.*,
   531 U.S. 457 (2001)................................................................................................5

**Statutes**

17 C.F.R. Parts 242 .........................................................................................................3

17 C.F.R. § 240.17a-4 ......................................................................................................2

17 C.F.R. § 242.613 .........................................................................................................3

17 C.F.R. § 242.613(c)(3).................................................................................................4

17 C.F.R. § 242.613(d)(3)..........................................................................................10, 11

17 C.F.R. § 242.613(f) ......................................................................................................6

17 C.F.R. § 242.613(g) .....................................................................................................7

Joint Industry Plan, 88 Fed. Reg. 62628, 62673 (September 12, 2023) ....................................3, 5

SEC Consolidated Audit Trail, Final Rule, Release No. 34-67457; File No. S7-11-
   10 (Oct. 1, 2012) (to be codified at 17 C.F.R. Parts 242) .......................................................3

4857-3729-8394.4

## Other Authorities

CAT NMS, LLC, *Limited Liability Company Agreement*
(effective date September 6, 2023), http://tinyurl.com/2p824tzd ...............................................8

FINRA, *In re Instinet*, *Financial Industry Regulatory Authority Letter of
Acceptance, Waiver, and Consent*,
No. 2020067139101 at 3, August 16, 2023, http://tinyurl.com/3ja8cf6x ...................................3

Hester Peirce, *This CAT is a Dangerous Dog*, RealClearPolicy, October 9, 2019,
https://www.realclearpolicy.com/articles/2019/10/09/this_cat_is_a_dangerous
_dog_111285.html ...................................................................................................................2

Jay Clayton, Chairman of the SEC, *Update on Consolidated Audit Trail*,
March 17, 2020, http://tinyurl.com/2uh5afn3 ...........................................................................8

Jeremy Hall, Comment, *Bailment Law as Part of a Property-Based Fourth
Amendment Framework*, 28 GEO. MASON U. L. REV. 481 (2020)...........................................12

Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving
Personal Property Due Protection*, 125 YALE L.J. 796 (2016)...............................................12

Michael Simon, Chair of the CAT NMS Plan Operating Committee, Testimony
Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate,
October 22, 2019, at 59:00, http://tinyurl.com/49ccaecv............................................................4

Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*,
119 YALE L.J. 700 (2010) ........................................................................................................12

Samuel A. Alito, Jr., *Documents and the Privilege against Self-Incrimination*, 48
U. PITT. L. REV. 27 (1986)..........................................................................................9, 11, 12

SEC, ENFORCEMENT MANUAL 85, Division of Enforcement, Office of Chief
Counsel, November 28, 2017.................................................................................................8, 16

SEC, "Update on Consolidated Audit Trail," *Statement of SEC Chairman Jay
Clayton*, March 17, 2020, available at http://tinyurl.com/2uh5afn3.........................................8

Shelly Bohlin, Testimony Before the Committee on Banking Housing, and Urban
Affairs, U.S. Senate, October 22, 2019.......................................................................................4

Shelly Bohlin, Testimony Before the Committee on Banking Housing, and Urban
Affairs, U.S. Senate, October 22, 2019.......................................................................................7

Sir Samuel Toller, THE LAW OF EXECUTORS AND ADMINISTRATORS (Philadelphia,
John Grigg 1829) ......................................................................................................................12

4857-3729-8394.4

Texas Office of the Attorney General, *Texas Data Privacy And Security Act*,
    https://www.texasattorneygeneral.gov/consumer-protection/file-consumer-
    complaint/consumer-privacy-rights/texas-data-privacy-and-security-act .................................2

Thomas Potts, A COMPENDIOUS LAW DICTIONARY
    (London, T. Ostell 1803) ..........................................................................................12

4857-3729-8394.4

**STATEMENT OF INTEREST OF *AMICI CURIAE*[1]**

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual Cato Supreme Court Review and files amicus briefs. Cato's Center for Monetary and Financial Alternatives focuses on identifying, studying, and promoting alternatives to centralized, bureaucratic, and discretionary financial regulatory systems.

