**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| ERIK DAVIDSON, JOHN RESTIVO & NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,<br><br>Plaintiffs,<br><br>v.<br><br>PAUL S. ATKINS, *et al.*,<br><br>Defendants. | Civil Action No. 6:24-cv-00197 |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

On October 15, 2026, a panel of the United States Court of Appeals for the Fifth Circuit (Clement, Elrod and Oldham, JJ.) issued a decision in *Consumers Research v. Federal Communications Commission*, No. 25-60535 (attached hereto as Exhibit A) holding that the FCC lacked statutory authority to create the Universal Service Administrative Company (USAC), a private corporation established to finance the Congressionally approved Universal Service Program to extend communications services across the country. Specifically, the Fifth Circuit held that under the Government Corporation Control Act (GCCA) 31 U.S.C. §§ 9101-9110, an "agency may establish or acquire a corporation to act as an agency only by and under a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. Because FCC regulations directed the creation of the USAC and "Congress never specifically authorized the FCC to establish USAC," the Fifth Circuit held that the FCC "violated the [GCCA] by creating the corporation." Slip Op. at 2. Then, based on 5 U.S.C. § 706(2)(C), which prohibits agencies from exceeding their

statutory authority, the panel concluded it "must 'hold unlawful and set aside [the] agency action.'" "Vacatur is therefore the proper remedy." Slip Op. at 19.

This case, *Davidson v. Atkins*, challenges the legality and constitutionality of the SEC's Consolidated Audit Trail (CAT) which lacks any Congressional authority whatsoever for its existence, funding, or operations. See Am. Complaint Dkt. 99. Both defendants state that CAT is owned and operated by CAT LLC, a Delaware "private limited-liability company whose owners are private organizations" (SROs), Dkt. 38 p. 11, 34, and that CAT LLC runs the SEC's surveillance operations which this suit challenges as unlawful and unconstitutional in their entirety. Unlike the FCC's Universal Service Plan, which was established by Congress, the SEC's CAT lacks any shred of statutory authority for its existence, much less specific authorization for a private LLC to run its financial and data-collection operations.

The attached circuit court decision is dispositive and accordingly warrants prompt vacatur of the SEC's rule that launched this unconstitutional, lawless and dangerous surveillance of each and every trade made on American financial markets.

Dated: October 30, 2026

Respectfully Submitted,

Mark Siegmund
State Bar Number 24117055
CHERRY JOHNSON SIEGMUND JAMES, PLLC
7901 Fish Pond Rd., Suite 200
Waco, TX 76710
Tel: (254) 732-2242
MSiegmund@CJSLAW.com

/s/ *Margaret A. Little*
Margaret A. Little CT303494
Caitlin M. Moyna* NY4176897
Margot Cleveland*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203

Tel: (202) 869-5210
Fax: (202) 869-5238
Peggy.Little@ncla.legal
Caitlin.Moyna@ncla.legal
Margot.Cleveland@ncla.legal
* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas, Waco Division, using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ *Margaret A. Little*
Margaret A. Little (CT 303494)

# Exhibit A

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 15, 2026

Thomas B. Plunkett, III
Clerk

---

No. 25-60535

---

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INCORPORATED; EDWARD J. BLUM; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KIRBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS; JAMES ROMEO; CODY CARNETT; PHILLIP ARONOFF; JACQUELINE KLEIN,

*Petitioners*,

*versus*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

---

Petition for Review of an Order of the Federal Communications Commission
Agency No. 96-45

---

Before ELROD, *Chief Judge*, and CLEMENT and OLDHAM, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

In pursuit of "universal service," the Federal Communications Commission ("FCC") collects billions of dollars from telecommunications companies each year through "required payments, called contributions," which "subsidize basic communications services for consumers in certain

underserved communities—particularly, rural and low-income areas." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 663–64 (2025). To that end, the FCC established a private corporation, the Universal Service Administrative Company ("USAC"), to collect contributions and disburse payments via the Universal Service Fund. Petitioners challenge the Fourth Quarter 2025 contribution factor—a figure the FCC calculated by relying on data from USAC—which set the amount that each telecommunications company had to pay into the Fund for that quarter. They raise several constitutional and statutory arguments, but we address only one: whether the FCC had the statutory authority to establish USAC. Because Congress never specifically authorized the FCC to establish USAC, we hold that the agency violated the Government Corporation Control Act ("GCCA") by creating the corporation. Thus, when the FCC relied on USAC to set the contribution factor, it exceeded its statutory authority. We therefore GRANT the petition for review, VACATE the Fourth Quarter 2025 contribution factor, and REMAND for further proceedings.