Cato Institute scholars have published extensive research on securities regulation and constitutional law. The Securities and Exchange Commission's (SEC) consolidated audit trail proceedings implement several new public policies and regulations affecting securities brokers' businesses and rights, as well as impacting the rights of individual investors. This case interests the Cato Institute because it concerns the legality of a new, massive data collection and regulatory effort by the SEC that threatens individual liberty.

ICAN is a not-for-profit public interest litigation organization committed to serving as legal advocate and voice for investors and entrepreneurs seeking to enter the capital markets. Through its advocacy efforts, ICAN seeks to draw official attention among the judiciary and regulatory bodies to the serious challenges facing investors and entrepreneurs. ICAN takes an interest in this case because of the far-reaching implications the SEC's consolidated audit trail will have for everyday investors and their personal trading and identifying information.

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or part, and no party or party's counsel made a monetary contribution to fund preparation or submission of this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In this "smart" and digitized world, nearly everything we do could be captured, stored, and made accessible to the government. The time we wake up (using our phone's alarm), the places we go (using our car's built-in GPS), the news stories we read, the snacks we purchase for our kids, the route of our daily run, how much we weigh, and even the temperature we prefer to keep our homes is routinely collected and stored by commercial companies. Normally, the government cannot access that information—absent a manual process like issuing a subpoena, obtaining a search warrant, or making a formal, emailed request to a company for customer information. The SEC's Consolidated Audit Trail (CAT) system threatens to change all of that,[2] and it gives government agencies a blueprint for pervasive and constant government surveillance: 1) require third-parties to collect and retain immense amounts of sensitive information about their customers, 2) offer no chance to opt-out,[3] and 3) and demand unfettered access to the data on the theory that the government might need the information in the future for law enforcement. Such a system is a massive threat to privacy rights and our constitutional order and deserves this Court's attention and scrutiny.

For decades, the SEC has imposed limited records preservation requirements on investors, broker-dealers, and financial institutions. *See, e.g.*, 17 C.F.R. § 240.17a-4 (lists of communications, financial, and other records brokers and dealers must preserve). And the SEC could sometimes access that information using "blue sheets" and other manual requests to regulated companies when investigating. But the CAT system represents a break from previous policies in that it is an

---

[2] *See* Hester Peirce, *This CAT is a Dangerous Dog*, RealClearPolicy, October 9, 2019, https://www.realclearpolicy.com/articles/2019/10/09/this_cat_is_a_dangerous_dog_111285.html.

[3] Ironically, the inability to opt-out places CAT in conflict with state data privacy laws—including Texas's recently-passed Texas Data Privacy and Security Act. *See* Texas Office of the Attorney General, *Texas Data Privacy And Security Act*, https://www.texasattorneygeneral.gov/consumer-protection/file-consumer-complaint/consumer-privacy-rights/texas-data-privacy-and-security-act.

4857-3729-8394.4

automatic, national, and daily production order to brokers and others in the industry for vast amounts of personal and financial information—and SEC regulators will have "unfettered access" to it.[4] The CAT system represents a radically new form of surveillance that implicates both Fourth and Fifth Amendment rights.

The CAT system originated in July 2012, when the Securities and Exchange Commission published a rule requiring self-regulatory organizations (SROs) like the Financial Industry Regulatory Authority (FINRA) to submit a "national market plan" for creating and operating a consolidated audit trail system. *Id*. This central data repository would capture billions of customer identifiers and financial "events" for securities transactions, orders, and quotes and would make this information readily accessible to the government.[5] 17 C.F.R. § 242.613. Those plans further developed over a decade according to SEC prescriptions. The CAT system emerged from those dictates began capturing personal information about investors in March 2023, though it had already been capturing data about trades. *See* Jennifer Schulp,[6] In the September 2023 Order at issue, the SEC proceeded with plans to fund this troubling surveillance system. Joint Industry Plan, 88 Fed. Reg. 62628, 62673 (September 12, 2023).

According to the testimony of Shelly Bohlin, the President of FINRA CAT, LLC, the entity charged with building and maintaining the CAT system, the SEC rules require the system to "collect, process, and store a vast amount of data" for the purpose of "facilitate[ing] . . . more

---

[4] SEC Consolidated Audit Trail, Final Rule, Release No. 34-67457; File No. S7-11-10 (Oct. 1, 2012) (to be codified at 17 C.F.R. Parts 242) ("Final Rule Release No. 34-67457").