I

A

In 1934, Congress created the FCC with the goal "to make available, so far as possible, to all the people of the United States, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. Early on, when AT&T was a regulated monopoly, the FCC "used a combination of implicit and explicit subsidies to achieve its goal" of universal service. *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999). But when Congress deregulated the telecommunications sector in 1996, it "overhauled" this patchwork of subsidies, eliminated implicit subsidies altogether, and "substituted a plan for explicit transfer payments to ensure

that basic communications services extend across the country." *Consumers' Rsch.*, 606 U.S. at 666.

Section 254 of the Telecommunications Act of 1996 sets forth the modern framework for universal service. 47 U.S.C. § 254. Congress directed the FCC to establish "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." *Id.* § 254(b)(5). The statute broadly defines "universal service" as "an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services." *Id.* § 254(c)(1). When deciding what services to support with its universal-service support mechanisms, the FCC is to consider a set of four factors, *id.* § 254(c)(1)(A)–(D), and six principles, *id.* § 254(b)(1)–(6). The FCC may also base policies on any additional principles it deems "necessary and appropriate for the protection of the public interest, convenience, and necessity." *Id.* § 254(b)(7). And beyond the "general" services the FCC can support under § 254(c)(1), it may fund additional support mechanisms to provide "advanced" services to "schools, libraries, and health care providers." *Id.* § 254(c)(3), (h)(2).

The FCC currently operates four universal-service programs. *Consumers' Rsch.*, 606 U.S. at 668. The first, Lifeline, "gives low-income consumers a markdown on their monthly phone bills, usually of $9.25 per month." *Id.* (first citing 47 U.S.C. § 254(j); and then citing 47 C.F.R. §§ 54.400–54.424). Second, the High Cost program "furnishes carriers with funds enabling them to provide basic communications services in 'rural, insular, and [other] high cost areas' at costs comparable to those charged in urban areas." *Id.* (alteration in original) (quoting 47 U.S.C. § 254(b)(3)) (citing 47 C.F.R. §§ 54.302–54.322). Third, the "E-Rate program subsidizes communications services for schools and libraries across the country, with greater discounts going to facilities in rural or low-income areas." *Id.* (first

citing 47 U.S.C. § 254(b)(6), (h)(1)(B); then citing 47 C.F.R. §§ 54.500–54.523; and then citing *Wis. Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 143–46 (2025)). Fourth, "the Rural Health program supports rural hospitals and other health care facilities, enabling them to use telemedicine in caring for far-flung patients and ensuring that they receive the needed communications services at roughly the rates urban facilities pay." *Id.* (first citing 47 U.S.C. § 254(b)(6), (h)(1)(A); and then citing 47 C.F.R. §§ 54.600–54.633).

To pay for these services, Congress requires "[e]very telecommunications carrier that provides interstate telecommunications services [to] contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission." 47 U.S.C. § 254(d). The FCC determines the amount carriers must pay into the Universal Service Fund by calculating a quarterly "contribution factor." *Consumers' Rsch.*, 606 U.S. at 668 (citing 47 C.F.R. § 54.709(a)). "That factor is a fraction, expressed as a percentage," the numerator of which "is the Fund's projected expenses for the upcoming quarter (the subsidy payments it will make plus overhead) and" the denominator of which "is the total projected revenue of contributing carriers during that same period." *Id.* at 668–69 (citing § 54.709(a)(2)). A carrier must pay "an amount equal to its own projected revenue multiplied by the contribution factor," *id.* at 669 (citing § 54.709(a)(3)), and it "may then pass along to its customers the cost of its contributions," *id.* (citing § 54.712(a)).