[5] One broker-dealer was penalized for "late reporting issues in connection with at least 26 billion events from November 2020 through December 2022, which constitute approximately 8% of the firm's CAT reporting obligation for this period." FINRA, *In re Instinet, Financial Industry Regulatory Authority Letter of Acceptance, Waiver, and Consent*, No. 2020067139101 at 3, August 16, 2023, http://tinyurl.com/3ja8cf6x (settlement with Instinet LLC).

[6] Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON, Feb. 7, 2023, http://tinyurl.com/56vhex57.

4857-3729-8394.4

robust market surveillance."[7] The SEC ordered that these billions of "events" and personal records must be transmitted to and stored on the SEC-accessible data repositories each and every day. 17 C.F.R. § 242.613(c)(3). The system is built so "that the market regulators—including the SEC, FINRA, and the national securities exchanges—can use it as intended to efficiently and accurately *track all activity in the US securities markets*."[8] A member of the CAT Operating Committee testified before Congress that regulators can query investors' trading behavior even in the absence of reasonable suspicion.[9]

The constitutional implications of the CAT system are apparent and far-reaching. As the U.S. Supreme Court warned in *Boyd*, an early case evaluating the Fourth and Fifth Amendment implications of government seizure of private financial records:[10]

> illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Courts should scrutinize the accumulating records demands of the SEC—and especially the order that funds the CAT system—in light of the Supreme Court rulings since 2012 when the SEC's CAT-system plans were adopted. The Supreme Court explained in *Utility Air Regulatory*

---

[7] Shelly Bohlin, Testimony Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate, Oct. 22, 2019, at 1.

[8] *Id.* at 2 (emphasis added).

[9] Michael Simon, Chair of the CAT NMS Plan Operating Committee, Testimony Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate, October 22, 2019, at 59:00, http://tinyurl.com/49ccaecv. Mr. Simon further commented on why CAT will not require regulators to input a reason for database queries—"from a regulatory standpoint, you see abnormalities in trading and you don't really know what you're looking for. . . . [Therefore] it's very difficult up front to put in a reason why" the query is made."

[10] *Boyd v. United States*, 116 U.S. 616, 635 (1886).

*Grp.* that in evaluating the authority of agencies, courts must "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted).

The SEC's rules for and initiation of the CAT system raise several questions of vast economic and political significance. Namely, the CAT system is a novel automatic, national, and daily production order for investors' financial information—in essence, a blanket subpoena for the sensitive personal and financial information of anyone who chooses to participate in the financial markets. The SEC acquires brokers' and investors' personal and financial records without a warrant, and these records are held for years for later suspicion-less analysis and auditing by the government in ways that implicate the Fourth Amendment and Fifth Amendment rights of Americans who trade or broker securities. It is a drastic and troubling deviation from previous practice—and one that may affect trading behavior of tens of millions of Americans. Therefore, the SEC must have clear authority from Congress to create it. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assoc.*, 531 U.S. 457, 468 (2001). Yet, in its "Statutory Authority" section of its 2012 rule, the agency offers a single sentence merely listing ten sections of the Exchange Act.[11] The Final Rule contains no analysis about the nature and extent of the SEC's authority and lacks a single mention of the Fourth Amendment search and Fifth Amendment self-incrimination implications of mandating that regulated companies and brokers collect, store, and track customer-identifying information and sensitive financial information from millions of citizens—they cannot fairly be called "suspects"—on behalf of the

---

[11] *See* Final Rule Release No. 34-67457. In its 2023 CAT funding order, the SEC conceded there is no "express authorization for CAT by Congress." SEC Joint Industry Plan; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail; Notice, 88 Fed. Reg. 62628, 62673 (Sept. 6, 2023).

4857-3729-8394.4

government. Because the SEC's Order funding the CAT system raises significant political and economic questions, including possible violations of the Fourth and Fifth Amendment rights of brokers and investors, the Court should deny Defendants' motion to dismiss Plaintiffs' Complaint and grant Plaintiffs' preliminary injunction motion.