When calculating the contribution factor, the FCC relies on financial projections produced by USAC. *Id.* USAC "is a private, not-for-profit corporation owned by an association of carriers." *Id.* To assist the FCC in setting the contribution factor, USAC "estimates the Fund's expenses," "adds up the estimates it receives from individual carriers about their revenues," and "then submits those figures, along with supporting

documentation, to the Commission for approval and eventual use in calculating required contributions." *Id.* at 669–70 (citing § 54.709(a)(2)–(3)).

Moreover, since 1998, USAC has served as "permanent Administrator of the federal universal service support mechanisms." 47 C.F.R. § 54.701(a). As administrator, USAC manages the "day-to-day operations" of the Fund. *Wis. Bell*, 604 U.S. at 144. It "bills and collects contributions from carriers," *id.* (citing 47 C.F.R. § 54.702), and "distributes the resulting pot of money, as FCC rules provide, to program beneficiaries," *id.* (citing § 54.702(b)). In addition, USAC's directors sit on committees that "oversee the administration" of the four universal-service programs. 47 C.F.R. § 54.705(a)(1), (b)(1), (c)(1). These committees "have [the] authority to make decisions concerning" the operation of the programs, from developing and administering applications to auditing beneficiaries. *Id.* § 54.705(a)(1)(ii)–(iii), (x); *id.* § 54.705(b)(1)(ii)–(iii), (viii); *id.* § 54.705(c)(ii)–(iv).

B

In August 2025, USAC sent the FCC the Fund's projected expenses and program demand for the fourth quarter of 2025: $2.25 billion. Petitioners—Consumers' Research (a nonprofit organization that aims to educate consumers); Cause Based Commerce, Inc. (a reseller of telecommunications services that pays directly into the Fund); and several individual consumers—filed a comment with the FCC challenging this projection. They argued that various aspects of the Fund are unlawful, so the contribution factor should be set at 0.0% or at least reduced to account for "any unlawful portions" of the factor.

After USAC sent the FCC the total projected revenue of contributing carriers for the quarter, the FCC issued a public notice

proposing a Fourth Quarter 2025 contribution factor of 38.1%. *See Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, 40 FCC Rcd. 7160, 7160 (2025); 47 C.F.R. § 54.709(a)(3). To reach this figure, the FCC largely adopted USAC's projections. It did, however, "direct[] USAC to apply $100 million in unused Schools & Libraries (E-Rate) program funds to offset the $628.68 million projected E-Rate program demand," thus reducing the contribution factor "to a level below what [it] would have been based on USAC's filings." *Id.* The factor was therefore calculated by dividing USAC's adjusted expenses ($2,153,410) by USAC's projection of the participating telecommunications companies' relevant revenue ($5,659,892) and rounding up to the nearest tenth of a percentage: 38.1%. *Id.* at 7161–62.

The same day the FCC issued its notice, Petitioners filed another comment, asserting the same arguments they raised in their first notice. The FCC took no action in response, so the proposed contribution factor was deemed approved fourteen days later. *Id.* at 7162–63.

Petitioners then filed a timely petition for review in this court. The Supreme Court recently rejected Petitioners' prior challenge to § 254, holding that the statute as a whole does not violate the nondelegation doctrine. *Consumers' Rsch.*, 606 U.S. at 698. But now, Petitioners contend that the specific provisions of § 254 authorizing the FCC to fund "advanced" and "additional" services for schools, hospitals, and libraries impermissibly delegate legislative power to the FCC. *See id.* at 687 n.9 (declining to "address any nondelegation issues raised by Sections 254(c)(3) and (h)(2) in particular"); *see also id.* at 733 (Gorsuch, J., dissenting) (inviting parties to "attack . . . the constitutionality of whatever contributions the FCC demands for its subsection (c)(3) and (h)(2) programs"). Petitioners further argue that the FCC violated the Administrative Procedure Act ("APA") by failing to consider the Supreme Court's decision in *Consumers' Research* or respond to their comment when

setting the contribution factor. Lastly, they challenge the FCC's reliance on USAC in setting the contribution factor, asserting that the FCC established the corporation in violation of the GCCA and that USAC's directors are appointed in violation of the Appointments Clause.

Because Petitioners' GCCA challenge is dispositive, we do not address their alternative arguments.