## ARGUMENT

**I.    The creation of the CAT system and capture of investor and broker data is state action.**

For an investor or broker to assert a Fourth or Fifth Amendment violation, there needs to be state action directed against them. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ("As a matter of substantive constitutional law, the state action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'") (citation omitted); *Smith v. Md.*, 442 U.S. 735, 740 (1979) (noting "the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action.") (citations omitted). Though the investor and broker data collection here is being carried out by non-governmental actors, *see* 17 C.F.R. § 242.613(f), there is still state action. The Supreme Court has held that a private entity can qualify as a state actor in certain circumstances: first, "when the private entity performs a traditional, exclusive public function," second, "when the government compels the private entity to take a particular action," and third, "when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).

Here, the private actors' collection, storage, and sharing of personal and financial data represents state action—because the government requires the collection, storage, and sharing of investors' and brokers' data. The CAT system is not an industry-initiated audit system—it was

6

mandated by the SEC and designed *expressly for government use and government surveillance of investors*. Its creators have stated that it was designed to allow SEC staff "to analyze and run complex queries on the CAT system data" and "to see visual displays of the consolidated equity market order book for any given period of time."[12] The SEC's relevant rule mandates that "SROs . . . require each SRO and its members to capture and report specified trade, quote, and order activity in all [national market system] securities to the central repository . . ., across all markets, from order inception through routing, cancellation, modification, and execution."[13] The SEC also requires private actors to enforce compliance with the data-sharing requirements of this government-mandated surveillance system, including by imposing financial penalties.[14]

In short, the SROs' and brokers' data collection, storage, and sharing of investor and broker data via the CAT system, as well as penalties assessed for noncompliance, are compelled by the government and constitute state action. And as this Court noted just months ago, as Americans we have the "right to be free from collections of information beyond authorized by law." *Texas Blockchain Council v. Dep't of Energy*, No. W-24-CV-00099-ADA, 2024 WL 990067, at *1 (W.D. Tex. Feb. 23, 2024) (citing *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012)).

## II.    Many of the CAT system records do not satisfy the required records test and implicate the Fifth amendment.

The CAT system amounts to a daily subpoena to financial institutions and brokers, sweeping in new kinds of financial records from millions of stock-owning (and law-abiding)

---

[12] Shelly Bohlin, Testimony Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate, October 22, 2019, at 3.

[13] Final Rule Release at 7.

[14] 17 C.F.R. § 242.613(g).

7

Americans for the purposes of law enforcement.[15] It is the SEC's longstanding policy that the agency will assist and share information with criminal prosecutors,[16] so it is reasonable to expect that CAT Records will be used in criminal prosecutions of investors and brokers. The information that brokers and the industry must collect include investors' names, addresses, and birth years.[17] Using the CAT system, regulators will be able to query at least six years' worth of financial "events"—including type of financial product, orders, quotes, and canceled orders—linked to customers' unique identifiers.[18] Since the mere production of records may be testimonial, *see*, *e.g.*, *United States v. Hubbell*, 530 U.S. 27 (2000) ("[W]e have also made it clear that the act of producing documents in response to a subpoena may have a compelled testimonial aspect."), the CAT system records mandates may violate investors' and brokers' Fifth Amendment right against self-incrimination.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. AMEND. V. It was understood at the time of the American Founding that the common law barred the compelled production of self-incriminatory documents, including the production of corporate records. *See*, *e.g.. Fisher v. United States*, 425 U.S. 391, 418 n.4 (1976) (Brennan, J., concurring) ("Without a

---

[15] *See*, *e.g.*, Final Rule Release at 91 ("With this information, regulators could more quickly initiate investigations, and more promptly take appropriate enforcement action.").

[16] The SEC Enforcement Manual notes that "Generally, sharing information with criminal prosecutors is permissible, even though the sharing of information is intended to and does in fact assist criminal prosecutors." SEC, ENFORCEMENT MANUAL 85, Division of Enforcement, Office of Chief Counsel, November 28, 2017.