## II

Under the APA, we must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). We review issues of statutory interpretation de novo. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").

## III

We begin by assessing our jurisdiction, both constitutional and statutory. *See United States v. Pedroza-Rocha*, 933 F.3d 490, 493 (5th Cir. 2019) (per curiam) ("This court has a continuing obligation to assure itself of its own jurisdiction, sua sponte if necessary." (citing *Bass v. Denney*, 171 F.3d 1016, 1021 (5th Cir. 1999))).

### A

To establish Article III standing, at least one petitioner must have had standing when the petition was filed. *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) (evaluating a plaintiff's standing "at the time the action commence[d]"). Thus, a petitioner "must have suffered an injury in fact—a

concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Nebraska*, 600 U.S. at 489 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

For the same reasons our en banc court discussed in Petitioners' previous challenge, we are satisfied that at least one petitioner—Cause Based Commerce—had Article III standing when the petition was filed. *Consumers' Rsch. v. FCC*, 109 F.4th 743, 752–53 (5th Cir. 2024) (en banc), *rev'd on other grounds*, 606 U.S. 656 (2025); *accord Consumers' Rsch. v. FCC*, 67 F.4th 773, 783–84 (6th Cir. 2023). Cause Based Commerce "incurred a classic pocketbook injury" because it was required to contribute directly to the Fund. *Consumers' Rsch.*, 109 F.4th at 753. That injury is fairly traceable to the Fourth Quarter 2025 contribution factor, which dictates how much Cause Based Commerce was required to pay into the Fund. *Id.* And at the time the petition was filed, a favorable decision vacating the contribution factor would have redressed this injury. *Id.*

Further, even though Cause Based Commerce has already paid into the Fund for the fourth quarter of 2025, this action is not moot because the quarterly contribution factor is "capable of repetition, yet evading review." *Consumers' Rsch.*, 606 U.S. at 671 n.1 (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016)). Thus, this action is justiciable.

B

As for our statutory jurisdiction, Intervenor National Telecommunications Cooperative Association ("NTCA") argues that we lack jurisdiction over Petitioners' GCCA claim under the Hobbs Act. The Hobbs Act grants the courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" certain "final orders" of the FCC. 28 U.S.C. § 2342(1); *see* 47 U.S.C. § 402(a)

(requiring "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter" to be brought under the Hobbs Act). A party aggrieved by a final order must file a petition for review within sixty days of the order's entry. 28 U.S.C. § 2344; *see also City of Arlington v. FCC*, 668 F.3d 229, 237 (5th Cir. 2012) (noting that this requirement is jurisdictional). Because Petitioners challenge the establishment of USAC, which was established in 1997,NTCA argues that their claim is barred by the Hobbs Act's sixty-day time limit.

But this sixty-day limit does not bar review of agency action that is "capable of continuing application." *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958). The Hobbs Act "cut[s] off review directly from the order promulgating a rule," but it does not foreclose review of subsequent agency actions applying that rule. *Id.*

When the FCC uses USAC's projections to set the quarterly contribution factor, it effectively reapplies its prior action establishing the corporation. Thus, the FCC's action establishing USAC has "continuing application." *Id.* That means that each time the FCC approves a new contribution factor, it "restarts the sixty-day clock." *Consumers' Rsch.*, 67 F.4th at 786; *accord Consumers' Rsch. v. FCC*, 88 F.4th 917, 922 (11th Cir. 2023). Petitioners filed their petition for review two days after the Fourth Quarter 2025 contribution factor was deemed approved by the FCC. Thus, their challenge is timely, and we proceed to the merits.