[17] *See* Jay Clayton, Chairman of the SEC, *Update on Consolidated Audit Trail*, March 17, 2020, http://tinyurl.com/2uh5afn3.

[18] *See* CAT NMS, LLC, *Limited Liability Company Agreement* at App. D-5, D-26, D-27 (effective date September 6, 2023), http://tinyurl.com/2p824tzd. In 2020, the SEC did exempt certain customer data from collection within the CAT system. *See Statement of SEC Chairman Jay Clayton*, March 17, 2020, http://tinyurl.com/2uh5afn3.

8

doubt, the common-law privilege against self-incrimination in England extended to protection against the production of incriminating personal papers prior to the adoption of the United States Constitution."); Samuel A. Alito Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 65 (1986) ("English precedents at the time of the adoption of the fifth amendment extended the protection of the privilege against self-incrimination to corporate as well as individual records.") (citations omitted).

However, that traditional understanding of the common law privilege was narrowed in modern Fifth Amendment jurisprudence. *See Fisher v. United States*, 425 U.S. 391 (1976). One prominent exception to the Fifth Amendment privilege against self-incrimination is the "required records" exception. *See Shapiro v. United States*, 335 U.S. 1, 32 (1948). In *Shapiro*, the Court affirmed a lower court's decision that compelling individuals to produce records by valid regulations does not violate the right against self-incrimination. *Id.*.

However, CAT goes far beyond *Shapiro*—which was a 5-4 decision allowing a wartime price control office to obtain one month of invoices from a licensed commodity seller. *Id*. at 4. The majority opinion in *Shapiro* imposed a significant limitation: only records "customarily kept" were within the exception. *Id*. at 42. The Court reiterated this limitation in defining the required records exception 20 years later in *Grosso v. United States*:[19]

> first, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind that the regulated party has customarily kept; and third, the records themselves must have assumed "public aspects" that render them at least analogous to public documents.

Accordingly, the Supreme Court in *Fisher* held the production of tax documents by a taxpayer for the IRS were not testimonial only because "[t]he existence and location of the papers [were] a

---

[19] *Grosso v. United States*, 390 U.S. 62, 67-68 (1968).

9

foregone conclusion." *Fisher*, 425 U.S. at 411. *See also In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1344 (11th Cir. 2012) (holding that records production is not testimonial when "the location, existence, and authenticity of the purported evidence is known with reasonable particularity").

The analysis is altogether different when the government demands production of new types of records or records it merely suspects (or hopes) the individual possesses. As the Supreme Court explained in *Marchetti*, a government demand to "provide information, unrelated to any records which he may have maintained . . . is not significantly different from a demand that he provide oral testimony." *Marchetti v. United States*, 390 U.S. 39, 57 (1968).[20]

Much of the records and data collected by the CAT system fails to satisfy the required records exception because the SEC has ordered the creation of new records not "customarily kept" by brokers. The SEC is quite clear many of these records are not customarily kept: the SEC demands brokers and SROs collect new types of investor data because existing data collection sources "lack[] key elements important to regulators" such as "the time of execution" and "the identity of the customer" in equity cleared reports, "the identity of the customers who originate orders," and "the fact that two sets of orders may have been originated by the same customer."[21] The SEC also requires brokers and others to record reportable events down to the millisecond, 17 C.F.R. § 242.613(d)(3), which is a record not kept by industry custom. The CAT system, because it merges and connects investors' and brokers' historical information together in a way that is not "customarily kept" by brokers or SROs, falls outside the required records exception.

---

[20] The Court has also rejected, on Fifth Amendment grounds, the government's "broad-sweeping subpoenas" that "attempt[] to compensate for its lack of knowledge by requiring [someone] to become, in effect, the primary informant against himself." *United States v. Doe*, 465 U.S. 605, 613 n.12 (1984) (quoting appellate court's affirmance of district court's findings).

[21] Final Rule Release No. 34-67457, at 4-5.