## IV

The federal government has a "long history" of creating and participating in corporations "for the achievement of governmental objectives." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 386 (1995). "The first was the Bank of the United States," created in 1791, and while the federal government continued to charter private corporations throughout the

nineteenth century, the "first large-scale use of Government-controlled corporations came with the First World War." *Id.* at 386–88. "These entities were dissolved after the war ended," but not long after, the Great Depression spurred the creation of longer-lasting government corporations "primarily directed to stabilizing the economy and to making distress loans to farms, homeowners, banks, and other enterprises." *Id.* at 388. Congress created many—but not all—of these corporations. *Id.* While entities like the Federal Deposit Insurance Corporation and the Tennessee Valley Authority were established by statute, Congress also empowered the Reconstruction Finance Corporation "to create corporations without specific congressional authorization." *Id.* It did so "with gusto." *Id.* at 389. Other government entities also started forming corporations "without even the general congressional authorization granted the [Reconstruction Finance Corporation]." *Id.*

"By the end of World War II," recognizing that these governmental corporations "had gotten out of hand, in both their number and their lack of accountability," Congress "moved to reestablish order" by enacting the Government Corporation Control Act of 1945, 31 U.S.C. §§ 9101–9110. *Lebron*, 513 U.S. at 389. Under the GCCA, government corporations must submit budgets for congressional approval, 31 U.S.C. § 9103, and be audited by the Comptroller General, *id.* § 9105. Relevant here, the GCCA also provides that an "agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." *Id.* § 9102.

For USAC to fall within § 9102's ambit, the FCC must have "establish[ed]" or "acquire[d]" it "to act as an agency." *Id.* If it did, and Congress did not "specifically authoriz[e] the action," then the FCC violated the GCCA by establishing USAC. *Id.*

A

The parties do not contest that the FCC established USAC. In the early days of the modern universal service regime, the FCC appointed the National Exchange Carrier Association, Inc. ("NECA")—which it established in 1983, *see* 47 C.F.R. § 69.601(a)—as temporary administrator of the universal-service support mechanisms, *In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8798 (1997). Two months later, the FCC directed NECA "to create an independently functioning, not-for-profit subsidiary, to be designated the Universal Service Administrative Company (USAC) that will administer temporarily the universal service support mechanisms." *In re Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Assoc., Inc.*, 12 FCC Rcd. 18400, 18415 (1997). In September 1997, the FCC approved the "proposed incorporation documents" submitted by NECA and instructed NECA to file those documents "with the Secretary of State of the State of Delaware on behalf of USAC." *Comm'n Approves Incorporation Documents for Universal Serv. Admin. Co., Schs. and Librs. Corp., & Rural Health Care Corp.*, 12 FCC Rcd. 14094, 14094 (1997).

In short, USAC was incorporated under Delaware law by NECA—which itself was established by the FCC—at the behest of the FCC. Thus, we conclude that it was "establish[ed]" by the FCC for purposes of the GCCA. 31 U.S.C. § 9102.

We turn, then, to whether the FCC established USAC "to act as an agency." *Id.* The original text of the GCCA prohibited federal agencies from "creat[ing], organiz[ing], or acquir[ing]" any corporation "for the purpose of acting as an agency *or instrumentality* of the United States" absent "an Act of Congress specifically authorizing such action." Government Corporation Control Act, ch. 557, § 304(a), 59 Stat. 597, 602 (1945) (emphasis added). When Congress codified Title 31 in 1982, it revised this section to omit "or

instrumentality," leaving the currently operative language that requires specific authorization for an agency to "establish or acquire a corporation to act as an agency." Act of Sept. 13, 1982, Pub. L. No. 97-258, sec. 1, § 9102, 96 Stat. 877, 1042 (codified at 31 U.S.C. § 9102). But Congress made clear that although it rephrased this provision, it did so "without substantive change." *Id.* sec. 4(a), 96 Stat. at 1067 ("Those [restated] sections may not be construed as making a substantive change in the laws replaced."); *see also In re Benjamin*, 932 F.3d 293, 297 (5th Cir. 2019) (describing the "recodification canon, which states that 'when legislatures codify the law, courts should presume that no substantive change was intended absent a clear indication otherwise'" (quoting *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1314 (11th Cir. 2016)). Confirming this, Congress defined "agency" to mean "a department, agency, or instrumentality of the United States Government" throughout Title 31. 31 U.S.C. § 101.

Thus, even if USAC does not otherwise act as a freestanding federal agency, it still falls within the GCCA's ambit if the FCC established it to act as an instrumentality.