Investors and brokers, therefore, are required to produce testimonial records since their records production is responsive to government records demands—which are merely outsourced to the SROs. Since the agency does not immunize investors and brokers, nor allow them to refuse to provide the new types of information, the system poses Fifth Amendment problems. As Justice Samuel Alito wrote when he was Deputy Assistant Attorney General, "the compulsory organization, filing, and creation of documents are acts that clearly are testimonial and may be self-incriminating."[22] Regarding such compulsory record keeping, future-Justice Alito added, "The individual should be free to refuse to create or organize records on fifth amendment grounds."[23] Government agencies cannot be allowed to mandate new "customs" of records collection and then use those "required customs" to evade Americans' Fifth Amendment rights.

## III.   THE CAT SYSTEM IMPLICATES THE FOURTH AMENDMENT.
### A.   The SEC's use of the CAT system is akin to a search of investors' and brokers' papers or effects.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and requires that warrants have "probable cause, supported by Oath or affirmation, and particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV. The Supreme Court notes "that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. Cal.*, 573 U.S. 373, 403 (2014). "[A] central aim of the Framers was 'to place obstacles in

---

[22] Samuel A. Alito Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 75 (1986).

[23] *Id*. at 76.

the way of a too permeating police surveillance.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018), quoting *United States v. Di Re,* 332 U.S. 581, 595 (1948).[24]

Investors and brokers have a possessory and privacy interest in the digital records collected in CAT repositories.[25] Courts, therefore, must assess whether these records qualify as investors' or brokers' "papers" or "effects." What constitutes "effects" has not been clearly discerned by courts.[26] However, "effects" almost certainly includes one's financial records. Founding-era legal dictionaries and early American legal treatises, for example, specifically contemplate and define one's financial records as one's "effects." *See* 1 T. Cunningham, ATTACHMENT, BANKRUPTCY, A NEW AND COMPLETE LAW-DICTIONARY, OR, GENERAL ABRIDGMENT OF THE LAW (London, S. Crowder & J. Coote 1764) (quoting a directive of the Lord Commissioners providing rules for transfers and custody of "sum[s] of money, tallies, orders, bonds, deposits, securities, and other effects"); Thomas Potts, A COMPENDIOUS LAW DICTIONARY 52, 192, 219, 39 (London, T. Ostell 1803) (advising, for example, that a bankrupt person must "disclose and discover all his estate and effects, real and personal"); Sir Samuel Toller, THE LAW OF EXECUTORS AND ADMINISTRATORS 254

---

[24] For much of this nation's history, therefore, the protection of citizens' personal papers and financial records was nearly absolute. The first federal law authorizing the search or seizure of books or records was not passed until March 1863. Act of March 3, 1863, ch. 76, 12 Stat. 737. Even the context for the passage of this law suggests the gravity of government seizure and search of Americans' records—it was a wartime measure to allow the U.S. government to investigate the conduct of men disloyal to the Union cause, passed, in fact, the same day as the Act suspending the writ of *habeas corpus*. *See* Alito., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. at  31 n.7.

[25] *See*, *e.g., People v. Seymour*, 2023 CO 53, slip op. at 19-21 (Colo. Supreme Court 2023) (holding, after analyzing Google's terms of service with its users, that Google users had a possessory interest in their digital records for the purposes of the Fourth Amendment). *See also* Jeremy Hall, Comment, *Bailment Law as Part of a Property-Based Fourth Amendment Framework*, 28 GEO. MASON U. L. REV. 481 (2020); Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*, 119 YALE L.J. 700, 710–14 (2010) (discussing that a seizure of digital property occurs when the government copies someone's data because it is the copying of the digital records that preserves it for future evidentiary use and therefore meaningfully interferes with the possessory interest of exclusive control).

[26] *See* Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 YALE L.J. 796 (2016).

(Philadelphia, John Grigg 1829) (a section titled "Of collecting the effects" notes the executor "has, also, a right to take deeds and other writings relative to the personal estate out of a chest in the house, if it be unlocked, or the key be in it; but he has no right to break open even a chest. If he cannot take possession of *the effects* without force, he must desist, and resort to his action.") (emphasis added).