When the GCCA was enacted in 1945, "instrumentality" meant a "means" or "agency" used to reach an end. *Federal Instrumentality*, BLACK'S LAW DICTIONARY (4th ed. 1951) ("A means or agency used by the federal government."); *see also* 5 OXFORD ENGLISH DICTIONARY 357 (1933) (defining "instrumentality" as "[t]he quality or condition of being instrumental; the fact or function of serving or being used for the accomplishment of some purpose or end; agency"). So if the FCC established USAC as a means to achieve a governmental purpose, then it established the corporation "to act as an agency." 31 U.S.C. § 9102; *cf. Lebron*, 513 U.S. at 399 ("[A] corporation is an agency of the Government, for purposes of the constitutional obligations of Government . . . , when the State has specifically created that corporation for the furtherance of

governmental objectives, and not merely holds some shares but controls the operation of the corporation through its appointees.").

The FCC originally established USAC to "administer temporarily the universal service support mechanisms for high cost areas and low-income consumers, as well as perform billing and collection functions associated with the universal service support mechanisms for schools and libraries and rural health care providers." *In re Changes to the Bd. of Dirs.*, 12 FCC Rcd. at 18415. It tasked USAC, as temporary administrator, with both "collecting contributions" and "disbursing universal service support funds," as well as "determin[ing] quarterly projected demand" for the programs and using that projection to "calculate the . . . contribution factor." *Id.* at 18424–26. And it reserved to its chairman the power to "select the members of the USAC Board," along with ensuring that that USAC would "be directly accountable to the [FCC] for the performance of [its] respective responsibilities." *Id.* at 18415, 18424.

A year later, the FCC appointed USAC "the permanent Administrator" of the Fund and made it responsible for "administering the universal service support mechanisms in an efficient, effective, and competitively neutral manner." 47 C.F.R. § 54.701(a). The FCC established USAC to administer the universal-service support mechanisms in a manner accountable to the FCC, meaning that USAC was established to act as an instrumentality of the FCC.

A 2024 memorandum of understanding between the FCC and USAC bolsters this conclusion. That memorandum describes USAC's "sole purpose" as "assist[ing] the FCC in the administration of the [universal-service] programs (and such other programs as agreed upon and directed by the FCC), as an agent and instrumentality of the FCC." Memorandum of Understanding Between the Federal Communications

Commission and the Universal Service Administrative Company 2 (Oct. 17, 2024).

The FCC argues that when it comes to calculating the contribution factor, USAC does not act as an agency because it gives recommendations to the FCC in a strictly "advisory role." But even in this capacity, USAC acts as an instrumentality of the FCC. The FCC uses USAC as a means to calculate the quarterly contribution factor, relying on its projections to determine both the Fund's expenses and carriers' revenues. *Consumers' Rsch.*, 606 U.S. at 669–70. It is true, as the FCC notes, that "[a]s long as an agency . . . retains decision-making power," it "may rely on advice and assistance from private actors" without running afoul of the Constitution. *Id.* at 692. But if that private actor is a corporation established by the agency, such reliance can still run afoul of the GCCA absent specific congressional authorization.

In sum, we conclude that the FCC established USAC to act as an agency to administer the universal-service programs. The GCCA therefore applies, which means that Congress must have "specifically authoriz[ed]" the FCC to establish USAC. 31 U.S.C. § 9102.

B

Respondents point to three sources of congressional authorization for the FCC's creation of USAC. We consider each in turn.

1

First, NTCA asserts that Congress expressly authorized the FCC to establish USAC via 47 U.S.C. § 154(i). That provision grants the FCC authority to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). We have explained that

this "necessary and proper" provision "suppl[ies] the FCC with ancillary authority to issue regulations that may be necessary to fulfill its primary directives contained elsewhere in the statute." *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 443–44 (5th Cir. 1999) (alteration in original) (quoting *Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 795 (8th Cir. 1997), *aff'd in part, rev'd in part sub nom. AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999)). Since § 254 tasks the FCC with implementing "specific, predictable, and sufficient . . . mechanisms to preserve and advance universal service," 47 U.S.C. § 254(b)(5), and § 154(i) grants the FCC ancillary authority to fulfill that directive, NTCA argues that these provisions authorized the FCC to establish USAC to administer the Universal Service Fund.