A person's papers and effects have the same, strong protection against government search as the person's home. *United States v. Chadwick*, 433 U.S. 1, 8 (1977) (remarking that the Fourth Amendment "draws no distinctions among 'persons, houses, papers, and effects' in safeguarding against unreasonable searches and seizures"), *overruled on other grounds by Cal. v. Acevedo*, 500 U.S. 565 (1991)

Since the digital records in the CAT system are likely investors' or brokers' papers or effects, it's probable a government "search" is occurring. A "search" means "to look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief." *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (quoting Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 66 (1828) (reprint 6th ed. 1989)). The government's acquisition of a person's voluminous digital records amounts to a search. *See Carpenter*, 138 S. Ct. at 2220 (holding "Government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment"). The amount and breadth of the information acquired and analyzed by the government in *Carpenter* contributed to the Supreme Court's finding that a search had occurred. *Id.* at 2218. In *Carpenter*, the federal government acquired records containing "merely" 13,000 datapoints about an individual's location over a period of 127 days. *Id.* at 2212.

13

Here, the government is clearly acquiring far more voluminous digital records in the CAT system. The CAT records contain tens of billions of datapoints about investors' financial dealings stretching over years. The SEC mandates that that all the digital records "be transmitted in a manner that ultimately allows the central repository to make this data available to regulators," and must be transmitted daily.[27] Making this data available to the SEC is necessary, the agency says, to "help surveillance and investigations by facilitating . . . examinations [and] allowing more accurate and faster surveillance for manipulation."[28] The SEC goes so far as to call its examination of CAT records "searches."[29] Courts should have little trouble, then, finding that the government conducts a search when it accesses and (in SEC parlance) searches historical trading records that provide a comprehensive chronicle of investors' and brokers' past transactions.[30]

Finally, it's worth distinguishing the CAT system from the financial surveillance challenged in the *California Bankers* case. In *California Bankers*, the Supreme Court rejected depositors' Fourth Amendment challenge to new Bank Secrecy Act requirements that banks report "abnormally large transactions" to the government. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 67 (1974). However, the Court did not evaluate the merits of the Fourth Amendment issues because the depositors lacked standing to sue. *Id*. at 67–68. Further, it was significant to the Court that the "required records" in that case "would 'not be made automatically available for law

---

[27] Final Rule Release No. 34-67457 at 10-11.

[28] *Id*. at 34.

[29] *Id*. at 291 (illustrations of how the SEC will use CAT include "*searching* for trades with trade sizes above a certain threshold, *searching* for trades in securities with execution prices that change more than a certain percentage in a given period of time, and *searching* for orders that are canceled within a certain period of time") (emphasis added).

[30] If the SEC believed in 2012 that the CAT system fell within the administrative search doctrine, the Supreme Court effectively foreclosed that possibility in a 2015 case. *See Los Angeles v. Patel*, 576 U.S. 409 (2015) (limiting the doctrine to four specific industries and refusing to extend the doctrine to include hotels' customer records).

enforcement purposes, [but could] only be obtained through existing legal process.'" *Id*. at 27 (quoting congressional reports) (citations omitted). *California Bankers*, therefore, has little application here—especially given the Court's *dicta* in *California Bankers* expressing special skepticism about government rules requiring "automatic availability" of financial records.

### B.        The CAT system records do not fall within the third-party doctrine.

Certain information that people turn over to commercial companies falls outside the protection of the Fourth Amendment. *See United States v. Miller*, 425 U.S. 435 (1976) (holding that a depositor had no legitimate expectation of privacy concerning certain financial records held by a bank); *Smith*, 442 U.S. at 743-44 (holding that a suspect had no legitimate expectation of privacy concerning phone numbers he "conveyed" to a phone company via dialing phone numbers). The Supreme Court has said that its *Miller* decision, which concerned financial records, stands for the principle that "*a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties*." *Smith*, 442 U.S. at 743-44 (citing *Miller*, 425 U.S. at 442-44) (emphasis in original).