This argument is unavailing. True, we have recognized that § 154(i) grants "the FCC broad authority to implement" § 254. *Tex. Off. of Pub. Util. Couns.*, 183 F.3d at 444. But § 154(i) "is not infinitely elastic." *N. Am. Telecomms. Ass'n v. FCC*, 772 F.2d 1282, 1292 (7th Cir. 1985). That provision's broad, generalized grant of authority does not provide the *specific* congressional authorization the GCCA requires.

2

Next, the FCC and NTCA advance an implied-authorization theory. To unpack this argument, we must consider the historical involvement of USAC and its parent entity, NECA, in administering universal-service programs.

Before Congress enacted the Telecommunications Act of 1996, the FCC tasked NECA with calculating the charges that telecommunications carriers paid into the Universal Service Fund. 47 C.F.R. § 69.116 (1996). NECA was also responsible for billing and collecting those contributions, as well as disbursing revenue to beneficiaries. *Id.* § 69.116(b). In a separate section of the Code of Federal Regulations, the FCC assigned NECA the

same duties—calculating, billing, and collecting the charge and disbursing revenue—with regard to the Lifeline program in particular. 47 C.F.R. § 69.117(b) (1996). When Congress enacted the 1996 Act, it specifically authorized the FCC to continue using NECA to administer the Lifeline program; the statute provides, "Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title." 47 U.S.C. § 254(j).

Thus, the FCC and NTCA assert that "Congress was aware of NECA's role when it adopted section 254, which affirmed and expanded the Commission's authority to direct the administration of universal service and therefore, implicitly affirmed the Commission's authority to employ an independent entity to administer universal service." *In re Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Assoc., Inc.*, 13 FCC Rcd. 25058, 25066 (1998) (footnote omitted). In other words, because Congress authorized the FCC to use NECA to administer the Lifeline program, they argue it implicitly authorized USAC, a later-formed subsidiary of NECA, to administer the Universal Service Fund.

But § 254(j) does not provide the specific congressional authorization the FCC needed to establish USAC. Authorization for one private entity to administer a single universal-service program does not amount to specific authorization for another private entity to administer the entirety of the multi-billion-dollar Universal Service Fund. "If anything, the text of § 254 suggests Congress actually meant to *preclude* private entities from administering [universal-service] programs other than Lifeline." *Consumers' Rsch.*, 109 F.4th at 777 (emphasis in original); *see also Consumers' Rsch.*, 88 F.4th at 933 n.4 (Newsom, J., concurring) ("[I]t strains credulity to read subsection (j) as authorizing USAC's participation in the universal-service

scheme."). Congress expressly authorized NECA to continue administering Lifeline as provided in 47 C.F.R. § 69.117, "but it conspicuously did not reference § 69.116," the neighboring provision authorizing NECA to administer the pre-1996 Fund. *Consumers' Rsch.*, 109 F.4th at 777. Section 254(j) demonstrates that Congress knew how to speak clearly to authorize a private entity to administer certain universal-service programs. That it chose not to do so with respect to § 69.116 supports the inference that Congress did *not* intend to empower private entities to administer other programs or the Fund as a whole. *Cf. United States v. Vargas*, 74 F.4th 673, 686 (5th Cir. 2023) (en banc) (describing the *expressio unius* canon of construction, which "teaches that the expression of one thing implies the exclusion of others" (cleaned up)).

3

Lastly, the FCC and NTCA submit that even if the FCC lacked the authority to establish USAC in 1997, Congress ratified the agency's action by authorizing it to use USAC to administer two temporary programs created during the COVID-19 pandemic.

The first, the Affordable Connectivity Program, discounted the cost of "broadband service and connected devices" for "eligible low-income households." *In re Affordable Connectivity Program Emergency Broadband Benefit Program*, 37 FCC Rcd. 484, 485 (2022). Congress authorized the FCC to "avail itself" of USAC's services "to implement the Affordable Connectivity Program, including developing and processing reimbursements and distributing funds to participating providers." 47 U.S.C. § 1752(i)(5). The second program, the Emergency Connectivity Fund, provided funding for schools and libraries to purchase "connected devices and broadband connection for use by students, school staff, and library patrons." *In re Establishing Emergency Connectivity Fund to Close the Homework Gap*, 36 FCC

Rcd. 8696, 8697 (2021). Congress authorized both the FCC and USAC to administer this fund. American Rescue Plan Act of 2021, § 7402(c)(2)(A)(ii), 135 Stat. 4, 109 (2021). According to the FCC, these authorizations are "inexplicable" if Congress "doubted the propriety" of the FCC appointing USAC as administrator of the Universal Service Fund.