However, the Supreme Court has narrowed the third-party doctrine in recent years in ways that highlight that the CAT system is distinguishable from the circumstances in *Miller*. The CAT system data collection more closely resembles *Carpenter*, where the third-party exception did not apply, than *Miller*, where the third-party exception applied. The Court in *Carpenter* declined to extend *Miller*, *Smith*, and the "third-party doctrine" to a suspect's extensive digital (cellphone) records that were automatically transmitted to a third party. *Carpenter*, 138 S. Ct. at 2218 (majority denying that the third-party doctrine applied to the location records Carpenter transmitted to his phone company). In *Miller*, it was critical that "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information *voluntarily conveyed to the banks* and

15

exposed to their employees in the ordinary course of business." *Miller*, 425 U.S. at 442 (emphasis added). In contrast, the Court said in *Carpenter*, "in no meaningful sense does the [cellphone] user voluntarily 'assume[] the risk' of turning over a comprehensive dossier of his physical movements" to a phone company. *Carpenter*, 138 S. Ct. at 2220.

Likewise, here—as explained *supra* regarding state action—the brokers and the investors are not "voluntarily conveying" the customer identifiers and financial records to the government-accessible CAT-system repositories. The information in these repository records is mandated by the government, automatically and daily transmitted, and *Miller* is inapposite.

### C.    Searches of investors' and brokers' papers or effects are unreasonable.

The Supreme Court has said that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. v. Acton*, 515 U.S. 646, 653 (1995). In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). The SEC is seeking to "discover evidence of criminal wrongdoing" but has not explained which exception to the warrant exception its searches of the CAT system records might fall under.[31]

Further, the Supreme Court has recognized in recent years that, in determining the reasonableness of digital records searches, the government's analogies to the pre-digital, "manual" era of government surveillance often do not apply. *See Riley*, 573 U.S. at 386; *Carpenter*, 138 S. Ct. at 2218 ("[T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were

---

[31] *See*, *e.g.*, *id*. at 191 ("With this information, regulators could more quickly initiate investigations, and more promptly take appropriate enforcement action."). As explained *supra*, it is longstanding SEC policy to share information and coordinate with criminal prosecutors for criminal enforcement. *See* SEC, ENFORCEMENT MANUAL 85, Division of Enforcement, Office of Chief Counsel, November 28, 2017.

limited by a dearth of records and the frailties of recollection . . . . Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years."). In *Riley*, for instance, the Supreme Court prohibited the warrantless search of a digital storage device (a "flip phone"). In its decision, the Court rejected the government's extrapolation of legal precedents regarding traditional, often physical, records to digital records. *Riley*, 573 U.S. at 386 ("[W]hile *Robinson*'s categorical rule strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones."). The Court, in fact, cited government searches of financial records as the troubling example of the invasive warrantless searches that would follow from the government's impermissible extrapolation from precedent: "The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years." *Id*. at 400.

In *Riley* and *Carpenter* the Court rejected warrantless inspections of a much smaller amount of personal data from people with a lesser privacy interest—suspects in police detention or named as an accomplice in a series of crimes—than what is contemplated here. *See id. at* 393; *Carpenter*, 138 S. Ct. at 2212. The SEC—without a warrant and absent a showing of even reasonable suspicion—is acquiring and searching massive amounts of investors' and brokers' personal information and transactions stretching back years. Any agency mandating such an extensive and automatic data collection and surveillance system of millions of Americans should be expected to explain which exception to the Fourth Amendment's warrant requirement the agency is relying on.

## CONCLUSION

The SEC's Order funding the CAT system raises significant political and economic questions, including possible violations of the Fourth and Fifth Amendment rights of brokers and

17

investors. Therefore, *Amici* respectfully request the Court deny Defendants' motion to dismiss Plaintiffs' Complaint and grant Plaintiffs' preliminary injunction motion.

Date:  August 22, 2024

Respectfully submitted,

GRAY REED & MCGRAW LLP

/s/ Angela Laughlin Brown
Angela Laughlin Brown
Texas Bar No. 24034533
Chris Davis
Texas Bar No. 24050483
1601 Elm Street, Suite 4600
Dallas, Texas 75201
(T) (214) 954-4135
(F) (214) 953-1332
abrown@grayreed.com
cdavis@grayreed.com

*Counsel for Amici Curiae the Cato Institute and ICAN*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause it to be served on all parties and counsel of record.

/s/ Angela Laughlin Brown
Angela Laughlin Brown

*Counsel for Amici Curiae the Cato Institute and ICAN*

4857-3729-8394.4