It is "a long-settled principle" that Congress can ratify and "give the force of law to official action unauthorized when taken." *Kovac v. Wray*, 109 F.4th 331, 340 (5th Cir. 2024) (quoting *Swayne & Hoyt, Ltd. v. United States*, 300 U.S. 297, 301–02 (1937)). "Ratification may occur, for example, when 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation.'" *Nat'l Religious Broads. v. FCC*, 138 F.4th 282, 294 (5th Cir. 2025) (quoting *CFTC v. Schor*, 478 U.S. 833, 846 (1986)).

Congress has not ratified the FCC's establishment of USAC to act as an agency in administering the Universal Service Fund. As the FCC acknowledges, neither the Affordable Connectivity Program nor the Emergency Connectivity Fund was part of the Fund. We are loath to conclude that by authorizing the FCC to use USAC to administer two temporary, emergency measures—both of which ended in June 2024—Congress implicitly blessed USAC's appointment as permanent administrator of the entire Universal Service Fund. Congress acknowledged USAC's existence and empowered the FCC to use it to administer two non-universal-service programs, but that does not amount to specific authorization for USAC to fulfill its "sole purpose" of "assist[ing] the FCC in the administration of the [universal-service] programs." Memorandum of Understanding Between the Federal Communications Commission and the Universal Service Administrative Company 2 (Oct. 17, 2024).

* * *

The FCC established USAC to act as an agency in administering the Universal Service Fund. Because it did so without "a law of the United States specifically authorizing the action," the FCC violated the GCCA. 31 U.S.C. § 9102. Thus, by relying on USAC in calculating the Fourth Quarter 2025 contribution factor, the FCC exceeded its statutory authority, and we must "hold unlawful and set aside [the] agency action." 5 U.S.C. § 706(2)(C).

C

That leaves the question of remedy. The "default rule is that vacatur is the appropriate remedy" for unlawful agency action. *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). We depart from this rule only if there is "a 'serious possibility' that the agency will be able to correct the [action's] defects on remand" and "vacating the challenged action would produce 'disruptive consequences.'" *Chamber of Com. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (quoting *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022)).

Here, USAC's projections undergird the quarterly contribution factor. With only one adjustment, the FCC adopted USAC's projections in toto and set the contribution factor accordingly. Its reliance on USAC was therefore a "serious procedural" deficiency that the FCC would not be able to correct on remand. *Id.*

Vacatur is therefore the proper remedy under our rule of orderliness, by which we are bound to apply the precedent of past panels "absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016) (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). Though the state of courts' "set aside" power under

§ 706(2) of the APA has come under scrutiny,[1] no "unequivocal" change in the law has occurred to unseat past precedent. *Mercado*, 823 F.3d at 279 ("For a Supreme Court decision to satisfy this Court's rule of orderliness, it must 'be unequivocal, not a mere "hint" of how the Court might rule in the future.'" (quoting *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013)). Accordingly, remand with vacatur is the appropriate remedy.

V

The GCCA forbids an agency to "establish or acquire a corporation to act as an agency" absent "a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. Despite this clear instruction, the FCC established USAC to act as an agency in administering the Universal Service Fund even though Congress never authorized it to do so. Thus, by relying on USAC's projections in setting the Fourth Quarter 2025 contribution factor, the FCC exceeded its statutory authority. We therefore GRANT the petition for review, VACATE the Fourth Quarter 2025 contribution factor, and REMAND to the FCC for further proceedings.

---

[1] *Contrast United States v. Texas*, 599 U.S. 670, 693–702 (2023) (GORSUCH, J., concurring) (expressing skepticism that § 706(2) of the APA authorizes universal vacatur), *with Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."). *See generally* Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 YALE L.J. 2304 (2024); John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 YALE J. ON REGUL. BULL. 119 (2023).